1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF LOUISIANA

3

4    VINCENT FUSILIER, SR.,        *    CIVIL ACTION
     ET AL                         *
5                                  *    NO. 3:14-69
                                   *
     VERSUS                        *
6                                  *    FEBRUARY 8, 2017
                                   *
     PYYUSH JINDAL, ET AL          *
7    * * * * * * * * * * * * * *   *

8
                      _DAUBERT_ HEARING BEFORE
9             THE HONORABLE JAMES J. BRADY
              UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12   FOR THE PLAINTIFF:          NAACP LEGAL DEFENSE AND
                                 EDUCATIONAL FUND, INC.
13                               BY:   LEAH C. ADEN, ESQ.
                                       WILLIAM A. LESSER, ESQ.
14                                     VICTORIEN WU, ESQ.
                                 40 RECTOR STREET, 5TH FLOOR
15                               NEW YORK, NY 10006

16
     FOR THE DEFENDANTS:         LOUISIANA DEPARTMENT OF JUSTICE
17                               BY:   ANGELIQUE D. FREEL, ESQ.
                                 POST OFFICE BOX 94005
18                               BATON ROUGE, LOUISIANA 70804

19   OFFICIAL COURT REPORTER:    SHANNON L. THOMPSON, CCR
                                 UNITED STATES COURTHOUSE
20                               777 FLORIDA STREET
                                 BATON ROUGE, LOUISIANA 70801
21                               (225) 389-3567

22

23        PROCEEDINGS RECORD BY MECHANICAL STENOGRAPHY USING
              COMPUTER-AIDED TRANSCRIPTION SOFTWARE
24

25

```
 1                            INDEX

 2   DEFENDANT'S WITNESSES:

 3    MICHAEL BEYCHOK
```

```
 4      DIRECT EXAMINATION BY MS. FREEL . . . . . . . . .  4

 5      CROSS-EXAMINATION BY MS. ADEN . . . . . . . . . .  24

 6      REDIRECT EXAMINATION BY MS. FREEL . . . . . . . .  45
```

```
 7    RONALD E. WEBER, M.D.
```

```
 8      DIRECT EXAMINATION BY MS. FREEL . . . . . . . . .  49
```

```
 9    ANGELE C. ROMIG
```

```
10      DIRECT EXAMINATION BY MS. FREEL . . . . . . . . .  66

11      CROSS-EXAMINATION BY MR. LESSER . . . . . . . . .  97

12      REDIRECT EXAMINATION BY MS. FREEL . . . . . . . .  103
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | (FEBRUARY 8, 2016) |
| 2 | THE COURT: ALL RIGHT. BE SEATED. |
| 3 | GOOD MORNING. |
| 4 | IN CONCERT: GOOD MORNING. |
| 5 | THE COURT: THE COURT IS HERE THIS MORNING FOR |
| 6 | HEARINGS IN RELATED MATTERS IN THE CASE OF *TERREBONNE PARISH* |
| 7 | *BRANCH NAACP VERSUS JINDAL*. |
| 8 | ARE THE MOVERS READY TO PROCEED, THE PLAINTIFFS? |
| 9 | MS. ADEN: YES. |
| 10 | THE COURT: AND THE DEFENDANTS? |
| 11 | MS. FREEL: YES, YOUR HONOR. |
| 12 | THE COURT: ALL RIGHT. HAVE ALL OF YOU MADE YOUR |
| 13 | APPEARANCES? |
| 14 | MS. FREEL: YES. |
| 15 | MS. ADEN: YES. |
| 16 | THE COURT: ALL RIGHT. THE FIRST MATTER, I BELIEVE, |
| 17 | THAT WE WILL TAKE UP IS THE *DAUBERT* HEARING RELATING TO RONALD |
| 18 | WEBER. |
| 19 | IS HE ON THE -- |
| 20 | THE CLERK: IT'S AT 10:30. |
| 21 | THE COURT: 10:30, OKAY. I'M SORRY. SO I GUESS |
| 22 | THAT GETS US TO MR. BEYCHOK. |
| 23 | GOOD MORNING. |
| 24 | MS. FREEL: THANK YOU, YOUR HONOR. |
| 25 | ANGELIQUE FREEL HERE ON BEHALF OF THE ATTORNEY |

```
1   GENERAL AND GOVERNOR.
2               IF YOU JUST GIVE ME ONE SECOND, I'LL PULL OUT MY
3   DOCUMENTS RELATED TO MR. BEYCHOK.  I THOUGHT WE WERE GOING
4   WITH MS. ROMIG FIRST.  SO LET ME -- IT WILL JUST TAKE ME A
5   SECOND TO GET THESE READY.
6               THE COURT:  WELL, MAYBE I'VE GOT MY SCHEDULE
7   BACKWARDS.  WAS THAT --
8               MS. ADEN:  WE'RE HAPPY TO GO WITH MR. BEYCHOK FIRST.
9               MS. FREEL:  I'M FINE WITH GOING WITH MR. BEYCHOK,
10  TOO.  I JUST NEED TO GRAB THE DOCUMENT.
11                   (OFF-RECORD DISCUSSION.)
12              MS. FREEL:  I'D LIKE TO GO AHEAD AND AT THIS TIME
13  CALL MICHAEL BEYCHOK TO THE STAND, YOUR HONOR.
14              THE COURT:  ALL RIGHT.
15              (WHEREUPON, MICHAEL BEYCHOK, HAVING BEEN DULY SWORN,
16  TESTIFIED AS FOLLOWS.)
17              THE COURT:  GOOD MORNING.
18              PROCEED, MA'AM.
19              MS. FREEL:  THANK YOU.
20                   DIRECT EXAMINATION
21  BY MS. FREEL:
22      Q.   CAN YOU PLEASE STATE YOUR NAME.
23      A.   MICHAEL BEYCHOK.
24      Q.   AND WHAT IS YOUR OCCUPATION?
25      A.   I'M A POLITICAL CONSULTANT.
```

```
1        Q.    AND YOUR PLACE OF EMPLOYMENT?

2        A.    THE BEYCHOK GROUP.

3        Q.    AND WHAT IS YOUR PRESENT TITLE?

4        A.    I AM PRESIDENT OF THE BEYCHOK GROUP.  I'M CREATIVE

5   DIRECTOR FOR OURSO BEYCHOK, INCORPORATED.

6        Q.    ARE THOSE TWO SEPARATE ENTITIES?

7        A.    THEY ARE TWO SEPARATE ENTITIES.

8        Q.    CAN YOU GO AHEAD AND EXPLAIN A LITTLE BIT ABOUT WHAT

9   THESE BUSINESSES DO?

10       A.    SO OURSO BEYCHOK IS A POLITICAL COMMUNICATIONS,

11  CORPORATE COMMUNICATIONS, GOVERNMENTAL RELATIONS FIRM.  SO WE

12  WORK ON CAMPAIGNS.  CLIENTS INCLUDE POLITICAL CANDIDATES,

13  POLITICAL ACTION COMMITTEES, CORPORATE ENTITIES.  AND THEN THE

14  BEYCHOK GROUP IS A VENDOR BASICALLY OF OURSO BEYCHOK.

15       Q.    AND WHAT DO THEY SPECIALIZE IN?

16       A.    THEY DO MOSTLY -- ALMOST EXCLUSIVELY POLITICAL

17  COMMUNICATIONS.

18       Q.    WHAT ACADEMIC DEGREES DO YOU HOLD, AND WHERE DID YOU

19  OBTAIN THEM?

20       A.    I HAVE A GENERAL STUDIES DEGREE FROM LSU.

21       Q.    IF YOU HAD TO ESTIMATE, CAN YOU TELL US HOW MANY

22  CAMPAIGNS YOU HAVE WORKED ON AS A POLITICAL CONSULTANT?

23       A.    I MEAN, IT'S OVER 500.  IT COULD BE CLOSER TO A

24  1,000, YOU KNOW.  SO I'VE BEEN IN THE BUSINESS SINCE 1987 AS A

25  BUSINESS.  SO, YEAH, SOMEWHERE IN THAT RANGE.  IT'S HARD TO
```

1    KEEP TRACK AT THIS AGE ANYMORE.

2        Q.    AND CAN YOU GO AHEAD AND TELL US WHO-ALL -- IF YOU

3    CAN JUST GIVE US A SAMPLING OF SOME OF THE CANDIDATES THAT YOU

4    HAVE WORKED FOR AS A POLITICAL CONSULTANT?

5        A.    WELL, WE'VE WORKED FOR CANDIDATES ANYWHERE FROM, YOU

6    KNOW, CITY COUNCIL ALL THE WAY UP TO LAST YEAR, WE WORKED WITH

7    GOVERNOR MARTIN O'MALLEY FOR PRESIDENT CAMPAIGN AS A SENIOR

8    CONSULTANT.  WE JUST FINISHED A RACE FOR MAYOR SHARON WESTON

9    BROOME IN BATON ROUGE.  WE'VE WORKED FOR SENATE CAMPAIGNS,

10   UNITED STATE'S SENATE CAMPAIGNS, IN NEVADA, KENTUCKY, NORTH

11   CAROLINA, ARKANSAS, LOUISIANA.  WE'VE WORKED FOR CONGRESSIONAL

12   CAMPAIGNS ALL OVER THE COUNTRY, COUNTY PROSECUTORS, MICHIGAN,

13   KALAMAZOO COUNTY LAST YEAR, DOING A MAYOR'S RACE IN ST. LOUIS

14   CURRENTLY.

15        SO, I MEAN, WE'VE WORKED ON LEGISLATIVE CAMPAIGNS,

16   MAINE, KANSAS, NORTH CAROLINA.  WE'VE WORKED IN JUST ABOUT

17   EVERY LEVEL OF POLITICAL CAMPAIGN THAT YOU CAN IMAGINE.

18        Q.    AND HAVE YOU WORKED FOR -- AS A POLITICAL CONSULTANT

19   FOR MINORITY CANDIDATES?

20        A.    YES.

21        Q.    AND CAN YOU THINK OF SOME OFFHAND THAT YOU HAD DONE

22   POLITICAL CONSULTING WORK FOR?

23        A.    YOU KNOW, SOMETIMES THAT'S DIFFICULT BECAUSE I DON'T

24   REALLY THINK OF THEM IN THAT TERMS.  BUT YEAH, I MEAN, WE JUST

25   DID MAYOR SHARON WESTON BROOME, SHE'S AFRICAN AMERICAN.  WE'VE

1    DONE MAYOR JAMIE MAYO.  WE HAVE WORKED FOR KIP HOLDEN, WHO WAS

2    A MAYOR, AS A STATE LEGISLATOR; AVON HONEY; ALFRED WILLIAMS AS

3    A LEGISLATOR.  WE JUST DID JUDGE TARVALD SMITH, BATON ROUGE

4    CITY COURT, HE'S AFRICAN AMERICAN.  I MEAN, THOSE ARE JUST THE

5    MOST RECENT ONES THAT WE'VE WORKED FOR.

6        Q.    WHAT ABOUT NATIONAL PARTIES?

7        A.    SO IN TERMS OF THE AFRICAN-AMERICAN CANDIDATES OR --

8        Q.    JUST GENERALLY.

9        A.    RIGHT.  SO WE'VE WORKED FOR THE DEMOCRATIC NATIONAL

10   COMMITTEE.  WE'VE DONE WORK SPECIFICALLY FOR THE SENATE

11   MAJORITY PAC, WHICH IS THE DEMOCRATIC SENATORIAL CAMPAIGN

12   COMMITTEE'S POLITICAL ACTION COMMITTEE.  WE'VE WORKED FOR THE

13   DEMOCRATIC LEGISLATIVE CAMPAIGN COMMITTEE.  THESE ARE ALL

14   NATIONALLY BASED ASSOCIATIONS WHICH FOCUS ON THEIR SPECIFIC

15   BRANCHES, SO TO SPEAK, OF LEGISLATIVE CAMPAIGNS.

16       Q.    NOW, HAVE YOU DONE WORK FOR THE LOUISIANA DEMOCRATIC

17   PARTY --

18       A.    YES.

19       Q.    -- AS A POLITICAL CONSULTANT?

20       A.    YES.  WE HAVE WORKED FOR THE LOUISIANA DEMOCRATIC

21   PARTY AND NUMEROUS OTHER DEMOCRATIC PARTIES AROUND THE

22   COUNTRY, AS I WORK WITH LEGISLATIVE CAMPAIGNS.  SO LIKE THE

23   NORTH CAROLINA DEMOCRATIC PARTY, MISSOURI, MAINE, KANSAS,

24   THOSE DEMOCRATIC PARTIES.

25       Q.    WHAT'S THE GOAL OF CANDIDATES OR PARTIES THAT MEET

1    WITH A POLITICAL CONSULTANT, AS YOU UNDERSTAND IT?  WHY ARE

2    THEY MEETING WITH A POLITICAL CONSULTANT?

3        A.    WHY ARE PARTIES MEETING WITH POLITICAL --

4        Q.    OR CANDIDATES.

5        A.    WELL, CANDIDATES ARE LOOKING FOR ADVICE.  THEY'RE

6    LOOKING FOR PROFESSIONAL EXPERT ADVICE ON HOW TO WIN THEIR

7    PARTICULAR CAMPAIGN.

8        Q.    AND IS IT YOUR COMPANY THAT IS AVAILABLE TO PROVIDE

9    THAT ADVICE?

10       A.    YES, THAT'S WHAT WE DO.  WE PROVIDE STRATEGIC ADVICE

11   TO POLITICAL CAMPAIGNS AND ENTITIES.

12       Q.    NOW, HAVE YOU, AS A POLITICAL CONSULTANT, PROVIDED

13   TRAINING OR LECTURES ON ELECTION MATTERS?

14       A.    WE'VE DONE -- I'VE DONE MULTIPLE TRAININGS WITH

15   CANDIDATES, ONE ON ONE AND IN GROUPS, AS PART OF OUR WORK WITH

16   SOME OF THESE LEGISLATIVE CAUCUSES IN OTHER STATES, MAINE AND

17   KANSAS AND MISSOURI, WHERE WE WOULD -- YOU KNOW, THEY BRING IN

18   CANDIDATES, AND WE BASICALLY SPEND A DAY OR TWO TRAINING,

19   QUOTE/UNQUOTE, TRAINING THEM, EDUCATING THEM IS A BETTER WORD,

20   ON THE DIFFERENT ELEMENTS OF A POLITICAL CAMPAIGN AND HOW

21   THEIR CANDIDACY IS GOING TO WORK IF THEY'VE NEVER RUN FOR

22   OFFICE AND WHAT TO EXPECT BASICALLY FROM A POLITICAL CAMPAIGN.

23       Q.    AND WHAT HAVE BEEN SOME OF THE TITLES OF THE

24   TRAINING PROGRAMS, IF YOU RECALL?

25       A.    FUND RAISING, GRASS ROOTS, YARD SIGNS DON'T VOTE,

1    DOOR TO DOOR, PAID COMMUNICATIONS, FREE MEDIA.  JUST

2    EVERYTHING THAT COULD POSSIBLY ENCOMPASS A POLITICAL CAMPAIGN.

3        Q.    ANY TRAININGS ON ELECTIONS 101 OR THINGS GENERALLY

4    IN REFERENCE TO --

5        A.    WELL, I THINK ALL THOSE THINGS WOULD FALL UNDER

6    ELECTIONS 101.  SO WHEN THESE CAUCUSES AND ORGANIZATIONS, YOU

7    KNOW, BRING US IN, WE ARE USUALLY TASKED TO SPEAK TO

8    EVERYTHING ABOUT A CAMPAIGN, NOT JUST A PARTICULAR SEGMENT OF

9    A CAMPAIGN.

10       Q.    HAVE YOU EVER TAUGHT ABOUT THESE ELECTION COMPONENTS

11   AT UNIVERSITIES HERE IN LOUISIANA?

12       A.    I'VE DONE A COUPLE OF SPEAKING.  I DON'T KNOW IF I

13   WOULD CHARACTERIZE IT AS TEACHING, BUT I'VE BEEN INVITED TO

14   COME IN AND SPEAK TO STUDENTS AT THE COLLEGE OF MASS

15   COMMUNICATION.  THERE'S BEEN A LOYOLA INSTITUTE OF POLITICS

16   THAT I'VE APPEARED AT ON A FEW OCCASIONS OVER THE PAST FEW

17   YEARS TO TALK SPECIFICALLY ABOUT A CAMPAIGN AND WHAT WE DO AND

18   WHAT OUR BUSINESS DOES IN CAMPAIGNS.

19       Q.    AND ARE YOU A MEMBER OF ANY PROFESSIONAL SOCIETIES,

20   ASSOCIATIONS, OR ORGANIZATIONS?

21       A.    A MEMBER OF THE AMERICAN ASSOCIATION OF POLITICAL

22   CONSULTANTS, AND I'M ALSO A MEMBER OF THE NATIONAL TURF

23   WRITERS AND BROADCASTERS ASSOCIATION.

24       Q.    AND HAVE YOU RECEIVED ANY HONORS, ACKNOWLEDGMENTS,

25   OR AWARDS FOR YOUR WORK IN THIS FIELD?

1    A.    OUR FIRM -- WE HAVE RECEIVED MULTIPLE PEER-REVIEWED,

2    PEER-HONORED AWARDS OVER THE PAST 20 YEARS DATING BACK TO

3    1995, I THINK, WAS THE FIRST TIME I WON AN AWARD.

4         SO WE SUBMIT WORK THAT WE'VE PRODUCED TO OUR PEERS,

5    AND THEY JUDGE IT TO BE EITHER, YOU KNOW, WORTHY OF AN AWARD

6    AS PART OF THE BEST OF THAT YEAR'S PRODUCT.

7    Q.    ARE THESE AWARDS KNOWN AS "POLLIE AWARDS"?

8    A.    THERE ARE TWO -- NOW TWO CATEGORIES OR TWO GROUPS.

9    ONE IS THE POLLIE AWARDS, THAT'S THE AMERICAN ASSOCIATION OF

10   POLITICAL CONSULTANTS AWARDS, AND, AGAIN, THEY ARE JUDGED BY

11   OUR PEERS.  AND THEN THERE'S ALSO NOW THE REED AWARDS, WHICH

12   ARE GIVEN OUT BY CAMPAIGNS IN ELECTION MAGAZINE.

13        SO THOSE ARE LIKE THE TWO COMPETING AWARDS.  ONE --

14   I WOULD CHARACTERIZE ONE AS LIKE THE ACADEMY AWARDS AND ONE AS

15   LIKE THE GOLDEN GLOBES.

16   Q.    OKAY.  AND I BELIEVE THAT THE ORIGINAL CV THAT I

17   OFFERED IN THIS CASE WAS OLDER BECAUSE OF THE TIME THAT YOU

18   DID YOUR INITIAL REPORT AND IT MAY HAVE ONLY LISTED ONE AWARD.

19   WOULD YOU AGREE THAT YOUR BUSINESS HAS BEEN THE RECIPIENT OF

20   MANY POLLIE AND REED AWARDS, MUCH MORE THAN ONE AWARD?

21   A.    WE HAVE BEEN THE RECIPIENT OF MANY MORE THAN ONE.  I

22   DON'T KNOW HOW MANY IT ACTUALLY IS, BUT OVER THE PAST FEW

23   YEARS, WE'VE WON QUITE A FEW.

24   Q.    NOW, IS IT CORRECT THAT IN THIS PARTICULAR MATTER,

25   YOU'VE BEEN ASKED TO ANALYZE ELECTIONS THAT OCCURRED IN

1    TERREBONNE PARISH?

2         A.    YES.

3         Q.    HAVE YOU OFFERED SIMILAR TESTIMONY RELATED TO

4    ELECTIONS, NOT SPECIFIC TO TERREBONNE PARISH, BUT GENERALLY

5    WITH REGARD TO ELECTIONS IN OTHER FEDERAL COURTS?

6         A.    I DID TESTIFY IN THE *HALL VERSUS LOUISIANA CASE*, I

7    BELIEVE, AND I BELIEVE THERE WAS ONE OTHER CASE.  I'M NOT SURE

8    OF THE NAME.  IT'S ON THE CV, *MONTECINO VERSUS LOUISIANA* --

9         Q.    YES.

10        A.    -- WHICH WAS MANY -- A FEW YEARS AGO INVOLVING

11   VIDEO-POKER CONTRIBUTIONS.

12        Q.    AND WERE THESE BOTH CASES WHERE YOU DISCUSSED

13   SIMILAR METHODOLOGIES AS THE ONE THAT YOU USE IN YOUR REPORT

14   IN THIS CASE?

15        A.    YES.

16        Q.    CAN YOU DESCRIBE BRIEFLY WHAT'S YOUR UNDERSTANDING

17   OF WHAT YOU WERE ASKED TO DO IN THIS CASE?

18        A.    I WAS JUST ASKED TO LOOK AT SPECIFIC -- SOME

19   SPECIFIC RACES IN TERREBONNE PARISH -- SOME SPECIFIC ELECTIONS

20   IN TERREBONNE PARISH AND ANALYZE THE RACES TO DETERMINE WHAT

21   FACTORS I THOUGHT WERE DETERMINING OF WHO WON THE RACE.

22        Q.    IN PERFORMING YOUR ANALYSIS, DID YOU EXCLUDE RACE

23   FROM CONSIDERATION?

24        A.    NO.

25        Q.    YOU CONSIDERED RACE TO BE ONE FACTOR OR -- AND THERE

1  BE -- AND OTHER FACTORS MIGHT COME INTO PLAY; IS THAT

2  ACCURATE?

3       A.    YES.

4       Q.    OKAY.   NOW, IN YOUR EXPERIENCE AS A POLITICAL

5  CONSULTANT, HAVE YOU NOTICED TRENDS IN WHAT WOULD CONSISTENTLY

6  BE REVEALED IN SUCCESSFUL CAMPAIGNS?

7       A.    YES.

8       Q.    AND WHAT ARE -- AND DO YOU DISCUSS THAT IN YOUR

9  OPINION?

10       A.    I DO DISCUSS IT.   AND I THINK THE TRENDS, YOU KNOW,

11  WOULD -- ARE FAIRLY CONSISTENT IN MY EXPERIENCE, AND THOSE

12  ARE, YOU KNOW, CANDIDATES THAT ARE ABLE TO RAISE MONEY,

13  CANDIDATES THAT ARE ABLE TO UTILIZE THEIR TIME, HAVE THE MOST

14  TIME TO CAMPAIGN, AND THEN CANDIDATES IN CAMPAIGNS THAT ARE

15  ABLE TO RECRUIT AND ACTIVATE PEOPLE OR VOLUNTEERS ARE, YOU

16  KNOW, THE MOST SUCCESSFUL.

17       Q.    NOW, IS IT YOUR UNDERSTANDING THAT THIS CASE

18  INVOLVES A CHALLENGE WITH REGARD TO THE METHOD OF ELECTING

19  JUDGES IN TERREBONNE PARISH?

20       A.    YES.

21       Q.    HAVE YOU -- HAS YOUR METHODOLOGY UNCOVERED ANY

22  SPECIFIC UNIQUE CHARACTERISTICS WHEN IT COMES TO JUDICIAL

23  CAMPAIGNS?

24       A.    WELL, MY RESEARCH -- I MEAN, JUDICIAL CAMPAIGNS ARE

25  A LITTLE BIT DIFFERENT THAN OTHER CAMPAIGNS FOR A COUPLE OF

1    REASONS.   ONE, THE CANDIDATES THEMSELVES ARE NOT ALLOWED TO

2    RAISE MONEY DIRECTLY FROM PEOPLE, SO THAT MAKES THEM UNIQUE;

3    TWO, THERE IS A HISTORICAL INCUMBENCY RE-ELECTION FACTOR,

4    WHICH IS DIFFERENT THAN OTHER PARTICULAR CAMPAIGNS.   I THINK

5    IN LOUISIANA IT CAN BE AS HIGH -- OR IS AS HIGH AS 90 TO 95

6    PERCENT.   SO THOSE ARE TWO UNIQUE FACTORS FOR JUDICIAL

7    CAMPAIGNS.

8         Q.    AND WHEN YOU MENTIONED THE UNIQUENESS OF JUDICIAL

9    FACTORS IN INCUMBENCY, DO YOU RELY IN PART ON THE STATISTICAL

10   ANALYSIS PERFORMED BY MS. ROMIG?

11        A.    YES.

12        Q.    OKAY.

13        A.    THAT'S WHERE I GOT THAT NUMBER FROM.

14        Q.    NOW, YOU MENTION THAT WITH REGARD TO EXAMINING

15   JUDGES THEY HAVE UNIQUE RULES WITH REGARD TO CAMPAIGN FINANCE

16   RULES.

17        I WANT TO REGRESS FOR A MINUTE.   IS IT CLEAR TO

18   DESCRIBE THAT THERE ARE THREE THINGS THAT YOU'VE NOTED OVER

19   AND OVER IN SUCCESSFUL CAMPAIGNS AND THAT THEY INCLUDE TIME,

20   IN TERMS OF WHEN THE PERSON STARTS THEIR CAMPAIGN; THEIR

21   ABILITY TO -- OR THEIR ACCESS TO MONEY; AND THEN ALSO

22   VOLUNTEERS.   IS THAT ACCURATE?

23        A.    YES, THAT'S ACCURATE.

24        Q.    OKAY.   WHEN IT COMES TO YOUR METHODOLOGY OF

25   ANALYZING JUDICIAL ELECTIONS, WHAT DO THE CAMPAIGN FINANCE

1   RECORDS TELL YOU ABOUT STARTS OF CAMPAIGNS?

2       A.    SO THE CAMPAIGN FINANCE RECORDS CAN ANSWER A LOT OF

3   THOSE QUESTIONS ABOUT WHEN A CAMPAIGN STARTED.  OUR CURRENT

4   CAMPAIGN FINANCE RULES IN LOUISIANA OR LAWS REQUIRE THAT A

5   CAMPAIGN, ANY CAMPAIGN, FILE A STATEMENT OF ORGANIZATION ONCE

6   THEY HAVE EITHER RAISED OR SPENT $500.  WITHIN TEN DAYS OF

7   THAT DATE, THEY NEED TO FILE A STATEMENT OF ORGANIZATION OR --

8   AND I'M NOT A LAWYER SO I DON'T KNOW HOW THIS WORKS WITH

9   INTENT -- BUT IT DOES SAY WHEN YOU ANTICIPATE THAT YOU WILL

10  RAISE OR SPEND $500, WITHIN TEN DAYS OF THAT MOMENT, YOU NEED

11  TO FILE A STATEMENT OF ORGANIZATION.  THAT GIVES US LOOKING

12  BACK A WAY OF KNOWING WHEN THEY STARTED THEIR CAMPAIGN.

13      Q.    SO AT LEAST WITH REGARD TO THE MONETARY ASPECTS, YOU

14  CAN REVIEW CANDIDATE FINANCE REPORTS AND PINPOINT A PRETTY

15  APPROXIMATE TIME AS TO WHEN A CAMPAIGN STARTS?

16      A.    YOU CAN PINPOINT THE TIME WHEN THEY RECEIVED THEIR

17  FIRST CONTRIBUTION.

18      Q.    THIS WOULD EXCLUDE POSSIBLY THEM GOING OUT AND

19  TALKING WITH PEOPLE OR TRYING TO GET VOLUNTEERS ON BOARD.  BUT

20  WITH PRETTY MUCH CONSISTENCY, YOU'RE ABLE TO DETERMINE THIS

21  USING THIS METHODOLOGY; IS THIS CORRECT?

22      A.    THAT'S CORRECT.

23      Q.    AND YOU MENTIONED IT IS THE LAW IN LOUISIANA, RIGHT,

24  TO FILE THESE CANDIDATE FINANCE REPORTS?  IS THAT ACCURATE?

25      A.    EVERY CANDIDATE OR CAMPAIGN COMMITTEE AND JUDICIAL

1    CANDIDATES OF CAMPAIGN COMMITTEES HAVE TO FILE, AS I'VE SAID,

2    THESE REPORTS.

3         Q.    OKAY.

4         A.    IF THEY EXPEND OR RAISE MORE THAN $500.

5         Q.    AND ALSO FROM REVIEWING THE CANDIDATE FINANCE

6    REPORT, YOU CAN DETERMINE, NOT JUST FOR JUDICIAL ELECTIONS BUT

7    ANY ELECTION, MONEY AVAILABLE FOR THE CAMPAIGN; IS THAT

8    ACCURATE?

9         A.    THAT'S ACCURATE.

10        Q.    OKAY.  AND THEN ALSO -- WILL IT ALSO GIVE YOU A

11   WINDOW INTO WHO POSSIBLY IS SUPPORTING THE CANDIDATE?

12        A.    IT DOES, BECAUSE YOU HAVE TO DISCLOSE THE

13   CONTRIBUTIONS AND WHO GAVE THE CONTRIBUTIONS.  WE DON'T HAVE

14   ANONYMOUS DONATIONS.  IT ALSO GIVES US A WINDOW INTO HOW THE

15   CANDIDATES ARE SPENDING THEIR MONEY, AND ALSO, YOU KNOW, HOW

16   MUCH MONEY THEY ARE ACTUALLY RAISING, HOW MANY PEOPLE ARE

17   ACTUALLY CONTRIBUTING TO THE CAMPAIGN.  THEY ARE VERY

18   REVEALING IN THE EFFICACY OF A CAMPAIGN, TO ME ANYWAY, TO

19   SOMEONE WHO HAS DONE CAMPAIGNS WHO CAN LOOK BACK AND SAY,

20   WELL, YOU'VE SPENT YOUR MONEY WELL, YOU'VE RAISED A LOT OF

21   MONEY, OR YOU SPENT YOUR MONEY NOT WELL, OR YOU DIDN'T START

22   AT A CERTAIN TIME, YOU GOT OUTSTARTED, OR SOMEONE ELSE STARTED

23   WAY BEFORE YOU DID.

24            AND THAT'S JUST ONE OF THE FACTORS IN A CAMPAIGN,

25   THE TIME -- WE JUST CANNOT -- YOU CAN'T RECOVER TIME IN A

1    CAMPAIGN 'CAUSE THERE'S AN END DATE.

2        Q.    NOW, IF THERE WAS A VARIATION IN YOUR REPORT IN THIS

3    METHODOLOGY BECAUSE, SAY, AN ELECTION THAT WAS ANALYZED BY THE

4    PLAINTIFFS IN THAT YOU ARE DISCUSSING MAY HAVE HAPPENED THREE

5    OR FOUR DECADES AGO, WHAT WOULD BE SOME OF THE REASONS WHY

6    THAT WOULD BE VARIED?  WOULD YOU HAVE LESS OPPORTUNITY TO SEE

7    THE DOCUMENTS?

8        A.    YOU MAY HAVE NOT ACCESS TO QUITE THE INFORMATION

9    THAT -- FROM A RACE THAT WAS 20, 25, 30 YEARS AGO.  THE

10   CAMPAIGN FINANCE REPORTS MAY NOT BE COMPLETE.  THE CAMPAIGN

11   FINANCE RECORDS AND LAWS MAY HAVE BEEN DIFFERENT 20, 25 YEARS

12   AGO, SO THE REQUIREMENTS TO DISCLOSE CONTRIBUTIONS AND

13   EXPENDITURES MAY HAVE BEEN DIFFERENT.  AND THEN JUST, YOU

14   KNOW, ACCESS TO INFORMATION FROM 20 OR 25 YEARS AGO, BE IT

15   ONLINE OR THROUGH A NEWSPAPER ARTICLE OR SOMETHING, IS

16   CERTAINLY LIMITED -- OR MORE LIMITED THAN IT IS WITH A RACE

17   THAT OCCURRED THREE YEARS AGO.

18       Q.    IN TERMS OF YOUR SOURCES OF DATA THAT YOU USED IN

19   YOUR ANALYSIS IN THIS CASE, CAN YOU DISCUSS THOSE BRIEFLY?

20       A.    YEAH.  SO MOST -- I MEAN, A LOT OF THE CAMPAIGN

21   FINANCE DATA WAS GARNERED FROM THE ETHICS BOARD WEBSITE,

22   CAMPAIGN FINANCE WEBSITE, WHERE THEY HAVE ALL THE CAMPAIGN

23   FINANCE REPORTS ONLINE, EITHER ELECTRONIC OR SCANNED.  AND

24   THEN I ALSO LOOKED AT NEWSPAPERS THAT ARE ONLINE FROM

25   TERREBONNE AND LAFOURCHE THAT HAD NEWSPAPER ARTICLES THAT WERE

1    POSTED THAT MENTIONED THE CANDIDATES WHICH GAVE ME SOME

2    INSIGHT INTO WHEN THEY ANNOUNCED BECAUSE BY -- HISTORICALLY,

3    CANDIDATES WILL SEND OR MAKE AN ANNOUNCEMENT IN THE NEWSPAPER

4    OR THE LOCAL PRESS WILL REPORT ON IT, EITHER OR, AND IT WILL

5    RUN IN THE NEWSPAPER, AND THAT IS TYPICALLY WHEN A -- YOU

6    KNOW, WHEN A CANDIDATE STARTS HIS OR HER CAMPAIGN.

7         Q.    OKAY.

8         A.    SO THE NEWSPAPER, THE ETHICS BOARD WEBSITE, AND THEN

9    ALSO THE SECRETARY OF STATE'S WEBSITE FOR ELECTION RESULTS.

10        Q.    OKAY.   IN TERMS OF OPINIONS THAT YOU MAY HAVE GIVEN

11   ON TRENDS WITH PARTY AFFILIATION IN THE PARISH, WHAT WOULD YOU

12   HAVE RELIED ON FOR THAT -- WHAT TYPE OF DATA WOULD YOU HAVE

13   RELIED ON FOR THAT?

14        A.    SO I WOULD HAVE LOOKED AT THE SECRETARY OF STATE'S

15   WEBSITE AND GONE BACK AND LOOKED AT THE REGISTRATION

16   STATISTICS FROM THE YEAR THAT THE ELECTION WAS BEING HELD THAT

17   I WAS LOOKING AT, AND THEN MAYBE COMPARED IT TO CURRENT

18   REGISTRATION STATISTICS.   SO IT'S ALWAYS IMPORTANT, FOR

19   INSTANCE, IF THERE WAS, YOU KNOW, A 1993 ELECTION TO SEE WHAT

20   THE REGISTRATION WAS AT THE TIME OF THE ELECTION, RATHER THAN

21   JUST LOOKING AT IT TODAY.

22        Q.    NOW, IN EXECUTING THAT METHODOLOGY, IN REVIEWING

23   ELECTION RETURNS, ARE YOU ABLE TO DECIPHER PARTY AFFILIATION?

24        A.    I'M ABLE TO DECIPHER THE PARTY AFFILIATION AS IT

25   PERTAINS TO REGISTRATION, AND THEN ALSO AS WE MOVE FORWARD,

1    THE SECRETARY OF STATE HAS ALSO ACCUMULATED POST-ELECTION

2    STATISTICS WHERE WE CAN DETERMINE WHAT PERCENTAGE OF -- YOU

3    SAID PARTY -- REPUBLICANS HAVE VOTED AS OPPOSED TO WHAT

4    PERCENTAGE OF DEMOCRATS HAVE VOTED.

5        Q.    WOULD --

6        A.    AND HOW MANY DEMOCRATS VOTED AND HOW MANY

7    REPUBLICANS VOTED.

8        Q.    WOULD THAT DATA ALSO ALLOW YOU TO DETERMINE PARTY

9    AFFILIATION OF THE CANDIDATES?

10       A.    YES.

11       Q.    AND WOULD THAT DATA ALLOW YOU TO DETERMINE AGE OF

12   THE CANDIDATE?

13       A.    THE DATA THAT IS ON THE SECRETARY OF STATE'S SITE

14   CERTAINLY INDICATES PARTY.  I BELIEVE THAT YOU WOULD HAVE TO

15   -- I'M NOT SURE WHERE THE AGE WOULD COME FROM.

16       Q.    WHAT ABOUT RACE?  CAN YOU TELL RACE?

17       A.    RACE, YES.  WE REQUIRE RACE WHEN YOU QUALIFY HERE.

18       Q.    WHAT ABOUT GENDER?

19       A.    YES.

20       Q.    AND --

21       A.    FROM THE SECRETARY OF STATE'S SITE WHEN THEY ARE AN

22   OFFICIAL QUALIFIED CANDIDATE.

23       Q.    AND WHEN YOU -- IN ALSO POSSIBLY VOTING HISTORIES OF

24   THE CANDIDATES AS WELL WOULD BE AVAILABLE; IS THAT ACCURATE?

25       A.    THAT IS AVAILABLE.  I THINK IT'S AVAILABLE ON THE

1    SECRETARY OF STATE'S SITE.

2        **Q.**    OKAY.  AND SO WHEN YOU DID THE ANALYSIS IN THIS CASE

3    AND YOU USED YOUR METHODOLOGY, YOU WERE ABLE TO EXTRACT

4    FACTORS SUCH AS RACE, PARTY AFFILIATION, AND THEN USING YOUR

5    OTHER METHODOLOGY WITH REGARD TO HOW TO WIN CAMPAIGNS, YOU ARE

6    ABLE TO REACH SOME CONCLUSIONS IN THIS CASE; IS THAT ACCURATE?

7        **A.**    THAT'S CORRECT.

8        **Q.**    OKAY.  NOW, YOU MENTION IN THE REPORT A THEORY ABOUT

9    STALENESS OF ELECTIONS.  THAT'S NOT JUST YOUR THEORY; IS THAT

10   CORRECT?

11       **A.**    WELL, I DON'T KNOW WHOSE THEORY IT IS, BUT ELECTIONS

12   DO GET STALE.  I MEAN, WHEN WE'RE LOOKING AT A CURRENT

13   ELECTION AND YOU WANT TO GO BACK AND FIGURE OUT, YOU KNOW,

14   WHAT HAS HAPPENED, I THINK THERE'S A CERTAIN POINT WHERE YOU

15   SAY THAT ELECTION IS JUST NOT GOING TO SHED ANY LIGHT ON OUR

16   CURRENT SITUATION.  I THINK -- I GUESS IT PROBABLY -- IT'S A

17   MOVING TARGET IN TERMS OF MY PRACTICE OF POLITICAL CONSULTING.

18            I THINK IN THIS PARTICULAR INSTANCE -- OR THESE

19   INSTANCES HERE, YOU KNOW, 20 YEARS AGO, ELECTIONS FROM 20, 25

20   YEARS AGO ARE -- YOU CAN CALL THEM WHATEVER YOU WANT -- STALE,

21   IRRELEVANT, BECAUSE THE ELECTORATE IS SO DIFFERENT THAN IT WAS

22   20 OR 25 YEARS AGO.  AND I'M NOT TALKING ABOUT PARTY

23   REGISTRATION OR AGE.  I'M TALKING ABOUT SPECIFICALLY THOSE

24   PEOPLE WHO WERE VOTING 30 YEARS AGO ARE SIMPLY NOT EVEN ON THE

25   -- THE MAJORITY OF THE PEOPLE THAT VOTED 20 OR 30 YEARS AGO

1    ARE SIMPLY NOT EVEN ON THE ROLLS ANYMORE IN THAT PARTICULAR

2    PARISH, SO IT SEEMS TO ME THAT THAT'S NOT REALLY A FAIR

3    COMPARISON.

4         Q.   AND THEN IN TERMS OF DATA THAT MIGHT REFLECT THAT,

5    YOU HAD THE OPPORTUNITY TO REVIEW ANGELE ROMIG'S EXPERT REPORT

6    HERE WHERE SHE ACTUALLY GAVE THE DATA THAT SHOWED THE FALL OFF

7    IN VOTER ROLLS AND THE DIFFERENCES; IS THAT ACCURATE?

8         A.   I DID REVIEW THAT DATA.

9         Q.   OKAY.  AND JUST TO REFRESH YOUR MEMORY, DO YOU

10   RECALL THAT IN THE *HALL* CASE, THAT DR. ENGSTROM ONLY EXAMINED

11   ELECTIONS FROM 2012 BECAUSE HE SAID OTHER ELECTION CYCLES WERE

12   STALE?

13        A.   I DO RECALL THAT ARGUMENT BEING MADE.

14        Q.   OKAY.  NOW, JUST TO GIVE AN EXAMPLE TO THE COURT OF

15   WHERE YOU HAVE OPINED ON CERTAIN MATTERS USING THIS

16   METHODOLOGY AND IT HAS BEEN ACCURATE, DID YOU THINK IT WAS

17   NECESSARY IN BATON ROUGE CITY COURT FOR THERE TO BE A MINORITY

18   SUBDISTRICT IN ORDER FOR THE MINORITY CANDIDATE TO BE ELECTED

19   AS CITY COURT JUDGE?

20        A.   NO.  I THINK MY TESTIMONY AND OPINION IN THE *HALL*

21   CASE WAS I DID NOT BELIEVE THAT THERE WAS A NEED FOR A

22   AFRICAN-AMERICAN SUBDISTRICT TO ELECT AN AFRICAN AMERICAN AT

23   LARGE.

24        Q.   AND SINCE THAT TIME, HAVE YOU SEEN WHERE YOUR

25   OPINION HAS COME TRUE, AS IT RELATES TO BATON ROUGE CITY

1  COURT?

2      A.   WELL, THERE WAS AN AFRICAN AMERICAN ELECTED AT LARGE

3  POST-TESTIMONY, BUT I DON'T -- YES, I HAVE SEEN WHERE THAT

4  PARTICULAR -- WHERE MY OPINION CAME TRUE.

5      Q.   NOW, IN THE SUPPLEMENTAL REPORT, YOU -- IN ADDITION

6  TO THE ORIGINAL ELECTIONS YOU ANALYZED, YOU LOOKED AT JUSTICE

7  OF THE PEACE WARD ELECTIONS; IS THAT ACCURATE?

8      A.   YES.

9      Q.   AND WHAT WOULD BE THE CONNECTION BETWEEN JUSTICE OF

10  THE PEACE ELECTIONS AND JUDICIAL ELECTIONS?

11      A.   WELL, IN LOUISIANA -- MAYBE OTHER STATES -- BUT IN

12  LOUISIANA, JUSTICE OF THE PEACES ARE TREATED UNDER THE

13  JUDICIAL ELECTION SYSTEM, ELECTION CODE, SO THEY ARE VIEWED AS

14  JUDGES, SO THAT WOULD MAKE THEM SOMEWHAT SIMILAR TO A JUDICIAL

15  RACE.

16      MS. FREEL:  YOUR HONOR, AT THIS TIME, I'D LIKE TO GO

17  AHEAD AND OFFER MR. MICHAEL BEYCHOK'S CVS INTO EVIDENCE.  I

18  HAVE THE ORIGINAL ONE THAT WAS CIRCULATED WITH HIS REPORT

19  ALMOST TWO YEARS AGO, AND THEN I HAVE A MORE UPDATED CV.

20      THE COURT:  NO OBJECTION TO THAT?

21      MS. ADEN:  NO, SIR.

22      THE COURT:  OKAY.  GO AHEAD AND MARK IT, PLEASE, MS.

23  FREEL.

24      MS. FREEL:  YOUR HONOR, FOR PURPOSES OF

25  IDENTIFICATION, I HAVE MARKED THE NEW CV AS EXHIBIT 1 AND THE

1    OLDER CV AS EXHIBIT 2, AND I'D LIKE TO GO AHEAD AND OFFER

2    THOSE INTO EVIDENCE AT THIS TIME.

3         **THE COURT:**  ALL RIGHT.  WITHOUT OBJECTION, THEY'RE

4    ADMITTED.

5    **BY MS. FREEL:**

6         Q.   NOW, YOUR ABILITY TO MEASURE A START DATE OF

7    CAMPAIGNS, WE TALKED ABOUT THAT A LITTLE BIT EARLIER.  BUT

8    WOULD YOU AGREE THAT THAT VARIABLE IS DEPENDENT ON PART OF

9    WHEN THE CANDIDATE REPORTS THE INFORMATION?  IS THAT ACCURATE?

10        **A.**   IT'S DEPENDENT UPON, I GUESS, TWO THINGS IN MY

11   REPORTS.  ONE IS WHEN THE CANDIDATE ANNOUNCED HIS OR HER

12   CAMPAIGN; AND, TWO, AND THIS -- AND THEY MAY NOT MATCH UP,

13   WHEN HE OR SHE FILED THEIR STATEMENT OF ORGANIZATION WITH THE

14   BOARD OF ETHICS.

15        Q.   AND TO THE EXTENT THAT PLAINTIFFS MAY HAVE

16   CRITICIZED YOU FOR INCONSISTENTLY APPLYING YOUR METHODOLOGY,

17   IS IT BECAUSE YOU ARE LIMITED AS TO THE AVAILABILITY OF

18   CERTAIN DATA FOR CERTAIN ELECTIONS?

19        **A.**   WELL, CERTAINLY IN THAT CASE, IF THE INCONSISTENCY

20   IS THAT IN ONE CASE I USED WHEN THEIR ANNOUNCEMENT WAS IN THE

21   PAPER, AND THE OTHER CASE I MAY HAVE USED WHEN THEY FILED A

22   STATEMENT OF ORGANIZATION.  THOSE ARE TWO DIFFERENT METHODS OF

23   DETERMINING WHEN A CAMPAIGN STARTS.

24        Q.   BUT THERE ARE --

25        **A.**   BOTH OF WHICH ARE -- CAN BE VALID.

1        **Q.**   AND ARE THEY BOTH, IN YOUR OPINION, EFFECTIVE MEANS

2   OF DOING THAT FOR --

3        **A.**   YES.

4        **Q.**   AS A POLITICAL CONSULTANT, YOU WOULD AGREE WITH

5   THAT?

6        **A.**   YES.

7        **Q.**   AND IN ADDITION TO THE METHODOLOGY YOU DESCRIBED,

8   YOU ALSO WERE ABLE TO REACH YOUR OPINIONS FROM ACTUALLY

9   TALKING TO CANDIDATES; IS THAT ACCURATE?

10       **A.**   THAT IS CORRECT.

11       **Q.**   LIKE, FOR EXAMPLE, JUAN PICKETT.  YOU SPOKE WITH

12   HIM?

13       **A.**   YEAH.  I INTERVIEWED JUDGE PICKETT MARCH OF 2015, I

14   THINK IT WAS.

15       **Q.**   OKAY.

16       **A.**   JUST TO GET A -- YOU KNOW, I MEAN, I WANTED TO GET

17   MORE OF A SENSE OF WHEN HE STARTED HIS CAMPAIGN AND JUST HAD A

18   FEW MORE QUESTIONS ABOUT HIS CAMPAIGN THAT I WANTED TO GET HIM

19   TO ANSWER.

20       **Q.**   AND YOU WERE -- WERE YOU ABLE TO APPLY YOUR

21   METHODOLOGY TO THE FACTS THAT YOU ELICITED THROUGH SPEAKING

22   WITH HIM TO REACH A CONCLUSION IN THIS CASE?

23       **A.**   YES.  HIS -- HE WAS FORTHCOMING AS WE -- AND THE

24   ACTIVITIES THAT HE PERFORMED OR ACCOMPLISHED DURING HIS

25   CAMPAIGN MATCHED UP VERY WELL WITH THE THREE FACTORS.

1          **MS. FREEL:**  AT THIS TIME, YOUR HONOR, I'D LIKE TO GO

2   AHEAD AND TENDER MICHAEL BEYCHOK AS AN EXPERT POLITICAL

3   CONSULTANT TO GIVE OPINION ON FACTORS THAT EXISTS TO DETERMINE

4   ELECTION OUTCOMES.

5          **THE COURT:**  OKAY.  THANK YOU.

6          CROSS ON HIS EXPERTISE?

7          **MS. ADEN:**  YES.

8                    **CROSS-EXAMINATION**

9   BY MS. ADEN:

10         **Q.**  GOOD MORNING, MR. BEYCHOK.

11         **A.**  GOOD MORNING.

12         **Q.**  YOU JUST TESTIFIED ON DIRECT THAT YOU CONSIDERED

13  RACE IN THIS CASE; IS THAT CORRECT?

14         **A.**  YES.

15         **Q.**  DO YOU RECALL TESTIFYING IN A DEPOSITION WITH ME IN

16  2015?

17         **A.**  YES.

18         **Q.**  AND DO YOU RECALL IN YOUR DEPOSITION MS. FREEL

19  STATING THAT YOU, QUOTE, HAVE NOT TALKED ABOUT RACE AS A

20  FACTOR, END QUOTE?

21         **A.**  WELL, YOU SAID, DID I CONSIDER RACE.  YOUR QUESTION

22  IS, DID I -- WELL, YOUR QUESTION WAS, DID I TALK ABOUT IT.  IS

23  THERE --

24         **Q.**  DO YOU RECALL -- MY QUESTION IS, DO YOU RECALL MS.

25  FREEL STATING, QUOTE, THAT YOU HAVE NOT TALKED ABOUT RACE AS A

1   FACTOR, END QUOTE?

2           **MS. FREEL:**  AND IF YOU'D LIKE TO SHOW HIM A COPY.

3           I'M GOING TO OBJECT.

4           IF YOU'D LIKE TO SHOW HIM A COPY.

5           AND ALSO TO THE EXTENT THAT THERE ARE OTHER AREAS IN

6   THAT DEPOSITION WHERE HE SPECIFICALLY SAID HE CONSIDERED MANY

7   FACTORS, THEN HE SHOULD BE GIVEN THE DEPOSITION TO LOOK AT.

8   **BY MS. ADEN:**

9       **Q.**   DO YOU RECALL MS. FREEL MAKING THAT STATEMENT?

10          **THE COURT:**   WAIT.  YOU CAN PUT -- DO YOU HAVE A COPY

11  OF THE DEPOSITION?

12          **MS. ADEN:**  I CAN SHOW --

13          **MS. FREEL:**  I'M SURE I DO.

14          **THE COURT:**   LET MS. FREEL GIVE HIM A COPY.

15          **MS. FREEL:**   YOUR HONOR, I WOULD ALSO LIKE TO PUT AN

16  OBJECTION ON THE RECORD TO THE RELEVANCE OF THIS LINE OF

17  QUESTIONING BECAUSE IN A SECTION 2 CASE AS A DEFENDANT, WE

18  HAVE THE BURDEN TO PUT ON FACTORS, NON-RACIAL FACTORS, AND SO

19  IT'S IRRELEVANT TO HIS QUALIFICATIONS AS AN EXPERT.  I ALSO

20  OBJECT BECAUSE IT MISCHARACTERIZED THE TESTIMONY HE GAVE IN

21  THE DEPOSITION.

22          **THE COURT:**  I AM GOING TO OVERRULE THE OBJECTION.

23          GO AHEAD AND GIVE HIM A COPY.

24          **MS. ADEN:**  I CAN SHOW HIM THE PAGE.  DO YOU WANT HIM

25  TO HAVE THE WHOLE DEPOSITION?

1          **THE COURT:**  YES.  BECAUSE I HAVE A FEELING YOU ARE

2    GOING TO BE REFERRING TO IT FROM TIME TO TIME.

3          IF YOU CAN GO BACK THERE, THAT WOULD WORK UNTIL SHE

4    FINDS IT.

5          **MS. FREEL:**  OKAY.  YOUR HONOR, JUST AT THE OUTSET,

6    I'D LIKE TO POINT OUT THE INDEX OF THIS DEPOSITION WHERE

7    YOU'LL SEE UNDER THE WORD "RACE," AND YOU WILL SEE IT HAD BEEN

8    CITED ACTUALLY TWO COLUMNS IN THIS DEPOSITION.  SO, AGAIN, I

9    RE-URGE MY OBJECTION TO THE EXTENT THAT THEY ARE TAKING ONE

10   LINE OUT OF A DEPOSITION TO --

11         **THE COURT:**  YOU WILL BE ABLE TO COME BACK AND POINT

12   THAT OUT.

13         ALL RIGHT.  GO AHEAD.

14         **MS. FREEL:**  WHAT PAGE?

15         **MS. ADEN:**  CAN YOU, PLEASE, TURN TO PAGE 77, AND I

16   AM LOOKING AT LINE 11 THROUGH 13.

17         **THE COURT:**  DO YOU HAVE IT?  IT'S NOT ON THERE?

18         **THE WITNESS:**  IT'S COMING.  THINGS ARE HAPPENING.

19         **MS. ADEN:**  THIS IS PAGE 77, LINE 11 THROUGH 13.

20         **MS. FREEL:**  OKAY.  AGAIN, I'D LIKE TO RE-URGE MY

21   OBJECTION TO THE EXTENT THAT THIS IS PAGE 77 OF A PAGE 284

22   DOCUMENT, AND IF YOU LOOK WHAT I SAID TO HIM WAS HE HAS NOT

23   TALKED ABOUT -- HE HAS NOT YET TALKED -- WAIT.  OBJECT,

24   BECAUSE THIS IS NOT WHAT HIS OPINIONS ARE IN THE CASE.  HE HAS

25   NOT TALKED ABOUT RACE AS A FACTOR.

```
 1              THE COURT:  ALL RIGHT.  WELL, YOU WILL HAVE AN
 2    OPPORTUNITY TO GO BACK AND CLEAR THAT UP.
 3              MS. FREEL:  OKAY.
 4    BY MS. ADEN:
 5         Q.   SO DO YOU SEE THAT STATEMENT?
 6         A.   YES, I DO.
 7         Q.   DO YOU AGREE WITH THAT STATEMENT, HE HAS NOT TALKED
 8    ABOUT RACE AS A FACTOR?
 9         A.   IN MY REPORT OR IN THE DEPOSITION?
10         Q.   IN YOUR REPORT AND/OR IN YOUR DEPOSITION, HAVE YOU
11    TALKED ABOUT RACE AS A FACTOR?
12         A.   I THINK I MENTIONED RACE.  I DON'T KNOW THAT I'VE
13    TALKED ABOUT IT AS A FACTOR.
14         Q.   DO YOU RECALL IN YOUR DEPOSITION THAT MS. FREEL
15    STATED THAT YOUR, QUOTE, REPORT SPECIFICALLY TALKS ABOUT OTHER
16    FACTORS BESIDES RACE, END QUOTE?
17              AND NOW I'M LOOKING AT PAGE 71, LINES 12 THROUGH 13.
18              MS. CARBONETTE:  YOUR HONOR, WE'RE ASKING THIS
19    WITNESS QUESTIONS --
20              THE CLERK:  CAN YOU COME TO THE PODIUM, PLEASE.
21              MS. CARBONETTE:  WE'RE ASKING THIS WITNESS QUESTIONS
22    ABOUT WHAT MS. FREEL SAID IN A DEPOSITION, NOT WHAT HE SAID IN
23    THE DEPOSITION.
24              MS. ADEN:  AND, YOUR HONOR, I'M ASKING FOR HIM TO
25    RECALL WHETHER HE --
```

1    **THE COURT:**  WELL, WHY DON'T YOU JUST ASK THOSE

2    QUESTIONS WITHOUT REFERRING TO THE DEPOSITION AND LET'S SEE

3    WHAT THE WITNESS SAYS.

4    **BY MS. ADEN:**

5        **Q.**    DO YOU RECALL IN YOUR DEPOSITION THAT MS. FREEL

6    STATED THAT YOUR, QUOTE, REPORT SPECIFICALLY TALKS ABOUT OTHER

7    FACTORS BESIDES RACE, END QUOTE?

8        **A.**    I DON'T RECALL THAT, BUT I'M GOING TO TAKE YOUR WORD

9    FOR IT BECAUSE YOU'RE --

10       **Q.**    DO YOU AGREE WITH THAT STATEMENT?

11       **A.**    DO I AGREE WITH THAT MY REPORT --

12       **Q.**    THAT YOUR REPORT SPECIFICALLY TALKS ABOUT OTHER

13   FACTORS BESIDES RACE?

14       **A.**    YES, IT DOES TALK ABOUT OTHER FACTORS.

15       **Q.**    IN FACT, YOU ONLY TALKED ABOUT THE RACE OF

16   CANDIDATES; ISN'T THAT CORRECT?

17       **THE COURT:**  I DIDN'T UNDERSTAND THE QUESTION.

18   **BY MS. ADEN:**

19       **Q.**    IN FACT, YOU ONLY IDENTIFIED THE RACE OF CANDIDATES?

20       **A.**    I DID IDENTIFY THE RACE OF CANDIDATES.  I DON'T KNOW

21   WHETHER I AGREE WITH THAT I ONLY TALKED ABOUT THE RACE OF

22   CANDIDATES.  ACTUALLY, I THINK I PROBABLY DISAGREE.  I'VE

23   TALKED ABOUT WHAT THEY DID FOR A LIVING, WHERE THEY LIVED,

24   WHAT THEIR -- YOU KNOW, HOW MUCH MONEY THEY RAISED, WHEN THEY

25   STARTED THEIR CAMPAIGN.  I THINK I TALKED ABOUT A LOT OF THOSE

1  THINGS ABOUT CANDIDATES, NOT JUST RACE.

2      Q.    SO IN TERMS ABOUT HOW YOU CONSIDERED RACE IN YOUR

3  REPORT, ONE OF THE WAYS THAT YOU DID THAT WAS BY IDENTIFYING

4  THE RACE OF CANDIDATES; IS THAT CORRECT?

5      A.    I DID IDENTIFY THE RACE OF CANDIDATES.

6      Q.    AND IS THE OTHER WAY THAT YOU DID IT BY CONCLUDING

7  THAT RACE WAS TOO SIMPLE OF AN EXPLANATION FOR WHY BLACK

8  CANDIDATES ARE LOSING PARISH-WIDE ELECTIONS IN TERREBONNE

9  PARISH?

10     A.    YES.

11     Q.    BUT YOU DID NOT ANALYZE -- BUT BESIDES THOSE TWO

12 WAYS, BY IDENTIFYING THE RACE OF THE CANDIDATE AND CONCLUDING

13 THAT RACE IS TOO SIMPLE OF AN EXPLANATION, YOU DID NOT

14 OTHERWISE ANALYZE THE ROLE OF RACE IN THE AT-LARGE PARISH-WIDE

15 ELECTIONS THAT YOU INCLUDED IN YOUR INITIAL REPORT; IS THAT

16 CORRECT?

17     A.    I PROBABLY --

18          MS. FREEL:  I'M GOING TO OBJECT BECAUSE THIS IS A

19 VOIR DIRE AND THIS IS ABOUT CHALLENGING METHODOLOGIES AND

20 ABOUT EXPERIENCE OF THE WITNESS, AND IT HAS NOTHING TO DO WITH

21 THE MERITS.

22          THE COURT:  WHERE ARE YOU GOING?  THIS SEEMS TO BE

23 THAT YOU ARE GETTING INTO THE MERITS.  BUT WHERE ARE YOU

24 AIMING?

25          MS. ADEN:  I'M TRYING TO HAVE A PROFFERED WITNESS

1   IDENTIFY THE WAYS THAT HE'S TALKED ABOUT RACE BEFORE HE HAS

2   THEN CONCLUDED THAT RACE WAS NOT ONE OF THE MOST IMPORTANT

3   FACTORS BESIDES MONEY, TIME, AND PEOPLE IN ELECTIONS.  SO I

4   WOULD LIKE HIM TO TALK ABOUT THE WAYS THAT HE HAS TALKED ABOUT

5   RACE BEFORE SO CONCLUDING THAT IT WAS NOT ONE OF THE MOST --

6           **THE COURT:**  ARE YOU CHALLENGING THE METHODOLOGY IN

7   SOME WAYS?

8           **MS. ADEN:**  YES.  YES.

9           **THE COURT:**  ALL RIGHT.  WELL, I AM GOING TO LET YOU

10  PROCEED, BUT TRY TO GET TO THAT POINT, PLEASE.

11          **MS. ADEN:**  OKAY.

12  BY MS. ADEN:

13      Q.   DO YOU RECALL ME TESTIFYING -- OR ASKING YOU THE

14  QUESTION -- EXCUSE ME -- SO TO BE CLEAR.  YOU DID NOT ANALYZE

15  THE ROLE OF RACE IN THIS PARTICULAR ELECTION FOR MR. MOSELY'S

16  CAMPAIGN?  DO YOU RECALL ME ASKING THAT QUESTION?

17      **A.**   YES.

18      Q.   AND DO YOU RECALL YOUR ANSWER BEING, NOT AS A

19  SPECIFIC, I GUESS.

20      **A.**   OKAY.

21      Q.   AND I CAN REFER YOU TO PAGE 194, LINES 22 THROUGH

22  25.

23          **THE COURT:**  I THINK HE HAS ANSWERED IT.

24          **MS. ADEN:**  OKAY.

25  BY MS. ADEN:

1    Q.   NOW, IN PREPARING YOUR REPORT IN MARCH OF 2015, YOU

2   REVIEWED THE EXPERT REPORT OF DR. ENGSTROM, PLAINTIFFS'

3   POLITICAL SCIENTIST WHO ANALYZED RACIALLY POLARIZED VOTING IN

4   TERREBONNE; IS THAT CORRECT?

5    A.   YES.

6    Q.   OKAY.  AND YOU DON'T DISPUTE DR. ENGSTROM'S RACIALLY

7   POLARIZED VOTING FINDINGS, DO YOU?

8    A.   I DON'T HAVE ANY STANDING TO DISPUTE IT.  I'M NOT --

9   THAT'S NOT -- I MEAN --

10    MS. FREEL:  I'M GOING TO OBJECT.  HE IS NOT BEING

11   OFFERED TO REFUTE ANYTHING THAT DR. ENGSTROM DID IN TERMS OF

12   RACIAL POLARIZATION ANALYSIS.  THAT IS NOT WHY THIS PERSON HAS

13   BEEN TENDERED AS AN EXPERT.

14   BY MS. ADEN:

15    Q.   AND THAT'S BECAUSE YOU'RE NOT QUALIFIED TO CONDUCT

16   RACIALLY POLARIZED --

17    THE COURT:  HOLD UP.  LET ME RULE ON THE OBJECTION.

18   I AM GOING TO OVERRULE THE OBJECTION.

19    BUT GO AHEAD.

20   BY MS. ADEN:

21    Q.   AND THAT'S BECAUSE YOU'RE NOT QUALIFIED TO CONDUCT A

22   RACIALLY POLARIZED VOTING ANALYSIS; IS THAT CORRECT?

23    A.   THAT IS ABSOLUTELY CORRECT.

24    Q.   OKAY.  AND YOU DON'T DISPUTE DR. ENGSTROM'S FINDINGS

25   THAT IN SEVEN CONTESTED AT-LARGE ELECTIONS IN TERREBONNE,

1    THERE WAS RACIALLY POLARIZED VOTING?

2              THE COURT:   AGAIN, I THINK YOU ARE GETTING INTO THE

3    MERITS.   WHERE ARE YOU HEADING?

4    BY MS. ADEN:

5         Q.   SO YOU ULTIMATELY CONCLUDED, QUOTE, THAT RACE -- YOU

6    ULTIMATELY CONCLUDED THAT RACE WAS, QUOTE, NOT THE BIGGEST

7    FACTOR, END QUOTE, AS MONEY, TIME, AND PEOPLE AND VOLUNTEERS

8    IN ELECTIONS THAT YOU EXAMINED IN YOUR INITIAL REPORT; IS THAT

9    CORRECT?

10        A.   THAT'S CORRECT.

11        Q.   OKAY.   BUT YOU AGREE THAT THE AMOUNT OF MONEY THAT A

12   CANDIDATE IS ABLE TO RAISE MAY BE IMPACTED BY RACE?

13             MS. FREEL:   I'M GOING TO OBJECT.

14        A.   I DO NOT AGREE WITH THAT.

15             THE COURT:   HOLD ON.

16             MS. FREEL:   WELL, I'M GOING TO WITHDRAW MY

17   OBJECTION.

18   BY MS. ADEN:

19        Q.   YOU DON'T AGREE THAT A VOTER'S ECONOMIC CIRCUMSTANCE

20   CAN AFFECT HIS OR HER WILLINGNESS TO MAKE A CAMPAIGN

21   CONTRIBUTION?

22        A.   THAT'S DIFFERENT THAN YOUR PREVIOUS QUESTION.

23        Q.   SO YOU HAD SAID THAT YOU DIDN'T AGREE WITH THAT ONE.

24        A.   IF SOMEONE WHO IS --

25        Q.   THE NEXT QUESTION.

1   **A.**    I DO --

2          **THE COURT:**   ASK THE QUESTION.

3   **A.**    I'M SORRY.

4          **THE COURT:**   AND THEN ALLOW HIM TO ANSWER BEFORE YOU

5   SPEAK AGAIN.

6   **BY MS. ADEN:**

7      **Q.**    SO YOU DON'T AGREE THAT THE AMOUNT OF MONEY THAT A

8   CANDIDATE IS ABLE TO RAISE MAY BE IMPACTED BY RACE?

9      **A.**    WHOSE RACE?

10     **Q.**    THE --

11     **A.**    THE RACE OF THE DONOR OR THE RACE OF THE CANDIDATE?

12     **Q.**    THE RACE OF THE DONOR.

13     **A.**    I THINK IT DEPENDS ON THE SITUATION.  I MEAN, IF YOU

14  HAVE A WEALTHY AFRICAN AMERICAN, IS THAT GOING TO -- I MEAN

15  . . .

16         **MS. FREEL:**   THIS IS CROSS-EXAMINATION.

17     **A.**    I THINK IT DEPENDS.

18         **MS. FREEL:**   THIS IS NOT A VOIR DIRE.

19     **A.**    IT DEPENDS.

20  **BY MS. ADEN:**

21     **Q.**    AND DO YOU AGREE THAT A VOTER'S ECONOMIC

22  CIRCUMSTANCES CAN AFFECT HIS OR HER WILLINGNESS TO MAKE A

23  CAMPAIGN CONTRIBUTION?

24     **A.**    SURE.

25     **Q.**    AND DO YOU -- AND YOU HAVE NO BASIS TO DISPUTE THAT

1   THERE ARE SOCIOECONOMIC DISPARITIES REPORTED BY MR. COOPER AND

2   DR. LICHTMAN IN THIS CASE?

3       A.   I DON'T HAVE THOSE REPORTS IN FRONT OF ME, AND I'M

4   NOT GOING TO --

5           THE COURT:   AGAIN, WE ARE NOT AT THIS HEARING TO

6   TEST THE RIGHT OR WRONG OF ANY OPINIONS.   IT'S TO WHETHER OR

7   NOT HIS METHODOLOGY COMPORTS WITH THE 702 FACTORS.

8           MS. ADEN:   AND THAT'S RIGHT, YOUR HONOR.   SO WHAT

9   I'M TRYING TO GET AT IS AS A MATTER OF LOGIC, HOW CAN MR.

10  BEYCHOK CONCLUDE THAT RACE IS NOT A FACTOR AND ATTRIBUTE THE

11  LOSS OF BLACK CANDIDATES TO MONEY, TIME, AND PEOPLE WHEN HE

12  ADMITS IN HIS REPORT THAT THERE ARE OTHER FACTORS BESIDES

13  MONEY, TIME, AND PEOPLE THAT MATTER WHEN RACE -- HE

14  ACKNOWLEDGES THAT RACE IS A FACTOR IN TERREBONNE ELECTIONS

15  WHEN HE HAS LOOKED AT THE RACIALLY POLARIZED VOTING ANALYSIS

16  AND CANNOT DISPUTE THOSE FINDINGS --

17          MS. FREEL:   I'M GOING TO OBJECT.

18          MS. ADEN:   -- WHEN HE DID NOT ANALYZE RACE AS A

19  FACTOR BESIDES THE TWO WAYS THAT HE EARLIER TESTIFIED WITH,

20  WHICH IS JUST BY IDENTIFYING THE RACE OF CANDIDATES, AND THEN

21  CONCLUDING THAT RACE WAS LESS IMPORTANT THAN MONEY, TIME, AND

22  PEOPLE.

23          THE COURT:   ALL RIGHT.   WELL, PHRASE THAT INTO HOW

24  IT APPLIES UNDER THE 702 FACTORS.

25          MS. ADEN:   OKAY.

1    MS. FREEL:   YOUR HONOR, AND I'LL JUST SAY UNDER THE

2    *LULAC* DECISION AND THE *TEAGUE* CASE, THAT IF THE PLAINTIFFS

3    DECIDE OR PUT ON EVIDENCE THAT RACE IS THE FACTOR IN THE

4    ELECTIONS, THE DEFEND -- THE BURDEN SHIFTS TO THE DEFENDANTS

5    TO PUT ON EVIDENCE OF NON-RACIAL FACTORS.  AND HIS DEPOSITION

6    CLEARLY SAYS THAT HE CONSIDERED RACE.

7    THE COURT:   WELL, I'M NOT WORRIED ABOUT HIS

8    DEPOSITION, MS. FREEL.  I'M WORRIED ABOUT JUST THE *DAUBERT*

9    FACTORS AND THE 702 FACTORS HERE TODAY.

10    MS. FREEL:   BUT THE FACTORS ARE THAT WILL IT ASSIST

11    THE TRIER OF FACT, IS HIS -- IS IT BASED ON SUFFICIENT DATA

12    AND FACTS.

13    THE COURT:   AND THAT'S WHAT I'M TRYING TO GET DONE

14    HERE.

15    MS. FREEL:   OKAY.

16    THE COURT:   GO AHEAD, MA'AM.

17    BY MS. ADEN:

18    Q.   IN PREPARING YOUR INITIAL REPORT, YOU LOOKED AT DR.

19    ENGSTROM'S FINDINGS, CORRECT?

20    A.   YES.

21    Q.   AND YOU DON'T DISPUTE THEM?

22    MS. FREEL:   I'M, AGAIN, GOING TO OBJECT TO THAT

23    BECAUSE THIS WITNESS HAS SAID THAT HE IS NOT GIVING AN OPINION

24    ON THE RACIAL POLARIZATION TEST THAT DR. ENGSTORM DID.

25    THE COURT:   ALL RIGHT.  I'M GOING TO OVERRULE THE

1    OBJECTION.

2              AND ANSWER IT, IF YOU CAN.

3              **MS. FREEL:**  AND --

4    **A.**    I DON'T HAVE THE ACADEMIC STANDING OR TRAINING TO

5    DISPUTE RACIAL POLARIZATION FINDINGS.

6    **BY MS. ADEN:**

7    **Q.**    OKAY.  HAVING LOOKED AT THE REPORT, YOU WILL AGREE

8    THAT BLACK VOTERS AND WHITE VOTERS RESPOND DIFFERENTLY TO

9    CANDIDATES' ACCESS TO MONEY, TIME, AND PEOPLE IN THE ELECTIONS

10   THAT YOU CONSIDERED?

11             **MS. FREEL:**  THIS, AGAIN -- I'M GOING TO OBJECT.

12   IT'S CROSS-EXAMINATION.  THIS IS NOT A VALID QUESTION.

13             **THE COURT:**  NO, I'M GOING TO OVERRULE.

14             GO AHEAD AND ANSWER IT IF YOU CAN.

15   **A.**    COULD YOU ASK THE QUESTION AGAIN?  I'M SORRY.

16   **BY MS. ADEN:**

17   **Q.**    YOU AGREE THAT BLACK AND WHITE VOTERS RESPONDED

18   DIFFERENTLY TO THE CANDIDATES' ACCESS TO MONEY, TIME, AND

19   PEOPLE IN THE ELECTIONS THAT YOU CONSIDERED?

20   **A.**    I DON'T --

21             **MS. FREEL:**  WHERE DID HE AGREE TO THIS?

22             **MS. ADEN:**  CAN YOU TURN TO PAGE 165 OF HIS

23   DEPOSITION?

24             **THE COURT:**  AGAIN, ARE WE GETTING INTO THE MERITS?

25   WHERE ARE YOU HEADING?

1          **MS. ADEN:**  AGAIN, I'M TRYING TO DISCERN, HAVING

2    LOOKED AT EXPERT ANALYSIS THAT HE DOESN'T DISPUTE, THAT THERE

3    IS POLARIZED VOTING PATTERNS.

4          **THE COURT:**  WELL, THAT'S A MERIT THING.  I WANT TO

5    KNOW WHETHER THIS WITNESS HAS THE QUALIFICATIONS UNDER 702 TO

6    MAKE HIM AN EXPERT WITNESS OR UNDER THE *DAUBERT* FACTORS,

7    THAT'S WHAT WE ARE HERE FOR TODAY.  I DON'T NEED TO HEAR THE

8    MERITS FROM EITHER SIDE.

9          **MS. ADEN:**  AND, AGAIN, JUST SO TO BE CLEAR.  WE ARE

10   NOT QUESTIONING THE QUALIFICATIONS OF MR. BEYCHOK.  WE ARE

11   GETTING TO THE RELIABILITY OF HIS OPINIONS.

12   **BY MS. ADEN:**

13       **Q.**  SO GOING BACK TO YOUR TESTIMONY --

14         **THE COURT:**  NOW RELIABILITY OF HIS OPINIONS IS MERIT

15   BASED.  THE METHODOLOGY, IF IT'S RELIABLE, THE TRAINING, THE

16   EXPERTISE, THAT'S WHAT WE ARE HERE FOR TODAY, TO SEE HOW HE

17   CAN CONCLUDE.

18   **BY MS. ADEN:**

19       **Q.**  SO -- OKAY.  LET ME GO BACK.  OKAY.  STEPPING BACK.

20   YOU BELIEVE THAT MONEY, TIME, AND PEOPLE ARE THE THREE MOST

21   IMPORTANT FACTORS FOR DETERMINING THE OUTCOMES OF CAMPAIGNS;

22   IS THAT CORRECT?

23       **A.**  YES.

24       **Q.**  BUT YOU ALSO BELIEVE THAT INCUMBENCY IN JUDICIAL

25   ELECTIONS IS AN IMPORTANT FACTOR?

1    A.    IT'S AN IMPORTANT FACTOR.

2    Q.    AND YOU BELIEVE THAT NAME RECOGNITION AND SCANDALS

3    INFLUENCE ELECTIONS?

4    A.    THOSE ARE FACTORS.

5    Q.    AND YOU AGREE THAT RACE IS A FACTOR IN ELECTIONS?

6    A.    YES.

7    Q.    AND YOU ALSO AGREE THAT THERE ARE ELECTIONS WHERE

8    THERE ARE OTHER FACTORS THAT ARE MORE IMPORTANT THAN TIME,

9    MONEY, AND PEOPLE?

10   A.    YES.

11   Q.    AND, IN FACT, YOU AGREE THAT THERE ARE SO MANY

12   FACTORS THAT DETERMINE THE OUTCOME OF ELECTIONS THAT IT MAY BE

13   IMPOSSIBLE TO EXPLAIN ELECTORAL OUTCOMES?

14   A.    OKAY.

15   Q.    CAN WE TURN TO YOUR DEPOSITION, PAGE 151, LINE 16.

16         THE REPORTER:    REPEAT THAT.

17         MS. ADEN:    ACTUALLY, STRIKE THAT.  I'M GOING TO MOVE

18   TO THE NEXT QUESTION.

19   BY MS. ADEN:

20   Q.    GIVEN THE FACT THAT THESE ARE THE THREE MOST

21   IMPORTANT FACTORS, BUT THERE ARE OTHER FACTORS THAT MAY BE

22   RELEVANT AND SOME FACTORS THAT MAY BE EVEN MORE IMPORTANT ON

23   CERTAIN OCCASIONS, IN THE SIX PARISH-WIDE AT-LARGE ELECTIONS

24   THAT YOU CONSIDERED, NONE OF THESE OTHER FACTORS WERE MORE

25   IMPORTANT THAN TIME, MONEY, AND PEOPLE?

1      **A.**   ABSOLUTELY RIGHT.

2      **Q.**   AND YOU FOCUSED ONLY ON THOSE THREE FACTORS IN

3  PREPARING YOUR REPORT?

4           **MS. FREEL:**  OBJECTION, THAT'S NOT WHAT THIS WITNESS

5  HAS TESTIFIED TO.

6           **THE COURT:**  WELL, HE CAN ANSWER THAT, MS. FREEL.

7      **A.**   NO, I DID NOT FOCUS JUST ON THOSE THREE FACTORS.

8  WHAT I FOUND THAT JUST THOSE THREE FACTORS IN THE ELECTIONS

9  THAT I ANALYZED WERE THE MOST IMPORTANT.

10  BY MS. ADEN:

11      **Q.**   AND MORE IMPORTANT THAN RACE?

12      **A.**   YES.

13      **Q.**   AND YOU REACHED THAT CONCLUSION BY CONSIDERING RACE

14  IN TWO WAYS.  FIRST, IDENTIFYING THE RACE OF CANDIDATES; IS

15  THAT CORRECT?

16      **A.**   I DID IDENTIFY THE RACE OF THE CANDIDATES.

17      **Q.**   AND THEN CONCLUDING THAT RACE WAS TOO SIMPLE OF AN

18  EXPLANATION FOR BLACK ELECTORAL LOSS?

19      **A.**   SO I REACHED THE CONCLUSION THAT TIME, MONEY, AND

20  PEOPLE WERE THE MOST IMPORTANT FACTORS IN THOSE ELECTIONS

21  AFTER ANALYZING THOSE ELECTIONS, NOT BEFORE.

22      **Q.**   AND IN WHAT OTHER WAYS --

23      **A.**   SO AT THE END OF THE ANALYSIS, THOSE WERE THE THREE

24  MOST IMPORTANT FACTORS, AND RACE IN THOSE PARTICULAR ELECTIONS

25  DID NOT REACH A THRESHOLD THAT THEY WERE THE MOST IMPORTANT.

1    Q.    BUT THERE ARE NO OTHER PLACES IN YOUR INITIAL REPORT

2    OR YOUR SUPPLEMENTAL REPORT WHERE YOU TALK ABOUT RACE, WHERE

3    YOU ENGAGE WITH THE ISSUE OF RACE AND MAKE A DETERMINATION

4    THAT IT'S THE FOURTH MOST IMPORTANT FACTOR.  OR IN THIS

5    ELECTION, IT DID NOT PLAY AS BIG OF A ROLE AS MONEY, TIME AND

6    PEOPLE.  WHERE -- THERE ARE NO OTHER PLACES IN YOUR REPORT

7    WHERE YOU TALK ABOUT RACE OTHER THAN WHEN YOU IDENTIFY THE

8    RACE OF THE CANDIDATE, AND THEN YOU ULTIMATELY INCLUDE THAT

9    RACE WAS NOT AS IMPORTANT AS MONEY, TIME, AND PEOPLE?

10           MS. FREEL:  I'M GOING TO OBJECT.  SHE'S TESTIFYING.

11   THIS IS ARGUMENTATIVE AT THIS POINT.

12           THE COURT:  THAT --

13           MS. FREEL:  AND IT'S NOT -- IF YOU LOOK AT THE

14   REPORT, YOUR HONOR, IT'S NOT TRUE.

15           THE COURT:  MS. FREEL, I'M GOING TO SUSTAIN YOUR

16   OBJECTION.

17           JUST ASK THE QUESTION.

18   BY MS. ADEN:

19   Q.    OUTSIDE OF IDENTIFYING THE RACE OF THE CANDIDATE AND

20   CONCLUDING THAT RACE IS TOO SIMPLE OF AN EXPLANATION FOR

21   EXPLAINING THOSE OUTCOMES, THERE IS NO OTHER ANALYSIS THAT YOU

22   HAVE CONDUCTED TIED TO RACE?

23   A.    THAT'S NOT TRUE.

24   Q.    WHERE ELSE DID YOU TALK ABOUT RACE?

25   A.    WELL, I DON'T HAVE MY REPORT IN FRONT OF ME, BUT I

| | |
|---|---|
| 1 | DO KNOW THAT I MADE SOME STATEMENTS ABOUT THE SHARE OF AFRICAN |
| 2 | AMERICAN VOTE THAT CERTAIN CANDIDATES WERE ABLE TO GARNER |
| 3 | POST-ELECTION.  THAT SEEMS TO ME TO BE A STATEMENT ABOUT RACE |
| 4 | AS IT PERTAINS TO THOSE ELECTIONS.  SO THAT MAY BE A THIRD |
| 5 | PLACE WHERE I TALKED ABOUT RACE. |
| 6 | Q.   WELL, LET'S LOOK AT ONE PARTICULAR ELECTION. |
| 7 | MS. ADEN:  CAN YOU TURN TO PAGE 194 OF THE |
| 8 | DEPOSITION, LINES 22 THROUGH 25. |
| 9 | MS. FREEL:  I AM NOT HER ASSISTANT. |
| 10 | THE COURT:  WHAT ARE YOU USING THE DEPOSITION FOR? |
| 11 | THAT'S NOT THE WAY IT WORKS.  UNLESS . . . |
| 12 | MS. ADEN:  I'D LIKE TO IMPEACH HIM, ATTEMPT TO |
| 13 | IMPEACH HIM BECAUSE HE -- |
| 14 | THE COURT:  WELL, YOU HAVE TO ASK HIM THE QUESTION |
| 15 | AND HAVE HIM DENY IT AND THEN SHOW WHERE HE HAS SAID SOMETHING |
| 16 | OTHER THAN THAT.  AND, AGAIN, IF IT'S A MERIT-BASED THING, I |
| 17 | DON'T WANT TO HEAR IT. |
| 18 | BY MS. ADEN: |
| 19 | Q.   YOU DID NOT CONSIDER THE ROLE OF RACE IN THE |
| 20 | PARTICULAR ELECTION OF THE CITY MARSHAL IN 2014; IS THAT |
| 21 | CORRECT? |
| 22 | A.   NO, THAT'S NOT CORRECT. |
| 23 | Q.   OKAY.  WILL YOU, THEN, LOOK AT PAGE 194, LINES 22 |
| 24 | THROUGH 25, OF YOUR DEPOSITION. |
| 25 | MS. FREEL:  I'M NOT YOUR ASSISTANT.  IF YOU WANT TO |

```
1   COME OVER HERE AND SHOW IT TO HIM, THEN THAT'S FINE.  I'M NOT

2   GOING TO PROVE YOUR CASE FOR YOU, LEAH.

3           MR. WILSON:  AND, YOUR HONOR, CAN COUNSEL BE MORE

4   CIVIL?

5           THE COURT:  I KNOW.  JUST CALM DOWN.

6           DO YOU HAVE A COPY OF THE DEPOSITION?  THAT IS WHERE

7   WE STARTED OUT WITH ALL OF THIS.

8           MS. ADEN:  MY COLLEAGUE, VIC WU, IS GOING TO HELP ME

9   WITH IT, PLEASE.

10          THE COURT:  ALL RIGHT.

11          MS. ADEN:  PAGE 194, LINES 22 THROUGH 25.

12          MS. FREEL:  THIS IS NOT *DAUBERT* FACTORS.

13          THE COURT:  WE DON'T KNOW WHO YOU ARE.

14          MR. WILSON:  OH, I'M SORRY, YOUR HONOR.  I'M RON

15  WILSON.

16          THE CLERK:  OKAY.

17          MR. WILSON:  I'M SORRY.

18          MS. ADEN:  I CHECKED HIM IN AND LET THE COURT KNOW

19  THAT HE WOULD BE A LITTLE BIT LATE.

20          THE COURT:  ALL RIGHT.  GO ON OR WE ARE GOING TO

21  HAVE TO TAKE A BREAK TO GET MR. WEBER AT 10:30.

22  BY MS. ADEN:

23      Q.   DO YOU RECALL ME ASKING YOU, SO TO BE CLEAR, YOU DID

24  NOT ANALYZE THE ROLE OF RACE IN THIS PARTICULAR ELECTION FOR

25  MR. MOSLEY'S CAMPAIGN?
```

```
1         A.    AND MY ANSWER WAS, NOT AS A SPECIFIC, I GUESS.

2         Q.    TURNING TO YOUR SUPPLEMENTAL REPORT, IT CONCERNED

3    THE WARD LEVEL ELECTIONS, CERTAIN WARD LEVEL ELECTION IN

4    TERREBONNE PARISH; IS THAT CORRECT?

5         A.    DO YOU HAVE A COPY OF THE SUPPLEMENTAL REPORT I CAN

6    LOOK AT SO I CAN --

7              THE COURT:   MS. FREEL, GIVE THE WITNESS HIS REPORT.

8              MS. FREEL:   SURE.

9              THE COURT:   HIS SUPPLEMENTAL REPORT, PLEASE.

10             MS. FREEL:   OKAY.

11             THE WITNESS:   THANK YOU.

12   BY MS. ADEN:

13        Q.    SO YOU CONSIDERED WARD LEVEL ELECTIONS IN THREE OF

14   TEN WARDS IN TERREBONNE PARISH IN THIS SUPPLEMENTAL REPORT; IS

15   THAT CORRECT?

16        A.    WHAT PART ARE YOU REFERRING TO?

17        Q.    PAGES 2 THROUGH 4.

18        A.    YES.

19        Q.    NONE OF THESE ELECTIONS WERE PARISH-WIDE ELECTIONS;

20   IS THAT CORRECT?

21        A.    THAT'S CORRECT.

22        Q.    CONCERNING THESE WARD ELECTIONS, YOU DID NOT ANALYZE

23   THE AMOUNT OF MONEY THAT ANY OF THE CAMPAIGNS RAISED; IS THAT

24   CORRECT?

25        A.    THAT'S CORRECT.
```

1       Q.      YOU DID NOT ANALYZE THE AMOUNT OF TIME THAT ANY OF

2   THE CAMPAIGN SPENT COMMUNICATING WITH VOTERS; IS THAT CORRECT?

3       A.      THIS ELECTION WAS 1977.

4       Q.      SO IS THE ANSWER NO?

5       A.      NO, THE ANSWER TO YOUR QUESTION WAS -- IS YES.

6       Q.      WHERE DID YOU ANALYZE THE AMOUNT OF TIME THAT ANY OF

7   THE CAMPAIGN SPENT COMMUNICATING WITH VOTERS?

8       A.      NO, I'M SORRY.  I THOUGHT YOU SAID YOU DID NOT.

9       Q.      YOU DID NOT ANALYZE --

10      A.      SO MY --

11      Q.      -- THE AMOUNT OF TIME THAT ANY OF THE CAMPAIGN SPENT

12  COMMUNICATING WITH VOTERS; IS THAT CORRECT?

13      A.      THAT'S CORRECT.

14      Q.      YOU DID NOT ANALYZE THE EXTENT TO WHICH ANY OF THE

15  CAMPAIGNS RECRUITED VOLUNTEERS; IS THAT CORRECT?

16      A.      THAT'S CORRECT.

17      Q.      AND ASIDE FROM IDENTIFYING THE RACE OF SOME

18  CANDIDATES, YOU DID NOT ANALYZE THE ROLE OF RACE IN ANY OF THE

19  CAMPAIGNS?

20      A.      THAT'S CORRECT.

21      Q.      AND YOU DID NOT IDENTIFY EVEN THE RACE OF ALL OF THE

22  CANDIDATES IN THE CAMPAIGNS THAT YOU REPORTED; IS THAT

23  CORRECT?

24      A.      THAT IS CORRECT.  I DIDN'T HAVE ACCESS TO A 1977

25  ELECTION, THE RACE OF A CANDIDATE, BUT I SUBSEQUENTLY DID FIND

```
1    THE RACE OF THE CANDIDATE, SO . . . AT THE TIME OF THE REPORT.
2              MS. ADEN:  WILL YOU GIVE ME ONE MOMENT, JUDGE?
3              THE COURT:  SURE.
4    BY MS. ADEN:
5         Q.   JUST TO BE CLEAR.  IN YOUR ENTIRE CAREER, YOU'VE
6    ONLY TESTIFIED IN ONE OTHER SECTION 2 OF THE VOTING RIGHTS ACT
7    CASE; IS THAT CORRECT?
8         A.   I THINK THAT'S CORRECT.
9              MS. ADEN:  THAT'S ALL THE QUESTIONS I HAVE, YOUR
10   HONOR.
11             THE COURT:  ALL RIGHT.  BRIEF REDIRECT?
12             MS. FREEL:  YOUR HONOR, I'D LIKE PERMISSION TO
13   QUESTION FROM THE ELMO, PLEASE.
14             THE COURT:  SURE.
15                     REDIRECT EXAMINATION
16   BY MS. FREEL:
17        Q.   IN RESPONSE TO SOME OF THE LINE OF QUESTIONING BY
18   PLAINTIFFS' COUNSEL, MR. BEYCHOK, ONE WAY, WOULD YOU AGREE,
19   THAT YOU CONSIDERED RACE BEYOND JUST MENTIONING IT IN THE
20   REPORT WAS WHEN YOU WENT AND YOU INTERVIEWED JUAN PICKETT; IS
21   THAT ACCURATE?
22        A.   THAT WOULD BE CORRECT.
23        Q.   WHAT'S HIS RACE?
24        A.   HE'S AFRICAN AMERICAN.
25        Q.   AND WHAT POSITION DOES HE HOLD?
```

1      **A.**   HE'S A DISTRICT JUDGE.

2      **Q.**   AND WHEN WAS HE ELECTED?

3      **A.**   2014.

4      **Q.**   AND DID THE METHODOLOGY THAT YOU HAVE TALKED ABOUT,

5   TIME, MONEY, VOLUNTEERS, RING TRUE WITH THIS AFRICAN-AMERICAN

6   CANDIDATE?

7      **A.**   ABSOLUTELY.

8      **Q.**   NOW, ALSO IN YOUR SUPPLEMENTAL REPORT, YOU LOOKED AT

9   THE ELECTION DEALING WITH MELVIN JOHNSON, JUSTICE OF PEACE; IS

10  THAT ACCURATE?

11     **A.**   THAT'S RIGHT.

12     **Q.**   AND WHEN YOU CONSIDERED RACE, DIDN'T YOU CONSIDER

13  THAT MR. MELVIN JOHNSON WAS THE FIRST MINORITY EVER TO BE

14  ELECTED IN THE STATE OF LOUISIANA FROM A MAJORITY WHITE

15  DISTRICT; IS THAT ACCURATE?

16          **MR. WILSON:**   YOUR HONOR, I MEAN, WE'RE GOING TO

17  OBJECT.

18          **THE CLERK:**   WOULD YOU COME TO THE PODIUM WHEN YOU

19  SPEAK, PLEASE.

20          **MR. WILSON:**   COUNSEL IS ALLOWED TO LEAD AN EXPERT

21  WITNESS BUT SHE CAN'T TESTIFY.   I MEAN, THAT'S WHAT SHE'S

22  DOING, YOUR HONOR.

23          **THE COURT:**   WELL, I WILL -- SHE IS.   DON'T LEAD THE

24  WITNESS.

25  **BY MS. FREEL:**

1      Q.    WHAT'S ANOTHER EXAMPLE IN THE SUPPLEMENTAL REPORT

2  WHERE YOU CONSIDERED RACE?

3      A.    WELL, THE REASON WHY I WAS LOOKING AT THE MELVIN

4  JOHNSON ELECTION FOR JUSTICE OF THE PEACE WAS BECAUSE HE WAS

5  THE FIRST AFRICAN AMERICAN ELECTED IN A MINORITY -- A MAJORITY

6  WHITE DISTRICT AS AN AFRICAN AMERICAN.

7      Q.    OKAY.  AND THEN --

8          THE COURT:  WHEN WAS THAT?

9      A.    IN TERREBONNE PARISH.  THAT WAS IN 1977.

10  BY MS. FREEL:

11     Q.    AND YOU EXPLAINED WHY THERE WOULD HAVE BEEN

12  DEVIATIONS IN YOUR METHODOLOGY BASED ON LACK OF RECORDS, THAT

13  WAS THE ONLY REASON WHY; IS THAT CORRECT?

14     A.    WELL, THERE WAS -- THE ELECTION RETURNS ARE

15  CERTAINLY AVAILABLE.  CAMPAIGN FINANCE REPORTS WERE NOT

16  AVAILABLE, AND IT WAS DIFFICULT TO DETERMINE AT THAT POINT,

17  ALTHOUGH I KNEW THIS FROM NEWSPAPER ARTICLES, THAT HIS

18  OPPONENT WAS WHITE.

19     Q.    AND IS IT YOUR UNDERSTANDING THAT POSSIBLY THE

20  CANDIDATE FINANCE RULES WOULD HAVE BEEN DIFFERENT IN THE '70S,

21  IN TERMS OF ETHICS REQUIREMENTS?

22     A.    THE CAMPAIGN FINANCE RULES WERE DEFINITELY DIFFERENT

23  IN THE '70S.  I THINK THEY CHANGED SOMEWHERE IN THE LATE '80S

24  AND HAVE BEEN FAIRLY CONSISTENT.

25     Q.    OKAY.  I'D LIKE TO JUST TURN YOUR ATTENTION TO

1  PAGE 2O OF YOUR REPORT WHERE YOU TALK ABOUT CONCLUSION.

2      **A.**   OKAY.

3      **Q.**   AND JUST GENERALLY LOOKING AT YOUR REPORT, DO YOU

4  SEE NUMEROUS PLACES WHERE RACE IS CONSIDERED AND TALKED ABOUT?

5  JUST ON THIS PAGE ALONE.

6      **A.**   YES.

7           **MS. FREEL:**  YOUR HONOR, I'D LIKE AT THIS TIME TO GO

8  AHEAD AND OFFER, IF NECESSARY, IT'S ATTACHED TO THE VOLUMINOUS

9  PLEADINGS THAT WE FILED HERE, BUT IF IT -- FOR EASE OF

10  REFERENCE, I CERTAINLY CAN OFFER A COPY OF HIS REPORT AND

11  SUPPLEMENTAL REPORT AT THIS TIME.

12           **THE COURT:**  I THOUGHT IT WAS IN.

13           **MS. FREEL:**  THE CVS, NOT THE REPORTS.

14           **THE COURT:**  ALL RIGHT.  THE REPORT.  ANY OBJECTION?

15           **MS. ADEN:**  NO, YOUR HONOR.

16           **THE COURT:**  ALL RIGHT.  THEN THE REPORTS ARE IN, YOU

17  ARE CORRECT.  SO THAT WOULD BE 3 AND 4?

18           **MS. FREEL:**  YES, YOUR HONOR.

19           **THE COURT:**  ALL RIGHT.  THEY'RE ADMITTED.

20           ARE YOU FINISHED WITH THE WITNESS?

21           **MS. FREEL:**  YES, YOUR HONOR, I AM.

22           **THE COURT:**  ALL RIGHT.  YOU ARE FREE TO GO, MR.

23  BEYCHOK.

24                    **(WITNESS EXCUSED.)**

25           **THE COURT:**  ALL RIGHT.  WE ARE GOING TO TAKE A BRIEF

```
1    RECESS WHILE WE GET MR. WEBER ON THE PHONE.
2                        (RECESS.)
3            THE COURT:  ALL RIGHT.  BE SEATED.
4            ALL RIGHT.  WE ARE GOING TO NOW HAVE THE HEARING ON
5    MR. WEBER, BUT LET ME LAY SOME PRELIMINARY THINGS.  FIRST AND
6    FOREMOST, COME TO THE PODIUM WHEN YOU MAKE YOUR OBJECTIONS,
7    PLEASE, AND DO NOT TALK OVER EACH OTHER.  IF YOU ASK A
8    QUESTION, LET THE WITNESS ANSWER IT BEFORE YOU ASK SOMETHING
9    ELSE, AND THAT WILL, I THINK, HELP EVERYTHING ALL THE WAY
10   AROUND.
11           ALL RIGHT.  PROCEED.
12           GOOD MORNING, MR. WEBER.
13           THE WITNESS:  GOOD MORNING, YOUR HONOR.
14                   DIRECT EXAMINATION
15   BY MS. FREEL:
16       Q.   GOOD MORNING, DR. WEBER.
17            IT'S ANGELIQUE.  HOW ARE YOU?
18       A.   GOOD MORNING.
19       Q.   I THINK MY BACK MIGHT BE TO YOU, AND I APOLOGIZE FOR
20   THAT.
21           THE CLERK:  WE CAN TURN THE PODIUM.
22           MS. FREEL:  OKAY.
23   BY MS. FREEL:
24       Q.   DR. WEBER, I JUST WANT TO MAKE SURE THAT YOU ONLY
25   HAVE YOUR -- I HAD ASKED YOU TO BRING COPIES OF YOUR REPORTS,
```

1    AND THAT'S ALL YOU HAVE, RIGHT?

2         A.    YES.   MY TWO REPORTS.

3         Q.    OKAY.   GREAT.

4               AND EXHIBIT A AND B TO THE FIRST REPORT; IS THAT

5    CORRECT?

6         A.    YES.   THE APPENDICES OR THE ATTACHMENTS TO THE FIRST

7    REPORT.

8         Q.    OKAY.

9         A.    TWO ATTACHMENTS.

10        Q.    OKAY.   GREAT.   THANK YOU.

11              CAN YOU GO AHEAD AND PLEASE STATE YOUR NAME FOR THE

12   RECORD.

13        A.    RONALD E. WEBER, SPELLED W-E-B-E-R.

14        Q.    AND JUST AS A PRELIMINARY MATTER, I KNOW THAT YOU

15   HAD MENTIONED TO US THAT YOU ARE ILL RIGHT NOW, SO IF AT ANY

16   TIME YOU NEED TO TAKE A BREAK, PLEASE LET US KNOW.

17        A.    I UNDERSTAND, YES.

18        Q.    OKAY.   AND WHAT IS YOUR OCCUPATION?

19        A.    I'M A RETIRED POLITICAL SCIENTIST.

20        Q.    DO YOU ALSO CONSIDER YOURSELF A DEMOGRAPHER?

21        A.    YES.   WELL, I -- MY TRAINING IS BOTH IN POLITICAL

22   SCIENCE AND DEMOGRAPHY, YES.

23        Q.    AND WHERE DO YOU CURRENTLY RESIDE?

24        A.    I RESIDE IN THE STATE OF OREGON, PORTLAND, OREGON.

25        Q.    AND WHAT IS YOUR PRESENT TITLE?

1    **A.**   I'M THE PROFESSOR EMERITUS.  I'M THE WILDER CRANE

2    PROFESSOR EMERITUS OF GOVERNMENT AT THE UNIVERSITY OF

3    WISCONSIN, MILWAUKEE, AND I'M THE FORMER AND CO-EDITOR OF

4    STATE POLITICS AND POLICY QUARTERLY, A JOURNAL, AND ALSO A

5    FORMER CO-EDITOR OF THE JOURNAL OF POLITICS, WHICH I EDITED

6    WHEN I WAS AT LSU.

7    **Q.**   OKAY.  THE JOURNAL OF POLITICS IS -- I'M SORRY.  WE

8    JUST CAN'T HEAR YOU VERY WELL, SO I'M JUST RESTATING -- THAT'S

9    CORRECT?

10   **A.**   OKAY.  IT'S THE JOURNAL OF POLITICS, AND I WAS

11   CO-EDITOR OF THAT WHEN I WAS AT LSU.

12   **Q.**   AND CAN YOU DESCRIBE BRIEFLY THE SUBJECT MATTER OF

13   YOUR SPECIALITY?

14   **A.**   WELL, IN THE CONTEXT OF A CASE LIKE THIS, I DO

15   ANALYSIS OF WHAT WE CALL "AGGREGATE LOADING DATA," DATA THAT

16   WE COLLECT AT THE PRECINCT OR ELECTION DISTRICT LEVEL, AND I

17   ANALYZE THAT IN RELATIONSHIP TO THE MAKEUP OF THE SUBGROUPS

18   THAT WE'RE LOOKING AT.  IN THIS CASE, IT TURNS OUT TO BE

19   AFRICAN AMERICAN AND NON-AFRICAN AMERICAN POPULATIONS.  I'VE

20   ALSO HAD EXTENSIVE EXPERIENCE IN DEVELOPING AND EVALUATING

21   REDISTRICTING PLANS FOR STATE AND LOCAL CLIENTS, ALSO IN THE

22   CONTEXT OF LITIGATION BY PLAINTIFFS.  AND IN THIS PARTICULAR

23   CASE, I HAVE EXPERIENCE WITH TERREBONNE PARISH IN THAT IN THE

24   EARLY 1990S, I WAS A CONSULTANT TO THE PARISH -- TERREBONNE

25   PARISH COUNCIL AND THE SCHOOL BOARD ON THEIR LOCAL

1    REDISTRICTING PLANS.

2        Q.    AND YOU MENTIONED THAT YOU HAVE EXPERIENCE DOING

3    REDISTRICTING FOR LITIGATION, BUT DID YOU DO REDISTRICTING

4    PROJECTS FOR NON-LITIGATION REASONS?

5        A.    YES.   YES.   I PROBABLY HAD MORE EXPERIENCE DOING

6    THAT.   AND, AGAIN, I HAD MY BUSINESS IN GONZALES, LOUISIANA

7    FROM 1984 TO 2005.   WE HAD EXTENSIVE EXPERIENCE, PARTICULARLY

8    IN LOUISIANA, WORKING WITH CITIES, SCHOOL BOARDS, POLICE

9    JURIES, PARISH COUNCILS, ON THEIR LOCAL REDISTRICTING PLANS,

10   AND DEVELOPED THE PLANS FOR THEM, WORKED THEM THROUGH THE

11   PROCESS TO WHICH THEY WOULD GET APPROVAL OF THE RELEVANT

12   GOVERNING BODY.   AND THEN I DID ALL OF THE PRECLEARANCE WORK,

13   HELPING THEM TO GET PRECLEARANCE THROUGH THE DEPARTMENT OF

14   JUSTICE IN WASHINGTON.

15       Q.    AND HAVE YOU EVER DONE REDISTRICTING WORK FOR THE

16   STATE LEGISLATURE OR EMPLOYEES OF THE LOUISIANA LEGISLATURE?

17       A.    YES.   WHEN I - I CAME TO BATON ROUGE IN 1979, TO

18   TAKE A POSITION AS A PROFESSOR OF POLITICAL SCIENCE AT LSU AND

19   ALSO DIRECTOR OF THE INSTITUTE OF GOVERNMENTAL RESEARCH.   AND

20   ONE OF THE THINGS THAT THE UNIVERSITY ASKED ME TO DO WAS TO

21   REACH OUT TO THE STATE AGENCIES AND THE LEGISLATURE AND TRY TO

22   ASSIST THEM ON PARTICULAR THINGS.   AND IN THAT PARTICULAR

23   CASE, A 1980 CENSUS HAD JUST BEEN CONDUCTED.   THEY WERE

24   LOOKING FOR TECHNICAL HELP IN DEVELOPING DATABASES AND

25   COMPUTER -- THEY WERE EARLY STAGES OF COMPUTERIZATION -- AND

1   SO I WOULD WORK TO ASSIST, USING UNIVERSITY RESOURCES, TO --

2   WITH THE REDISTRICTING OF THE STATE LEGISLATURE AND THE

3   CONGRESSIONAL DISTRICTS, RIGHT AFTER THE 1980 CENSUS.  THIS

4   WOULD HAVE BEEN 1981, 1982.

5       Q.    NOW, HAVE YOU DONE YOUR TYPE OF SPECIALIZED WORK ON

6   THE BEHALF OF PLAINTIFFS AND DEFENDANTS?

7       A.    I'VE WORKED FOR BOTH SIDES, BUT I THINK IF WE WERE

8   TO LOOK THROUGH THE CASES, WE'D PROBABLY DISCOVER THAT I'VE

9   WORKED MORE OFTEN FOR DEFENDANTS THAN PLAINTIFFS.

10         THE PLAINTIFF WORK HAS PRIMARILY BEEN WHAT WE CALL

11  THE CASES THAT GREW OUT OF THE *SHAW VERSUS RENO* DECISION IN

12  THE EARLY 1990S, WHERE PLAINTIFFS WERE CHALLENGING RACIAL

13  REDISTRICTING OF CONGRESSIONAL DISTRICTS AND STATE LEGISLATIVE

14  DISTRICTS.  AND I WORKED ON A BUNCH OF THOSE CASES WHERE I WAS

15  WORKING FOR PLAINTIFFS.

16      Q.    NOW, HAVE YOU, ON OCCASION, SERVED AS AN EXPERT FOR

17  PLAINTIFF'S COUNSEL IN THIS CASE, MR. RON WILSON?

18      A.    YES.  IT TURNS OUT THAT I MET MR. WILSON, I THINK,

19  IN THE LATE '80S.  ANOTHER PERSON INVOLVED IN THE CASE,

20  PROFESSOR RICHARD ENGSTROM, WAS I THINK WORKING ON A CASE IN

21  JEFFERSON PARISH WHERE HE WAS GOING TO DO THE VOTING ANALYSIS,

22  AND HE RECOMMENDED ME TO MR. WILSON TO SERVE AS A DEMOGRAPHER

23  TO WORK ON DEVELOPING AN ILLUSTRATIVE PLAN TO OFFER TO THE

24  COURT FOR THE PURPOSES OF MEETING PRONG ONE OF *GINGLES*.

25      Q.    SO DR. RICHARD ENGSTROM, THAT IS AN EXPERT PRESENTLY

| 1 | IN THIS CASE, RECOMMENDED YOU TO MR. RON WILSON AS AN EXPERT |

1    IN THIS CASE, RECOMMENDED YOU TO MR. RON WILSON AS AN EXPERT

2    ON *GINGLES* ONE; IS THAT CORRECT?

3        **A.**    THAT IS CORRECT.   YES.

4        **Q.**    AND YOU SERVED AS AN EXPERT FOR *GINGLES* ONE; IS THAT

5    CORRECT, IN THAT CASE?

6        **A.**    YES, IN THAT CASE.  IT WAS A CHALLENGE TO THE

7    JEFFERSON PARISH COUNCIL, SYSTEM OF ELECTIONS.

8        **Q.**    AND WERE THERE SOME DIFFICULTIES IN DRAWING THE

9    DISTRICT THERE?

10       **A.**    YES.  IT WAS A BIT DIFFICULT BECAUSE THE AFRICAN

11   AMERICAN CONCENTRATIONS IN JEFFERSON PARISH ARE PRIMARILY ON

12   THE WEST BANK, RUNNING FROM GRETNA THE -- I GUESS I WANT TO

13   SAY THE EAST SIDE OF THE PARISH OVER TO -- ALMOST TO THE

14   BRIDGE WHERE YOU CROSS OVER TO GET INTO THE EAST BANK OF

15   JEFFERSON PARISH.  BUT THEN THERE WASN'T SUFFICIENT POPULATION

16   TO DO IT JUST THERE.  YOU HAD TO GO UP INTO KENNER AND BRING A

17   CONCENTRATION BACK TO THE AFRICAN-AMERICAN PERSONS IN KENNER

18   INTO THE DISTRICT, SO IT DIDN'T CREATE A VERY BEAUTIFUL

19   ILLUSTRATIVE DISTRICT.

20       **Q.**    AND WERE THERE PROBLEMS THAT REQUIRED THE DISTRICT

21   TO BE REDRAWN, SO THEY COULD ULTIMATELY SATISFY THE *GINGLES*

22   ONE?

23       **A.**    WELL, EVENTUALLY, THE PLAINTIFFS WON THE CASE.  I

24   DON'T REALLY REMEMBER PRECISELY WHETHER OR NOT THE JUDGE

25   ACCEPTED OR REJECTED MY ILLUSTRATIVE REDISTRICTING.

1    Q.    NOW, YOU MENTIONED THAT YOU DEVELOPED REDISTRICTING

2  PLANS FOR THE PARISH COUNCIL AND THE SCHOOL BOARD IN

3  TERREBONNE PARISH.  WAS THAT AS A RESULT OF THE REDUCTION IN

4  THE NUMBER OF SEATS FROM -- IT WAS EITHER 16 OR 15 TO 9?

5    A.    IT WAS REALLY TWO FACTORS THAT CAME INTO PLAY.

6  FIRST OF ALL, THE 1990 CENSUS HAD BEEN TAKEN, AND SO THAT

7  POPULATION ADJUSTMENTS WOULD HAVE HAD TO OCCUR IF THEY STUCK

8  WITH THEIR OLD SYSTEM, BUT THE PARISH COUNCIL DECIDED AT THAT

9  TIME -- I THINK IT WAS PROBABLY BECAUSE OF THE VOTER.  YOU

10 KNOW, THEY WENT TO THE VOTERS AND ASKED THE VOTERS TO APPROVE

11 A REDUCTION FROM 15 POLICE JURY TO A PARISH COUNCIL SYSTEM.

12 SO I ASSISTED THE PARISH COUNCIL, AND BECAUSE THE SCHOOL BOARD

13 ALSO WAS OPERATING WITH NINE DISTRICTS AT THAT TIME, THEY

14 DECIDED TO COOPERATE WITH THE SCHOOL DISTRICT, AND SO WE

15 WORKED TOGETHER WITH BOTH BODIES TO DRAW UP A PLAN IN WHICH

16 THE DISTRICTS WERE EXACTLY THE SAME FOR EACH OF THE TWO

17 BODIES.

18    Q.    SO YOU HAVE SPECIFIC PERSONAL KNOWLEDGE WITH REGARD

19 TO THE GEOGRAPHY OF TERREBONNE PARISH OUTSIDE OF THIS

20 LITIGATION; IS THAT ACCURATE?

21    A.    YES.  AND, OBVIOUSLY, IN THAT KIND OF A CONTEXT, YOU

22 GO TO THE PARISH, AND YOU MEET WITH THE PARISH OFFICIALS.  YOU

23 SIT DOWN WITH THEM AND YOU TALK WITH THEM ABOUT THE GEOGRAPHY

24 AND HOW IT SHOULD -- YOU KNOW, HOW THE PEOPLE AND THE

25 GEOGRAPHY SHOULD RELATE TO EACH OTHER, SO YOU'D GET ALL THAT

1   KIND OF LOCAL INPUT, AND SO I GOT THAT IN THE 1990S WHEN I WAS

2   DOING THEIR PLANS FOR THE PARISH COUNCIL AND SCHOOL BOARD.

3       Q.    AND WHAT ACADEMIC DEGREES DO YOU HOLD AND WHERE WERE

4   THEY OBTAINED?

5       A.    OKAY.  WELL, I'M A LITTLE DATED.  MY BACHELOR'S

6   DEGREE IS FROM MACALESTER COLLEGE IN ST. PAUL, MINNESOTA,

7   1964, AND THEN I WENT ON TO GRADUATE SCHOOL AT SYRACUSE

8   UNIVERSITY IN SYRACUSE, NEW YORK, AND I COMPLETED A PHD IN

9   1969.  AND THERE MY SPECIALITIES WERE AMERICAN STATE POLITICS,

10  VOTING BEHAVIOR, AND QUANTITATIVE ANALYSES OF POLITICAL DATA.

11      Q.    AND THEN DID YOU HAVE SPECIALIZED DEGREE TRAINING?

12      A.    YES.  ONE OF THE BENEFITS OF GRADUATE SCHOOL IN

13  SYRACUSE WAS THAT THEY WERE A MEMBER OF A LARGER ORGANIZATION

14  AT THE UNIVERSITY OF MICHIGAN CALLED "INTER-UNIVERSITY OF

15  CONSORTIUM FOR POLITICAL RESEARCH."  AND THEY RAN AN ADVANCED

16  PROGRAM IN METHODS, A SUMMER PROGRAM, AND I JUST WENT TO THAT

17  PROGRAM AND TOOK SIX HOURS OF ADVANCED METHODOLOGICAL TRAINING

18  IN THEIR PROGRAM IN THE SUMMER OF 1966.

19      Q.    AND THEN DID YOU ALSO DO RESEARCH FOR THE UNIVERSITY

20  OF MICHIGAN, OR IS IT THE SAME THING?

21      A.    NOT IN THAT SENSE.  I MEAN, I DID PAPERS FOR BOTH

22  COURSES.

23      Q.    OKAY.  SORRY.

24          NOW, WHAT POSITIONS HAVE YOU HELD SINCE COMPLETION

25  OF FORMAL EDUCATION AND THE LENGTH OF TIME OF THOSE POSITIONS?

1          A.     WELL, MY FIRST POSITION WAS AT INDIANA UNIVERSITY IN

2    BLOOMINGTON, INDIANA.   WENT THERE IN THE FALL OF 1969.   I WAS

3    AN ASSISTANT PROFESSOR, AND THEN AN ASSOCIATE PROFESSOR, AND

4    THEN AN ASSOCIATE PROFESSOR WITH TENURE.   AND I WAS THERE FOR

5    TEN YEARS.

6          AND THEN AN OPPORTUNITY CAME UP, LSU WAS LOOKING FOR

7    SOME HELP WITH ACCREDITATION OF THEIR PHD PROGRAM, AND I WAS

8    SORT OF ANTSY BY THEN, IN TERMS OF LIVING IN INDIANA, AND SO I

9    MADE AN APPLICATION AND WAS SUCCESSFUL IN GAINING THAT

10   POSITION.   AND THAT BROUGHT ME DOWN TO LSU IN 1979 AS A FULL

11   PROFESSOR OF POLITICAL SCIENCE WITH TENURE.   AND I DID THAT

12   FOR 11 YEARS AT LSU.

13         1990, MY WIFE'S ELDERLY PARENTS WERE BEGINNING TO

14   FAIL IN HEALTH AND SHE SAID, WELL, WE REALLY PROBABLY SHOULD

15   RETURN TO THE MIDWEST.   I HAD GONE UP TO MINNESOTA, AND SO WE

16   FOUND A POSITION AT THE UNIVERSITY OF WISCONSIN, MILWAUKEE,

17   HAD TURNED OUT TO BE AN ENDOWED CHAIR CALLED THE WILDER CRANE

18   PROFESSOR OF GOVERNMENT, AND I WENT THERE AND DID THAT FOR 15

19   YEARS.

20         SO THAT'S MY ACADEMIC EXPERIENCE.   I RETIRED FROM

21   FORMAL TEACHING IN THE SPRING OF 2005, WITH THE UNIVERSITY OF

22   WISCONSIN, MILWAUKEE.

23         Q.     NOW, HAVE YOU TESTIFIED IN MOST VOTING RIGHTS CASES

24   IN LOUISIANA?

25         A.     I THINK I'VE TESTIFIED PROBABLY IN SEVEN OR EIGHT

1    CASES.  I'VE PROBABLY WORKED IN A COUPLE OF ADDITIONAL ONES

2    THAT NEVER WENT TO TRIAL.  I REMEMBER THE *GLASPER* CASE IN

3    BATON ROUGE; I SPENT SEVERAL YEARS WORKING ON THAT CASE, BUT

4    THAT CASE NEVER WENT TO TRIAL.  BUT I HAVE DONE CASES IN THE

5    EASTERN DISTRICT AND MIDDLE DISTRICT AND, OF COURSE, THE

6    WESTERN DISTRICT UP IN SHREVEPORT AND MONROE.

7        Q.    AND WERE YOU AN EXPERT IN THE *CLARK* CASE IN THE

8    EARLY '90S?

9        A.    YES.  I WAS THE EXPERT IN THE *CLARK VERSUS EDWARDS,*

10   *ROEMER* AND *EDWARDS*.  IT HAD THREE DIFFERENT TITLES.

11       Q.    NOW, HAVE YOU WORKED ON ANY POLITICAL CAMPAIGNS?

12       A.    ONE OF THE THINGS THAT I DID, I DIDN'T MENTION MY

13   FULBRIGHT EXPERIENCE IN 1980 TO '83 IN JAPAN.  BUT, ANYWAY,

14   WHEN I CAME BACK FROM JAPAN, IT WAS PRETTY CLEAR THAT THE

15   UNIVERSITY WASN'T REALLY HAPPY WITH ME DOING PRIVATE

16   CONSULTING WORK THROUGH THE UNIVERSITY.  IN OTHER WORDS, I

17   COULDN'T USE THE COMPUTER CENTER AND THE COMPUTER RESOURCES.

18   I HAD BEEN DOING THAT PRIOR TO THAT AND WAS PAYING FOR THAT,

19   YOU KNOW, AT THE STANDARD CHARGES AT THE UNIVERSITY, THE

20   UNIVERSITY APPLIED.

21          SO ANYWAY, I MET UP WITH A GUY IN GONZALES NAMED

22   CHESTER J. DIEZ, JR., D-I-E-Z, AND HE SAID, RON, WHY DON'T YOU

23   THINK ABOUT MAYBE WE OUGHT TO SET UP A POLITICAL CONSULTING

24   BUSINESS AND WE DID.  AND WE DID THAT IN 1984.  AND I KEPT

25   THAT GOING FOR ABOUT 21 YEARS, 22 YEARS.  CLOSED THAT DOWN IN

1    2005.

2          BUT ANYWAY, WHAT THE BUSINESS DID WAS WE STARTED OUT

3    WITH A VISION THAT WE WERE GOING TO WORK IN POLITICAL

4    CAMPAIGNS.   AND WE DID SOME WORK IN POLITICAL CAMPAIGNS.   I

5    REMEMBER VIVIDLY WORKING FOR KEVIN REILLY, WHEN HE RAN FOR

6    STATE TREASURER, I THINK, IN THE LATE '80S.   AND I WORKED ON A

7    COUPLE OF THE DOUG GREEN CAMPAIGNS, A NAME OUT OF THE PAST,

8    OBVIOUSLY.   AND I WORKED ON SOME JUDICIAL CAMPAIGNS ALSO IN

9    1980.

10          AND ONE OF THE THINGS THAT'S ON MY CV, BUT I HAVEN'T

11    REALLY TALKED ABOUT IT IS WHEN I WAS LIVING IN BLOOMINGTON,

12    INDIANA AND WORKING AT INDIANA UNIVERSITY, I WAS ACTIVE IN

13    POLITICS THERE, SO I HAD A LOT OF, YOU KNOW, EXPERIENCE.   I

14    ACTUALLY RAN FOR POLITICAL OFFICE, HAD ONE POLITICAL OFFICE,

15    AT THE COUNTY LEVEL IN MONROE COUNTY IN INDIANA.   SO I HAD A

16    LOT OF THAT EXPERIENCE.   CHESTER HAD EVEN MORE EXPERIENCE AT

17    THAT TIME, MY PARTNER.   SO WE STARTED DOING THAT.

18          AND THEN, EVENTUALLY, I GOT THE FIRST PHONE CALL

19    ABOUT LITIGATION.   IT CAME FROM YOUR OFFICE, THE ATTORNEY

20    GENERAL'S OFFICE, KENNETH DEJEAN, CALLED AND HE HAD A CASE IN

21    THE EASTERN DISTRICT CALLED *QUANT* AND I THINK IT MIGHT HAVE

22    BEEN *EDWARDS*, BUT I'M A LITTLE VAGUE ON THE DEFENDANT.   BUT IT

23    WAS A CASE WHERE -- JESSIE JACKSON CAMPAIGN IN 1984, AND

24    THAT'S THE FIRST TIME I BECAME INVOLVED ANY KIND OF EXPERT

25    WORK IN LITIGATION.

1    Q.    HAVE YOU AUTHORED ANY PUBLICATIONS IN YOUR FIELD?

2    A.    YES.  I'VE HAD SOME GOOD FORTUNE, I GUESS, HAVING

3    EDITORS LIKE SOME OF MY WORK THAT I PUBLISHED IN THE AMERICAN

4    POLITICAL SCIENCE REVIEW, I PUBLISHED IN THE JOURNAL OF

5    POLITICS, PUBLISHED IN MIDWEST JOURNAL OF POLITICAL SCIENCE,

6    LEGISLATIVE STUDIES QUARTERLY, POLITY, POLITICAL GEOGRAPHY,

7    THE MICHIGAN LAW REVIEW -- I DIDN'T HAVE AN ARTICLE IN THE

8    MICHIGAN LAW REVIEW.  BUT THERE ARE SEVEN OR EIGHT OR NINE

9    JOURNALS.  AND THERE'S SEVERAL PAGES IN MY CV THAT CERTIFY

10   EVERYTHING THAT I'VE DONE IN TERMS OF PEER-REVIEWED

11   PUBLICATION.

12   Q.    SO AT THE CONCLUSION OF YOUR TESTIMONY TODAY, IF I

13   OFFER AND INTRODUCE WHAT YOU HAVE MARKED AS EXHIBIT A, WHICH

14   IS YOUR CV, AND EXHIBIT B, YOUR CASE LIST, IT WILL HAVE A MORE

15   COMPREHENSIVE LIST OF THIS INFORMATION THAT WOULD BE ACCURATE;

16   IS THAT CORRECT?

17   A.    YES.

18   Q.    OKAY.

19   A.    YES.

20   Q.    OKAY.

21   A.    THAT IS COMPREHENSIVE AND IT IS UP TO DATE, AS OF

22   THE FILING OF THE INITIAL REPORT IN THIS CASE IN 2015.

23   Q.    AND IT HASN'T BEEN UPDATED SINCE 2015, CORRECT?  I

24   MEAN, JUST SO IT'S CLEAR.  THE ONE THAT I'M GOING TO BE

25   OFFERING TODAY IS THE ONE THAT WAS ATTACHED TO THE -- YOUR

1    REPORT THAT WAS IN 2015.  SO I'M JUST LETTING YOU KNOW.

2        A.    THAT'S CORRECT.

3        Q.    ALL RIGHT.  DO YOU HOLD MEMBERSHIP IN ANY

4    PROFESSIONAL SOCIETIES, ASSOCIATIONS, OR ORGANIZATIONS?

5        A.    CURRENTLY, I'M A MEMBER OF THE AMERICAN POLITICAL

6    SCIENCE ASSOCIATION, THE SOUTHERN POLITICAL SCIENCE

7    ASSOCIATION, AND THE MIDWEST POLITICAL SCIENCE ASSOCIATION.  I

8    ONCE WAS A MEMBER OF SEVERAL OTHER ASSOCIATIONS AS WELL.

9        Q.    HAVE YOU RECEIVED ANY HONORS, ACKNOWLEDGMENTS, OR

10   AWARDS IN YOUR FIELD?

11       A.    I THINK I'LL JUST MENTION A COUPLE.  WHEN I WAS AT

12   LSU, WE COLLABORATED WITH SOUTHERN UNIVERSITY ON A PROGRAM TO

13   SERVE THE AMERICAN POLITICAL SCIENCE ASSOCIATION BY PROVIDING

14   A SUMMER PROGRAM IN WHAT WE CALL THE SCOPE AND METHODS OF

15   POLITICAL SCIENCE FOR ASPIRING UNDERGRADUATES WHO MIGHT

16   CONCEIVABLY WANT TO GO TO GRADUATE SCHOOL IN POLITICAL

17   SCIENCE.  IT WAS SPONSORED BY THIS COMMITTEE ON THE STATUS OF

18   BLACKS IN THE AMERICAN POLITICAL SCIENCE ASSOCIATION.  AS THAT

19   PROGRAM CONCLUDED, THEY GAVE ME AND THE OTHER INSTRUCTORS IN

20   THE PROGRAM AN AWARD OF RECOGNITION FOR EXEMPLARY SERVICE, AND

21   I THINK THAT WAS IN 1989, AT THE MEETING OF THE AMERICAN

22   POLITICAL SCIENCE ASSOCIATION.

23            SUBSEQUENT TO THAT, THE SOUTHERN POLITICAL SCIENCE

24   ASSOCIATION AWARD, IT WAS CALLED THE MANNING J. DAUER AWARD,

25   WHICH IS SORT OF AN AWARD FOR DISTINGUISHED SERVICE TO THE

1  PROFESSION.   AND THEN, FINALLY, THERE'S AN ORGANIZED SECTION

2  WITHIN POLITICAL SCIENCE CALLED THE STATE POLITICS AND POLICY

3  SECTION, AND IN 2009, THEY GAVE ME THE CAREER ACHIEVEMENT

4  AWARD.

5       Q.   YOUR ATTACHMENT B INDICATES THAT YOU HAVE BEEN

6  RETAINED AS A CONSULTANT AND EXPERT WITNESS IN ABOUT 50

7  REDISTRICTING AND VOTING RIGHTS CASES; IS THAT ACCURATE?

8       A.   YES.   THAT IS ACCURATE AND UP TO DATE.

9       Q.   AND YOU HAVE BEEN QUALIFIED AS AN EXPERT WITNESS BY

10 THE U.S. DISTRICT COURTS IN THE MIDDLE DISTRICT, EASTERN,

11 NORTHERN, AND SOUTHERN DIVISIONS OF ALABAMA; EASTERN DISTRICT

12 OF LOUISIANA; NORTHERN DISTRICT, PANAMA CITY AND TALLAHASSEE

13 DIVISIONS; MIDDLE DISTRICT, JACKSONVILLE DIVISION, OF FLORIDA;

14 SOUTHERN DISTRICT, AUGUSTA DIVISION, OF GEORGIA; NORTHERN

15 DISTRICT, EASTERN DIVISION, OF ILLINOIS; EASTERN, MIDDLE, THE

16 WESTERN DISTRICT OF LOUISIANA; IN ADDITION TO THE EASTERN AND

17 MIDDLE DISTRICT OF MARYLAND; DISTRICT, WESTERN DIVISION, OF

18 MASSACHUSETTS; EASTERN DISTRICT, SOUTHERN DIVISION, OF

19 MICHIGAN; NORTHERN, EASTERN, WESTERN DIVISIONS, SOUTHERN,

20 HATTIESBURG DIVISION; DISTRICTS IN MISSISSIPPI; EASTERN

21 DISTRICT, MISSOURI; DISTRICT OF MONTANA, GREAT FALLS DIVISION;

22 DISTRICT OF NEBRASKA; THE EASTERN AND SOUTHERN DISTRICTS OF

23 NEW YORK; THE EASTERN DISTRICT OF NORTH CAROLINA, EASTERN

24 DIVISION; THE DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION;

25 THE NORTHERN, DALLAS DIVISION; THE SOUTHERN, HOUSTON DIVISION;

1    WESTERN, AUSTIN DIVISION; DISTRICTS OF TEXAS; EASTERN

2    DISTRICT, RICHMOND DIVISION, OF VIRGINIA; EASTERN DISTRICT OF

3    WISCONSIN; DISTRICT OF WYOMING.   AND YOU HAVE GIVEN DEPOSITION

4    ADDITIONALLY BY -- TESTIMONY BY DEPOSITION IN NUMEROUS CASES;

5    IS THAT ACCURATE?

6         A.    I THINK THAT'S AN ACCURATE LIST OF THEM.

7         Q.    OKAY.

8         A.    THE ONES IN WHICH I ACTUALLY TESTIFIED EITHER BY --

9    YOU KNOW, DIRECTLY AS AN EXPERT ADMITTED BY THE COURT OR

10   THROUGH DEPOSITION.

11        Q.    AND YOUR SERVICES, WOULD YOU AGREE, ARE AVAILABLE TO

12   PLAINTIFFS, DEFENDANTS, STATE AGENCIES, LAW ENFORCEMENT

13   AGENCIES, ANYBODY WHO WANTS TO RETAIN YOU; IS THAT ACCURATE?

14        A.    THAT'S CORRECT.   YES.

15        Q.    CAN YOU -- AND IF YOU NEED TO LOOK AT YOUR REPORT,

16   BY ALL MEANS, FEEL FREE TO DO SO.   BUT CAN YOU JUST DESCRIBE

17   BRIEFLY WHAT YOUR TASK WAS IN TERMS OF ANALYSIS HERE AND THE

18   CASE INVOLVING THE 32ND JUDICIAL DISTRICT IN TERREBONNE

19   PARISH?

20        A.    WELL, I THINK -- I DON'T REMEMBER THE CONVERSATION

21   WORD FOR WORD THAT I HAD WHEN WE BEGAN DISCUSSING MY

22   INVOLVEMENT IN THE CASE; BUT, BASICALLY, THEY WANTED ME TO

23   LOOK AT THE THREE *GINGLES* FACTORS IN TERMS OF THE POSSIBLE

24   GEOGRAPHICAL COMPACTNESS OF AN AFRICAN-AMERICAN MAJORITY

25   SUBDISTRICT IN TERREBONNE PARISH, ONE OUT OF FIVE, GIVEN THERE

1    ARE FIVE MEMBERS OF THE COURT AT THE PRESENT TIME.  AND YOU

2    ALSO WANTED ME TO EXAMINE THE VOTING BEHAVIOR FOR A SERIES OF

3    ELECTIONS, BOTH IN TERMS OF AFRICAN-AMERICAN BEHAVIOR AND ALSO

4    NON-AFRICAN AMERICAN BEHAVIOR.  AND THEN YOU ALSO ASKED ME TO

5    LOOK AT WHAT WE CALL THE NUMBER OF TOTALITY OF CIRCUMSTANCES

6    FACTORS IN THE CASE.  SO I SET THEM UP, STARTING WORKING ON

7    ALL OF THOSE FACTORS.

8         Q.    OKAY.  AND IN TERMS OF YOUR --

9              THE COURT:  WHAT ARE YOU TENDERING DR. WEBER AS?

10             MS. FREEL:  AN EXPERT -- WELL, AS A POLITICAL

11   CONSULTANT AND A DEMOGRAPHER THAT'S AN EXPERT IN -- I HAVE IT

12   WRITTEN DOWN -- SORRY.  I JUST WANT TO MAKE SURE.  BUT IN

13   ELECTIONS, HE WILL BE CONDUCTING AN EXAMINATION UNDER RACIAL

14   POLARIZATION, AND HE'LL ALSO BE COMMENTING ON TOTALITY OF

15   CIRCUMSTANCES.

16             THE COURT:  ALL RIGHT.  IS THERE ANY DISPUTE OF THE

17   QUALIFICATIONS OF DR. WEBER?

18             MR. WU:  NO, YOUR HONOR, WE DON'T DISPUTE THE

19   QUALIFICATIONS OF DR. WEBER.  WE DO DISPUTE THE RELIABILITY OF

20   THE OPINIONS THAT HE HAS RENDERED ON THE THREE *GINGLES*.

21             THE COURT:  WELL, THAT CAN BE HANDLED, THEN, AT

22   TRIAL.  SO YOU SIMPLY DISAGREE WITH THAT.

23             SO WITH THAT BEING SAID, THEN, THE COURT WILL ACCEPT

24   DR. WEBER, AS HAVE MANY OTHER COURTS, INCLUDING THIS ONE, AS

25   AN EXPERT IN POLITICAL SCIENCE AND DEMOGRAPHICS.

1          **MR. WU:**   YOUR HONOR, IF I MAY, I WOULD NOTE THAT WE

2    WOULD OBJECT TO THAT RULING BECAUSE IT IS OUR VIEW THAT DR.

3    WEBER'S TESTIMONY ON THE THREE *GINGLES* PRECONDITIONS DO NOT

4    MEET THE REQUIREMENTS OF RULE 702 OF EVIDENCE AND, THEREFORE,

5    INADMISSIBLE.   WE UNDERSTAND THAT THE COURT IS NOW LETTING DR.

6    WEBER TESTIFY TO THOSE SUBJECTS AT TRIAL.

7          **THE COURT:**   ALL RIGHT.   YOUR OBJECTION IS NOTED.

8          **MS. FREEL:**   THANK YOU, YOUR HONOR.

9          AND DR. WEBER IS SCHEDULED TO HAVE SURGERY SO THAT

10   HE CAN BE HERE FOR TRIAL, ALTHOUGH HE MAY BE TAKING A TRAIN TO

11   GET HERE.   SO I APPRECIATE THAT, DOCTOR.

12         **THE COURT:**   ALL RIGHT.   DOCTOR, I WISH YOU WELL.

13         **THE WITNESS:**   THANK YOU, SIR.

14         **THE COURT:**   ALL RIGHT.   THEN, I THINK, THAT LEAVES

15   US WITH MS. ROMIG.

16         **MS. FREEL:**   OKAY.

17         **THE COURT:**   I WOULD JUST ASK YOU TO SPEAK CLEARLY

18   INTO THAT MICROPHONE, PLEASE.

19         GOOD MORNING.

20         **THE WITNESS:**   (ROMIG) GOOD AFTERNOON.   HOW ARE YOU?

21         **THE COURT:**   FINE.

22         I JUST ASK YOU TO SPEAK CLEARLY INTO THAT

23   MICROPHONE, PLEASE.

24         **THE WITNESS:**   (ROMIG) GOOD AFTERNOON.

25         **MS. FREEL:**   IS IT AFTERNOON?

```
 1              THE WITNESS:  (ROMIG) I THINK SO.  ALMOST, SO . . .
 2   BY MS. FREEL:
 3        Q.   CAN YOU STATE YOUR NAME FOR THE RECORD, PLEASE.
 4        A.   ANGELE CARRIERE ROMIG.
 5        Q.   AND WHAT IS YOUR OCCUPATION, MS. ROMIG?
 6             THE REPORTER:  SHE NEEDS TO BE SWORN.
 7             MS. FREEL:  OH, SORRY.  THANK YOU.
 8             (WHEREUPON, ANGELE C. ROMIG, HAVING BEEN DULY SWORN,
 9   TESTIFIED AS FOLLOWS.)
10                        DIRECT EXAMINATION
11   BY MS. FREEL:
12        Q.   AND WHAT IS YOUR OCCUPATION, MS. ROMIG?
13        A.   I AM VICE-PRESIDENT AND CHIEF ADMINISTRATIVE OFFICER
14   OF GCR, INC.  I AM A CONSULTANT.  I WAS -- I HAVE FORMERLY
15   BEEN THROUGH MY 30 YEARS WITH THE COMPANY A PROJECT MANAGER, A
16   PROGRAM MANAGER, AND NOW I'M IN EXECUTIVE MANAGEMENT.
17        Q.   WHAT WAS THE FORMER NAME OF GCR, INC.?
18        A.   GREGORY C. RIGAMER & ASSOCIATES.
19        Q.   AND DO YOU CONSIDER YOURSELF HAVING BEEN THE
20   RIGHT-HAND TO MR. GREGORY RIGAMER?
21        A.   YES.  FOR 26 YEARS, I WORKED WITH MR. RIGAMER IN ALL
22   CAPACITIES OF PROJECT DELIVERY, OVERALL BUSINESS DEVELOPMENT,
23   AND THE GROWTH OF THE COMPANY TO WHERE WE ARE TODAY.
24        Q.   AND DID THAT WORK ALSO INVOLVE POLITICAL CONSULTING?
25        A.   YES, IT DID.  FOR A NUMBER OF YEARS.
```

```
1        Q.    AND WHEN DID THE COMPANY, GCR, INC., STOP DOING THE
2   POLITICAL CONSULTING?
3        A.    ON DECEMBER 31ST, 2011, GREGORY C. RIGAMER WAS
4   ACQUIRED BY A PRIVATE EQUITY GROUP, AND BEGINNING IN JANUARY
5   OF 2012, WE WERE ASKED TO CEASE AND DESIST WITH POLITICAL
6   WORK.   THEY DID NOT WANT US DOING THAT TYPE OF WORK ANYMORE.
7   AND AT THAT POINT, MR. RIGAMER STARTED A SEPARATE COMPANY FOR
8   POLITICAL CONSULTING.
9        Q.    AND IS IT YOUR UNDERSTANDING THAT IT WAS IN PART DUE
10  TO FEDERAL LAWS AND OTHER REGULATIONS THAT LIMITED THE ABILITY
11  FOR GCR TO CONTINUE TO DO THAT WORK WHEN THEY WERE -- ONCE
12  THEY BECAME A PRIVATE EQUITY GROUP?
13       A.    YES.   AS PART OF THE PORTFOLIO, THE REPORTING
14  REQUIREMENTS WITH SECURITIES & EXCHANGE, IT WAS DEEMED JUST
15  TOO COMPLICATED, AND IT WAS IMPORTANT FOR US TO STOP THAT
16  WORK.
17       Q.    OKAY.   NOW, HAVE YOU BEEN PROJECT DIRECTOR FOR
18  PROJECTS FOR THE STATE OF LOUISIANA?
19       A.    YES, I HAVE.
20       Q.    AND, SPECIFICALLY, WOULD THAT INCLUDE THE ELECTIONS,
21  REGISTRATION, APPLICATION WHICH WE COMMONLY REFER TO AS
22  "ERIN"?
23       A.    YES.   I WAS PROJECT DIRECTOR ON THAT PROJECT
24  BEGINNING IN 2005.
25       Q.    OKAY.   I'M GOING TO GO BACK TO THAT, BUT WHAT ABOUT
```

1   "QUORA", WHAT WAS THAT?

2        A.    IN 2008, I WAS PROJECT DIRECTOR ON THE COMMERCIAL

3   ONLINE BUSINESS REGISTRATION APPLICATION, NICKNAME "QUORA."

4   THIS IS THE BUSINESS REGISTRATION FOR THE STATE OF LOUISIANA.

5             GCR COMPETITIVELY WON THAT PROJECT FOLLOWING OUR

6   WORK WITH ERIN.  WE'RE STILL ON BOARD AS THE CONTRACTOR OF

7   RECORD FOR MAINTENANCE AND SUPPORT FOR BOTH OF THOSE SYSTEMS.

8        Q.    OKAY.  AND THE "SLABS," WHAT'S THAT?

9        A.    IN -- WELL, BASICALLY, IN 1986, GCR DID THE

10  STATEWIDE INVENTORY FOR LAND AND BUILDINGS.  THAT WAS WHEN I

11  WAS ORIGINALLY HIRED AT GCR.  AND THAT LAND AND BUILDING

12  INVENTORY, LATER YEARS, BECAME AN ELECTRONIC ONLINE

13  APPLICATION FOR THE STATE'S REAL PROPERTY ASSETS.  THAT DATA

14  HAS SINCE BEEN MIGRATED TO THE STATE OF LOUISIANA'S ERP

15  SYSTEM.  BUT AN ONLINE INTERNET VERSION IS AVAILABLE FOR STATE

16  AGENCIES TO USE AS WELL.

17       Q.    NOW, YOU MENTIONED THAT AT ONE TIME IT WAS ONLINE,

18  BUT IN THE ORIGINAL YEARS, DID THE WORK REQUIRE YOU TO TRAVEL

19  A LOT AROUND THE STATE?

20       A.    YES.  ALL 64 PARISHES THROUGHOUT THE STATE, VISITING

21  ALL STATE AGENCIES, WALKING ON ALL STATE PROPERTY,

22  PHOTOGRAPHING FOR A NUMBER OF YEARS.  BASICALLY FROM '86 TO

23  '89, I DID THAT.

24       Q.    OKAY.  AND WOULD THAT HAVE INCLUDED TERREBONNE

25  PARISH?

1    A.    YES.

2    Q.    OKAY.  NOW, YOU DESCRIBED GCR AS A CONSULTING FIRM.

3    IT ALSO DEVELOPS SOFTWARE APPLICATIONS AND PROVIDES BUSINESS

4    ANALYTICAL SERVICES; IS THAT ACCURATE?

5    A.    YES.  OUR CLIENT BASE IS QUITE VARIED, AND WE HAVE

6    BASICALLY DIVIDED OUR COMPANY INTO TWO SIDES.  WE HAVE THE

7    PEER-TECHNOLOGY SIDE WITH PRODUCTS AND INTELLECTUAL PROPERTY,

8    AND WE HAVE SERVICES SIDE.

9          SO IN THE SERVICES SIDE, FREQUENTLY WE ARE HIRED TO

10   DO ECONOMIC EVALUATIONS, DEMOGRAPHIC EVALUATIONS, ASSISTING ON

11   INVENTORY-TYPE WORK, REAL PROPERTY ACQUISITION.

12         ON THE IP-PRODUCT SIDE, WE DO -- WE HAVE -- THE

13   MAJORITY OF NUCLEAR POWER PLANTS IN THE UNITED STATES USE OUR

14   CHEMISTRY DATA MANAGEMENT SOFTWARE.

15         OUR AIRPORT WORK THAT WE DO IS OUR AVIATION REVENUE

16   MANAGEMENT SYSTEM.  THAT'S THROUGHOUT MID-SIZE AIRPORTS IN THE

17   UNITED STATES, WITH A COUPLE OF LARGE AIRPORTS USING IT.

18         SO IT'S A VERY DIVERSE OFFERING OF THE COMPANY.

19   WE'VE GROWN OVER THE YEARS.  WE'VE HAD TWO ACQUISITIONS UNDER

20   US.  SO OUR BREADTH OF OFFERINGS, AS FAR AS PRODUCT AND

21   SERVICES, IS PRETTY BROAD.

22   Q.    AND DO YOUR CLIENTS INCLUDE OTHER SECRETARIES OF

23   STATE BESIDES THE ONE HERE IN LOUISIANA?

24   A.    CORRECT.  CURRENTLY, WE HAVE 26 SECRETARIES OF

25   STATES THAT WE WORK FOR AROUND THE UNITED STATES.  WE'VE

1   RECENTLY JUST STARTED WORK IN NEVADA.  THAT WAS SOMETHING THAT

2   JUST GOT KICKED OFF, AN ADDITIONAL QUORA-TYPE APPLICATION.  IT

3   WILL BE A COMMERCIAL REGISTRATION, BUSINESS REGISTRATION

4   SYSTEM.

5           SO WE ARE ONE OF -- I THINK WE ARE THE TOP VENDOR

6   PROVIDING SYSTEM SERVICES TO SECRETARIES OF STATES.

7       Q.   NOW, WHAT IS YOUR PRESENT TITLE WITH GCR, INC.?

8       A.   I AM VICE-PRESIDENT AND CHIEF ADMINISTRATIVE

9   OFFICER.  I OVERSEE THE OPERATIONS OF THE OFFICE FROM THE

10  HUMAN RESOURCES SIDE TO THE FACILITIES; ALL OF THE PROJECT

11  DELIVERY SIDE AS WELL.

12      Q.   NOW, HOW LARGE IS THE COMPANY?

13      A.   WE HAVE 280 EMPLOYEES.  WE HAVE OTHER

14  SUB-CONSULTANTS THAT WE USE AS WELL, BUT FULL-TIME, 280.

15      Q.   NOW, CLEARLY, YOU HAVE A LOT OF EXPERIENCE AND YOU

16  ARE RUNNING THE COMPANY NOW.  BUT DO YOU HAVE EXPERIENCE AS A

17  DEMOGRAPHER THAT YOU UTILIZE EVEN AS CHIEF ADMINISTRATIVE

18  OFFICER NOW?

19      A.   PERIODICALLY, I'M CALLED UPON TO -- FIRST OF ALL, I

20  DO QUALITY ASSURANCE ON A LOT OF OUR PROJECTS THAT WE'RE

21  DELIVERING RIGHT NOW, WHETHER FOR HOUSING AUTHORITIES OR

22  WHATEVER.  I THINK MY YEARS OF EXPERIENCE, AS FAR AS OUR

23  QUALITY CONTROL IN REVIEWING PRODUCT BEFORE IT IS TURNED OVER

24  TO A CLIENT, I HAVE A ROLE IN THAT.  BUT PERIODICALLY, I AM

25  ASKED TO LOOK AT ONE PARTICULAR ISSUE AND WRITE A REPORT ON

1    IT, OR GET INVOLVED WITH A GROUP AND WRITE A REPORT.

2            EXAMPLES, THE SMOKING CESSATION FUND FOR THE STATE

3    OF LOUISIANA.  WE INITIALLY HELPED THEM TO IDENTIFY THE POOL

4    OF AVAILABLE APPLICANTS THAT WE THINK WOULD BE ELIGIBLE TO

5    PARTICIPATE IN THE SMOKING CESSATION PROGRAM.

6            **THE COURT:**  LET ME ASK YOU TO MOVE TOWARDS DETAILS

7    OF THIS CASE.

8            **MS. FREEL:**  I'M SORRY.  YEAH, I'M TRYING TO.

9    BY MS. FREEL

10        **Q.**   IN TERMS OF YOUR DEMOGRAPHY WORK, HAVE YOU DONE

11   REDISTRICTING?

12        **A.**   YES.

13        **Q.**   AND HAVE YOU EVEN REVIEWED REDISTRICTING PLANS FOR

14   THE LEGISLATURE FOLLOWING THE 2010 CENSUS?

15        **A.**   YES.

16        **Q.**   OKAY.  WILL YOU TALK BRIEFLY ABOUT THE ERIN SYSTEM

17   WITH THE SECRETARY OF STATE.  WHAT'S THE ERIN SYSTEM?

18        **A.**   IT IS THE ELECTION'S REGISTRATION INFORMATION

19   NETWORK.  IT IS THE REPOSITORY FOR ALL VOTER REGISTRATION AND

20   ELECTION-RELATED DATA.  IT WAS A MAINFRAME APPLICATION THAT

21   WAS RUN IN FROM THE LATE '70S, AND IT WAS REWRITTEN IN 2005,

22   INTO A MORE MODERN FRAMEWORK, A SEQUEL DATABASE FRAMEWORK.

23   AND I WAS THE PROJECT DIRECTOR ON IT BEGINNING IN 2005.

24        **Q.**   AND DOES THE SECRETARY OF STATE STILL MAINTAIN A

25   CONTRACT WITH GCR, INC. WITH REGARD TO THE ERIN PROJECT?

1     **A.**    YES.   THROUGH A COMPETITIVE BID EVERY THREE YEARS,

2     WE HAVE SUCCESSFULLY MAINTAINED THAT CONTRACT.

3     **Q.**    ALL RIGHT.   AND DO YOU STILL DO WORK ON A PERSONAL

4     BASIS FOR THE SECRETARY OF STATE AS IT RELATES TO THE ERIN

5     SYSTEM?

6     **A.**    YES, I DO RECEIVE SPECIAL REQUESTS.

7     **Q.**    WHY WOULD THE SECRETARY OF STATE ASK YOU TO EXTRACT

8     DATA FROM THE ERIN SYSTEM AS OPPOSED TO A COMPUTER PROGRAMMER?

9     **A.**    MY KNOWLEDGE AND EXPERIENCE WITH THE DESIGN AND THE

10    DEVELOPMENT OF THE SYSTEM IS KEY.   THERE'S A DIFFERENCE

11    BETWEEN DATA AND INFORMATION.   MY RELEVANT EXPERIENCE IS BEING

12    ABLE TO EXTRACT THE DATA TO PROVIDE INFORMATION TO RESPOND TO

13    REQUESTS.   I CAN DO IT QUICKLY.   I DON'T HAVE A LEARNING CURVE

14    IN THAT REGARD.   SO, PERIODICALLY, I'M ASKED TO DO THAT.

15    **Q.**    AND WHAT ABOUT THE DATA?   IS IT LABELED BY NAME OR

16    DOES IT HAVE VALUES AND CODES?   WHAT WOULD BE DIFFICULT FOR A

17    LAYMAN TO JUST TRY TO EXTRACT DATA FROM ERIN?

18    **A.**    THE DATABASE STRUCTURE IS COMPLEX.   IT'S OVER 500

19    TABLES, ABOUT 548 TABLES, TO BE PRECISE.   IT IS DRIVEN BY

20    VALUE CODES, QUITE FREQUENTLY.   YOU KNOW, WE HAVE WRITTEN

21    INTERFACES FOR THE PUBLIC TO USE THE DATA TO ACQUIRE VOTER

22    REGISTRATION AND THE LIKE.   SO THERE IS A SIMPLIFIED USER

23    INTERFACE SO THAT THE PUBLIC CAN ACQUIRE VOTER REGISTRATION

24    AND ELECTION DATA.   BUT FOR MORE COMPLEX QUERIES, HAVING

25    KNOWLEDGE AND EXPERTISE WITH THE DATABASE IS QUITE NECESSARY.

1    Q.    OKAY.   DOES YOUR WORK AS A DEMOGRAPHER HELP YOU IN

2    ORDER TO TRANSLATE AND BE FAMILIAR WITH THE DATA CONTAINED IN

3    ERIN?

4    A.    YES.   EVERYTHING IS TIED BACK TO A JURISDICTION.

5    IT'S THE PEOPLE AND THE PLACE, WHICH IS TYPICALLY WHEN WE DO A

6    DEMOGRAPHIC PROFILE, WE'RE LOOKING AT PEOPLE IN PLACE.  WE'RE

7    LOOKING AT ECONOMIC CONDITIONS WITH PEOPLE IN PLACE.  WE'RE

8    LOOKING AT GEOGRAPHY, AND THAT IS A SIMILAR STRUCTURE IN VOTER

9    REGISTRATION.  IT'S PEOPLE TIED TO PLACE AND JURISDICTIONS.

10   Q.    SO TO THIS DAY, EVEN THOUGH IT'S THE SECRETARY OF

11   STATE'S DATABASE, THEY PERSONALLY CONTACT YOU WHEN THEY HAVE

12   RESEARCH PROJECTS TO GET YOU TO EXTRACT THE DATA FROM THEIR

13   SYSTEM; IS THAT ACCURATE?

14   A.    THEY'RE ASKING ME TO WORK WITH THEM TO DEVELOP

15   INFORMATION FROM THE SYSTEM.  I'D JUST LIKE TO MAKE THAT

16   CLARIFICATION.  THE DATA, THEY COMPLETELY OWN.  WE WORK

17   TOGETHER AND RESPOND TO REQUESTS FROM -- WHETHER IT'S PUBLIC

18   LAW ENFORCEMENT TO PREPARE DATA AND INFORMATION, AND THAT'S

19   WHERE MY EXPERTISE COMES INTO PLAY.

20   Q.    AND IT WAS THE SECRETARY OF STATE THAT FIRST

21   RETAINED YOU AS AN EXPERT IN THIS CASE; IS THAT ACCURATE?

22   A.    YES.

23   Q.    AND THEN WHEN THEY WERE VOLUNTARILY DISMISSED, YOU

24   AGREED TO CONTINUE ON YOUR WORK FOR THE REMAINING STATE

25   DEFENDANTS; IS THAT ACCURATE?

| | |
|---|---|
| 1 | **A.**    YES. |
| 2 | **Q.**    OKAY.   WHAT ACADEMIC DEGREES DO YOU HOLD AND WHERE |
| 3 | WERE THEY OBTAINED? |
| 4 | **A.**    I HAVE AN UNDERGRADUATE DEGREE IN POLITICAL SCIENCE |
| 5 | FROM LOUISIANA STATE UNIVERSITY, AND I HAVE A GRADUATE DEGREE, |
| 6 | MASTER'S OF PUBLIC ADMINISTRATION, FROM LOUISIANA STATE |
| 7 | UNIVERSITY. |
| 8 | **Q.**    OKAY.   AND YOU MENTIONED THAT YOU WERE AT ONE TIME A |
| 9 | POLITICAL CONSULTANT.   HOW MANY CAMPAIGNS DID YOU WORK ON? |
| 10 | **A.**    LIKE MR. BEYCHOK SAID BEFORE, THE NUMBERS RUN |
| 11 | TOGETHER, BUT I WOULD SAY A MINIMUM OF 300. |
| 12 | **Q.**    CAN YOU LIST SOME OF YOUR CLIENTS AND WHETHER -- AND |
| 13 | ALSO, IN PARTICULARLY, IF THEY WERE MINORITY CANDIDATES IN |
| 14 | ELECTIONS? |
| 15 | **A.**    RUNS THE GAMUT FOR ME.   BEING A RESIDENT OF ORLEANS, |
| 16 | I'VE WORKED WITH MANY LOCAL CANDIDATES, THROUGH THE JUDICIARY, |
| 17 | THE CITY COUNCIL, THE MAYOR'S RACE, SUPREME COURT CANDIDATES. |
| 18 | TO NAME NAMES, MOST OF THE MAYORAL CANDIDATES IN RECENT YEARS, |
| 19 | I'VE WORKED WITH BACK TO THE FIRST MAYORAL CANDIDATE OF MARC |
| 20 | MORIAL.   I HAVE WORKED FOR CONGRESSMAN CEDRIC RICHMOND.   I |
| 21 | WORKED FOR MANY OF THE JUDGES, HERBERT CADE, SIDNEY CATES.   ED |
| 22 | LOMBARD, I WORKED FOR HIM FOR CLERK OF COURT AND FOR HIS |
| 23 | JUDICIAL RACES.   JUST MANY, MANY CANDIDATES. |
| 24 | **Q.**    WHAT ABOUT FOR THE STATE OR REPUBLICAN PARTY -- I |
| 25 | MEAN, THE DEMOCRATIC OR THE REPUBLICAN COMMITTEES? |

1    **A.**   I'VE WORKED FOR THE STATE DEMOCRATIC PARTY, EARLY

2    DAYS WITH JUDGE -- WITH GOVERNOR BLANCO.   SCOTT ARCENEAUX,

3    WORKED VERY CLOSELY WITH SCOTT.   RENEE LAPEYROLERIE, HAVE

4    WORKED WITH RENEE.   I HAVE DONE SOME PAC WORK IN THE

5    REPUBLICAN AREA BACK IN THE 2000 -- I THINK -- 6 TERM.

6         SO I'VE WORKED FOR BOTH SIDES OF THE DEMOCRATIC AND

7    THE REPUBLICAN PARTY AFFILIATIONS.

8    **Q.**   WHAT TYPE OF WORK WOULD YOU PROVIDE FOR THE

9    CANDIDATES?

10   **A.**   WITH OUR POLITICAL CONSULTING, IT'S QUITE DIFFERENT

11   THAN WHAT MR. BEYCHOK DESCRIBED BEFORE.   WE ASSIST IN

12   MICROTARGETING, AS FAR AS USING CENSUS DATA, DEMOGRAPHIC

13   INFORMATION ABOUT THE VOTERS, THEIR FREQUENCY OF VOTING.   AS

14   AN INDIVIDUAL REGISTERED VOTER, WE KNOW THE LAST 20 ELECTION

15   EVENTS THAT YOU'VE PARTICIPATED IN.   AND WE CAN CLASSIFY YOU

16   IN YOUR FREQUENCY OF VOTING.   GCR HAD A PROPRIETARY ALGORITHM

17   THAT WE USED TO GRADE VOTERS.   THAT HELPED US TO PRESENT TO

18   YOU A CANDIDATE AND YOUR CAMPAIGN MANAGER TARGET LISTS AND WHO

19   YOU NEEDED TO REACH OUT WITH TO SECURE YOUR PERCENTAGES FOR

20   VICTORY.

21        WE ALSO GAVE YOU ANALYSIS OF PAST ELECTION EVENTS TO

22   HELP YOU UNDERSTAND WHAT THE ELECTORATE WAS GOING TO POSSIBLY

23   DO IN YOUR ELECTION.

24        SO OUR POLITICAL CONSULTING WAS DATA-DRIVEN MORE SO

25   THAN, YOU KNOW, THE COMMERCIAL CONTENT, YOUR FLYERS, WHAT YOUR

1    SIGNS LOOKED LIKE.   OURS WAS REALLY ABOUT COUNTING THE VOTES.

2    THE ONLY WAY TO WIN IS TO GET MORE VOTES THAN THE NEXT GUY SO

3    WE PREPARED YOUR TARGETING LIST FOR YOU.

4         Q.    SO DATA-DRIVEN CANDIDATE SUPPORT SERVICES.   DID YOU

5    USE ELECTION RETURNS FOR PURPOSES OF PREPARING THAT DATA AT

6    TIMES?

7         A.    YES.   AND WE MAPPED THEM, WE DID DETAILED MAPS OF

8    TURNOUT, WE DID DETAILED MAPS OF DEMOGRAPHICS, AND BASED ON

9    YOU TRACKING YOUR FAVORABLES, WE COULD PROJECT FOR YOU AND DO

10   FORECASTING FOR YOU FOR WHAT ELECTION DATE WOULD LOOK LIKE.

11        Q.    AND WOULD THIS GO ALL THE WAY DOWN POSSIBLY TO THE

12   PRECINCT LEVEL?

13        A.    YES.   AT THE PRECINCT LEVEL IS WHERE WE ALWAYS

14   STARTED.

15        Q.    AND GCR, INC., DIDN'T USE THE ERIN TO DO THIS, THEY

16   PURCHASED THE DATA SEPARATELY FROM THE SECRETARY OF STATE.

17   JUST SO THAT'S CLEAR.   CORRECT?

18        A.    CORRECT.

19        Q.    OKAY.   HAVE YOU EVER TAUGHT OR LECTURED IN YOUR

20   FIELD?

21        A.    AS MICHAEL BEYCHOK MENTIONED EARLIER, THE INSTITUTE

22   OF POLITICS AT LOYALTY UNIVERSITY, DR. ED RENWICK RAN THAT.

23   AND FOLLOWING ELECTION EVENTS, I WOULD DO A PRESENTATION WITH

24   MR. RIGAMER ON THE RESULTS OF THE ELECTION.   WE DID THAT FOR

25   ABOUT EIGHT YEARS.

1         **Q.**   AND YOU MENTIONED THAT YOU HAVE BEEN WITH GCR, INC.,

2    FOR 30 YEARS.   ARE YOU LOOKING TO RETIRE SOON, AND -- OR ANY

3    TIME IN THE FUTURE AND DO YOU PLAN ON RE-ENTERING THE REALM OF

4    POLITICAL CONSULTING?

5         **A.**   WELL, I MIGHT POSSIBLY BE RETIRING.   IT'S A PLAN B

6    THAT I HAVE OUT THERE.   I DID GREATLY ENJOY IT.   THE -- LIKE I

7    SAID, THE DATA-DRIVEN SIDE WAS ALWAYS A POINT OF ENJOYMENT FOR

8    ME, AND I FELT LIKE WE HAD GREAT SUCCESS.   OUR SCORE CARD WAS

9    PRETTY WONDERFUL.   SO . . .

10        **Q.**   HAVE YOU SUBMITTED REDISTRICTING PLANS TO THE USDOJ

11   FOR PRECLEARANCE?

12        **A.**   YES.

13        **Q.**   AND HAVE YOU WRITTEN ANY ARTICLES FOR MAGAZINES OR

14   OTHER PUBLICATIONS?

15        **A.**   THE ONLY PUBLISHED ARTICLE THAT I HAVE OF RECORD IS

16   THE CAMPAIGNS AND ELECTION'S ARTICLE FROM YEARS BACK ON

17   MICROTARGETING.   MOST OF MY WRITTEN WORK IS FOR PROJECT

18   DELIVERY FOR CLIENTS, AS FAR AS COMPLETED REPORTS, DEMOGRAPHIC

19   ANALYSIS, AND THE LIKE.

20           SO PUBLICATION GENERALLY IS NOT SOMETHING THAT IS

21   PART OF MY WORK THAT I DO.   YOU KNOW, I DO DELIVERY TO

22   CLIENTS.

23        **Q.**   WAS THE ARTICLE THAT YOU JUST MENTIONED PART OF THE

24   CAMPAIGNS AND ELECTIONS MAGAZINE?

25        **A.**   YES.

1          **MS. FREEL:**  NOT TO INTRODUCE IT AS AN EXHIBIT, YOUR

2   HONOR, BUT VERY QUICKLY, I JUST WANT TO SHOW YOU AN EXAMPLE OF

3   SOME OF THE REPORTS THAT SHE ROUTINELY DOES, JUST ON THE ELMO,

4   IF THAT'S OKAY.

5          **THE COURT:**  SURE.

6          **MS. FREEL:**  THANKS.

7   BY MS. FREEL:

8      Q.   MS. ROMIG, CAN YOU JUST TELL VERY QUICKLY WHAT THIS

9   REPORT DID AND JUST ESTABLISH THAT YOU AUTHORED THE REPORT OR

10  ASSISTED WITH THE PREPARATION OF THE REPORT?

11     A.   FOLLOWING EVERY ELECTION EVENT FOR ANY OF OUR

12  CLIENTS, WE PRODUCE A COMPLETE REPORT ON THE DEMOGRAPHICS AND

13  THE VOTER TURNOUT PERCENTAGES AND WHERE THE VOTE WAS WON AND

14  LOST FOR THE CANDIDATE.  IT HELPS THEM, IT'S PART OF OUR

15  DELIVERABLE.  SO WE DO THIS FOR EVERY CANDIDATE.  THIS IS ONE

16  EXAMPLE IN ORLEANS PARISH.  LIKE I SAID, I HAVE HUNDREDS OF

17  THESE REPORTS ON MY BOOKSHELF.

18          **MS. ADEN:**  YOUR HONOR, EXCUSE ME.  JUST FOR THE

19  RECORD, I WOULD LIKE TO NOTE --

20          **THE CLERK:**  PLEASE COME TO THE PODIUM.  THOSE MICS

21  DON'T PICK UP AS WELL AS THESE DO.

22          THANK YOU.

23          **MS. ADEN:**  YOUR HONOR, JUST FOR THE RECORD, I'D JUST

24  LIKE TO NOTE THAT PLAINTIFFS HAVE NEVER RECEIVED ANY OF THESE

25  DOCUMENTS BEFORE.

1      THE COURT:   WELL, THEY ARE JUST EXAMPLES.  I MEAN, I

2   REALLY DON'T NEED THEM. SO . . .

3      MS. FREEL:   YOUR HONOR, JUST FOR CLARIFICATION.

4   THEY REQUESTED PUBLICATIONS IN THE LAST TEN YEARS.  THIS IS

5   REPORTS.  BUT, MORE IMPORTANTLY, FOR A *DAUBERT* HEARING, RULES

6   OF EVIDENCE DON'T NECESSARILY APPLY.  I'M NOT TRYING TO OFFER

7   THEM AS EXHIBITS.  I JUST WANTED TO -- FOR YOU TO UNDERSTAND

8   HOW SHE HAS USED THE DATA THAT'S AVAILABLE FOR ELECTIONS FOR

9   -- AND SHE EXTRACTS THIS DATA AND USES IT ROUTINELY SO YOU

10  COULD SEE HER METHODOLOGY.

11     THE COURT:   WELL, I THINK MS. ROMIG HAS TESTIFIED TO

12  THAT.

13     MS. FREEL:   OKAY.

14     THE COURT:   SO I THINK WE CAN MOVE ON.

15     MS. FREEL:   OKAY.   THANK YOU.

16  BY MS. FREEL:

17     Q.   HAS GCR, INC. BEEN THE RECIPIENT OF ANY AWARDS FOR

18  THEIR ELECTION WORK?

19     A.   YES.   THE NATIONAL ASSOCIATION OF THE SECRETARIES OF

20  STATE AWARDED THE "GO VOTE" MOBILE APP INNOVATION OF THE YEAR

21  AWARD IN 2013, AND I TRAVELED TO ANCHORAGE, ALASKA FOR THAT

22  CONVENTION AND RECEIVED THE AWARD WITH SECRETARY SCHEDLER.

23  YOU KNOW, A NUMBER OF INNOVATIONS THAT HAVE BEEN INTRODUCED

24  AND HAVE RECEIVED ACCLAIM IN HIS OFFICE, I'VE BEEN A PART OF.

25  AND, IN PARTICULAR, THE "GO VOTE," WHICH WAS THE FIRST OF ITS

1    KIND IN THE UNITED STATES.  I WAS VERY FORTUNATE TO RECEIVE

2    THE AWARD FOR.

3         Q.    I'M SHOWING ON THE ELMO A PUBLICATION THAT WAS IN A

4    MAGAZINE CALLED INVENTOR OF THE YEAR 2003, AND YOU BROUGHT

5    THIS, THE ACTUAL HARD COPY FROM THE -- I'M SORRY -- WHAT

6    PUBLICATION WAS IT?  CAN YOU EXPLAIN?

7         A.    WELL, IT WAS A SPECIAL PUBLICATION OF CITY BUSINESS

8    IN THE CITY OF NEW ORLEANS.  IT WAS JUST RECOGNITION OF OUR

9    WORK THAT WE HAD DONE WITH MARY LANDRIEU AND HER INITIAL

10   VICTORY OVER SUZANNE HAIK TERRELL WITH HER "GET OUT THE VOTE"

11   TECHNOLOGY THAT WE DEPLOYED.

12        Q.    AND THIS IS A PICTURE OF YOU AND MR. RIGAMER?

13        A.    YES.

14        Q.    NOW, YOU WERE ASKED TO TESTIFY IN THE *HALL* CASE; IS

15   THAT CORRECT?

16        A.    YES.

17        Q.    AND DID YOU GO THROUGH ANY TYPE OF *DAUBERT* HEARING

18   LIKE YOU'RE DOING NOW?

19        A.    I DID NOT.

20        Q.    AND IS IT YOUR UNDERSTANDING IT WAS BECAUSE THE

21   PARTIES HAD SAID THAT YOU WOULD ONLY BE PROVIDING FACT

22   TESTIMONY?

23        A.    CORRECT.

24        Q.    AND AT THE HEARING -- OR AT THE TRIAL ACTUALLY, WHAT

25   THE COURT SAYS IS THAT THE COURT DID NOT SEE WHY IT WAS

1  NECESSARY TO QUALIFY YOU AS AN EXPERT BECAUSE YOU WOULD BE

2  PROVIDING FACT TESTIMONY; IS THAT ACCURATE?

3      **A.**    YES.

4      **Q.**    IT WAS NOT BECAUSE THE COURT MADE A DETERMINATION

5  THAT YOU WERE NOT QUALIFIED TO GIVE EXPERT TESTIMONY; IS THAT

6  YOUR UNDERSTANDING?

7      **A.**    YES.

8      **Q.**    YOU CAN'T THINK OF ANY OTHER CASE WHERE YOU HAVE

9  BEEN OFFERED AS AN EXPERT?

10     **A.**    I HAVE NOT.

11     **Q.**    WHAT WERE YOU ASKED TO DO IN THIS CASE?

12     **A.**    INITIALLY, BY THE ATTORNEYS FOR THE SECRETARY OF

13  STATE, I WAS ASKED TO EXAMINE JUDICIAL CANDIDATE DATA FROM

14  ERIN, BEGINNING AT THE EARLIEST POINT I COULD, THROUGH THE END

15  POINT OF WHEN THE DATA WAS PULLED.

16         SO THE BEGINNING OF THE ELECTRONIC DATA WAS 1990,

17  AND AT THE TIME WHEN I WAS WRITING MY REPORT, THE DATA WAS

18  PULLED THROUGH DECEMBER OF 2014.

19         SO, FIRST OF ALL, I WAS ASKED TO REVIEW JUDICIAL

20  CANDIDATE DATA AND ELECTION OUTCOMES.  I WAS ALSO ASKED TO

21  LOOK AT NON-JUDICIAL PARISH-WIDE DATA IN TERREBONNE PARISH.  I

22  WAS ASKED TO LOOK AT THE THREE ELECTIONS THAT WERE CITED IN

23  DR. ENGSTROM'S REPORT:  THE CITY JUDGE, THE COURT OF APPEALS,

24  AND THE DISTRICT JUDGESHIP -- I THINK IT WAS THE SECOND ONE --

25  AND LOOK AT THOSE ELECTION RESULTS, LOOK AT THE CANDIDATES,

| | |
|---|---|
| 1 | AND JUST BASICALLY, THEY THROUGH A WIDE NET TO ME AND SAID, |
| 2 | SEE WHAT YOU CAN SEE WITH THIS DATA. |
| 3 | SO IN A SIMILAR FASHION TO WHAT I HAD DONE IN THE |
| 4 | *HALL* CASE, I STARTED PULLING THE JUDICIAL CANDIDATE RECORDS AS |
| 5 | A STARTING POINT, VOTER REGISTRATION, ELECTION OUTCOME DATA. |
| 6 | Q.   OKAY.   WERE YOU ALSO ASKED TO REVIEW PARTY |
| 7 | AFFILIATION AND ELECTION OUTCOMES IN TERREBONNE OVER THE PAST |
| 8 | 24 YEARS? |
| 9 | A.   YES, I WAS. |
| 10 | Q.   AND TO IDENTIFY FACTORS IMPACTING A CANDIDATE'S |
| 11 | ELECTORAL SUCCESS? |
| 12 | A.   YES.   IN LOOKING AT TRENDS IN THE DATA. |
| 13 | Q.   AND DID YOU ALSO ANALYZE VOTER REGISTRATION DATA |
| 14 | FROM -- TO DETERMINE THE ROLLOFF OF VOTERS FROM THE VERY FIRST |
| 15 | ELECTIONS ANALYZED BY PLAINTIFFS' COUNSEL TO WHAT THE EXISTING |
| 16 | VOTER ROLLS LOOK LIKE PRESENT -- WELL, AT THE TIME OF YOUR |
| 17 | REPORT? |
| 18 | A.   JUST THE CURRENCY OF A VOTER IN THE CURRENT DATA, AS |
| 19 | FAR AS IF YOU ARE A VOTER TODAY, WERE YOU ELIGIBLE TO VOTE IN |
| 20 | THOSE EARLIER ELECTIONS IN 1993, 1994, AND 2014, THAT APRIL |
| 21 | ELECTION, JUST TO LOOK AT TODAY'S ROLL, WHO WAS ON THE ROLLS |
| 22 | ELIGIBLE TO VOTE. |
| 23 | Q.   OKAY.   AND IN TERMS OF YOUR METHODOLOGY, THE DATA |
| 24 | YOU USED, CAN YOU DESCRIBE BRIEFLY WHAT ALL YOU USED? |
| 25 | A.   IN USING THE CANDIDATE FILE IN ERIN, I EXTRACTED |

1    THROUGH THE QUERY THE ELECTION -- THE CANDIDATE DATA, BASED ON

2    THE TITLE OF THE POSITION.  SO THERE IS A LISTING IN MY REPORT

3    OF ALL THE TITLES THAT WERE PULLED FROM 1990 TO 2014; AND WITH

4    THAT, YOU GET THE TITLE OF THE OFFICE, THE NAME OF THE

5    CANDIDATE, FIRST NAME, LAST NAME, BALLOT NAME.  YOU GET THEIR

6    RACE, YOU GET THEIR GENDER OR SEX, PARTY AFFILIATION, WHETHER

7    THE ELECTION EVENT THAT THEY PARTICIPATED IN WAS A

8    PRESIDENTIAL ELECTION EVENT, WHETHER IT WAS A FEDERAL ELECTION

9    EVENT, WHETHER IT WAS A STATE ELECTION EVENT, THE ELECTION

10   DATE ITSELF, THE NUMBER OF OPPONENTS THAT THAT CANDIDATE HAD

11   AGAINST THEM ON THE BALLOT, AND WHETHER OR NOT THEY ARE AN

12   INCUMBENT, AND THEN THE OUTCOME OF THEIR CANDIDACY.  THEY ARE

13   EITHER DEFEATED, ELECTED, UNOPPOSED, OR THEY MATURED TO A

14   RUNOFF.

15       Q.    OKAY.  SO I'M GOING TO SUMMARIZE SOME OF THE DATA

16   CONTAINED IN YOUR REPORT JUST TO GET US THROUGH THIS PROCESS.

17            SO IT INCLUDES INFORMATION ABOUT JUDICIAL CANDIDATES

18   AND JUDICIAL ELECTIONS AND OUTCOMES, ELECTION DATES, VOTER

19   REGISTRATION COUNTS, POST-ELECTION STATS.  WHAT WAS YOUR

20   SOURCE FOR ALL OF THAT ANALYSIS?

21       A.    THE DATA WAS EXTRACTED FROM ERIN.

22       Q.    OKAY.  AND THEN FOR THE -- YOU GO AN ADDITIONAL STEP

23   IN THIS CASE AND LOOK AT THE THREE ENDOGENOUS ELECTIONS THAT

24   WERE ANALYZED BY DR. ENGSTROM, MEANING THE THREE JUDICIAL

25   CONTESTS.  THERE WERE OTHER ELECTIONS ANALYZED BY DR.

1    ENGSTROM.   THE SECRETARY OF STATE DID NOT ASK YOU TO GIVE AN

2    OPINION ON THOSE EXOGENOUS ELECTIONS; IS THAT CORRECT?

3         **A.**   THEY DID NOT.

4         **Q.**   ALL RIGHT.

5         **A.**   THEY JUST ASKED FOR THOSE THREE.

6         **Q.**   AND WHAT DOCUMENTS DID YOU USE TO FORM YOUR OPINIONS

7    ON THE ELECTION, THE INDIVIDUAL ELECTIONS?

8         **A.**   THE CANDIDATE DESCRIPTIONS, AS FAR AS NAME, PARTY

9    AFFILIATION, AND RACE AND GENDER, THE ELECTION RESULTS

10   THEMSELVES AT THE PRECINCT LEVEL, AND THEN AT THE DISTRICT

11   LEVEL, BECAUSE -- AND THE PARISH LEVEL, BECAUSE ONE OF THEM

12   WAS AN AT-LARGE WITH MULTIPLE PARISHES.   AND THEN TO FURTHER

13   INVESTIGATION FOR THE MORE CURRENT ELECTION, THE 2014

14   ELECTION, WAS TO LOOK AT THE CANDIDACY OF THE INDIVIDUALS TO

15   SEE IF THERE WAS ANYTHING OUT THERE JUST GENERALLY AVAILABLE

16   THAT COULD HELP DESCRIBE TO ME WHY THERE WAS A DIFFERENCE IN

17   THE VOTE.   AND AT THAT POINT, THAT'S WHEN I USED THE BOARD OF

18   ETHICS' CAMPAIGN FINANCE PORTAL TO OBTAIN RECORDS FOR THOSE

19   THREE CANDIDATES.

20        **Q.**   WHO COLLECTS THE DATA THAT'S CONTAINED IN THE ERIN

21   SYSTEM?

22        **A.**   THE ERIN SYSTEM IS A REPOSITORY.   THE DATA IS

23   COLLECTED THROUGH THE 64 CLERKS OF COURT AND THE 64 REGISTRARS

24   OF VOTERS.   LIKEWISE, NEW RECORDS ARE PASSED THROUGH THE

25   DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, THROUGH

1   REGISTRATION, DEPARTMENT OF SOCIAL SERVICES FOR VOTER

2   REGISTRATION, AND THEN THE SECRETARY OF STATE IS ALSO

3   EMPOWERED WITH ELECTION RESULTS AND FILING AT THEIR OFFICE

4   HERE IN BATON ROUGE TO ENTER DATA INTO THE SYSTEM.

5        Q.    WOULD YOU AGREE WITH THIS CHARACTERIZATION OF YOUR

6   TESTIMONY IN YOUR REPORT, FOR A LARGE AMOUNT OF WHAT YOU DO IN

7   THE REPORT IS A SUMMATION OF VOLUMINOUS DOCUMENTS CONTAINED IN

8   ERIN; IS THAT ACCURATE?

9        A.    VOLUMINOUS DATA THAT IS --

10       Q.    DATA, SORRY.

11       A.    -- CONTAINED IN ERIN, YES.

12       Q.    BUT THEN YOU GO A STEP FURTHER IN THIS CASE THAN YOU

13  DID IN *HALL* AND ACTUALLY MAKE SOME OPINIONS BASED ON THE DATA,

14  CORRECT?

15       A.    YES.

16       Q.    OKAY.  WHO DEVELOPED THE QUERY TO EXTRACT THE DATA

17  FROM THE ERIN SYSTEM?

18       A.    I DEVELOPED THE QUERY.

19       Q.    OKAY.  AND WHAT TEST DO YOU CONDUCT TO DETERMINE

20  THAT THE DATA YOU RECEIVE IS ACCURATE?

21       A.    WITH THE QUERY DEVELOPED, YOU RUN IT MULTIPLE TIMES.

22  IF THE QUERY IS SOUND AND ACCURATE, YOU GET THE SAME RESULTS

23  EVERY TIME YOU RUN IT.  BEAR IN MIND THAT THE VOTER

24  REGISTRATION DATA IS TRANSACTIONAL AND IT'S CONTINUALLY

25  CHANGING.  SO WITHIN A WINDOW, YOU RUN YOUR QUERY MULTIPLE

1   TIMES AND YOU LOOK AT THE EXTRACT.  IF IT IS IDENTICAL, AND
2   YOU FEEL YOU'RE READY TO GO, YOU MARK -- YOU TIME STAMP THE
3   QUERY, YOU TIME STAMP THE DATA EXTRACT, BECAUSE IF YOU RUN IT
4   THREE WEEKS LATER, YOU MIGHT GET A DIFFERENT RESULT.  SO YOU
5   TIME STAMP YOUR DATA, AND THEN YOU PROCEED.

6         SO THE VALIDATION OCCURS THROUGH REPEATED RUNS AND
7   THEN TIME STAMPING WHAT YOU HAVE DONE.

8         Q.   NOW, DO YOU HAVE SOMEBODY AT THE -- ONCE YOU DEVELOP
9   THE QUERY, DO YOU HAVE SOMEONE IN THE SECRETARY OF STATE
10  ACTUALLY RUN IT?

11        A.   YES.  I COMMUNICATE WITH THE IT DIRECTOR, SCOTT
12  MYERS.  HE TYPICALLY ASSIGNS A DEVELOPER WHO HAS THE SECURED
13  ACCESS IN THE PRODUCTION SYSTEM.

14        AS MANY OF YOU KNOW, IN JANUARY, THE DEPARTMENT OF
15  HOMELAND SECURITY HAS NAMED ELECTION SYSTEMS AND VOTER
16  REGISTRATION PART OF OUR CRITICAL INFRASTRUCTURE OF THE UNITED
17  STATES.  WE HAVE RECOGNIZED THAT LONG AGO, ONLY CERTAIN PEOPLE
18  HAVE ACCESS IN THE STATE OF LOUISIANA TO THE PRODUCTION DATA.
19  I DO NOT HAVE ACCESS.  SO SCOTT, THE IT DIRECTOR, ASSIGNS
20  SOMEONE WITH ACCESS TO ACTUALLY RUN AND DO THE EXTRACT.

21        Q.   OKAY.  WHEN YOU EXAMINE JUDICIAL RACES, WHAT WERE
22  YOU TOLD ABOUT THE PURPOSE OF COLLECTING THE DATA?

23        A.   I REALLY WASN'T LED DOWN ANY PARTICULAR PATH.  I WAS
24  ASKED TO LOOK AT THE JUDICIAL CANDIDACY DATASET AND MAKE SOME
25  CONCLUSION.

1          I MEAN, TO ME, I LOVE THIS DATASET, YOU KNOW, ALMOST
2     7,000 JUDICIAL CANDIDATES SINCE 1990 THROUGH 2014 HAVE
3     REGISTERED TO RUN FOR A JUDICIAL SEAT.  YOU KNOW, WHEN YOU
4     START LOOKING AT THAT DATA, AND YOU'RE FILTERING ON SOME OF
5     THE FIELDS, YOU CAN SEE PARTY AFFILIATION, YOU CAN SEE SUCCESS
6     OF AN ELECTORATE, YOU CAN SEE A CANDIDATE RUNNING MULTIPLE
7     TIMES FOR THE SAME SEAT, AND WHAT THE OUTCOMES ARE.  SO MY
8     CALL WAS SIMPLY TO LOOK AT -- THE FIRST CALL WAS TO LOOK AT
9     THE JUDICIAL DATASET OF CANDIDATES AND TO DRAW SOME
10    STATISTICS, AND THAT'S THE FIRST PART OF MY REPORT ABOUT WHAT
11    INCUMBENCY LOOKS LIKE, WHAT NON-INCUMBENCY LOOKS LIKE.
12        Q.    AND YOU WERE NOT TOLD TO EXCLUDE CERTAIN DATA,
13    CORRECT?  IT WAS ENCOMPASSED BY EVERYTHING THAT EXISTED ONCE
14    THE ERIN SYSTEM -- THE DOCUMENTS BECAME ELECTRONIC IN 1990,
15    THROUGH THE TIME THAT YOU RAN THE QUERY IN DECEMBER OF 2014;
16    IS THAT ACCURATE?
17        A.    YES.
18        Q.    YOU DID NOT CHERRYPICK CERTAIN JUDICIAL ELECTIONS TO
19    LOOK AT.  YOU LOOKED AT ALL JUDICIAL ELECTIONS IN LOUISIANA
20    DURING THAT TIME?
21        A.    YES.  THAT REPRESENTED -- I THINK THERE WERE 104
22    ELECTION EVENTS WITH JUDICIAL CANDIDATES ON THE BALLOT.
23        Q.    AND FROM THERE, YOU WERE ABLE TO EXTRACT DATA AND
24    PROVIDE CONCLUSIONS THAT SHOWED BREAKDOWNS OF INCUMBENTS'
25    SUCCESS, INCUMBENCY, THE RACIAL MAKEUP OF THE JUDICIARY IN

1   LOUISIANA, WHETHER OR NOT JUDGES WERE OPPOSED OR UNOPPOSED,

2   WHETHER OR NOT THAT THAT'S RARE, THINGS OF THAT NATURE; IS

3   THAT CORRECT?

4        A.   ON SOME OF THOSE ITEMS I WROTE ABOUT IN MY REPORT.

5        Q.   OKAY.  NOW, OTHER TIMES THAT YOU HAVE APPLIED THIS

6   METHODOLOGY, WE TALKED ABOUT THE *HALL* CASE.  HAVE YOU HAD TO

7   STUDY VOTERS IN OTHER PARISHES OR PARISHES FOR VARIOUS REASONS

8   TO LOOK AT VOTING PATTERNS?

9        A.   YES.  I HAVE DONE THAT NUMEROUS TIMES OVER MY CAREER

10  FOR DIFFERENT REASONS, YOU KNOW, ESPECIALLY WITH

11  REDISTRICTING, LOOKING AT VOTING AGE POPULATION TO ACTUAL

12  VOTING -- REGISTERED VOTER INFORMATION.

13        PERIODICALLY, WHEN SECRETARY SCHEDLER IS APPEARING

14  IN FRONT OF A ROTARY, PUTTING TOGETHER A DEMOGRAPHIC STUDY OR

15  SOME QUICK INFORMATION AND SOME TALKING POINTS FOR HIM ON

16  VOTER REGISTRATION FOR THE FOOTPRINT OF THAT ROTARY, I WILL

17  HELP WITH THAT.  JUST PEOPLE KNOW THAT I HAVE THE DATA AND I

18  HAVE THE ABILITY TO COMMENT AND WRITE TEXTS VERY QUICKLY ON

19  IT, I'M AT THEIR DISPOSAL.

20        Q.   OKAY.  AND IS THE WORK YOU PERFORMED SOMETHING THAT

21  CAN BE REPEATED AND VERIFIED?

22        A.   YES.

23        Q.   AND THE SECRETARY OF STATE SUBSEQUENTLY, FOR

24  PURPOSES OF TRIAL, HAS CERTIFIED YOUR QUERIES FOR WHAT EXISTS

25  AS TABLE A AND B IN YOUR REPORT?

1    **A.**    YES.   IT'S MY UNDERSTANDING, I MET WITH THEM, AND

2    THE CERTIFICATIONS WERE DONE ON A NEW EXPORT.

3    **Q.**    NOW, FOR PURPOSES OF GETTING THIS MATTER READY FOR

4    TRIAL, WE ASKED YOU TO WORK WITH THE SECRETARY OF STATE FOR

5    PURPOSES OF GETTING AUTHENTIC RECORDS.   CAN YOU JUST DESCRIBE

6    TO THE COURT HOW VOLUMINOUS THOSE RECORDS WOULD BE?

7    **A.**    WELL, INDIVIDUAL ELECTION RESULTS, EVEN PRESENTED AT

8    THE PRECINCT LEVEL STATEWIDE, ARE A COUPLE OF THOUSAND PAGES

9    OF PAPER.   BEING ABLE TO DISTILL IT DOWN INTO TABLES WITH

10   COUNTS, WHICH POST-ELECTION STATISTICS DOES NICELY, IS A

11   PROPER FORMAT.   THE DATA, IN AND OF ITSELF, IS VOLUMINOUS.   SO

12   SUMMARY TYPE DATA IS BEST PREPARED WHENEVER TALKING ABOUT

13   ELECTION RESULTS AND CANDIDACIES, THE DATASET IS QUITE LARGE.

14   **Q.**    OKAY.   NOW, YOU ALSO GIVE AN OPINION BASED ON THE

15   FACT OF THE CHANGES IN THE EXISTING VOTER ROLLS AT THE TIME OF

16   YOUR REPORT VERSUS WHAT EXISTED AT THE TIME OF THE FIRST

17   ELECTION ANALYZED BY PLAINTIFFS' EXPERTS, CORRECT?

18   **A.**    YES.

19   **Q.**    AND YOU DESCRIBE HOW -- WHAT YOUR STATISTICAL

20   ANALYSIS SHOWED SUPPORTED A THEORY OF STALENESS; IS THAT

21   CORRECT?

22   **A.**    WELL, SIMILAR TO WHAT MR. BEYCHOK SAID --

23   **THE COURT:**   ALL RIGHT.   LET ME INTERRUPT YOU.   AT

24   THIS TIME MY LAW CLERKS AND I HAVE A FUNCTION --

25   **MS. FREEL:**   I'M SORRY.

```
 1                THE COURT:   -- AWAY FROM DOWNTOWN THAT WE HAVE TO BE
 2   AT.
 3                MS. FREEL:   OKAY.
 4                THE COURT:   SO WE CAN RESUME AT 1:30?  IS THAT --
 5                MS. ADEN:   THAT'S FINE.
 6                MS. FREEL:   ANGELE, ARE YOU OKAY WITH THAT?
 7                THE WITNESS:   YES.
 8                THE COURT:   ALL RIGHT.  WE WILL RESUME AT 1:30.
 9                WE ARE IN RECESS.
10                THE CLERK:   JUDGE DEGRAVELLES HAS SOMETHING IN THIS
11   COURTROOM THIS AFTERNOON.
12                MS. FREEL:   DO YOU WANT ME TO TENDER HER?
13                THE COURT:   ALL RIGHT.  WE MAY HAVE -- WE WILL COME
14   BACK AT 1:30.  JUDGE DEGRAVELLES WILL BE IN HIS COURTROOM FOR
15   A SENTENCING FOR PROBABLY 2:00 TO 2:30, AND THEN WE WILL
16   RESUME IF WE HAVEN'T FINISHED.
17                MS. FREEL:   OKAY.  THANK YOU.
18                          (RECESS.)
19                THE COURT:   ALL RIGHT.  BE SEATED.
20                MS. ROMIG, COME BACK UP.
21                GO AHEAD, MA'AM.
22                MS. FREEL:   THANK YOU, YOUR HONOR.
23                I WILL RESUME.
24   BY MS. FREEL:
25        Q.   I WAS JUST ASKING YOU ABOUT YOUR METHODOLOGY THAT
```

1    YOU USED IN YOUR REPORT, MS. ROMIG.

2              AFTER YOU DID THE ANALYSIS WITH REGARD TO THE

3    JUDICIARY, WHICH YOU DESCRIBED EARLIER, YOU ACTUALLY WENT A

4    STEP FURTHER AND GAVE AN OPINION WITH REGARD TO RELEVANCY OF

5    INCUMBENCY; IS THAT CORRECT?

6         A.    RELEVANCY OF WHAT?  I'M SORRY.

7         Q.    THE INCUMBENCY FACTOR.

8         A.    YES.  JUST THAT --

9         Q.    YOU DON'T HAVE TO SAY WHAT THE SPECIFIC OPINION IS,

10   BECAUSE I DON'T WANT TO GET INTO THE MERITS.

11        A.    YES.

12        Q.    BUT JUST -- I JUST WANT THE COURT TO REALIZE THAT

13   YOU DO HAVE OPINIONS IN THIS REPORT?

14        A.    YES.

15        Q.    OKAY.  AND THAT'S BASED ON THE DATA AND METHODOLOGY

16   THAT YOU EXPLAINED EARLIER?

17        A.    YES.

18        Q.    OKAY.  THE NEXT AREA IN YOUR REPORT IS YOU DISCUSS

19   CHANGES IN PARTY AFFILIATION AND JUDICIAL CANDIDATES WHICH HAS

20   OCCURRED IN TERREBONNE PARISH OVER A 24-YEAR STUDY.

21              WAS THE METHODOLOGY THAT YOU USED TO MAKE THIS

22   DETERMINATION THE SAME THAT YOU DESCRIBED EARLIER IN TERMS OF

23   EXTRACTION OF DATA FROM THE ERIN SYSTEM?

24        A.    YES.  IT WAS STILL THE SAME EXTRACTION OF DATA WITH

25   THE FOCUS ON THE JUDICIAL CANDIDATES AND OUTCOMES IN

1    TERREBONNE PARISH SPECIFICALLY, WITH THE DATA BEING FILTERED

2    FOR POLITICAL AFFILIATION BASED ON PARTY.

3         Q.    AND THEN YOU ALSO DO ANALYSIS IN THE REPORT AND

4    OFFER OPINIONS WITH REGARD TO TERREBONNE PARISH VOTER

5    REGISTRATION, AND IT LOOKS LIKE YOU LOOK AT COUNTS FROM AS

6    EARLY 1990, AND YOU GO THROUGH JANUARY OF 2015; IS THAT

7    CORRECT?

8         A.    YES.

9         Q.    WAS YOUR METHOD OF EXTRACTING DATA FROM ERIN THE

10   SAME AS THE PROCESS THAT YOU HAD DESCRIBED EARLIER?

11        A.    THE VOTER REGISTRATION COUNTS WERE OBTAINED THROUGH

12   THE COMMERCIAL ONLINE SYSTEM, AS FAR AS -- THAT'S OPEN TO THE

13   GENERAL PUBLIC -- JUST RUNNING COUNTS WITH VARIOUS

14   REGISTRATION DATES BEING USED AS PIVOT FACTORS FOR ATTAINING

15   THOSE COUNTS.

16             SO WHOLESALELY, I DID NOT DOWNLOAD EVERY NAME OF

17   EVERY VOTER, BUT I ACCESSED THE COUNTS OF THE REGISTERED

18   VOTERS AT VARIOUS POINTS IN TIME.

19        Q.    OKAY.   AND THAT WAS ALL SECRETARY OF STATE DATA; IS

20   THAT ACCURATE?

21        A.    YES.

22        Q.    OKAY.   AND THEN YOUR THEORY, WITH REGARD TO THE

23   CHANGE IN VOTER ROLLS, AND HOW THAT DEMONSTRATED A STALENESS

24   OF POSSIBLE ELECTIONS, IS THAT A THEORY THAT YOU HAVE COME UP

25   WITH, OR IS THAT SOMETHING THAT YOU ARE AWARE IS RECOGNIZED BY

1    OTHER POLITICAL CONSULTANTS IN --

2         A.   NO, I DID NOT CREATE THAT THEORY.

3              AND MY ANALYSIS OF THE CURRENT VOTERS, AND HOW MANY

4    CURRENT VOTERS WERE ELIGIBLE TO VOTE IN THOSE PRIOR ELECTIONS,

5    TO ME, WAS A PRESENTATION OF FACT AND COUNTS TO JUST SHOW THAT

6    THE ELECTORATE IN 1993 IS NOT THE SAME ELECTORATE IN 2014.

7    THE ELECTORATE IN 1994 IS NOT THE SAME ELECTORATE IN 2014,

8    WHEN THE COUNTS WERE DRAWN.

9         Q.   AND YOU USED THE DATA THAT YOU EXTRACTED FROM THE

10   SECRETARY OF STATE'S COLLECTION OF DATA TO BE ABLE TO MAKE

11   THAT OPINION; IS THAT ACCURATE?

12        A.   YES.

13        Q.   OKAY.  NOW, YOUR ANALYSIS OF TERREBONNE PARISH

14   JUDICIAL ELECTIONS, IT'S A LITTLE DIFFERENT THAN WHAT MICHAEL

15   BEYCHOK DID; IS THAT ACCURATE?

16        A.   YES.  MY UNDERSTANDING HE LOOKED AT MANY ELECTIONS.

17   I JUST LOOKED AT THE THREE ELECTIONS THAT I WAS ASKED TO LOOK

18   AT BY THE SECRETARY OF STATE'S ATTORNEY.

19        Q.   AND YOUR ANALYSIS GOES DOWN TO PRECINCT LEVEL DATA;

20   IS THAT ACCURATE?

21        A.   YES.

22        Q.   OKAY.  AND WHERE WAS THE SOURCE OF THAT DATA

23   ORIGINATING FROM?

24        A.   THE ELECTION RETURNS DATA AS STORED IN THE SECRETARY

25   OF STATE'S SYSTEM.

1    Q.   NOW, THE -- WHAT CAN -- WHEN YOU GO DOWN ALL THE WAY

2  TO PRECINCT LEVEL DATA, WHAT DOES THAT SHOW YOU ABOUT

3  SOMEBODY'S CORE OF ELECTORATES?

4    A.   WELL, ONE OF THE THINGS THAT I'M ALWAYS CURIOUS

5  ABOUT IS HOW DID A PERSON WIN OR LOSE AN ELECTION.  SINCE DATA

6  IS SUMMARIZED AT THE PRECINCT LEVEL, KEEPING TRACK OF WHO WINS

7  A PRECINCT, WHO LOSES A PRECINCT, WHERE A TIE EVEN IS, BECOMES

8  -- IS IMPORTANT BECAUSE YOU ALWAYS WANT TO SAY WHAT IS THE

9  TURN OUT IN THAT PRECINCT COMPARED TO THE AVERAGE TURN OUT

10  THROUGHOUT THE ENTIRE JURISDICTION.

11    SO JUST FROM MY UNDERSTANDING AND HAVING

12  COMPREHENSION ABOUT WHAT OCCURRED IN AN ELECTION, I GO DOWN TO

13  THE PRECINCT AND LOOK AT THAT DATA IN COMPARISON TO THE WHOLE

14  DISTRICT.  WAS THIS PRECINCT ACTING LIKE THE REST OF THE

15  DISTRICT IN THE OUTCOME, OR WAS THIS PRECINCT ACTING

16  DIFFERENTLY?  IT'S JUST PART OF HOW I APPROACH UNDERSTANDING

17  THE ELECTION EVENT.

18    YOU CAN ALSO LOOK AT THIS INFORMATION GEOGRAPHICALLY

19  AND MAKE DETERMINATIONS IF THERE IS SOMETHING IN A

20  SUBDIVISION, A COMMUNITY OF INTEREST, THAT LOOKS DIFFERENT

21  THAN THE REST OF THE DISTRICT.

22    Q.   THAT EXAMINATION AND ANALYSIS OF PRECINCT LEVEL DATA

23  IS THE SAME TYPE OF ANALYSIS AND METHODOLOGY THAT YOU HAVE

24  USED AS A POLITICAL CONSULTANT IN THE PAST WHEN YOUR FIRM

25  REPRESENTED CANDIDATES TO DO THE TYPE OF REPORTS THAT YOU

1    SHOWED US ONE EARLIER TODAY; IS THAT ACCURATE?

2        **A.**    YES.

3        **Q.**    OKAY.  SO YOU HAVE USED THIS METHODOLOGY OUTSIDE OF

4    LITIGATION?

5        **A.**    DEFINITELY.

6        **MS. FREEL:**  YOUR HONOR, AT THIS TIME I'D LIKE TO

7    OFFER AS AN EXHIBIT ANGELE ROMIG'S CV.  I HAVE ONE THAT WAS

8    PROVIDED AT THE TIME THAT SHE DID HER REPORT IN 2015, AND I

9    HAVE ONE THAT IS MORE UPDATED.  I'D LIKE TO OFFER THEM BOTH AS

10   EXHIBITS 5 AND 6, PLEASE.

11       **THE COURT:**  ALL RIGHT.  WITHOUT OBJECTION, THEY ARE

12   ADMITTED.

13       **MS. ADEN:**  PLAINTIFF'S COUNSEL IS REQUESTING A COPY

14   FOR THE RECORD.

15       **MS. FREEL:**  ALSO, WHILE WE ARE PUTTING STUFF ON THE

16   RECORD, YOUR HONOR, I APOLOGIZE.  I DIDN'T MAKE AN

17   INTRODUCTION EARLIER, WHICH I THINK IS DUE.  WE DID TELL THE

18   COURT REPORTER.  BUT SITTING AT OUR TABLE IS CHESTER CEDARS.

19   HE'S NOT HERE IN HIS CAPACITY AS AN ATTORNEY.  HE'S HERE AS A

20   REPRESENTATIVE OF THE ATTORNEY GENERAL WHO IS A NAMED

21   DEFENDANT IN THE CASE.

22       **THE COURT:**  GOOD AFTERNOON.

23   BY MS. FREEL:

24       **Q.**    MS. ROMIG, BEFORE I TENDER YOU AS AN EXPERT, I JUST

25   WANTED TO ASK YOU, AS IT RELATES TO THE *HALL* CASE, THERE WAS

1    CONCERN THAT YOU WERE ACTUALLY SCHEDULED TO BE OUT OF TOWN,

2    RIGHT, FOR THE TRIAL INITIALLY?  IS THAT CORRECT?

3         **A.**    YES.

4         **Q.**    AND SO YOUR PERPETUATION DEPOSITION OF TESTIMONY --

5    OR YOUR PERPETUATION -- YOUR DEPOSITION WAS TAKEN IN ADVANCE

6    OF TRIAL IN *HALL*; IS THAT ACCURATE?

7         **A.**    YES.

8         **Q.**    BUT THEN WHEN MR. JOHNSON HAD HIS HEART ATTACK AND

9    THE CASE WAS RESET IN NOVEMBER, YOU ACTUALLY WERE AVAILABLE

10   AND YOU CAME AND YOU TESTIFIED IN THE *HALL* PROCEEDING; IS THAT

11   CORRECT?

12        **A.**    YES.

13        **Q.**    OKAY.  DO YOU REMEMBER IN THE DEPOSITION WHERE --

14             AND THIS IS JUST FOR A POINT OF REFERENCE FOR THE

15   COURT.  THIS IS IN OUR OPPOSITION TO MOTION TO STRIKE MS.

16   ROMIG AT WHAT'S KNOWN AS EXHIBIT 7, PAGE 23 OF THAT EXHIBIT,

17   BUT IT'S RECORD DOCUMENT 218-18 WHERE RON JOHNSON, WHO IS

18   COUNSEL FOR THE PLAINTIFF AT THAT TIME, OBJECTED TO ANGELE

19   ROMIG'S TESTIMONY GOING FORWARD AS A LAY WITNESS BECAUSE HE

20   FELT THAT SHE WAS TOO EXPERIENCED TO BE A LAY WITNESS.  AND

21   HIS EXACT QUOTE IS: "MY OBJECTION IS THE ENHANCED LEVEL OF THE

22   EXPERIENCE THAT THIS WITNESS HAS, AND THAT EXPERIENCE HAS BEEN

23   ACQUIRED THROUGH HER LENGTHY PERIOD OF EMPLOYMENT IN

24   RELATIONSHIP WITH THE STATE.  AND BECAUSE THAT EXPERIENCE IS

25   NOT WITHIN THE ORDINARY LAY WITNESS' BASIS FOR EXPERIENCE, SHE

1  CANNOT TESTIFY IN THE ROLE AS LAY WITNESS."

2          DO YOU RECALL THAT DISCUSSION?

3      **A.**   YES.

4      **Q.**   OKAY.  SO THE OBJECTION WASN'T THAT YOU WEREN'T

5  QUALIFIED AS AN EXPERT, IT WAS THAT YOU HAD BEEN DISCLOSED AS

6  BEING A FACT WITNESS IN THE *HALL* CASE?

7      **A.**   THAT'S MY RECOLLECTION.

8          **MS. FREEL:**  AND THEN JUST AS A POINT OF REFERENCE, I

9  WOULD LIKE TO JUST PINPOINT RECORD DOCUMENT -- I BELIEVE IT'S

10 199-2.  IT'S ACTUALLY PLAINTIFFS' EXHIBIT 1 TO THEIR MOTION TO

11 STRIKE AT PAGE 18, WHICH IS WHERE JUDGE JACKSON SAYS IT'S NOT

12 NECESSARY TO QUALIFY ANGELE ROMIG AS AN EXPERT BECAUSE IN THAT

13 CASE, SHE WAS ONLY GOING TO BE TESTIFYING AS A FACT WITNESS.

14          AT THIS POINT, YOUR HONOR, I WOULD LIKE TO TENDER

15 MS. ROMIG AS AN EXPERT IN THE ERIN SYSTEM OF LOUISIANA

16 DEMOGRAPHY AND AS A POLITICAL CONSULTANT.

17          **THE COURT:**  ALL RIGHT.  COUNSEL?

18                    **CROSS-EXAMINATION**

19 BY MR. LESSER:

20     **Q.**   GOOD AFTERNOON.

21     **A.**   HI.

22     **Q.**   I'M GOING TO START WITH A FEW QUESTIONS ABOUT THE

23 *HALL* CASE, SINCE THAT'S WHERE WE JUST ENDED.

24          SO IT'S TRUE THAT YOU HAVE NOT TESTIFIED AT TRIAL AS

25 AN EXPERT WITNESS; IS THAT CORRECT?

1      **A.**    YES.

2      **Q.**    OKAY.  IN *HALL V. LOUISIANA*, YOU WERE A FACT WITNESS

3   ONLY; IS THAT CORRECT?

4      **A.**    YES.

5      **Q.**    AND THE JUDGE ORDERED THAT YOUR REPORT BE REDACTED

6   TO THE EXTENT IT INCLUDED OPINIONS; IS THAT CORRECT?

7      **A.**    YES.

8      **Q.**    AND DO YOU RECALL THAT THE COURT DID SAY AND I,

9   QUOTE, BY THE COURT:  IT CERTAINLY IS AN OPINION AND SHE'S NOT

10  QUALIFIED AS AN EXPERT.

11         IS THAT CORRECT?

12     **A.**    I DON'T RECALL.

13     Q.    OKAY.

14     **A.**    I THINK THERE WERE FOUR SENTENCES IN MY REPORT THAT

15  WERE STRUCK.

16     Q.    OKAY.  AND DO YOU REMEMBER THAT BEING BECAUSE YOU

17  WERE OFFERED AS A FACT WITNESS, NOT AS AN EXPERT; IS THAT

18  CORRECT?

19     **A.**    I THOUGHT THEY WERE STRUCK BECAUSE I SAID "IN MY

20  OPINION," AND THAT'S WHY THEY WERE STRUCK.

21     Q.    OKAY.  YOU WOULDN'T CONSIDER YOURSELF TO BE A

22  POLITICAL SCIENTIST, WOULD YOU?

23     **A.**    I DO NOT HAVE A PHD IN POLITICAL SCIENCE, BUT I

24  THINK I'M PRETTY WELL ACA -- NO.  I'LL ANSWER YOUR QUESTION

25  NO.

1      Q.    AND YOU WOULDN'T CONSIDER YOURSELF TO BE A HISTORIAN

2   EITHER; IS THAT CORRECT?

3      A.    CORRECT.

4      Q.    OKAY.  ON DIRECT EARLIER TODAY YOU TESTIFIED THAT

5   YOU ARE NOT A POLITICAL CONSULTANT; IS THAT CORRECT?

6      A.    I AM CURRENTLY --

7      Q.    CURRENTLY.

8      A.    -- NOT A POLITICAL CONSULTANT BASED ON THE OWNERSHIP

9   OF MY COMPANY.

10      Q.    OKAY.  AND THAT THAT'S POTENTIALLY YOUR PLAN B IN

11   THE FUTURE; IS THAT CORRECT?

12      A.    DON'T TELL MY HUSBAND, YES.

13      Q.    OKAY.  AND WHILE WORKING AT GCR, YOU YOURSELF ARE

14   NOT A CAMPAIGN MANAGER; IS THAT CORRECT?

15      A.    NO.  I WAS A CONSULTANT.

16      Q.    OKAY.  AND YOU HAVE DESCRIBED YOURSELF AS A PROJECT

17   MANAGER; IS THAT CORRECT?

18      A.    AT VARIOUS POINTS, I WAS A PROJECT MANAGER.

19      Q.    AND WOULDN'T YOU SAY THAT YOUR EXPERIENCE IS IN

20   PULLING DATA OR CULLING DATA FROM ERIN?

21      A.    THAT'S ONE OF MY EXPERIENCES.  IT'S ALSO DESIGNING

22   AND DEVELOPING THE SYSTEM.

23      Q.    I MEANT TO SAY EXPERTISE.

24          WOULDN'T YOU SAY THAT YOUR EXPERTISE IS IN PULLING

25   OR CULLING DATA FROM ERIN?

1      **A.**    BASED ON MY KNOWLEDGE OF THE DATABASE STRUCTURE,

2      THAT IS ONE AREA OF EXPERTISE.

3      **Q.**    OKAY.   REGARDING PUBLICATIONS, YOU HAVEN'T PUBLISHED

4      ANY ARTICLES ON THE ROLE OF INCUMBENCY, HAVE YOU?

5      **A.**    I HAVE NOT.   MY PUBLICATIONS HAVE BEEN DIRECTLY FOR

6      CLIENTS.   I AM NOT AN ACADEMICIAN, AND MY PUBLICATIONS ARE

7      ABOUT BUILDING PROFESSIONAL WORK FOR MY COMPANY.

8      **Q.**    OKAY.   SO THE ANSWER IS NO, YOU HAVEN'T PUBLISHED

9      ANY ARTICLES ON INCUMBENCY, CORRECT?

10     **A.**    I HAVE NOT.

11     **Q.**    OKAY.   AND REGARDING THE OTHER FACTORS THAT WERE

12     SPOKEN ABOUT JUST NOW, PARTY AFFILIATION AND ELECTIONS, YOU

13     HAVEN'T PUBLISHED ANYTHING ON THAT, HAVE YOU?

14     **A.**    I HAVE NOT PUBLISHED.   I'VE WRITTEN ABOUT THEM FOR

15     CLIENTS CONTINUALLY IN MY CAREER.

16     **Q.**    OKAY.   AND SAME THING WITH CAMPAIGN FINANCE, YOU

17     HAVEN'T PUBLISHED ANYTHING ON CAMPAIGN FINANCE; IS THAT

18     CORRECT?

19     **A.**    THAT'S CORRECT.

20     **Q.**    AND SAME THING WITH CAMPAIGN ORGANIZATION AND

21     ELECTIONS, NO PUBLICATIONS ON THAT?

22     **A.**    I HAVE PUBLISHED A LOT.

23     **Q.**    CORRECT.

24     **A.**    I MEAN, WHAT IS YOUR DEFINITION OF PUBLISHED?

25     **Q.**    SCHOLARLY PUBLICATIONS.

1      **A.**    SCHOLARLY PUBLICATIONS, NO.

2      **Q.**    AND YOU'VE NEVER PUBLISHED ANY SCHOLARLY

3   PUBLICATIONS ON THE ROLE OF CANDIDATES' BACKGROUNDS AND

4   EXPERIENCES IN ELECTIONS; IS THAT CORRECT?

5      **A.**    THAT'S CORRECT.

6      **Q.**    AND YOU'VE NEVER WRITTEN AN ARTICLE ON STALENESS OF

7   ELECTIONS; IS THAT CORRECT?

8      **A.**    THAT IS CORRECT.

9      **Q.**    SO YOU'VE DISCUSSED CERTAIN FACTORS IN YOUR REPORT

10   AND HOW THESE FACTORS INFLUENCE ELECTIONS, THAT'S CORRECT?

11      **A.**    WHAT SECTION OF THE REPORT ARE YOU REFERRING TO?  I

12   FEEL LIKE THERE ARE THREE SECTIONS TO MY REPORT.  THAT'S HOW I

13   DIVIDED IT UP.

14      **Q.**    SO THE CATEGORIES THAT I JUST LISTED FOR

15   PUBLICATIONS, THOSE ARE CATEGORIES THAT YOU HAVE EXPOUNDED

16   UPON IN YOUR REPORT; IS THAT CORRECT?

17      **A.**    I DON'T CARE FOR THE WORD "EXPOUNDED."

18      **Q.**    OKAY.

19      **A.**    MY COMMENTS IN MY REPORT ARE FACT BASED.  THERE'S

20   OPINION OFFERED.  I WOULDN'T USE THE WORD "EXPOUNDED."

21   THERE'S EXPLANATIONS PRESENTED AROUND THE FACTS.

22      **Q.**    SO, FOR EXAMPLE, YOU CONSIDERED THE ROLE OF JUDICIAL

23   INCUMBENCY; IS THAT CORRECT?

24      **A.**    CORRECT.

25      **Q.**    AND YOU'VE CONSIDERED VOTER TURN-OUT; IS THAT

| | |
|---|---|
| 1 | CORRECT? |
| 2 | **A.**    CORRECT. |
| 3 | **Q.**    AND YOU'VE CONSIDERED CAMPAIGN ORGANIZATION; IS THAT |
| 4 | CORRECT? |
| 5 | **A.**    CAMPAIGN ORGANIZATIONS, JUST IN THAT THIRD PART OF |
| 6 | THE REPORT, WITH LOOKING AT THOSE THREE RACES.  AND IN |
| 7 | PARTICULAR, JUST ONE RACE, THE MORE RECENT RACE OF 2014, WHERE |
| 8 | MORE INFORMATION WAS AVAILABLE. |
| 9 | SO ACROSS THE BOARD, I DID NOT USE THAT AS A |
| 10 | CRITERIA, JUST IN THAT ONE INSTANCE. |
| 11 | **Q.**    DID YOU CONSIDER A CANDIDATE'S BACKGROUND AND |
| 12 | EXPERIENCE? |
| 13 | **A.**    IN THAT ONE RACE ONLY. |
| 14 | **Q.**    AND IS IT CORRECT THAT YOU CONSIDERED PARTY |
| 15 | AFFILIATION? |
| 16 | **A.**    YES.  BECAUSE PART OF THE MIDDLE SECTION OF MY |
| 17 | REPORT DEALT WITH PARTY AFFILIATION IN TERREBONNE PARISH. |
| 18 | **Q.**    AND IT'S TRUE THAT YOU CONSIDERED FINANCING; IS THAT |
| 19 | CORRECT? |
| 20 | **A.**    JUST FOR THE ONE 2014 CITY COURT RACE IN THE REPORT. |
| 21 | **Q.**    YOU DID NOT OFFER AN OPINION ON WHETHER THESE |
| 22 | FACTORS, EITHER ALONE OR TOGETHER, LED TO THE ELECTION RESULTS |
| 23 | TO THE EXCLUSION OF RACE FOR THE THREE JUDICIAL ELECTIONS THAT |
| 24 | YOU CONSIDERED; IS THAT CORRECT? |
| 25 | **A.**    CORRECT.  I OFFERED THEM AS FACTORS TO CONSIDER. |

1    Q.    AND IN PREPARING YOUR REPORT, YOUR GOAL WAS TO

2  PROVIDE A FACTUAL PRESENTATION OF INFORMATION FROM THE DATA;

3  IS THAT CORRECT?

4    A.    BASED ON THE CHARGE THAT THE ATTORNEYS FOR THE

5  SECRETARY OF STATE ASKED ME TO FULFILL.

6    Q.    AND YOUR ROLE WAS MAINLY TO PULL TOGETHER THE

7  INFORMATION OR DATA AND JUST TO REPORT THE NUMBERS; IS THAT

8  CORRECT?

9    A.    I FEEL LIKE YOU'RE MINIMIZING MY HARD WORK, BUT IF

10  YOU WANT TO SAY THAT'S WHAT I DID, I DID.  BUT IN PULLING THE

11  NUMBERS, YOU'RE GENERATING INFORMATION FROM DATA, AND IT DOES

12  TAKE TIME TO CONSIDER ALTERNATIVES IN PERSPECTIVE OF WHAT THAT

13  DATA CAN MEAN AND LOOK AT DATA IN DIFFERENT WAYS THROUGH

14  DIFFERENT PIVOT TABLES TO COME TO CONCLUSIONS.  SO IT'S A

15  LITTLE BIT MORE ARDUOUS THAN, I THINK, YOU ARE PRESENTING.

16    Q.    BUT YOUR PRIMARY ROLE WAS JUST TO REPORT THE

17  NUMBERS; IS THAT CORRECT?

18    MS. FREEL:  I'M GOING TO OBJECT.  THE QUESTION HAS

19  BEEN ASKED AND THE WITNESS HAS ANSWERED.

20    THE COURT:  I THINK SO.  MOVE ON, SIR.

21    MR. LESSER:  NOTHING FURTHER.

22    THE COURT:  ALL RIGHT.  THANK YOU.

23                    REDIRECT EXAMINATION

24  BY MS. FREEL:

25    Q.    MS. ROMIG, THE DATA THAT YOU USED IS OBJECTIVE DATA

1    THAT WAS CONSISTENTLY USED THROUGHOUT YOUR REPORT; IS THAT

2    ACCURATE?

3         A.   YES.

4         Q.   AND YOU HAVE HAD AN OPPORTUNITY TO SEE SOME OF THE

5    OTHER EXPERT REPORTS IN THIS CASE?

6         A.   I HAVE NOT.

7         Q.   OKAY.

8         MS. FREEL:   THAT'S ALL I HAVE AT THIS TIME, YOUR

9    HONOR.

10        THE COURT:   OKAY.   THANK YOU.

11        YOU MAY STEP DOWN.

12                     (WITNESS EXCUSED.)

13        THE COURT:   ALL RIGHT.   GIVE ME ABOUT FOUR OR FIVE

14   MINUTES, AND THEN I WILL -- I WILL TELL YOU WHAT.   TELL THEM

15   THAT WE ARE FINISHED.   IF YOU WOULD TELL JUDGE DEGRAVELLES'

16   STAFF.   HAVE THEY GONE?

17        THE CLERK:   I THOUGHT THEY BROUGHT THE GUY OVER TO

18   COURTROOM 3.

19        THE COURT:   OH, OKAY.   ALL RIGHT.   GIVE ME FIVE

20   MINUTES, AND WE'LL COME BACK IN HERE.

21        WE'RE IN RECESS.

22                        (RECESS.)

23        THE COURT:   BE SEATED.

24        MS. FREEL:   YOUR HONOR, I HAVE ONE QUESTION ABOUT

25   THE ANGELE ROMIG, IF YOU DON'T MIND ME ADDRESSING THE COURT?

| | |
|---|---|
| 1 | THE COURT:  SURE. |
| 2 | THE CLERK:  WOULD YOU COME FORWARD, PLEASE. |
| 3 | MS. FREEL:  ANGELE ROMIG'S REPORT AND HER |
| 4 | ATTACHMENTS ARE FOUND SEVERAL PLACES IN THE RECORD, YOUR |
| 5 | HONOR.  BUT FOR EASE OF REFERENCE, I CERTAINLY CAN OFFER THEM |
| 6 | NOW AS EXHIBIT 7. |
| 7 | THE COURT:  ALL RIGHT.  HAVE YOU SEEN THESE? |
| 8 | MS. FREEL:  I HAVE EXTRA COPIES, YOUR HONOR.  I WILL |
| 9 | BE HAPPY TO GIVE A COPY TO THE PLAINTIFF. |
| 10 | THE COURT:  OKAY.  WELL, IF THEY HAVEN'T SEEN THEM, |
| 11 | THEN I WILL RESERVE RULING ON IT. |
| 12 | MS. ADEN:  SO, YOUR HONOR, THE REPORT AND THE |
| 13 | ATTACHMENTS TO THE EXTENT THAT THESE WERE PART OF WHAT WAS |
| 14 | DISCLOSED WITH THE ORIGINAL REPORT, WE HAVE SEEN THEM, AND WE |
| 15 | HAVE NO OBJECTION TO THEM. |
| 16 | THE COURT:  OKAY.  WELL, THEN, I WILL GO AHEAD AND |
| 17 | ADMIT THEM. |
| 18 | MS. ADEN:  ONE THING I WOULD LIKE TO NOTE, THOUGH, |
| 19 | FOR THE RECORD IS THE UPDATED RESUMÉ THAT WE RECEIVED TODAY. |
| 20 | IT IS THE FIRST TIME THAT WE ARE SEEING IT, SO I WANTED TO |
| 21 | NOTE THAT FOR THE RECORD. |
| 22 | THE COURT:  ALL RIGHT.  WELL, IT'S NOTED. |
| 23 | MS. FREEL:  THANK YOU. |
| 24 | THE COURT:  ALL RIGHT.  ANYTHING ELSE? |
| 25 | ALL RIGHT.  AS YOU KNOW, AND AS THE LAW STATES, |

```
1   COURTS ARE GIVEN SUBSTANTIAL DISCRETION ON WHETHER OR NOT TO
2   ADMIT EXPERT WITNESSES.  I HAVE LISTENED TO THE TESTIMONY HERE
3   THIS MORNING AND I HAVE DECIDED TO RULE AS FOLLOWS:   MR.
4   BEYCHOK'S EXPERT TESTIMONY WILL BE ALLOWED AT TRIAL.  AS A
5   POLITICAL CONSULTANT FOR OVER 20 YEARS OF EXPERIENCE -- AND
6   WHEN YOU READ 702 AND 703, THAT IS ONE OF THE COMPONENTS AS
7   WELL.  YOU DON'T HAVE TO BE A PHD TO TESTIFY ON CERTAIN
8   MATTERS AS AN EXPERT.  WITH HIS 20 YEARS OF EXPERIENCE, HE HAS
9   INSIGHT INTO ELECTIONS AND THE FACTORS THAT DETERMINE WHETHER
10  A CANDIDATE WILL WIN.
11          ADDITIONALLY, HE HAS BEEN QUALIFIED AS AN EXPERT IN
12  A PREVIOUS CASE IN THIS DISTRICT.  THE COURT FINDS THAT IT IS
13  PROPER TO ALLOW HIS TESTIMONY AT THE TRIAL IN THIS MATTER, AND
14  I FIND FURTHER THAT HIS TESTIMONY WILL HELP ME AS THE TRIER OF
15  FACT TO MAKE SUCH FINDINGS.
16          TO THE EXTENT THAT THE PLAINTIFFS SEEK TO ATTACK HIS
17  OPINIONS, THEY CERTAINLY WILL HAVE THE OPPORTUNITY TO DO THAT
18  VIA CROSS-EXAMINATION AT THE TRIAL.
19          AS I HAVE PREVIOUSLY INDICATED, I WILL ALLOW DR.
20  WEBER'S TESTIMONY TO BE ALLOWED AT THIS TRIAL AS AN EXPERT ON
21  ALL THREE GINGLES FACTORS.
22          NOW, THERE ARE CERTAINLY DISAGREEMENTS AS TO THE
23  CONCLUSIONS THAT HE MADE, AND THAT CAN BE HANDLED, AGAIN, VIA
24  CROSS-EXAMINATION OR OTHER EVIDENCE.
25          NOW, I HAVE DECIDED TO ALLOW MS. ROMIG TO OFFER
```

| | |
|---|---|
| 1 | EXPERT TESTIMONY.  NOW, I UNDERSTAND THAT THERE IS DEFINITELY |
| 2 | SOME DISAGREEMENT REGARDING WHETHER THE *HALL* COURT IN THIS |
| 3 | DISTRICT DEFINITIVELY SAID THAT MS. ROMIG WAS NOT QUALIFIED, |
| 4 | OR MERELY WHETHER IT WAS ENFORCING A STIPULATION BETWEEN THE |
| 5 | PARTIES, THAT SHE WAS ONLY TESTIFYING AS A FACT WITNESS.  BUT |
| 6 | THE COURT FINDS THAT IT IS PROPER TO ALLOW HER TO TESTIFY AS |
| 7 | AN EXPERT, GIVEN HER LONG INVOLVEMENT IN POLITICAL CAMPAIGNS, |
| 8 | IN MICROTARGETING, AND HER UNDERSTANDING OF THE ERIN SYSTEM. |
| 9 | AGAIN, HER OPINIONS CAN CERTAINLY BE ATTACKED BY THE |
| 10 | PLAINTIFFS ON CROSS-EXAMINATION OR WITH OTHER EVIDENCE. |
| 11 | SO FOR THOSE REASONS, THE PLAINTIFF'S MOTIONS TO |
| 12 | EXCLUDE DOCUMENTS 88, 89, AND 199 ARE DENIED. |
| 13 | NOW, THERE ARE SEVERAL OTHER MATTERS -- AND WE ARE |
| 14 | OFF THE FORMAL RECORD NOW.  WE ARE JUST GETTING KIND OF IN A |
| 15 | STATUS MODE. |
| 16 | **MS. FREEL:**  YOUR HONOR, I JUST HAD ONE QUESTION |
| 17 | ABOUT DR. WEBER.  YOU SAID THAT HE WOULD BE ALLOWED TO TESTIFY |
| 18 | AS TO THE THREE *GINGLES* FACTORS.  WE HAD ALSO REQUESTED THAT |
| 19 | HE BE ALLOWED TO TESTIFY AS TO TOTALITY OF CIRCUMSTANCES.  IS |
| 20 | THAT -- |
| 21 | **THE COURT:**  WELL, I THINK THAT WILL BE ALLOWED.  I |
| 22 | THINK THAT WAS WHAT YOU HAD PROFFERED HIM FOR. |
| 23 | **MS. FREEL:**  THANK YOU. |
| 24 | **THE COURT:**  I MAY HAVE MISSTATED IT. |
| 25 | **MS. FREEL:**  THANK YOU. |

1    THE COURT:  ALL RIGHT.  ANYTHING ELSE THAT NEEDS TO
2  BE ON THE RECORD?
3         REPORTER'S NOTE:  (AT THIS TIME, THERE WAS NO ORAL
4  RESPONSE.)
5         (WHEREUPON, THIS MATTER WAS CONCLUDED.)
6              C E R T I F I C A T E
7       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
8  FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED
9  NUMBERED MATTER.
10  _Shannon Thompson_____
11  SHANNON L. THOMPSON, CCR
12  OFFICIAL COURT REPORTER