UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TERREBONNE PARISH BRANCH NAACP, ET AL

VERSUS

PIYUSH ("BOBBY") JINDAL, THE GOVERNOR
OF THE STATE OF LOUISIANA, IN HIS OFFICIAL
CAPACITY, ET AL

CIVIL ACTION

NO. 14-0069-JJB-EWD

**RULING**

This matter is before the Court pursuant to Section 2 of the Voting Rights Act of 1965

("Section 2"), 52 U.S.C. § 10301 (previously codified at 42 U.S.C. § 1973), and the Fourteenth

and Fifteenth Amendments to the United States Constitution. A bench trial was held on March 13-

20 and April 26-28, 2017. The Court heard from 27 witnesses, and over 350 exhibits were admitted

into evidence.

I.    **BRIEF OVERVIEW / INTRODUCTION**

The individual Plaintiffs in this case are all black registered voters and residents of

Terrebonne Parish.[1] Terrebonne Branch NAACP ("Terrebonne NAACP") is also a Plaintiff in this

case. The Defendants in this case are the Governor of Louisiana and the Attorney General of

Louisiana, both of whom are sued in their official capacities.

The Plaintiffs challenge Louisiana's use of an at-large voting system for the 32nd Judicial

District Court ("32nd JDC"), a state court that exercises jurisdiction over Terrebonne Parish

("Terrebonne"). They claim that the use of at-large voting for election to the 32nd JDC effectively

affords black minority voters of Terrebonne less opportunity to elect judicial candidates of their

---

[1] The individual Plaintiffs in this case are Reverend Vincent Fusilier, Lionel Myers, Daniel Turner, and Wendell Desmond Shelby, Jr.

choice. Additionally, they claim that a discriminatory purpose has been a motivating factor in the maintenance of at-large voting for the 32nd JDC.

For the reasons explained more fully herein, the Court finds that at-large voting for the 32nd JDC deprives black voters of the equal opportunity to elect candidates of their choice in violation of Section 2, and it has been maintained for that purpose, in violation of Section 2 and the United States Constitution. The Court, having considered all of the testimony, evidence, and arguments presented by the parties, hereby enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2]

## II.    JURISDICTIONAL ISSUES

The Defendants, once again, urge this Court to find that it lacks jurisdiction to hear this case. First, they claim that they are entitled to immunity under the Eleventh Amendment. Second, they argue that the Plaintiffs lack standing to challenge at-large voting for the 32nd JDC. The Court finds these arguments unpersuasive.

First, while Defendants re-urge their argument that sovereign immunity under the Eleventh Amendment deprives the Court of subject matter jurisdiction, they provide no basis for this Court to depart from its prior ruling in this case.[3] Accordingly, the Eleventh Amendment does not bar any of Plaintiffs' claims in this case.

---

[2] The Court does not present its findings of fact and conclusions of law separately because in vote dilution cases findings of facts and conclusions of law are often inextricably intertwined. *See Hays v. Louisiana*, 839 F. Supp. 1188, 1193 (W.D. La. 1993) ("As the findings of fact and conclusions of law in this case are inextricably intertwined, we do not present them in separate sections. Such separate presentation would increase the length and redundancy of our discussion. Rather, our language will indicate whether we find a particular observation to be a finding of fact or a conclusion of law. To the extent that a finding of fact is also a conclusion of law, we adopt it as both a finding of fact and a conclusion of law. To the extent that a conclusion of law is also a finding of fact, we also embrace it as both a conclusion of law and a finding of fact.").

[3] Doc. 171.

Second, the Court finds that Plaintiffs have standing to bring this case. To establish Article III standing, a plaintiff must show that he has suffered an injury-in-fact caused by the defendant's challenged conduct and that a favorable decision will likely redress the plaintiff's injury.[4] The Defendants make three arguments to support dismissal on standing grounds: (1) there is no evidence of injury because Plaintiffs were able to elect a black individual (Judge Juan Pickett) to the 32nd JDC and white candidates to other parish-wide offices; (2) the Attorney General and the Governor are neither the proper parties as they cannot properly change the election method for the 32nd JDC nor has any evidence been presented that they discriminated against Plaintiffs; and (3) other officials, like the Secretary of State, play a role in the maintenance of the 32nd JDC, which means that causation and redressability are lacking as to the two Defendants.

The Plaintiffs have stated a cognizable injury. The dilution of an individual's right to vote is a cognizable injury for Article III standing purposes.[5] Neither Judge Pickett's election nor those of the white candidates definitively show the absence of vote dilution under at-large voting for the 32nd JDC.[6]

The Attorney General and Governor are proper defendants in this case. Contrary to Defendants' assertions, they are not "impotent," and they do play a role in the 32nd JDC elections. Defendants' argument is at odds with many voting rights cases arising in Louisiana (including some that have reached the United States Supreme Court) in which the Attorney General and the Governor were named as defendants.[7] Furthermore, Louisiana law requires the Attorney General and the Governor to play several important roles with respect to the electoral process for the

---

[4] *SCLC v. Supreme Court of State of La.*, 252 F.3d 781, 788 (5th Cir. 2011).
[5] *O'Hair v. White*, 675 F.2d 680, 688 (5th Cir. 1982).
[6] *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973) (fact that three black candidates had been successful in recent election did not mandate finding that at-large scheme did not dilute the black vote).
[7] *Chisholm v. Roemer*, 501 U.S. 380 (1991); *Clark v. Roemer*, 501 U.S. 1246 (1991).

Judicial District Courts which renders them proper defendants in this case.[8] The Defendants also assert that a claim of discriminatory purpose against them is inappropriate as no evidence has been introduced that the Governor or the Attorney General discriminated against the Plaintiffs. This does not undermine Plaintiffs' intent claim because the inquiry into intent focuses on the motivations of the legislative body at issue, not of any single official or named defendant.[9]

Finally, the fact that the Secretary of State plays a role in maintaining and overseeing the electoral method of the 32nd JDC does not mean that causation and redressability are absent with respect to Defendants.[10] Accordingly, the Court shall proceed to analyze the merits of this case.

## III.   OVERVIEW OF THE LAW GOVERNING THE COURT'S INQUIRY

The Plaintiffs effectively have two claims in this case. First, they bring a claim under Section 2, which requires them to show that at-large voting for the 32nd JDC has a discriminatory or dilutive effect. Second, they bring a claim under Section 2, the Fourteenth Amendment, and the Fifteenth Amendment, asserting that at-large voting for the 32nd JDC has been maintained for a discriminatory purpose.

### A.   Section 2 of the Voting Rights Act (Discriminatory Effect)

The Voting Rights Act ("VRA") was enacted to "give those who had been disenfranchised on account of their race the opportunity to participate in the political process."[11] "Section 2 proscribes practices that, while permitting a mechanical exercise of the right to vote, operate to cancel out or minimize [i.e. dilute] the voting strength of racial groups such that members of the

---

[8] Plaintiffs' Post-Trial Br. 4-7, Doc. 284.
[9] *See Veasey v. Abbott,* 830 F.3d 216, 235 (5th Cir. 2016) (in challenge to photo ID law, in which the governor was defendant, court considered whether "Texas Legislature passed SB 14 with a racially invidious purpose"); *Hunter v. Underwood,* 471 U.S. 222, 223-233 (1985) (in challenge to law, in which voter registrars were defendants, court analyzed intent of a 1901 state constitutional convention).
[10] *K.P. v. LeBlanc,* 627 F.3d 115, 123 (5th Cir. 2010) (holding that plaintiff had standing to sue a board even though board was far "from sole participant in the application of the challenged statute").
[11] *White v. Alabama,* 74 F.3d 1058, 1069 (11th Cir. 1996).

4

racial minority have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[12] Section 2 is not meant to guarantee electoral success for minority-preferred candidates, but rather, the goal of Section 2 is to prohibit certain electoral practices or structures that interact with "social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[13] In addition to covering elections for many types of executive and legislative positions, Section 2 also applies to judicial elections.[14]

When a plaintiff challenges an at-large voting system, such as the system that exists in this case, "[t]he theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters."[15] "[A]t-large election schemes…are not *per se* violative of minority voters' rights."[16] A plaintiff can show that an at-large election scheme violates Section 2 by showing that it has a "discriminatory effect alone."[17]

A successful Section 2 vote dilution claim has two components. First, a plaintiff must satisfy the three *Gingles* preconditions by showing: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" ("*Gingles* one"); (2) that the minority group is "politically cohesive" ("*Gingles* two"); and (3) that bloc voting

---

[12] *Rodriguez v. Harris Cnty. Tex.*, 964 F.Supp.2d 686, 698 (S.D. Tex. 2013) (internal quotation marks and citation omitted), *aff'd by Gonzalez v. Harris Cnty., Tex.*, 601 Fed. App'x 255 (5th Cir. 2015).
[13] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *Nevett v. Sides*, 571 F.2d 209, 236 (5th Cir. 1978).
[14] *Houston Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 428 (1991).
[15] *Gingles*, 478 U.S. at 48.
[16] *Id.*
[17] *Id.* at 35.  ("After appellees brought suit, but before trial, Congress amended § 2. The amendment was largely a response to this Court's plurality opinion in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had declared that, in order to establish a violation either of § 2 or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test.'").

by other members of the electorate usually defeats black-preferred candidates ("*Gingles* three").[18] Satisfaction of these three preconditions is necessary but not sufficient to establish liability.[19]

Second, "[i]f these three preconditions are met, the district court must then examine a variety of other factors to determine whether, under the totality of the circumstances, the challenged practice impairs the ability of the minority voters to participate equally in the political process and to elect a representative of their choice."[20] "It will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."[21]

Courts should consider the following non-exhaustive factors in determining whether minority plaintiffs do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters:

(1) the history of official voting-related discrimination in the state or political subdivision;
(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
(3) the extent to which the state or political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting;
(4) the exclusion of members of the minority group from candidate slating processes;
(5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;
(6) the use of overt or subtle racial appeals in political campaigns;
(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;
(8) whether there is a lack of responsiveness on the part of the elected officials to the particularized needs of minority group members; and

---

[18] *Id.* at 50-51.
[19] *League of United Latin American Citizens v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993).
[20] *Rodriguez*, 964 F.Supp.2d at 699.
[21] *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994); *Teague v. Attala Cnty. Miss.*, 92.F.3d 283, 293 (5th Cir. 1996).

(9) where the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous.[22]

Plaintiffs do not need to meet a majority of these factors or even a set number of these factors to prove a vote dilution claim.[23] Rather, these factors helpfully guide the court in reaching a conclusion about whether or not a certain electoral scheme dilutes the minority vote.[24] Of these factors, the two most important factors are "the existence of racially polarized voting and the extent to which minorities are elected to public office."[25]

In addition to examining these factors, a court must keep in mind that the totality of circumstances inquiry is "peculiarly dependent upon the facts of each case…and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms."[26] The court must conduct "a searching practical evaluation of the past and present reality [to determine] whether the political process is equally open to minority voters."[27] Due to the fact that "the resolution of a vot[e] dilution claim requires [a] close analysis of unusually complex factual patterns, and because the decision has the potential for serious interference with state functions…district courts [must] explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning."[28]

### B.    Constitutional and Section 2 Claims (Discriminatory Purpose)[29]

In addition to their discriminatory impact claim, the Plaintiffs also claim that the at-large system in the 32nd JDC has been maintained with a racially discriminatory purpose in violation of

---

[22] *Hall v. Louisiana*, 108 F.Supp.3d 419, 426-27 (M.D. La. 2015).
[23] *Patino v. City of Pasadena*, 230 F.Supp.3d 667, 676 (S.D. Tex. 2017).
[24] *Id.*
[25] *Clark v. Calhoun*, 88 F.3d 1393, 1397 (5th Cir. 1996).
[26] *Gingles*, 478 U.S. at 79 (internal quotation marks and citation omitted).
[27] *Id.*
[28] *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1203 (5th Cir. 1989).
[29] A court cannot "avoid ruling on [a] discriminatory intent claim [if]…the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation." *Veasey v. Abbott*, 830 F.3d 216, 230 n.11 (5th Cir. 2016); *see also Patino*, 230

7

Section 2, the Fourteenth Amendment, and the Fifteenth Amendment. To prevail on a vote dilution claim under either the Fourteenth or Fifteenth Amendment, a plaintiff must show that an electoral system has a "discriminatory or dilutive effect and a discriminatory purpose."[30] At-large districts violate the Constitution if they are "conceived or operated as purposeful devices to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population."[31]

A state violates the Constitution and Section 2 if it *maintains* an at-large voting system "for the invidious purpose of diluting the voting strength of the black population."[32] In order to prove that an electoral system is being maintained for discriminatory purposes, a plaintiff only needs to show that "a discriminatory purpose [was] a motivating factor" in the challenged decision.[33] "Racial discrimination need only be one purpose, and not even a primary purpose, [to establish] a violation of the Fourteenth and Fifteenth Amendments."[34]

To prove discriminatory intent, a plaintiff may rely upon direct or circumstantial evidence.[35] A plaintiff is not required to bring forward direct evidence because "[i]n this day and

---

F.Supp.3d at 718-19. Here, Plaintiffs request that Louisiana submit any future voting changes related to the 32nd JDC to preclearance by the Department of Justice under Section 3(c) of the VRA. 52 U.S.C. § 10302(c). Such relief is appropriate only if the Court finds a violation of the Fourteenth or Fifteenth Amendment. *Id.* Accordingly, because a finding of discriminatory effect is insufficient to provide this preclearance remedy, the Court must address Plaintiffs' discriminatory intent claims.

[30] Ruling on Motion to Dismiss 12, Doc. 32. The Court previously determined that a vote dilution claim is cognizable under the Fifteenth Amendment. *Id.*

[31] *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (citation omitted). Purposeful discrimination in the maintenance of voting systems is also prohibited by Section 2. *McMillan v. Escambia Cnty., Fl,.*, 748 F.2d 1037, 1046-47 (5th Cir. 1984) ("The results test of section 2 was intended to be a less stringent standard that substantially lessened the burdens on plaintiffs. Moreover, Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.") (emphasis in original).

[32] *Rogers*, 458 U.S. at 622; *McMillan*, 748 F.2d at 1046.

[33] *Village of Arlington Heights v. Metropolitan Housing Dev. Corp*., 429 U.S. 252, 265-266 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one….When there is proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.").

[34] *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted).

[35] *Veasey*, 830 F.3d at 235-36.

8

age we rarely have legislators announcing an intent to discriminate based upon race…To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence."[36]

In *Arlington Heights*, the Supreme Court identified five non-exhaustive factors that guide the circumstantial evidence inquiry: (1) the historical background of the challenged decision; (2) the sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence; (4) substantive departures; and (5) legislative history, especially where there are contemporary statements by decision-makers.[37] Once a plaintiff shows that race was a motivating factor, the "burden [then] shifts to the law's defenders to demonstrate that the law would have been [maintained] without this factor."[38]

## IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.   Terrebonne: Demographics, Advocacy, Courts, and the Local Government

For nearly 50 years, between 1968 when the 32nd JDC was created and the filing of this lawsuit in February 2014, no black candidate had ever been elected to the 32nd JDC.[39] In fact, no black candidate has ever been elected to any other parish-wide, at-large elected position in Terrebonne (*i.e.*, Parish President, District Attorney, Sheriff, Coroner, Clerk of Court, Tax Assessor, City Marshal, and Houma City Court Judge).[40] For the last twenty years, the Terrebonne

---

[36] *Id.*
[37] *Arlington Heights*, 429 U.S. at 267.
[38] *Veasey,* 830 F.3d at 231 (citation omitted).
[39] 3/13/17 Tr. 65-66, 218, Doc. 267; 3/14/17 Tr. 19-24, 250-251, Doc. 268; 4/28/17 Tr. 142-143, Doc. 283.
[40] 3/13/17 Tr. 65, 217, Doc. 267; 3/17/17 Tr. 34-35, 160, 179, 234-235, Doc. 271; 4/28/17 Tr. 142-43, Doc. 283.

NAACP and black voters have advocated for a majority-black subdistrict for the 32nd JDC, without success. In 1997, black residents of Terrebonne began advocating for an opportunity subdistrict to be created by the Louisiana Legislature.[41] Over the course of the next fifteen years, black residents of Terrebonne and the Terrebonne NAACP continued to advocate for the subdistrict. Countless bills were introduced, but none passed. The Plaintiffs brought this suit because they felt they had "exhausted all of [their] avenues."[42]

Terrebonne is located in Southern Louisiana. Houma, with a population of roughly 30,000, is the parish seat, the largest community in Terrebonne, and the only incorporated municipality.[43] The United States Census identifies nine other communities as Census-designated places ("CDPs")[44] in Terrebonne, including Gray and Schriever which are both located in the north part of the parish.[45] Between 1980 and 2010, the single-race black population of Terrebonne has grown significantly from 14,598 people to 21,139 people.[46] In 1980, this population constituted 15.47% of the total population in Terrebonne, and now it constitutes 18.9% of the total population.[47] By contrast, the non-Hispanic white proportion of the total population fell by more than 10 percentage points.[48] In 1980, 74,811 non-Hispanic whites lived in Terrebonne, and in 2010, 76,789 non-Hispanic whites lived in Terrebonne.[49] While they used to constitute 79.25% of the population in 1980, they now only constitute 68.65% of the population.[50]

---

[41] P128.

[42] 3/13/17 Tr. 69, Doc. 267.

[43] 3/14/17 Tr. 57-59, Doc. 268.

[44] CDPs are "are the statistical counterparts of incorporated places, and are delineated to provide data for settled concentrations of population that are identifiable by name but are not legally incorporated under the laws of the state in which they are located." https://www.census.gov/geo/reference/gtc/gtc_place.html.

[45] *Id.*; P165a ¶¶ 11, 18.

[46] P165a at 8.

[47] P165a at 8.

[48] P165a at 8.

[49] P165a at 8.

[50] P165a at 8.

Louisiana established the 32nd JDC with territorial jurisdiction over Terrebonne in 1968.[51] The 32nd JDC was retained under the Louisiana Constitution of 1974.[52] The 32nd JDC has five judges who are elected concurrently and serve non-staggered terms of six years.[53] Since the establishment of the 32nd JDC, all elections have been conducted at-large.[54] For the sole purpose of nominating and electing judges, the 32nd JDC is divided into five divisions (A through E) with one judge elected to each.[55]  When a candidate for the 32nd JDC decides to run, he or she must designate one division to run in.[56]

A voter in a primary or general election may vote for only one candidate for each division of the 32nd JDC.[57] Additionally, all qualified voters may vote in the primary and general elections without regard to their party affiliation, and all candidates who qualify for a primary or general election may be voted on without regard to their party affiliation.[58] A candidate for a division of the 32nd JDC who receives a majority of the votes cast in the primary election is elected.[59] If no candidate receives a majority, then the top two finishers move on to the general election.[60] The candidate who receives the most votes cast in the general election is elected to that division.[61] In addition to the 32nd JDC, Terrebonne is also served by the Houma City Court, which has one judge and, like the 32nd JDC, exercises parish-wide jurisdiction.[62]

---

[51] Stip. No. 26, Doc. 236
[52] Stip. No. 20, Doc. 236.
[53] Stip. No. 36, Doc. 236; La. R.S. § 13:621.32.
[54] Stip. Nos. 28, 35, Doc. 236.
[55] Stip. Nos. 29, 30, Doc. 236; La. R.S. § 13:582, § 13:583.
[56] Stip. No. 31, Doc. 236; La. R.S. § 13:584.
[57] Stip. No. 33, Doc. 236; La. R.S. § 18:522(B).
[58] La. R.S. § 18:401(B).
[59] Stip. No. 34, Doc. 236.
[60] *See* La. R.S. §§ 18:481, 18:482.
[61] Stip. No. 34, Doc. 236.
[62] La. R.S. § 13:1872 (A), (E).

Since 1997, the Terrebonne NAACP and black Terrebonne voters have advocated for a majority-black subdistrict.[63] This advocacy has spanned six different legislative proposals.[64] The Court discusses this advocacy in much greater detail *infra* in the discriminatory purpose section, but provides a brief synopsis here.

In 1997, after learning about House Bill ("HB") 1399, a bill to create a sixth 32nd JDC judgeship elected at-large, Jerome Boykin, the president of the Terrebonne NAACP, traveled to Baton Rouge with a few Terrebonne black attorneys to advocate for a subdistrict.[65] They urged Representative Hunt Downer, who was then Speaker of the Louisiana House of Representatives, to introduce an amendment that would have created the sixth judgeship to be elected from a majority-black subdistrict.[66] After legislative staff attempted to draw the subdistrict, Representative Downer chose to table the bill, noting that such a subdistrict would likely be objected to by the Department of Justice.[67] Representative Downer sent a letter to various individuals, including Jerome Boykin:

> [The proposed subdistrict] appears to fly in the face of recent court cases dealing with "gerrymandering" and…it would be subject to the "strictness of scrutiny" by the Justice Department and clearly subject to attack…[I]t does no one any good to address this matter in any fashion which would encourage a lawsuit (by any party) for then the election would be held up and we would be no closer to resolving the issue and getting a judgeship. Until this matter is resolved among the parties involved, on the local level, the bill will remain on the calendar and not taken up. I do not wish to put the House in a posture where an issue would be divisive, particularly a local matter.[68]

In 1998, Senator John Siracusa introduced Senate Bill ("SB") 166 which would have created a sixth judgeship to be elected at-large for the 32nd JDC.[69] Jerome Boykin and other black

---

[63] 3/13/17 Tr. 62-64, Doc. 267.
[64] *Id.* at 69.
[65] *Id.* at 63-67.
[66] *Id.*
[67] P17.
[68] *Id.*
[69] P167a at 30-31.

residents of Terrebonne opposed the bill because instead of creating a subdistrict it would have further perpetuated a system that they thought diluted the black vote.[70] Despite their opposition to the bill, SB 166 passed the Senate, but it did not come up for a vote in the House.[71]

In April 1999, Senator Michael Robichaux, introduced SB 1052 to create a sixth judgeship for the 32nd JDC to be elected from a majority-black subdistrict.[72] In response, in May 1999, one of the sitting 32nd JDC Judges, Judge Timothy Ellender, wrote to the chairman of the Senate Judiciary Committee to which SB 1052 had been referred.[73] He copied all of the other 32nd JDC judges, and urged that the chairman vote against the bill as "[i]t would be a waste of taxpayer's money to create a new district where it is not needed."[74] SB 1052 died in committee.[75]

The fourth piece of legislation for a subdistrict was introduced in March 2001.[76] Senator Butch Gautreaux introduced SB 968 to add a new judge to the 32nd JDC to be elected from a majority-black subdistrict.[77] The bill died in committee, and Senator Gautreaux later explained that the committee always goes along with the Judicial Council.[78] Although the Judicial Council had recommended that the 32nd JDC receive an additional judgeship in 1997, the Council withdrew that recommendation by 1999 after sitting judges on the 32nd JDC withdrew their request for an additional judgeship in 1998.[79]

---

[70] P167a at 30-31.
[71] P167a at 30-31.
[72] D15 at 17, 20-24.
[73] D127c1.
[74] *Id.*
[75] D15 at 13-14.
[76] D16 at 13, 16-20; P167a at 32.
[77] *Id.*
[78] D16 at 3-4; P167a at 32-33.
[79] P167a at 23, 30-33; D127B5.

On the same day that Senator Gautreaux introduced his bill, Representative Carla Dartez introduced a similar bill, HB 1723, in the Louisiana House.[80] Just like SB 968, HB 1723 was introduced to add a new judge to the 32nd JDC to be elected from a majority-black subdistrict.[81] One of the sitting judges of the 32nd JDC, Judge Edward Gaidry, wrote a letter to Representative Dartez requesting that she withdraw the bill to "avoid unnecessary consumption of time of the Legislature."[82] He stated that "our case load does not justify the creation of an additional judgeship, whether that be at large or through a special district."[83] HB 1723 died in committee.[84]

In April 2011, HB 582 was introduced to create a majority-black subdistrict to elect the Division C seat which was to be vacated by Judge Ellender in 2014.[85] This bill was different than the previous bills in that it did not add a sixth judgeship, but reorganized the method for election for the existing five seats. Specifically, this bill would create two election sections.[86] One judge would be elected from section one which would be a majority-black subdistrict, and the remaining four judges would be elected at-large from section two.[87] From April 2011 to June 2011, many individuals opposed this bill by sending letters and testifying against it.[88] The House Committee on House and Governmental Affairs approved HB 582 on June 1, 2011[89], but, on June 7, 2011, the full House voted against the bill by a vote of 51 to 41 with every black legislator voting for it.[90] A few days after this defeat—another unsuccessful attempt to create a majority-black subdistrict for

---

[80] D17 at 2, 5-9.
[81] *Id.*
[82] D127d1.
[83] *Id.*
[84] P167a at 35.
[85] D19 at 2-3, 14, 17-24.
[86] *Id.*
[87] *Id.*
[88] P29; D19; P28.
[89] D19 at 14-15.
[90] D19 at 11; P167a at 41-42.

the 32nd JDC—the Terrebonne NAACP began to publicize its intent to file a lawsuit challenging at-large voting for the 32nd JDC.[91] This suit was filed in February 2014.

During the pendency of this lawsuit, in November 2014, Juan Pickett, a first-time judicial candidate who is black, was elected without opposition to an open seat on the 32nd JDC.[92] For the first time in the history of the 32nd JDC, no white attorney competed for a seat on the 32nd JDC.

Over the past twenty years, two members of the 32nd JDC—Judge Paul Wimbish and Judge Ellender—have been disciplined by the Louisiana Supreme Court. Judge Wimbish was disciplined in 1999 for, among other things, failing to decide cases in a timely manner.[93]

Judge Ellender was first disciplined in 2004 after private citizens and his fellow judges of the 32nd JDC filed complaints against him.[94] In October 2003, Judge Ellender and his wife attended a Halloween party at a restaurant in Terrebonne.[95] Judge Ellender was dressed as a prisoner, wearing an orange jumpsuit, handcuffs, a black afro wig, and black makeup on his face, which he decided to apply after his costume did not "generate the laughs [he] had expected."[96] The Louisiana Supreme Court suspended Judge Ellender for one year and one day without pay, with six months deferred, for this misconduct.[97] The Supreme Court found that while the Judge "did not intend to offer an affront to the African-American community…[n]onetheless, his behavior exhibit[ed] his failure to appreciate the effects of his actions on the community as a whole."[98] Judge Ellender was reelected without opposition in 2008 to a six year term on the 32nd JDC.[99]

---

[91] P66; 3/13/17 Tr. 75-77, Doc. 267.
[92] *Id.* at 87-90, 221.
[93] *In re Wimbish*, 98-2882, (La. 4/13/99), 733 So.2d 1183.
[94] *In re Ellender*, 2004-2123 (La. 2004), 889 So.2d 225.
[95] *Id.* at 227.
[96] *Id.*
[97] *Id.* at 233.
[98] *Id.*
[99] 3/13/17 Tr. 60, 219, Doc. 267. Judge Ellender was suspended again in 2009 for misconduct in a domestic abuse case. *In re Ellender*, 2009-0736, (La. 2009), 16 So.3d 351, 356.

While the 32nd JDC continues to remain an at-large system, other Terrebonne bodies are elected from districts. Since the late 1970s, the Terrebonne Parish Council has had a district electoral plan, which includes two majority black-subdistricts.[100] The School Board also has a nine-district electoral plan which includes two majority-black subdistricts.[101] The majority-black subdistricts are identical in both plans.[102] One of those districts encompasses parts of Houma and rural areas to the south of Houma.[103] The other district includes a small portion of Houma and extends north through Bayou Cane and into Gray and Schriever.[104] The Parish Council plan is reproduced below.

---

[100] P165a ¶¶ 32-36; P167a at 16.
[101] P165a ¶¶ 32-36.
[102] *Id.*
[103] *Id.* at ¶ 33.
[104] *Id.*

**Terrebonne Parish Council Plan**



### B.     Discriminatory Effect Claim

#### a)     *Gingles One*

Based on the Illustrative plan presented by the Plaintiffs, the Court finds that the black population is sufficiently numerous and geographically compact to comprise a majority of the voting age population in one single member district in a five-district plan for the 32nd JDC. Below, the Court discusses (1) the two proposed plans introduced by the Plaintiffs; (2) the parties' disagreements about numerosity; (3) the parties' disagreements about whether the black population is compact; (4) whether the Court must undertake an effectiveness inquiry at this stage of the litigation; and (5) whether the Illustrative Plan is a racial gerrymander.

Plaintiffs' primary *Gingles* One expert is William S. Cooper. He is qualified to serve as an expert witness in redistricting and demographics. Since 1986, Mr. Cooper has prepared redistricting maps for approximately 700 jurisdictions for Section 2 litigation and other efforts to comply with the VRA.[105]

Defendants called two experts who opined on *Gingles* One—Mr. Michael Hefner and Dr. Ronald Weber. Mr. Hefner is qualified to serve as an expert witness in demographics and redistricting.[106] Mr. Hefner has served as an expert witness in various school desegregation cases and two other Section 2 cases.[107] Dr. Weber has testified in approximately 60 cases as an expert witness on political science and demographic issues.[108]

### (1)    The Proposed Plans

Satisfying the *Gingles* One preconditions—numerosity and compactness—"requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans."[109] In proving *Gingles* One, Plaintiffs' expert, Mr. Cooper, developed two plans—the Illustrative Plan and the Alternative Plan. At trial, and in their post-trial briefs, the Plaintiffs make clear that the Illustrative Plan is the primary demonstrative plan they submit to prove *Gingles* One. The Alternative Plan was introduced by the Plaintiffs to demonstrate that it was possible to create a plan out of whole precincts that existed during the November 2014 election. Accordingly, the Court focuses most of its discussion on the Illustrative Plan, and only addresses the Alternative Plan in the precinct section.[110]

---

[105] P165a at 31.
[106] 4/27/17 Tr. 12, Doc. 282.
[107] 4/27/17 Tr. 106, doc. 282.
[108] Daubert H'rg Tr. 64, Doc. 239; 4/28/17 Tr. 158-59, Doc. 283.
[109] *Gonzalez v. Harris Cnty. Tex.*, 601 Fed. App'x 255, 258 (5th Cir. 2015).
[110] To develop the Illustrative Plan, Mr. Cooper used (1) geographic boundary files created from the U.S. Census 2010 Tiger files and (2) population data from the 2010 PL 94-171 data file. The PL 94-171 dataset is the complete count

Consistent with his standard practice working on local-level redistricting plans, Mr. Cooper developed the Illustrative Plan at the census block level, which is the smallest geographic tabulation area from the decennial Census.[111] A census block may be as small as a regular city block or as large as several square miles; it is usually bounded on all sides by visible features such as roads or rivers.[112] The Illustrative Plan divides Terrebonne into five districts for the 32nd JDC.[113] District 1 is the majority-black subdistrict.



population designed by the Census for redistricting and contains basic race and ethnicity data on the total population and total voting age population found in units of census geography. In building his maps, Mr. Cooper used Maptitude for Redistricting, a geographic information system software that processes the TIGER files to produce a map for display on a computer screen and merges the demographic data from the PL 94-171 files to match the relevant Census geography. To develop his plan, he also obtained shapefiles which depicted the boundaries of the then-current precincts in Terrebonne, the Parish Council plan, and the School Board plan.

[111] 3/14/17 Tr. 75-76, Doc. 268.
[112] 3/14/17 Tr. 72-75, Doc. 268.
[113] P165a at 27.

*(2)     Numerosity*

Mr. Cooper, Mr. Hefner, and Dr. Weber all agreed that the black population in Terrebonne is sufficiently numerous such that District 1 has a greater than 50% voting-age black population.[114] While they agreed that the black voting age population is over 50% in District 1, they disagreed about the extent to which the black voting population rises above that threshold. Their disagreement stems from the fact that they all have different understandings of who should count as "black" for purposes of *Gingles* One.

The Census provides several different categories of race, three of which are relevant here: (1) non-Hispanic single-race black, which is the narrowest category of black; (2) non-Hispanic Department of Justice ("DOJ") black, which counts as black those who identify as black alone or as black and white; and (3) Any-Part black, which counts as black any person who self-identifies as black alone or black in combination with any other race or ethnicity, including those who self-identify as Hispanic.[115] In other words, Any-Part black and non-Hispanic DOJ black differ in that Any-Part black includes black Hispanics and multiracial individuals that are part black.

Mr. Cooper testified that District 1 has an Any-Part black voting age population of 50.81% based on the 2010 Census and a non-Hispanic black citizen voting age population of 53.33% based on the 2010-2014 American Community Survey ("ACS") estimates.[116] While Mr. Hefner does not dispute that the black population in Terrebonne is sufficiently numerous, to evaluate numerosity,

---

[114] In their post-trial brief, and contrary to their experts' testimony, the Defendants assert that the black population in District 1 is not sufficiently numerous because the non-Hispanic DOJ black voting age population of Terrebonne accounts for 17.4% of the voting age population in Terrebonne—and thus is 2.6 percentage points lower than 20%. Doc. 285 at 29. Defendants do not cite any authority for their theory that the black voting age population must constitute exactly 20% of the voting age population to be sufficiently numerous in a five district plan.

[115] 3/14/17 Tr. 51-52, Doc. 268.

[116] 3/14/17 Tr. 80-82, 127-130, Doc. 268.

he used the non-Hispanic DOJ black category rather than the Any-Part black category, which led him to conclude that the black population of District 1 is 50.22%.[117]

The parties appear to have two disputes regarding numerosity—whether it is proper to use the Any-Part category and whether it is proper to use ACS data. The Defendants assert that Mr. Cooper is using Any-Part black and ACS estimates (rather than decennial Census data), to attempt to arrive at a more favorable percentage for the Plaintiffs, that is, one that is a few percentage points above the necessary 50%, rather than right at the edge of 50%. While this may be the case, it is undisputed that, based on the 2010 Census data, the Plaintiffs have met the numerosity element of *Gingles* One. Therefore, the Court finds that the voting-age black population (as defined by the non-Hispanic DOJ black category and the Any-Part black category) in District 1 is greater than 50%. Accordingly, the Court is not required to address whether the proper percentage is 50.22%, 50.81%, or 53.33%, because under any reading of the Census data, the numerosity requirement is satisfied.[118]

### (3)    Compactness of the Black Population in Terrebonne

To satisfy the compactness requirement, a plaintiff must show that the minority community is geographically concentrated.[119] "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district."[120] "The compactness requirement is necessary to show that the challenged electoral practice, rather than the dispersion of the minority community, prevents the affected minority group from electing the candidates of

---

[117] 4/27/17 Tr. 19-20, 111, Doc. 282.
[118] A bright-line 50% plus one rule applies to numerosity. *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009); *Valdespino v. Alamo Heights Ind. Sch. Dist.*, 168 F.3d 848, 852-53 (5th Cir. 1999) (noting that *Gingles* One involves a "bright line test" and a minority group must exceed "50% of the relevant population in the demonstration district.").
[119] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433 (2006).
[120] *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996)).

their choice…A district is sufficiently compact if it allows for representation. A district would not be sufficiently compact if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived in the district."[121]

While there is no bright-line rule governing a Section 2 compactness determination, a court should take into account the shape of the proposed majority subdistrict[122], and it should also determine the degree to which the proposed district complies with "traditional districting principles such as maintaining communities of interest and traditional boundaries."[123] In making a compactness determination, the Court is mindful that "districting is hardly a science" and that there will often be "more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles."[124] For the reasons explained below, the Court finds that the black population in Terrebonne is compact.

(a)     Shape

The shape of a proposed district is not significant for its own sake. Rather, it is important because it serves values relating to representation. "[G]eographical compactness serves independent values: it facilitates political organization, electoral campaigning, and constituent representation."[125] There are many methods a court can use to assess the shape of a district. One recognized, although crude, measure is the "eyeball" test—a court can simply "examine the physical boundaries of the maps and the proposed districts and, based on that visual examination,

---

[121] *Rodriguez*, 964 F.Supp.2d at 738 (citations omitted); *Bush*, 517 U.S. at 979 (noting that if "because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district."); *Perry*, 548 U.S. at 433, 435 ("[T]here is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates…The mathematical possibility of a racial bloc does not make a district compact.").
[122] *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004).
[123] *Perry*, 548 U.S. at 433; *Bush*, 517 U.S. at 979 (noting that a district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact).
[124] *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000).
[125] *Karcher v. Daggett*, 462 U.S. 725, 756 (1983) (J. Stevens, Concurring).

determine if the district is strangely shaped."[126] *Gingles* One does not require that a "proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm…would be an unworkable concept."[127] Another, more objective, way to measure physical compactness is to use mathematical compactness scores, such as the Reock score or the Polsby-Popper score.[128]

The Court finds that the districts, including District 1, in the Illustrative Plan are geographically compact and regular in shape, based primarily on the testimony of Mr. Cooper. In terms of a visual examination, Mr. Cooper testified that a visual comparison of Illustrative District 1 to other electoral districts in Louisiana, such as State House Districts 51 and 52 (which are both partially located in Terrebonne), Congressional Districts 2 and 6, Judicial Subdistrict E for the 23rd JDC, as well as the Parish Council districts in West Feliciana and St. Martin parishes, confirms that the shape and geographical compactness of District 1 falls into the norm.[129]

Both Mr. Hefner and Dr. Weber testified that the general shape of District 1 was unusual. However, the Court disagrees with their visual observations, because they failed to provide any objective benchmarks for their visual assessments. Mr. Hefner testified that District 1 is "unusual and irregular."[130] Dr. Weber opined that the shape of District 1 is "odd."[131] Both Dr. Weber and Mr. Hefner concluded that the shape was odd (in their initial reports) without comparing District

---

[126] *Rodriguez*, 964 F.Supp.2d at 739 (citing *Sensley*, 385 F.3d at 596).
[127] *Dillard v. Baldwin Cnty. Bd. of Edu.*, 686 F.Supp. 1459, 1465-66 (M.D. Ala. 1988).
[128] *Cmte for a Fair and Balanced Map v. IL State Board of Elections*, 835 F.Supp.2d 563, 570 (N.D. Ill. 2011). The Reock and Polsby-Popper scores both compare a district to a circle, which is considered the most compact shape. The Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district, while the Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter. Both produce calculations between 0 and 1, with 1 being the most compact. P169 ¶ 3 n. 2, ¶ 5, n. 3.
[129] 3/14/17/ Tr. 93-99, Doc. 268; P165a at 22, 27; P169 at 3-4.
[130] 4/27/17 Tr. 117, 126, Doc. 282.
[131] 4/28/17 Tr. 28-29, 105-06, Doc. 283.

1 to any other electoral districts in Louisiana.[132] The Court finds that the "C" shape of District 1 is not odd or unusual when compared to other electoral districts in Louisiana, such as Louisiana House District 51 which also has a "C" shape and, like District 1, extends from the south in Houma to the west and then curves back north to Schriever.[133]

**Terrebonne Parish Sections of House Districts 51 and 52**



Both Dr. Weber and Mr. Hefner took issue with the fact that Illustrative District 1 runs from Schriever and Gray in the north to the western part of Terrebonne before entering Houma in the south.[134] However, the evidence shows that it is not odd to include Houma, the western part of Terrebonne, and the Schriever area in one electoral district. In fact, Dr. Weber admitted that parts of House District 51, and Districts 2 of both the Terrebonne Parish Council and the School Board

---

[132] 4/27/17 Tr. 126-127, Doc. 282; 4/28/17 Tr. 28-29, 105-06, Doc. 283.
[133] 3/14/17 Tr. 62-63, 82-83, 98-99, Doc. 268 ; P169 at 9; https://www.legis.la.gov/maps/House/District51.pdf.
[134] 4/28/17 Tr.  28-29, 106, Doc. 283 (Weber); 4/27/17 Tr. 77-78, Doc. 282 (Hefner).

extend from Houma in the south to Gray and Schriever in the north.[135] Additionally, Senate District 21 also combines parts of Houma with Gray and Schriever.[136]

Mr. Cooper also testified that District 1 is compact based on both the Reock and Polsby-Popper scores. No single statistical measure of compactness is dispositive. Quantitative scores are helpful as measures of comparison, but there is no predetermined level a district must meet to be considered compact.[137]

The Court finds that Illustrative District 1 has a Reock score of .39 and a Polsby-Popper score of .13.[138] In terms of its Reock score, it compares favorably to the mean Reock scores of current State House districts (.38) and current Louisiana Congressional districts (.36).[139] Additionally, while a Polsby-Popper score of .13 is a little bit low from an absolute perspective, this score compares favorably with the mean Polsby-Popper scores of current State House districts (.26) and current Louisiana Congressional districts (.15).[140] District 1's scores show that it is compact when compared to other electoral districts in Louisiana.

Mr. Hefner and Dr. Weber did not dispute the scores calculated by Mr. Cooper but they both criticized the scores on the grounds that they are low as an absolute matter, and that it is inappropriate to compare Illustrative District 1 to other electoral districts in Louisiana which were drawn when Louisiana still needed to seek preclearance from the DOJ.[141] Prior to the 2013 *Shelby County* decision, no change in voting procedures could take effect in Louisiana until federal authorities approved (i.e. precleared) new voting plans to confirm that the new plans had neither

---

[135] 4/28/17 Tr. 107-112, Doc. 283.
[136] 3/14/17 Tr. 65-66, Doc. 268.
[137] 3/14/17 Tr. 124, Doc. 268; 4/27/17 Tr. 126, Doc. 282; 4/28/17 Tr. 105, Doc. 283.
[138] 3/14/17 Tr. 88-91, Doc. 268.
[139] P169 at 2-3.
[140] P169 at 3.
[141] 4/27/17 Tr. 66-75, 118-19, Doc. 282.

the purpose nor the effect of diluting minority voting strength.[142] After *Shelby County*, changes to voting procedures in Louisiana and its subdivisions do not have to be precleared.

Mr. Hefner opined that comparing Illustrative District 1 to those pre-*Shelby* districts was essentially comparing apples to oranges because the pre-*Shelby* districts necessarily were less compact because they had to avoid retrogression of the existing minority voting strength.[143] Mr. Hefner testified that pre-*Shelby* drawers were constrained by the retrogression concerns while Mr. Cooper was not constrained by these same concerns when drawing his Illustrative Plan.[144] Dr. Weber expressed the same opinion in his reports.[145]

The Court finds that these pre-*Shelby* districts are adequate comparators because both before and after *Shelby County*, a plan drawer must adhere to traditional redistricting principles such as geographical compactness and non-dilution of minority voting strength.[146] Accordingly, the Court finds that it is appropriate to compare these pre-*Shelby* districts to District 1 in assessing whether District 1 is compact.

Relatedly, Defendants' experts testified that Terrebonne's population is diversifying and that black residents are too spread out to create a majority-black single member district.[147] Notwithstanding this argument, the Court finds that the black population in District 1 is sufficiently concentrated to constitute a single member district in the five member plan because, as explained above, District 1 compares favorably both in terms of its shape and its geographical compactness to other surrounding electoral districts.

---

[142] *Shelby Cnty., AL v. Holder,* 133 S.Ct. 2612, 2620 (2013).
[143] 4/27/17 Tr. 69-71, 119 Doc. 282.
[144] 4/27/17 Tr. 69-71, 119 Doc. 282.
[145] D7 at 6-8.
[146] 4/27/17 Tr. 120-122, Doc. 282.
[147] 4/27/17 Tr. 114-115, Doc. 282; 4/28/17 Tr. 29-32, Doc. 283.

(b)      Contiguity

Contiguity as a traditional redistricting principle does not mean that the concentrations of black voters in the proposed district must be contiguous. Rather, it means that the illustrative district itself must be contiguous—it simply has to be connected in one piece. All of the *Gingles* One experts agreed that District 1 is contiguous.[148] Accordingly, the Court finds that District 1 is in compliance with this principle.

(c)      Population Equality

Judicial districts, as opposed to legislative districts, are not *required* to comply with the principle of one person, one vote as a matter of constitutional law.[149] However, population equality is an equitable consideration: "A subdistrict which allows a much smaller number of people to elect one or more judges whose jurisdiction extends throughout the judicial district, including those who reside in the district but cannot vote for or against that judge or judges, raises rather perplexing questions…[E]quity demands that all such subdistricts—for whatever purpose created—must contain substantially equal populations."[150] The Supreme Court's "decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10%" is consistent with the principle of one person, one vote.[151] The Illustrative Plan has an overall deviation from population equality of 5.2% and complies with the one person, one vote principle.[152] Both Mr. Hefner and Dr. Weber agreed that the Illustrative Plan complies with this principle.[153] The Court finds that the Plan respects the one person, one vote requirement.

---

[148] 3/14/17 Tr. 99-101, Doc. 268 (Cooper); 4/27/17 Tr. 127-28, Doc. 282 (Hefner); *See* D6 at 23 (Weber).
[149] *Wells v. Edwards*, 347 F.Supp. 453, 455 (M.D. La. 1972), *aff'd*, 409 U.S. 1095.
[150] *Clark v. Roemer*, 777 F.Supp. 445, 453 (M.D. La. 1990).
[151] *Brown v. Thomson*, 462 U.S. 835, 842 (1983).
[152] 3/14/17 Tr. 100-02, Doc. 268.
[153] 4/27/17 Tr. 127-28, Doc. 282; *See* D7 ¶¶ 5-10 (no discussion of one person, one vote).

(d)     Communities of Interest

In assessing whether a district complies with traditional districting principles, a court should also determine whether the hypothetical district respects "communities defined by actual shared interests."[154] If race is the only "common thread" that binds certain areas together, the district cannot be said to respect communities of interest.[155] However, a district that has a particular racial makeup can still satisfy this principle as long as the individuals inside that district share "some common thread of relevant interests."[156]

The Court finds that the Illustrative Plan respects communities of interest for three main reasons. First, the testimony at trial, especially from the Plaintiffs themselves, showed that the areas that constitute District 1 share a common bond. Second, the residents share common socioeconomic characteristics. Third, other electoral districts combine parts of Houma, Gray, and Schriever which demonstrates that these areas form a unified community.

Black residents in Houma, Gray, and Schriever interact with each other frequently through the use of shared spaces.[157] Residents from Houma, Gray, and Schriever (1) share places of worship, libraries, and recreation;[158] (2) belong to the same civic organizations such as the NAACP and the Southern Christian Leadership Conference;[159] (3) shop together;[160] and (4) have access to the same television channels and newspapers.[161] Moreover, black residents in Gray and Schriever consider themselves to be part of the Terrebonne community.[162]

---

[154] *Miller v. Johnson*, 515 U.S. 900, 916 (1995).
[155] *Id.* at 920.
[156] *Id.*
[157] 3/17/17 Tr. 70-71, Doc. 271.
[158] 3/13/17 Tr. 33-35, Doc. 267.
[159]  3/14/17 Tr. 9-10, Doc. 268.
[160] 3/13/17 Tr. 35, Doc. 267.
[161] 3/13/17 Tr. 38, Doc. 267.
[162] 3/13/17 Tr. 37-39, Doc. 267; 3/14/17 Tr. 10-11, Doc. 268; 3/17/17 Tr. 69-70, Doc. 271.

Additionally, black residents in Illustrative District 1 share similar socioeconomic characteristics as compared to non-Hispanic whites in those same areas.[163] For example, black residents in Houma, Gray, and Schriever (1) live below poverty at a rate at least three times that of non-Hispanic white residents, (2) have an average per capita income that is no more than two-thirds of their non-Hispanic white peers, and (3) rely on food stamps at a rate that is at least double that of non-Hispanic white residents.[164]

Current electoral districts (Parish Council District 2, School Board District 2, House District 51, State Senate District 21), which combine parts of Houma, Gray, and Schriever, also demonstrate that these three areas share common bonds.[165] In fact, District 1 is very similar to Parish Council and School Board Districts 1 and 2. Approximately 84% of the total population (18,239) currently residing in Parish Council and School Board Districts 1 and 2 reside in Illustrative District 1, and approximately 94% of the black population (11,718) in those Parish Districts reside in Illustrative District 1.[166] This shows that Houma, Gray, and Schriever share similar interests, at least enough of a bond that local authorities thought it appropriate to combine them together.

Mr. Hefner opined that the Illustrative Plan does not maintain communities of interest because it is inappropriate to combine Houma, Gray, and Schriever. As support for his opinion, he pointed to various districts that separate Gray and Schriever, on the one hand, from Houma, on the other.[167] While there may be some districts that separate these areas, there are numerous districts that combine them, which is evidence that they form a singular community.

---

[163] 3/14/17 Tr. 102-109, Doc. 268.
[164] *Id.*
[165] 3/14/17 Tr. 99-103, Doc. 268.
[166] 3/14/17 Tr. 103, Doc. 268.
[167] 4/27/17 Tr. 77-78, Doc. 282.

Based on the foregoing facts, the Court finds that the Illustrative Plan maintains communities of interest.

(e)    Precinct Splits

In making a compactness determination, a court should also undertake to determine whether an illustrative plan respects political subdivisions.[168] "[W]hile respect for existing political boundaries is also a valued traditional districting method…election precincts are not such important political boundaries that they should negate a districting proposal, particularly where…other key districting principles are obeyed."[169] For example, a district drawer may sometimes split a precinct to ensure that a district is more compact and looks more normal.

The Court finds that the Illustrative Plan adequately minimizes precinct splits. The Illustrative Plan split 12 of the 86 precincts that were in place for the November 2014 elections in Terrebonne; 11 of those splits occurred in District 1.[170] The Defendants assert that this is an excessive number of splits which should cause the Court to find that the Illustrative Plan does not comply with traditional districting principles. The Court disagrees as the number of precincts in Terrebonne has changed quite a bit in the last 20 years. Accordingly, these boundaries, while they should be adhered to if possible, are not set in stone.[171] Moreover, it appears to the Court that many of these precincts were split to make the shape of District 1 more regular. Furthermore, the Court

---

[168] *Miller*, 515 U.S. at 919.

[169] *United States v. Village of Port Chester*, 704 F.Supp.2d 411, 439-40 (S.D.N.Y. 2011) (citation omitted).

[170] P169 at 6; P172 at 7.

[171] 4/28/17 Tr. 266, Doc. 283 (Mr. Cooper explaining that "[i]t would be a moving target to try to put together a plan that is based on whole precincts because precinct lines can change in Terrebonne from year to year as we have seen").

finds that these split precincts can be adequately accommodated by using lockouts[172], which are inexpensive and easily administered.[173]

Because the court finds that the Illustrative Plan adequately minimizes precinct splits, it need not review the Alternative Plan, a plan which Mr. Cooper introduced to show that a majority-black subdistrict could be drawn using the whole precincts that were in place for the November 2014 election.[174]

(f)   Incumbent Protection

Incumbent protection is another traditional districting principle.[175] Louisiana law "does not require a candidate for a division of a district court to be domiciled within the precinct boundaries or any other geographic boundaries of that division."[176]

The five current 32nd JDC judges live close to one another, and some of them live in the same Illustrative Districts.[177] Two of those judges are required to retire in 2020 because of age restrictions.[178] Due to the fact there is no requirement that an incumbent needs to run in the subdistrict in which he or she resides, the Illustrative Plan does not violate this principle. In other

---

[172] A lockout is a mechanism in a spilt precinct that ensures that only people "who are allowed to vote at the polling place, but who do not live within the [electoral district at issue like a] judicial subdistrict" cast their votes in the election in which they may participate. La. Att'y Gen Op. No. 02-189, 2002 WL 1483936 at *3.

[173] 3/20/17 Tr. 101, Doc. 273.

[174] Mr. Hefner testified that the Alternative plan did not satisfy *Gingles* One because it failed the numerosity prong. 4/27/17 Tr. 159, Doc. 282. He asserted that the non-Hispanic DOJ black voting age population of District 1 under this plan was only 49.7%, whereas Mr. Cooper, using both the Any-Part black category from the census and ACS estimates, testified that District 1 had a non-Hispanic black voting age population over 50% (50.35% using Any-part black and an estimated 53.90% using the non-Hispanic black citizen ACS data). *Id.*; P172 at 9. Once again, Mr. Hefner criticized the use of the Any-Part black count and the use of ACS estimates. Due to the fact that the Court finds that the Illustrative Plan adequately minimizes precinct splits, it need not resolve the disagreements between these experts regarding the viability of the Alternative Plan.

[175] *Prejean v. Foster*, 83 Fed. App'x 5, 9 (5th Cir. 2003).

[176] *Snyder v. Perilloux*, 198 So.3d 237, 241 (La. Ct. App. 5th Cir. 2016) (en banc) (finding that a candidate who did not reside in the subdistrict for Division B of the 40th JDC (but resided in the 40th JDC) was qualified to run for that seat), *aff'd in relevant part and rev'd in part on other grounds*, 197 So.3d 692 (La. 2016).

[177] 3/14/17 Tr. 122-23, Doc. 268.

[178] 3/17/17 Tr. 180, Doc. 271.

words, this Illustrative Plan will not require current incumbents to run against each other. Neither Mr. Hefner nor Dr. Weber dispute that the Illustrative Plan complies with this principle.[179] Accordingly, the Court finds that the Illustrative Plan protects incumbent judges.

(g)   Preserving Minority Voting Strength

A plan drawer is allowed to "subrogate one or more of the traditional redistricting criteria in order to maintain minority voting strength."[180]

Defendants assert that District 1 will effectively disenfranchise black voters who live outside of District 1. Mr. Hefner testified that if the proposed Illustrative Plan were to go into effect the remainder of the Parish outside of District 1 would only have a 9.8% black population, and this small group would have "absolutely no voice in the election of their judges."[181] Mr. Hefner explained that with the current at-large system, any candidate must at least appeal to the minority population because minorities represent a core that can swing an election, whereas if the subdistrict gets created, it is possible that the minority community outside of District 1 may not get any consideration.[182]

The Court finds Defendants' argument unpersuasive insofar as Defendants are using it in an attempt to argue that the Illustrative Plan does not preserve minority voting strength. As the Fifth Circuit has stated, "[w]henever a majority-black district is created to remedy a Section 2 violation, the number of black voters in the other districts must necessarily be reduced. Indeed, without this phenomenon, no majority-black districts would ever be created."[183] Accordingly, "[the] suggestion that the formation of plaintiffs' proposed district would dilute the voting strength

---

[179] *See generally* D1, D2, D3, D6, D7.
[180] 4/27/17 Tr. 121-122, Doc. 282.
[181] 4/27/17 Tr. 27, Doc. 282.
[182] 4/27/17 Tr. 27-28, Doc. 282.
[183] *Clark*, 21 F.3d at 95.

of black citizens in the remaining districts does not support [the] conclusion that the black population…is not sufficiently geographically compact" for purposes of *Gingles* One.[184]

        (h)      Overall Conclusion on Compactness

For all of the reasons stated above, the Court finds the black population in District 1 is sufficiently concentrated and compact, and the District itself adheres to traditional districting principles.

        *(4)      Effectiveness*

While Mr. Hefner agreed that the black population is sufficiently numerous to constitute a single member district because the black population constitutes over 50% of the voting age population of District 1, he testified that it will be very difficult to create an effective remedy in this case.[185] Essentially, he opined that the Plaintiffs are going to great lengths just to get over the 50% threshold (by excessively splitting precincts, utilizing more favorable racial categories, and working at the block level), and that by barely getting over this threshold, it is evident that any remedy ordered by the Court in this case will be ineffective. Mr. Hefner testified that in the cases that he has worked on, a majority-minority district will not be effective unless the black population is at least 56% of the voting age population of the proposed district.[186]

At the *Gingles* One stage, the Supreme Court "requires only a simple majority of eligible voters in the single-member district. The court may consider, at the *remedial* stage, what type of remedy is possible…But this difficulty should not impede the judge at the liability stage of the proceedings."[187]

---

[184] *Id.*
[185] 4/27/17 Tr. 112, Doc. 282.
[186] 4/27/17 Tr. 112, Doc. 282.
[187] *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (emphasis in original); *Mo. State Conf. of the NAACP v. Ferguson-Florissant School Dist.*, 201 F.Supp.3d 1006, 1031 (E.D. Mo. 2016). While the Court recognizes there is

(5)    *Racial Gerrymander*

Mr. Hefner and Dr. Weber contend that the Illustrative Plan is a racial gerrymander which is demonstrated by (1) Mr. Cooper's choice to work at the census block level, (2) the "odd" shape of District 1, (3) the inclusion of parts of Houma, Gray, and Schriever into District 1, and (4) the excessive splitting of precincts. Mr. Hefner and Dr. Weber's concerns about whether the plan is a racial gerrymander raise fundamental issues about the proper balance to be struck between the mandate of Section 2 and the equally strict commands of the Equal Protection Clause.

The Court finds that Defendants' argument—that the Plaintiffs cannot satisfy *Gingles* One because the Illustrative District is a racial gerrymander—is meritless for two main reasons. First, the Court need not undertake an equal protection analysis. Second, even if this analysis were required, the Court finds that the plan is not invalid under the Equal Protection Clause. Accordingly, this racial gerrymander argument does not defeat Plaintiffs' vote dilution case.

First, various courts, including the Fifth Circuit, have held that Section 2 plaintiffs in vote dilution cases are not required to show that their proposed plans comply with *Miller v. Johnson*[188] to satisfy *Gingles* One.[189] This is the case because *Miller* and *Gingles* present analytically distinct

---

no requirement to undertake an effectiveness inquiry at the liability stage, the Court nonetheless finds the plan submitted by the Plaintiffs to be sufficiently effective in providing black voters a reasonable opportunity to elect a candidate of their choice. The Court bases this conclusion on three factors, the voting age populations of black and white voters in Illustrative District 1, the rates of black voter support for black candidates / non-black voter support for black candidates, and the average turnout rates for black and white voters in Terrebonne. Even at current turnout rates for black voters, which are lower than the turnout for white voters, black voters would have a realistic opportunity to elect a candidate of their choice, albeit by a small margin. Furthermore, it is appropriate for a district court to consider the substantial increase in turnout of black voters that usually follows the creation of an opportunity district in its effectiveness analysis. *See United States v. Euclid City Sch. Bd.*, 632 F.Supp.2d 740, 765 (N.D. Ohio 2009) ("[I]t is unreasonable to assume that minority turnout will not increase under a system in which that turnout is made meaningful, relative to a system in which that turnout was entirely ineffective.") With the boost in turnout of black voters the district becomes substantially more effective.

[188] *Miller v. Johnson*, 515 U.S. 900 (1995).

[189] *Clark*, 88 F.3d at 1406-07 (holding that "*Miller* and its progeny [did not] work a change in the first *Gingles* inquiry" and rejecting the argument that "a proposed district that violates *Miller* does not satisfy the first *Gingles* factor per se"); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) ("The district court's attempt to apply authorities such as *Miller* to this Section Two case, however, is unpersuasive, because the *Miller* and *Gingles /Nipper /SCLC* lines address very different contexts."); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd.*, 952 F.Supp.2d 1360, 1365 (N.D. Ga. 2013)

legal issues. In *Miller* the "ultimate question [was] whether race was the predominant factor motivating the drawing of particular district lines."[190] In that case, the "Supreme Court confronted the constitutionality of Georgia's Eleventh Congressional District, one of three majority-minority districts in the State…[that was] [d]rawn in response to the Justice Department's refusal to preclear earlier reapportionment plans pursuant to Section 5 of the 1965 Voting Rights Act."[191]

In contrast to "*Miller's* focus on motivation…the first *Gingles* factor is an inquiry into causation that necessarily classifies voters by their race."[192] In undertaking a "causation" inquiry, a court is tasked with determining whether it is the current at-large system and not, for example, geographic dispersal that is the cause of the black populations' disproportionately weak political strength.[193] If a plaintiff can show that the minority population has the potential to elect a representative of its choice in some single-member district which adheres to traditional redistricting principles, then the plaintiff has necessarily shown that the current at-large system is the cause of the minority population's political weakness.[194] Accordingly, the Court need not undertake a *Miller* equal protection inquiry with regards to the Illustrative District, which is only being presented as an example to prove that a solution is possible, not that it is necessarily the final plan.[195]

---

(finding that there are no cases that hold that "§2 plaintiffs are required under the first prong of *Gingles* to show compliance with *Miller*."); *Harvell v. Blytheville School Dist.*, 71 F.3d 1382, 1391 (8th Cir. 1995) ("The Supreme Court's recent redistricting decision in *Miller* does not alter our analysis of the *Gingles* factors or our ultimate decision in this appeal. *Miller* analyzed the equal protection problems involved in drawing voting districts along race-based lines, but did not purport to alter our inquiry into the vote-dilution claim. We do, however, sound a cautionary note to the district court on remand to steer clear of the type of racial gerrymandering proscribed in *Miller*, while keeping in mind the need to vindicate the rights of the minority voters.").

[190] *Clark*, 88 F.3d at 1406.
[191] *Id.* at 1402.
[192] *Id.* at 1406-07.
[193] *Id.*
[194] *See Id.* at 1406.
[195] *Clark*, 21 F.3d at 95 ("[P]laintiff's proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible in Calhoun County. If a Section 2 violation is found, the county will be given the first opportunity to develop a remedial plan."); *Bone Shirt*, 461 F.3d at 1419 ("This court recently held that at the

However, even if the Court were to apply *Miller* and its progeny, the Court finds that the Illustrative Plan is not a racial gerrymander. While Mr. Cooper surely considered race as a factor in drawing the district, the Court finds that race was not the predominant factor in the creation of the Plan. Mr. Cooper testified that while race was a consideration—as it always is in any vote-dilution case—it was not the predominant or sole consideration.[196] The Court finds this testimony credible.

In contrast, Mr. Hefner and Dr. Weber both opined that race was the primary factor that Mr. Cooper used in creating the Illustrative Plan. These experts asserted that this is demonstrated by (1) Mr. Cooper's choice to work at the census block level, (2) the "odd" shape of District 1, (3) the inclusion of parts of Houma, Gray, and Schriever into District 1, and (4) the splitting of precincts even in Gray and Schriever. However, the Court does not find these opinions credible.

First, it is not inappropriate for a demographer to work at the census block level to develop an electoral plan.[197] Mr. Cooper testified that it is his normal practice to use census-blocks to develop local, as opposed to state-level, plans.[198] Additionally, Mr. Hefner conceded that he also used census blocks in his own work.[199] As evidence that Mr. Cooper was "cherry-picking" census blocks to maximize the black population in District 1, Mr. Hefner presented Defendants' Exhibit 11.17.[200] This map shows Illustrative District 1 overlaid on top of the census blocks that have

---

initial stage of the *Gingles* precondition analysis, the plaintiffs are only required to produce a *potentially* viable and stable solution.").

[196] 4/28/17 Tr. 263-264 ("I took into account traditional redistricting principles. I did not go block-by-block and try to maximize black voting age strength in the Illustrative Plan, District 1. Where possible, I followed precinct lines, and while race was a consideration, as it always is in a section 2 case, it was not the sole criterion."), Doc. 283.

[197] *Houston v. Lafayette Cnty., Ms.*, 56 F.3d 606, 611 (noting with approval plaintiffs' explanation that they used "existing census block lines" for their proposed plan and reversing the lower court's ruling that plaintiff did not satisfy the first *Gingles* requirement).

[198] 3/14/17 Tr. 75-76, Doc. 268.

[199] 4/27/17 Tr. 103-104, Doc. 282.

[200] 4/27/17 Tr. 46-48, Doc. 282. The Court is aware that there appears to be a mistake in this map. While Mr. Cooper presented a plan in which Precinct 33 was included in Illustrative District 1 (P165a at 92), Mr. Hefner's Map, D 11.17, fails to specify that Precinct 33 is in District 1. While the Court is aware of this mistake, the map otherwise appears to be correct.

majority black populations. While this map shows that Mr. Cooper surely considered race in drawing his district, it does not show that he used race as the sole factor. He did not include every conceivable census block that had a majority black population in Illustrative District 1. For example, he left out certain black majority census blocks in the northwest part of the parish, in Schriever, and in Houma, presumably to comply with other important principles such as population equality and shape regularity.[201] Additionally, as Mr. Cooper explained, he included a majority-white area in District 1 to make District 1 "more regularly shaped."[202]

Second, as discussed above, the shape of District 1 is not odd. It has a compactness score that falls within the norm when compared to nearby districts and it has a crescent shape that is similar to those same districts, like State House District 51, which has a crescent shape inside Terrebonne. Moreover, in regards to whether this crescent shape is evidence of a racial gerrymander, District 1 is much more normal looking than the districts found invalid under the Equal Protection Clause for using race as the predominant factor.[203]

Third, as previously discussed, it is not odd to include parts of Houma with Gray and Schriever as they constitute a unified community. Combining these areas does not serve as proof that race served as the predominant criterion in drawing the plan.

Finally, the existence of precinct splits, even those splits in Gray and Schriever, does not demonstrate that race predominated in the drawing of the plan. Many of these precincts were split to address various principles like population equality and geographical compactness as explained above.

---

[201] *See* D11.17.
[202] 3/14/17 Tr. 77-78, 83-84, Doc. 268.
[203] *Compare* the crescent shape of District 1 with *Cooper v. Harris*, 137 S.Ct. 1455, 1482-84 (2017) (North Carolina Congressional Districts 1 and 12); *Miller*, 515 U.S. at 928 (Georgia Congressional District 11); *Hays v. Louisiana*, 839 F.Supp. 1188, 1211 (W.D. La. 1993) (Louisiana Congressional District 4).

Even assuming this Plan were a racial gerrymander, that does not mean that Plaintiffs' vote dilution claim would necessarily fail. A plan is subject to strict scrutiny when it is shown that race was the predominant factor motivating the creation of a plan.[204] To satisfy strict scrutiny, the defender of the plan, usually the state, must demonstrate that its districting decision is narrowly tailored to achieve a compelling government purpose.[205] The Fifth Circuit has recognized that "compliance with Section 2 of the Voting Rights Act constitutes a compelling governmental interest."[206]

As described *infra*, there is clearly a Section 2 violation in this case. Nevertheless, even if the Illustrative Plan were a racial gerrymander, it would survive strict scrutiny because the plan is narrowly tailored to remedy that wrong. In other words, the Court finds that the plan does not use "race substantially more than is reasonably necessary" to remedy the Section 2 violation.[207] The Defendants have not offered any argument in opposition to the claim that the plan is narrowly tailored to remedy the vote dilution.

(6)     *Overall Gingles One Conclusion*

The Court finds that the Plaintiffs have satisfied the first *Gingles* precondition. The black population in Illustrative District 1 is sufficiently numerous and geographically compact to constitute a single-member district in a five district plan for the 32nd JDC. The Court concludes

---

[204] *Theriot v. Jefferson Parish*, 185 F.3d 477, 488 (5th Cir. 1999); *Clark*, 88 F.3d at 1405-06.

[205] *Clark*, 88 F.3d at 1406.

[206] *Id.* at 1405-06.

[207] *Clark*, 88 F.3d at 1407 (citation omitted); *See also Ga. State Conf. of NAACP v. Fayette Cnty.*, 118 F. Supp. 3d 1338, 1345 (N.D. Ga. 2015) ("Defendants' arguments and evidence to date seek to establish that the plans were drawn with race as the predominant consideration, but they do not address the issue of whether, assuming this is true, that use of race was narrowly tailored to achieve a compelling government interest. Indeed, with respect to both the Illustrative Plan and the Remedial Plan, the Court previously concluded that even if the plans were subject to strict scrutiny, they would pass constitutional muster.").

38

that the Plan is not a racial gerrymander, but, even it were, it would survive strict scrutiny because it is narrowly tailored to remedy a significant Section 2 violation.

      **b)**     ***Gingles Two and Three***

In order to make out a vote dilution claim, a plaintiff must also show that the minority group is politically cohesive (*Gingles* Two) and that the majority group usually votes as a bloc to defeat the minority-preferred candidate (*Gingles* Three).[208] In order to prove *Gingles* Two, a plaintiff must show that "a significant number of minority group members usually vote for the same candidates."[209] In order to prove *Gingles* Three and show that there is legally significant white bloc voting, a plaintiff must show that whites vote in such a way that they will "normally…defeat the combined strength of minority support plus white 'crossover' votes."[210] By proving these two preconditions, a plaintiff shows that elections in a given area are characterized by racially polarized voting ("RPV").[211]

In presenting statistical evidence that these two preconditions are met, a presumption is created in favor of the plaintiff that "racial bias [is] operating in the electoral system."[212] In other words, a plaintiff does not need to bring forward "conclusive proof that a minority group's failure to elect representatives of its choice is caused by racial animus."[213] By introducing sufficient statistical evidence of RPV, the plaintiff effectively shows that race played a role at the polls.[214] Once this showing is made, the burden then shifts to a defendant to show that race did not play a role in these elections and that other race-neutral factors explain the voting outcomes.[215]

---

[208] *Gingles*, 478 U.S. 56.
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] *Teague*, 92 F.3d at 290-91.
[213] *Clements*, 999 F.2d at 859.
[214] *Teague*, 92 F.3d at 290.
[215] *Id.*

A few other points of law are relevant to the Court's RPV discussion in this case. First, endogenous elections are elections for the office at issue, here the 32nd JDC, while exogenous elections are elections held for other offices. Although exogenous elections tend to be less probative of RPV than endogenous elections, they may not be excluded from the analysis completely, especially where there are very few relevant endogenous elections.[216] Second, the Fifth Circuit has explicitly rejected the argument that "plaintiffs may never make out a vote dilution claim where there is no evidence from '[endogenous]' elections."[217] "[P]laintiffs may not be denied relief simply because the absence of black candidates has created a sparsity of data on [RPV] in purely [endogenous] elections…To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress sought to remove."[218] Third, the Fifth Circuit has consistently held that biracial elections are the most probative of whether RPV is occurring.[219] Fourth, while surely "a pattern of [RPV] that extends over a period of time is more probative…than are the results of a single election," there is no minimum number of elections that must be analyzed.[220] Fifth, in order to find RPV, a court need not find that bloc voting is "absolute."[221] A plaintiff proves RPV where he shows that whites vote sufficiently as a bloc to "usually" defeat the minority population's preferred candidate.[222]

With these points of law in mind, the Court turns to the evidence presented on RPV. Two experts opined on whether RPV is occurring in Terrebonne—Dr. Richard Engstrom[223] for the

---

[216] *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502 (5th Cir. 1987); *Westwego*, 872 F.2d at 1207-8.
[217] *Id.* at 1209.
[218] *Id.* at 1208-09 n.9; *Clark*, 88 F.3d at 1398.
[219] *Westwego*, 872 F.2d at 1208 n. 7; *East Jefferson Coalition v. Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).
[220] *Gingles*, 478 U.S. 57 n. 25.
[221] *Teague*, 92 F.3d at 288.
[222] *Id.*
[223] Dr. Engstrom was qualified as an expert to testify on RPV, political science, and election systems. He has testified as an expert in more than 100 voting rights cases.

Plaintiffs and the previously discussed Dr. Weber for the Defendants. For the most part, they had nearly identical statistical findings, although they disagreed about the conclusions to draw from those findings. Two experts testified for the Defendants on the issue of whether factors other than race explain the electoral defeat of various black candidates—Ms. Angele Romig[224] and Mr. Michael Beychock.[225] Dr. Lichtman, an expert in political history, political analysis, and statistical methodology, critiqued Mr. Beychock's and Ms. Romig's explanations.[226]

The Court first analyzes whether Plaintiffs have presented enough statistical evidence to raise the presumption that racial bias is currently occurring in the electoral system.[227] Then, the Court addresses whether non-racial factors explain the election outcomes. For the reasons that follow, the Court finds that Terrebonne elections are characterized by significant patterns of RPV—that is, black voters are politically cohesive (*Gingles* Two) and non-black voters usually vote as a bloc to defeat the minority-preferred candidate (*Gingles* Three). The Court finds that this pattern can be explained by race rather than other factors.

### (1)    Racially Polarized Voting

Dr. Engstrom examined seven biracial elections that were held at-large or parish-wide in Terrebonne to determine the extent of RPV in the parish—(1) 1993 First Circuit Court of Appeal

---

[224] Ms. Romig has never previously testified as an expert in any case in federal court, although she has testified as a fact witness. Ms. Romig works for a private company that runs the Election Registration Information Network ("ERIN"), which is Louisiana's repository for voter registration and election data. The system generates ballots and intakes elections results.

[225] Mr. Beychock is a political consultant for both local and national elections. He has testified in one other Section 2 case.

[226] Dr. Lichtman analyzed the totality of the circumstances prong of *Gingles* in this case and the discriminatory purpose claim. *Gingles* Two and Three are closely related to Senate Factor 2—the extent to which voting is racially polarized. The Court finds it proper to address the non-racial factors at this point in its opinion, although it recognizes that it would be equally proper to address these factors in the totality of circumstances section.

[227] *Vecinos de Barrio UNO  v. Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995) ("The ultimate question in any Section 2 case must be posed in the present tense, not the past tense. The court must determine whether the challenged electoral structure deprives a racial minority of equal opportunity to participate in the political process at present. Though past elections may be probative of racially polarized voting, they become less so as environmental change occurs. In particular, elections that provide insights into past history are less probative than those that mirror the current political reality.").

election; (2) the 1994 32nd JDC election; (3) 2008 Presidential election; (4) 2011 Tax Assessor election; (5) the 2012 Presidential election; (6) 2014 Houma City Marshal election; and (7) the 2014 Houma City Court election. Dr. Weber conducted an analysis of RPV with respect to these same seven elections. They both used an inquiry called King's ecological inference ("EI") to analyze these elections, an inquiry that provides a specific estimate of a group's support for a candidate, and is widely recognized as the best method for determining candidate preferences for different groups.[228] Dr. Engstrom and Dr. Weber's King's EI estimates are virtually identical and summarized in the table below.[229]

---

[228] 3/13/17 Tr. 155-159, Doc. 267. In addition to providing a point estimate, King's EI also provides a range of estimates within which one can be 95% confident that the actual value of the group's support for a candidate lies. *Id.*
[229] These statistics are taken from Dr. Engstrom's report (P166) and Dr. Weber's report (D6).

| | Black Candidate and Party Affiliation | Number of White Opponents and Party Affiliation | Dr. Engstrom's Point Estimate of Percentage of Black Voters Who Supported Black Candidate | Dr. Engstrom's Point Estimate of Percentage of Non-Black Voters Who Supported Black Candidate | Dr. Weber's Point Estimate of Percentage of Black Voters Who Supported Black Candidate | Dr. Weber's Point Estimate of Percentage of Non-Black Voters Who Supported Black Candidate |
|---|---|---|---|---|---|---|
| 1993 First Circuit Court of Appeal Election | Anthony Lewis (Democrat) | 1 Democrat | 99.2% | 10.5% | 98.8% | 9.9% |
| 1994 32nd JDC Election | Anthony Lewis (Democrat) | 4 Democrats, 1 Republican | 72.8% | 1.1% | 71.2% | 1.2% |
| 2008 Presidential Election | Barack Obama (Democrat) | 1 Republican | 99.6% | 13.7% | 98.8% | 13.0% |
| 2011 Tax Assessor Election | Clarence Williams (Affiliation listed as "O") | 1 Republican, 1 Democrat, and 1 whose affiliation was listed as "N" | 71.4% | 2.6% | 67.3% | 1.6% |
| 2012 Presidential Election | Barack Obama (Democrat) | 1 Republican | 99.8% | 12.8% | 98.1% | 12.3% |
| 2014 City Marshal Election | David Mosely (Democrat) | 4 Republicans, 1 Democrat | 81.8% | 5.5% | 82.0% | 5.3% |
| 2014 City Court Election | Sharon Carter (Republican) | 2 Republicans | 85.1% | 8.3% | 84.5% | 6.1% |

The black-preferred candidate did not win in any of these elections in Terrebonne. Across the seven elections, Dr. Engstrom opined that black voters' support for the black candidates ranged from 71.4% to 99.8% with a mean of 87.1%, while non-black voter support for black candidates ranged from 1.1% to 13.7% with a mean of 7.8%.[230] The ranges based on Dr. Weber's estimates were similar—black support for black candidates ranged from 67.3% to 98.8% (with a mean of 85.8%), and non-black support for black candidates ranged from 1.2% to 13.0% (with a mean of 7.1%).[231] In each of these elections, the candidate of choice of the black voters was defeated regardless of whether the candidate ran: (a) as a Democrat, Republican, or otherwise; (b) for judicial or non-judicial office; (c) or for a local, state, or federal office.[232] Viewed another way, this pattern of stark RPV holds across judicial elections (1993 First Circuit Court of Appeal election, 1994 32nd JDC election, and 2014 Houma City Court election), low-visibility, non-judicial elections (2011 Tax Assessor and 2014 City Marshal elections), and high-visibility elections (2008 and 2012 Presidential elections).

The Court finds that these elections clearly show that in Terrebonne, blacks vote cohesively and non-black voters usually vote as a bloc to defeat the black-preferred candidates. This pattern is consistent in that it holds in many different contexts. Additionally, the pattern shows that black candidates receive minimal support from the white electorate. Notably, in a parish-wide election, no black candidate has ever received over one-third of the overall vote.[233]

---

[230] 3/13/17 Tr. 171-172, Doc. 267.
[231] *See* D6.
[232] 3/13/17 Tr. 172-175, Doc. 267.
[233] 3/14/17 Tr. 234-35, Doc. 268; 3/13/17 Tr. 172, Doc. 267 (Dr. Engstrom explaining that "the magnitude of polarization [in this case]…would certainly be among the most polarized context or environment that I have…studied. It's among them, if not the most.").

While Dr. Weber did not dispute Dr. Engstrom's numbers, he argued that certain elections had little probative value as to whether RPV is currently occurring in Terrebonne. He argued that certain elections should be discounted by the Court because (1) they are stale, (2) unenlightening, or (3) do not demonstrate RPV since non-minority voters do not vote cohesively. The Court does not agree with Dr. Weber's opinions on these issues.

First, although Dr. Weber found RPV in the 1993 First Circuit Court of Appeal election and the 1994 32nd JDC election, he stated that they should not be considered because they are stale.[234] Even if the Court were to eliminate these two elections, the pattern of RPV in the remaining elections would stay the same. Based on Dr. Weber's own point estimates, the mean level of black voter support for black candidates for those two elections in the 1990s was 85% (compared to 86.1% for the other five elections) and the mean level of non-black support for the black candidate was 5.6% in those two elections (as compared to 7.7% for the other five elections). The pattern is consistent.

Second, he opined that the Presidential elections are not very predictive or enlightening about local elections.[235] The Court disagrees with this statement, and finds that these two elections, especially when taken together with all of the other local elections, are probative of RPV.

Third, while Dr. Weber found RPV in five of the seven elections (1993 First Circuit Court of Appeal election, 1994 32nd JDC election, 2008 U.S. Presidential election, 2012 U.S. Presidential election, 2014 Houma City Court election), he refused to find RPV in two of the seven elections (the 2011 Tax assessor election and the 2014 City Marshal election).[236] According to Dr.

---

[234] 4/28/17 Tr. 9-11, 57-58, 87-88, 128, Doc. 283. Ms. Romig also opined that these elections were stale by showing that few voters who were around for those elections are still on the voter rolls in Terrebonne.
[235] 4/28/17 Tr. 60-61, Doc. 283.
[236] 4/28/17 Tr. 9-11, 57-65, Doc. 283.

Weber, in order to find RPV, both minority voters and non-minority voters must vote cohesively. Even if minority voters vote cohesively, Dr. Weber will not find RPV if non-minority voters split their votes among different candidates.[237] Dr. Weber found that there was no RPV in the 2011 (Tax Assessor) and the 2014 (City Marshal) elections because non-black voters did not sufficiently support a single, white candidate.[238] The Court finds that, based on *Gingles*, this is an incorrect way of understanding RPV. The proper inquiry is whether white voters support or refuse to support the minority-preferred candidate, not whether white voters coalesce behind a single, white candidate. Numerous courts in which Dr. Weber has testified have rejected this classification rule because of its improper focus.[239] Accordingly, the Court finds that the 2011 Tax Assessor and the 2014 City Marshal elections were both characterized by RPV.

Although the Court has only looked at one endogenous election, the Court has looked at exogenous elections that are particularly probative because they involve parish-wide offices. Moreover, the 2014 Houma City Court election is especially probative because it is a parish-wide office for a judicial position, so in a sense, it is as close to "endogenous" as one can get without being the seat at issue.[240] After reviewing the seven elections, the Court finds that the Plaintiffs have satisfied *Gingles* Two and *Gingles* Three.

---

[237] 4/28/17 Tr. 55, 124, Doc. 283.

[238] 4/28/17 Tr. 61-63, 122-125, Doc. 283.

[239] *Hall*, 108 F.Supp.3d at 435 (rejecting the classification rule because "[i]t is of no import…whether [black electoral] defeat is due to less or more than 60% of non-[black] voters supporting a single candidate, when the ultimate result is a defeat of the preferred candidate of [black] voters."); *Port Chester*, 704 F.Supp.2d at 430 ("It is not necessarily important that the non-Hispanic voters coalesce behind a particular candidate or that a particular percentage of non-Hispanic voters vote for any one candidate—what matters most is that those voters do not cast votes for the Hispanic candidate of choice, and those votes usually result in the defeat of the minority preferred candidates.); *Large v. Fremont Cnty.*, 709 F.Supp.2d 1176, 1214-15 (D. Wyo. 2010) ("Dr. Weber's approach to racially polarized voting is inconsistent with *Gingles*. In fact, *Gingles* would have come out differently if the Supreme Court had used Dr. Weber's arbitrary threshold because several of the elections in which the Court found polarization to be present did not meet Dr. Weber's standard.").

[240] 3/17/17 Tr. 19-21, Doc. 271.

*(2)     Non-Racial Explanations*

The Defendants introduced evidence that these voting patterns are better explained by non-racial factors like money, experience, and number of volunteers. A court may only find that minority plaintiffs have suffered a denial or abridgement of the right to vote on account of race or color by concluding that the minority group's failure to prevail at the polls, that is, their failure to attract the support of white voters, was the result of "built-in bias" rather than something else like partisan politics.[241] In other words, following the partisan politics example, Section 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats.[242]

Because the Court has found that Plaintiffs have satisfied *Gingles* Two and Three, it presumes that race played a role at the polls. Thus, the burden is on the Defendants to rebut that presumption. Both Mr. Beychock and Ms. Romig attempted to show that the black candidates lost for reasons other than race. The Court does not find their testimony credible on this issue.

Mr. Beychock examined all of the elections evaluated by Dr. Engstrom besides the U.S. Presidential elections. He testified that the divergent voting patterns discussed above were, for the most part, attributable to three factors other than race—(1) differences in campaign fundraising, (2) timing of the campaign (*i.e.*, when the candidate began outreach and fundraising), and (3) recruitment of volunteers.[243] In other words, he testified that the black candidates were not losing because they were black but because they did not mount competitive campaigns by putting in the time or raising the necessary funds. The Court does not find this opinion credible for three main reasons.

---

[241] *Clements*, 999 F.2d at 853-54.
[242] *Id.*
[243] D8 at 20.

First, Mr. Beychock's non-racial explanations are not credible because he admitted, both explicitly and implicitly, that race is a factor in Terrebonne elections.[244] He explicitly testified that "[r]ace is a factor in everything in Louisiana, including Terrebonne elections."[245] He also implicitly recognized that voting is polarized along racial lines in Terrebonne. When asked at trial whether Mr. Mosely, a black candidate, had a "racial disadvantage" in the 2014 City Marshal election, he said "You know, numbers are numbers…there are less African Americans in Terrebonne Parish. Does that mean you're at a disadvantage? Well, yes, in terms of campaigns, I would say that was my opinion. But I don't think it's an opinion. It's a fact."[246] Despite recognizing that race was a factor and that voting in Terrebonne is polarized along racial lines, he did not conduct an analysis that eliminated race as a factor.[247] While Mr. Beychock asserted that time, money, and people are the most important factors in explaining an election loss, the fact that he did not systematically take race into account, especially after explaining that race is a factor, casts doubt on his conclusion.

Second, Mr. Beychock's opinion, that non-racial factors explain the election outcomes, is not credible because he failed to recognize that race is inextricably intertwined with these non-racial factors, especially the ability to raise money. The Plaintiffs showed that the black population of Terrebonne lags behind the white population when it comes to income and education.[248] As Dr. Lichtman explained, these socioeconomic disparities create "difficulty in funding candidates."[249]

---

[244] 4/26/17 Tr. 118, 127-130, Doc. 280.
[245] 4/26/27 Tr. 118, Doc. 280.
[246] 4/26/27 Tr. 130-31, Doc. 280.
[247] 4/28/17 Tr. 177-183 (Dr. Lichtman explained that it is possible to "set up an equation in which you include race and these other factors [money, time, people] and see if race remains as the predominant factor. That is not done obviously by Mr. Beychock, and that is not done by Dr. Weber, even though that is standard practice within political science."), Doc. 283.
[248] *See infra*.
[249] 3/14/17 Tr. 248-249, Doc. 268.

Dr. Lichtman testified that "the disparities of wealth, poverty, employment are extreme in Terrebonne Parish which fundamentally affects the ability of [black] candidates to dip into significant sources of campaign funds as opposed to white candidates."[250] The Court finds that while the black candidates may have lost because they did not have as much money to spend as the white candidates, their ability to raise that money is inextricably linked with their race. Accordingly, the Court is unpersuaded that the voting patterns in Terrebonne are better explained by "non-racial" factors.

Third, and most importantly, the Court finds that Mr. Beychock's analysis is unhelpful in explaining what is happening in Terrebonne elections, because if "time, money, and people," were the most important factors in explaining the Terrebonne elections, the Court would expect to see that candidates with minimal funds would receive minimal votes among both whites and blacks. But this is not the case. The Court finds Dr. Lichtman's testimony credible on this point: "[One] cannot explain this pattern of voting, this sharp extreme polarized voting by citing across-the-board factors like money, or name recognition. Those factors, if at play, would be at play both for whites and blacks. It might explain why a candidate gets a very small number of votes from both communities. It cannot explain extreme patterns of [RPV]."[251] On this point, the Court also finds persuasive the testimony of a local black official in Terrebonne. Gregory Harding currently serves as a member of the Terrebonne Parish School Board.[252] He is elected from a majority-black single member district. He testified that even if he were to raise more money than his opponents, enter the race very early, and have more volunteers, he did not think he would have won the School

---

[250] 4/28/17 Tr. 183, Doc. 283.
[251] 4/28/17 Tr. 176-183, Doc. 283.
[252] 3/13/17 Tr. 207, Doc. 267.

Board seat had it been an at-large seat rather than a seat from a majority-black subdistrict.[253] He testified that he has never thought about running for a parish-wide office because he did not think he could win.[254]

Ms. Romig testified on "non-racial" factors as well. After reviewing her testimony, the Court finds it unhelpful in explaining election patterns in Terrebonne. First, she testified that judicial incumbency is a significant factor in forecasting judicial elections.[255] However, she also acknowledged that judicial incumbency is essentially irrelevant in this case in regards to whether that factor explained election outcomes, because the three Terrebonne judicial elections she looked at did not have incumbents.[256] Second, Ms. Romig testified that it is important to look at turnout, timing, fundraising, and experience when concluding why individuals vote for certain candidates, but she refused to state that these factors, rather than race, explained electoral defeat of the black candidates in the elections that she analyzed.[257] Third, and most importantly, Ms. Romig both admitted that race was a factor in Terrebonne elections while not offering any opinion as to whether non-racial factors were *more important* than race in explaining the electoral outcomes in Terrebonne.[258]

Accordingly—the Court finds that neither Mr. Beychock nor Ms. Romig—successfully showed the absence of racial bias in Terrebonne elections. In other words, the Defendants were not successful in rebutting the presumption that racial bias is operating in the electoral system in Terrebonne.

---

[253] 3/13/17 Tr. 215, Doc. 267.
[254] 3/13/17 Tr. 215, Doc. 267.
[255] 3/20/17 Tr. 28, Doc. 273.
[256] 3/20/17 Tr. 59-60, Doc. 273.
[257] 3/20/17 Tr. 66-67, Doc. 273.
[258] 3/20/17 Tr. 68-70, Doc. 273.

### c)     *Totality of the Circumstances*

Having found that the Plaintiffs satisfied the first three *Gingles* factors, the Court turns to the second prong of the vote dilution test. "If these three preconditions are met, the district court must then examine a variety of other factors to determine whether, under the totality of the circumstances, the challenged practice impairs the ability of the minority voters to participate equally in the political process and to elect a representative of their choice."[259] "It will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."[260]

Dr. Lichtman testified for the Plaintiffs on this prong, analyzing the factors identified in the Senate Report accompanying the 1982 amendments to Section 2 ("Senate Factors").[261] Mr. Cooper also presented demographic information which is relevant to some of the factors. Dr. Weber, Ms. Romig, and Mr. Beychock testified for the Defendants regarding these factors.

Plaintiffs do not need to meet a majority of these factors or even a set number of these factors to prove a vote dilution claim.[262] Rather, the Senate Factors helpfully guide the court in coming to the conclusion about whether or not a certain electoral scheme dilutes the minority vote.[263] Of these factors, the two most important factors are "the existence of racially polarized voting and the extent to which minorities are elected to public office."[264] In fact, courts have found vote dilution based solely on these two factors.[265]

---

[259] *Rodriguez*, 964 F.Supp.2d at 699.
[260] *Clark*, 21 F.3d at 97 (citation omitted); *Teague*, 92.F.3d at 293.
[261] *See Overview of Law section supra.*
[262] *Patino*, 230 F.Supp.3d at 676.
[263] *Id.*
[264] *Clark*, 88 F.3d at 1397.
[265] *Bone Shirt*, 461 F.3d at 1022; *NAACP v. Gadsen Cnty. Sch. Bd.*, 691 F.2d 978, 982-83 (11th Cir. 1982).

After reviewing the Senate Factors, the Court finds that seven of the nine Senate Factors weigh in favor of a finding that at-large voting for the 32nd JDC interacts with social and historical factors to cause an inequality in the political process for black voters.

**Senate Factor 1: History of Voting Discrimination in Terrebonne and Louisiana**

The Court finds that this factor weighs in favor of a finding of vote dilution. In their post-trial briefing, the Defendants contend that the Plaintiffs failed to offer any evidence that a voter in Terrebonne has been denied the right to register to vote or to vote because of his or her race.[266] Defendants' focus is misplaced. This is a case about vote dilution, not vote denial.[267] Accordingly, the Court focuses on Louisiana and Terrebonne's history of adopting and maintaining electoral schemes that dilute the black vote. While the Court agrees with the Defendants, that no evidence was introduced that black voters have been impeded from registering in Terrebonne in recent years, this fact alone does not tell the whole story. Louisiana and its subdivisions have a long history of using certain electoral systems that have the effect of diluting the black vote. The 32nd JDC was not created in a vacuum. In order to analyze this factor, the Court must explore the historical landscape in which at-large voting was adopted for the 32nd JDC.

From 1965 to 2013, Louisiana was a covered jurisdiction which had to seek preclearance under Section 5 of the VRA. Due to a long history of official discrimination, any change in law by Louisiana or its political subdivisions that affected a method of election had to be precleared by the DOJ.[268] The DOJ had the right to object to certain changes, and Louisiana or the relevant local subdivision could only override that objection by going to court.[269]

---

[266] Defs.' Post-Trial Br. 63, Doc. 285.
[267] *Veasey*, 830 F.3d at 244 (explaining that the two claims are different).
[268] 3/14/17 Tr. 220-230, Doc. 268.
[269] *Id.*

In response to the VRA and increased black enfranchisement, Louisiana passed various laws which, for the first time, allowed at-large voting for certain bodies.[270] Prior to 1968, Louisiana had prohibited the use of at-large elections for local governing boards like parish councils and parish school boards. In July 1968, shortly after passage of the VRA, Louisiana adopted laws which allowed these bodies to be elected at-large.[271] In the same year, the 32nd JDC was created with judges elected at-large.[272]

In regards to the council and school board changes allowing at-large elections, the DOJ interposed an objection in 1969: "I have concluded that the new procedures that both amendments provide for have had, and, if widely implemented, will have the effect of discriminating against negro voters on account of their race, and of denying to them an effective voice."[273] This objection, to at-large voting, was not an isolated incident. For the nearly 50 years while Louisiana was required to seek preclearance, the DOJ filed nearly 150 objections to proposed discriminatory changes, many of which blocked the use of at-large voting.[274]

The DOJ's objections to at-large voting have not been confined to just legislative elections. In the late 80s and early 90s, the DOJ objected to the creation of at-large elected judgeships in areas where the black population was numerous enough to create a majority-black subdistrict.[275] For example, in one objection letter, in regards to the Legislature's request that the DOJ withdraw its objection to the creation of an additional at-large judgeship for the Louisiana Third Circuit

---

[270] P167a at 14-15; 3/14/17 Tr. 222-23, Doc. 268.

[271] *Id.*

[272] *Id.*

[273] P167a at 15; The DOJ's objections for Louisiana can be found at https://www.justice.gov/crt/voting-determination-letters-louisiana?state=la.

[274] P167a at 14-16; 3/14/17 Tr. 224, Doc. 268; http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=la (*see, e.g.,* objections from September 23, 1988, May 12, 1989, October 23, 1990, November 20, 1990, September 20, 1991, and March 17, 1992).

[275] *Id.*

Court of Appeal, the DOJ wrote: "[T]he state continues to refuse to adopt a method of election in the sixteenth judicial district and third circuit which will provide black voters with an equal opportunity to participate in the political process and elect candidates of their choice."[276]

The DOJ is not the only entity who has recognized the discriminatory effects of at-large election systems in Louisiana. Numerous courts have found that at-large systems for the election of judges violated Section 2.[277] Louisiana federal courts have also found that Louisiana consistently ignored its preclearance requirements under Section 5. In 1990, this Court reprimanded Louisiana for failing to seek preclearance for changes related to 15 judgeships in *Clark v. Roemer*: "Louisiana has absolutely no excuse for its failure, whether negligent or intentional, to obtain preclearance of legislation when such preclearance is required by the Voting Rights Act."[278]

In addition to Louisiana being subject to scrutiny by the courts and the DOJ, Terrebonne itself has been subject to similar scrutiny for taking actions that diluted black voting strength. For example, in the 1970s, a lawsuit was filed to create majority-black subdistricts for the Terrebonne Parish Council and School Board; that lawsuit resulted in majority black-subdistricts.[279] In the early 1990s, the DOJ objected to a redistricting plan for the Parish Council which failed to create a third majority black subdistrict: "[F]rom the beginning of the 1991 redistricting process, the black community urged the council to create a third district in which black voters would have an opportunity to elect candidates of their choice by consolidating into one district black communities in the northern part of the parish…Our analysis indicates that this was readily achievable [and]…is

---

[276] 3/17/1992 Letter at http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=la.
[277] P167a at 16-19.
[278] P167a at 17.
[279] P167a at 16-17.

the likely result but for the fragmentation of that black community which exists in the proposed plan."[280]

While the Defendants are correct, that no testimony was introduced that black voters in Terrebonne have been precluded from registering or voting, this argument ignores the long history of the use of at-large voting in Louisiana, which has had the effect of denying the black population an effective voice in certain elections. Accordingly, this factor weighs in favor of a finding of vote dilution.

## Senate Factor 2: Racially Polarized Voting

This factor weighs overwhelmingly in favor of a finding of vote dilution. As described above, black candidates in Terrebonne are consistently defeated in at-large elections. Their loss cannot be explained by non-racial factors like time, money, or people.[281] Additionally, their losses cannot be explained by partisanship as black candidates consistently lose to white candidates of the same party.[282]

## Senate Factor 3: Enhancing Factors

This factor weighs heavily in favor of a finding of vote dilution as well. Courts have long recognized that certain "enhancing" factors, like a majority vote requirement and a "place" system, present a "continuing practical impediment to the opportunity of black voting minorities to elect candidates of their choice."[283] Dr. Lichtman concluded that the various features of the 32nd JDC create a "perfect storm" that hinders black voters from having an equal opportunity to elect their

---

[280] 01/03/1992 Letter at http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=la.
[281] *See Supra*.
[282] *See e.g.*, 1994 32nd JDC election and 2014 Houma City Court election, *supra*.
[283] *Gingles*, 478 U.S. at 39-40; *Westwego*, 946 F.2d at 1113 n.4; *Citizens for a Better Gretna*, 636 F.Supp. at 1124.

candidate of choice.[284] The Court agrees, and finds that three features of the 32nd JDC electoral system enhance the opportunity for discrimination against black voters.

First, the 32nd JDC has a majority-vote requirement, which ensures that a black-preferred candidate cannot win by a plurality of votes but must compete in a runoff election to win a 32nd JDC seat.[285] As Dr. Lichtman opined, this requirement makes it virtually impossible for a black-preferred candidate to win a seat even if that candidate makes it to the runoff: "[I]t doesn't matter…if whites fragment their votes among different white candidates, because there's a majority-vote requirement. So no [black] can get elected by slipping in because the white bloc[] vote against them is fragmented among different white candidates. They're still going to have to go one-on-one against a white candidate, and with white [support] ranging from 1 percent to 14 percent, they have absolutely no chance to win."[286]

Second, the 32nd JDC also features a designated divisional system, which *de facto* precludes single-shot voting.[287] In the 32nd JDC there are five divisions (A-E), and in each division there is a majority vote requirement.[288] This is distinct from a true at-large system without specific divisions in which all candidates would compete for the five contested seats.[289] In a true at-large system all voters would be able to cast five votes, and the top five candidates would win.[290] In this true at-large system, black voters would be able to engage in single-shot voting by casting one vote for their preferred candidate while withholding their other four votes; by doing this, black voters

---

[284] 3/14/17 Tr. 239, Doc. 268.
[285] 4/28/17 Tr. 192, Doc. 283.
[286] 3/14/17 Tr. 234-236, Doc. 268.
[287] 3/14/17 Tr. 237-239, Doc. 268.
[288] *Id.*
[289] *Id.*
[290] *Id.*

would increase their chances of getting their candidate elected.[291] Accordingly, the Court finds that these designated posts enhance the opportunity for discrimination.

The third enhancing feature of the 32nd JDC is that it is quite large as compared to the proposed subdistricts. Parish-wide contests are generally more expensive than contests in subdistricts. As explained in more detail below, there are disparities in wealth between black and white voters in Terrebonne, and so a larger election area imposes a greater burden on black candidates.[292]

### Senate Factor 4: Candidate Slating Process

This factor is inapplicable in this case as a candidate slating process is not used for the 32nd JDC.

### Senate Factor 5: Discrimination that Hinders Political Participation

This factor weighs in favor of a finding of vote dilution as black citizens of Terrebonne bear the effects of discrimination which depresses their socioeconomic status and their ability to participate in the political arena. To establish this factor, a plaintiff must prove two elements—(1) socioeconomic disparities in areas such as education, income level, and living conditions which arise from past discrimination, and (2) "proof that participation in the political process is in fact depressed among minority citizens," which can be shown by evidence of reduced levels of registration or lower turnout among minority voters.[293] Where these two factors are shown, "plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation."[294]

---

[291] *Id.*
[292] *Id.*
[293] *Clements*, 999 F.2d at 867.
[294] *Teague*, 92 F.3d at 294 (citation omitted).

It is indisputable that Louisiana has a long history of discriminating against black citizens. Even after the Supreme Court outlawed legalized segregation in public schools in 1954, segregation continued and Louisiana aided that segregation by giving support to segregated private schools.[295] *De facto* racial segregation remains in education in Louisiana. About 74% of all black elementary and secondary students attend majority-minority schools.[296] Only thirteen states have higher percentages of black students in these majority-minority schools.[297] Terrebonne citizens also testified about past discrimination and current discrimination in other aspects of life, from employment to the political arena.[298]

Socioeconomic disparities between black and white citizens in Terrebonne reflect this history of discrimination. For example, in Terrebonne, (1) of citizens 25 years or older, 7.4% of black individuals have a bachelor's degree or higher, while 15.2% of white people have a bachelor's degree or higher; (2) about 40% of black households rent their residences as compared to about 20% of white households; (3) the median income is about $30,000 for black households as compared to about $56,000 for white households; (4) the poverty rate for black people is about 34% as compared to about 10% for white individuals; (5) nearly half of all black children live in poverty as compared to one in eight white children; (6) about three times as many black households rely on food stamps as white households; (7) about twice as many working-age black individuals

---

[295] 3/14/17 Tr. 242-243, Doc. 268.

[296] *Id.*

[297] *Id.*

[298] 3/13/17 Tr. 50-56 (Mr. Boykin explaining that political figures in Terrebonne used offensive and derogatory terms to refer to black people in the 1990s), Doc. 267; *Id.* at 51-53 (Mr. Boykin explaining that black officers faced racial discrimination in promotion practices at the Terrebonne Sheriff's Office); *Id.* at 59-61 (Mr. Boykin describing the black face incident with Judge Ellender); 3/14/17 Tr. 184-195 (Mr. Turner describing incidents of discrimination when he was the first black firefighter in Houma), Doc. 268; 3/17/17 Tr. 70-76 (Mr. Shelby testifying to: the expectation of low achievement for black Terrebonne students; a white school employee's statements to him while he was in middle school to get his "cotton-picking hands off me"; the reduction of his work hours while working as the only black employee at a clothing store), Doc. 271.

are unemployed as compared to white individuals; and (8) almost four times as many black households lack access to a vehicle as compared to white households.[299] These socioeconomic disadvantages hinder both black individuals' ability to participate in the political process and black candidates' ability to run successful campaigns.[300]

Dr. Lichtman and Dr. Weber disagreed about whether the black population in Terrebonne shows signs of politically relevant lingering effects of past discrimination. Dr. Weber concluded that there are no lingering effects of discrimination on black political participation in Terrebonne.[301] Dr. Lichtman disagreed with this conclusion, testifying that Dr. Weber's "own data when properly analyzed and presented…decisively refutes his verbal claim."[302] The Court agrees with Dr. Lichtman and finds that black voters do not register or turn out to vote at the same rate as white voters. While the registration and turnout rates between black and white voters are not incredibly different, the numbers do reveal depressed political participation among black voters.

Social scientists prefer to calculate turnout rates as a percentage of the estimated voting age population rather than as a percentage of registered voters.[303] For voter turnout as a percentage of estimated voting age population, in all seven elections that Dr. Weber analyzed, white voter turnout exceeded black voter turnout.[304] Across the seven elections, the mean white voter turnout was about 46% and the mean black voter turnout was about 40%.[305] The Court finds that these numbers show a meaningful difference in political participation. While the registration rates across these seven elections were similar (the white registration rate was 79.8% while the black

---

[299] 3/14/17 Tr. 68-70, 246-248, Doc. 268; P165a at 13-15; P167a at 69. Dr. Weber did not disagree with any of these findings. D6 at 40.
[300] 3/14/17 Tr. 248-251, Doc. 268.
[301] D6 at 40; 4/28/17 Tr. 9-11, Doc. 283.
[302] 4/28/17 Tr. 194-196, Doc. 283; P173 at 3-5.
[303] 4/28/17 Tr. 134-135, Doc. 283
[304] 4/28/17 Tr. 135-140, Doc. 283.
[305] 4/28/17 Tr. 195-200, Doc. 283; P173 at 3-5.

registration rate was 77.6%)[306], this does not cut against a finding that black political participation is depressed in Terrebonne. Many witnesses testified that at-large voting discourages black voters from turning out to vote.[307] Accordingly, after reviewing the reports of Dr. Weber and Dr. Lichtman's criticism, the Court finds that this factor weighs in favor of a finding of vote dilution—there are stark socioeconomic disparities between black and white voters in Terrebonne and participation in the political process is depressed among minority voters.

**Senate Factor 6: Subtle or Overt Racial Appeals**

The Plaintiffs did not present any evidence that campaigns for the 32nd JDC have been characterized by overt or subtle racial appeals. Accordingly, this factor cuts against a finding of vote dilution.

**Senate Factor 7: Black Electoral Success**

The lack of black electoral success is a very important factor in determining whether there is vote dilution.[308] The Court finds that this factor weighs overwhelmingly in favor of a finding of vote dilution because of the consistent pattern of black electoral defeat over many years and for many positions. Moreover, the Court finds that Judge Pickett's election does not show the lack of vote dilution in this case, as his election was marked by many special features, ones which were discussed in *Gingles*, the seminal vote dilution case. Additionally, the ward level elections that Mr. Beychock cited do not indicate the absence of vote dilution as they have little probative value in this case. Finally, while the Court has considered that there are only a small number of minority

---

[306] 4/28/17 Tr. 195-197, Doc. 283; P173 at 3-5.

[307] 3/13/17 Tr. 61-63, 218-219, Doc. 267; 3/14/17 Tr. 17-19, Doc. 268; 3/17/17 Tr. 67-71, Doc. 271.

[308] *Teague*, 92 F.3d at 285 (reversing trial court's finding of no vote dilution where "no black candidate ha[d] ever won a county-wide election or an election in a white majority district when pitted against a white candidate."); *Clark*, 88 F.3d at 1398 (reversing finding of no vote dilution where there was a "virtually complete absence of black elected officials in county offices").

lawyers who would be eligible to run for judge in Terrebonne, this does not indicate the absence of vote dilution in this case.

*Black Electoral Success in Terrebonne*

In Terrebonne, black candidates have almost never been successful in parish-wide races. For nearly 50 years, between 1968 when the 32nd JDC was established and the filing of this litigation in February 2014, no black candidate had ever been elected to the 32nd JDC.[309] In November 2014, while this lawsuit was pending, Juan Pickett, a black candidate, was elected without opposition to the 32nd JDC.[310] Judge Pickett did not face opposition from the approximately 160 white lawyers in Terrebonne.[311] It was the first time in the history of the 32nd JDC that no white attorney competed for an open seat on the court.[312]

In the history of Terrebonne, with the exception of Judge Pickett's election, no black candidate has ever been elected to a parish-wide, at-large elected position (Parish President, District Attorney, Sheriff, Coroner, Clerk of Court, Tax Assessor, City Marshal, and Houma City Court Judge).[313] On the other hand, black candidates have been successful in Terrebonne when running in majority-minority subdistricts, like Districts 1 and 2 of the Parish Council and School Board.[314]

Statewide, blacks have also been underrepresented in the trial and appellate courts. While the black population comprises about 30.5% of the voting age population in Louisiana, black people only account for about 17.5% of the judges in Louisiana.[315]

---

[309] P167a at 71.
[310] P167a at 46.
[311] *Id.;* 4/28/17 Tr. 142, Doc. 283.
[312] P167a at 46.
[313] 3/13/17 Tr. 65-66, Doc. 267; 3/14/17 Tr. 19, Doc. 268; 4/26/17 Tr. 55-57, Doc. 277.
[314] 4/28/17 Tr. 177-183, Doc. 283.
[315] P167a at 71; 3/14/17 Tr. 252, Doc. 268.

*Judge Pickett's Election*

The Defendants assert that the November 2014 election of Juan Pickett, a black man, to the 32nd JDC shows that at-large voting does not dilute the voting strength of black citizens of Terrebonne. The Plaintiffs argue that this election is not probative because there were multiple special circumstances surrounding this election.

In *Gingles*, the Supreme Court recognized that sporadic black electoral success does not automatically defeat a vote dilution claim.[316] "[P]roof that some minority candidates have been elected does not foreclose a § 2 claim," especially where "special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting may explain minority electoral success."[317] Both the Supreme Court and Congress have advised courts to scrutinize minority electoral success during the pendency of litigation: "[Courts should] consider to what extent the pendency of…litigation might have worked a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting."[318] The Fifth Circuit has also recognized that electoral wins by minority candidates during the pendency of vote dilution cases has limited probative value when it comes to determining whether at-large districting generally works to dilute the minority vote.[319] Even

---

[316] *Gingles*, 478 U.S. at 75.
[317] *Id.* at 57, 75.
[318] *Id.* at 76 (internal quotation marks and citation omitted).
[319] *Clark*, 21 F.3d at 96 ("[T]he election of Ms. Steen to the county election commission was in an uncontested race that occurred while this litigation was pending. As the Supreme Court noted in *Gingles*, the election of some black candidates does not negate a § 2 claim and does not establish that polarized voting does not exist."); *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973) ("[W]e cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations–namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds. In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts

when black candidates win, a court is required to undertake an independent consideration of the record in order to determine the existence of vote dilution.[320]

After reviewing all of the evidence, the Court finds Judge Pickett's election was marked by special circumstances and does not negate Plaintiffs' Section 2 claim for three reasons. First, his win occurred during the pendency of this litigation. Second, the lack of opposition to Judge Pickett was exceptional and cuts against a finding that a minority-preferred candidate can be elected in the current at-large system. Third, it is not clear that Judge Pickett was the minority-preferred candidate, and so his win does not do anything to contradict the stark pattern of RPV which has characterized elections in Terrebonne.

First, his win does not negate Plaintiffs' Section 2 claim because it occurred during the pendency of this litigation. As early as June 2011, the NAACP publicized its intent to file a lawsuit to challenge at-large voting in the 32nd JDC.[321] This lawsuit was filed on February 3, 2014, and Judge Pickett was the *first black candidate ever* to win an at-large, parish-wide election in Terrebonne Parish in November 2014.

Second, his win does not prove that vote dilution is not occurring in Terrebonne because he ran unopposed, and so his win reveals little about the black population's access to the political process. Both Dr. Lichtman and Dr. Weber testified that it was unusual for Judge Pickett to run unopposed for an *open* seat on the 32nd JDC.[322] The history of Terrebonne elections demonstrated

---

to circumvent the Constitution. This we choose not to do. Instead, we shall continue to require an independent consideration of the record.").

[320] *Id.*

[321] 3/13/17 Tr. 76-77, Doc. 267.

[322] 3/14/17 Tr. 252-256 (Dr. Lichtman explaining that "You can look statewide, and I don't believe there's any other case anywhere in the state in modern times…where an African-American candidate in a heavily white-majority jurisdiction like the 32nd judicial district first-time candidate has run unopposed. This is not just exceptional with respect to the 32nd judicial district but exceptional with respect to the entire state of Louisiana."), Doc. 268; 4/28/17 Tr. 79-80, Doc. 283 ("[Y]ou would have expected that when there's an open seat, all of the lawyers in town are going to be running for that open seat because that's what you saw in 1994, with that open seat, there were six candidates.").

that multiple candidates invariably run for open 32nd JDC seats. All of the judges who testified at trial indicated that they faced opposition in their first candidacy.[323]

His lack of opposition was not only odd because he was running for an open seat, it was also odd because the evidence showed that he was the only black judicial candidate to run unopposed in a majority-white district between 1990 and 2014.[324] Ms. Romig testified that it was not unusual for Judge Pickett to run unopposed as 77 non-incumbent candidates won without opposition in the November 2014 election for various judicial elections.[325] However, Ms. Romig did not analyze whether any of those individuals were black candidates in white-majority districts.[326] Dr. Lichtman reviewed Ms. Romig's report and found that Judge Pickett's lack of opposition was not only unusual for November 2014, but it was unusual when viewed in the context of all judicial elections in the state of Louisiana: "[B]etween 1990 and 2014, Mr. Pickett was the only [black] candidate to run unopposed for an at-large judicial seat in a majority-white jurisdiction."[327]

Mr. Beychock testified that his lack of opposition was not unusual because Judge Pickett deterred all other candidates from running against him by campaigning early and raising a large amount of money.[328] The Court finds that Mr. Beychock's own report actually casts doubt on his conclusion. For example, Mr. Beychock found that Matt Hagen, a white candidate for Houma City Court in the same election cycle as Judge Pickett in 2014, raised $25,000 by June 2014 and $55,000 overall, yet this fundraising did not deter two other candidates from running against him.[329] Judge

---

[323] 3/17/17 Tr. 208, 216, 219, 234, Doc. 271; 3/20/17 Tr. 113, 161, 165, 189, Doc. 273; 4/26/17 Tr. 68-70, Doc. 277.
[324] P173 at 10; 3/14/17 Tr. 252-256, Doc. 268.
[325] 3/20/17 Tr. 60-61, Doc. 273.
[326] *Id.*
[327] P173 at 10; 3/14/17 Tr. 252-256, Doc. 268.
[328] D8 at 7-8.
[329] D8 at 5; P170 at 11-12.

Pickett raised $15,000 by May 2014 and over $60,000 by the first day of qualifying.[330] The deterrence theory cannot explain the unusual lack of opposition to Judge Pickett because if this theory were true, then the Court would expect that Mr. Hagen would have deterred his two opponents from running.

Third, and most importantly, his election does not indicate the absence of vote dilution because it is not clear that Judge Pickett was the candidate of choice for black voters in Terrebonne. The evidence actually showed that he had the backing of many of the most prominent opponents of a black opportunity subdistrict. This weighs in favor of a finding that his election was the type of exceptional election that does not negate a Section 2 claim. From an empirical standpoint, this Court has no way of knowing whether the black community supported Judge Pickett's candidacy in 2014. Because he faced no opposition, his name did not appear on the ballot in November 2014, and so black voters in Terrebonne were not able to vote for or against him.[331] Thus, no RPV analysis could be conducted for that election which would allow the Court to determine his support among black voters.[332]

The evidence shows that Judge Pickett *may not* have been the candidate of choice for the black community, and so his win does little to reveal anything about the ability of the black community to be successful in the current at-large system. Multiple black voters indicated that they were unsure if they would have voted for Judge Pickett if they had a choice between Judge Pickett and another candidate.[333] The Court credits their testimony for a variety of reasons. First, Judge Pickett is not from Terrebonne and does not live in a majority-black neighborhood.[334]

---

[330] D8 at 7.
[331] 3/20/17 Tr. 104, Doc. 273; 3/17/17 Tr. 84, Doc. 271.
[332] 3/13/17 Tr. 148, Doc. 271.
[333] 3/13/17 Tr. 88-90, 234, Doc. 267; 3/14/17 Tr. 21-36, Doc. 268; 3/17/17 Tr. 84-85, Doc. 271.
[334] 3/14/17 Tr. 22, 161, Doc. 268.

Second, Judge Pickett could not remember whether he identified his affiliation with any black organizations on his campaign materials, claiming that his 2014 campaign was "many years ago."[335] Third, he registered to vote as a Democrat in June 1994, changed his party affiliation to Independent in July 2014, Republican in August 2014, and after the election, in December 2014, he changed back to Democrat.[336] In other words, Judge Pickett chose to qualify as a Republican candidate even though he believed that "the party of choice for blacks in the parish is the Democratic Party."[337] When he was asked why he did this, Judge Pickett said it was "just a choice I chose."[338] This is not to say that Judge Pickett would *definitely* not have been the candidate of choice for the minority population. It is possible that had he faced off against an opponent, the black community would have rallied behind him as he is undoubtedly qualified. However, the Court raises these issues only to show that Judge Pickett's win does not negate a finding of vote dilution.

In further support of the fact that Judge Pickett's win does not negate a finding of vote dilution, it appears that Judge Pickett was monetarily supported by some of the most prominent opponents of a black opportunity district.[339] Judge Pickett's largest contributor (at $2,500) was Gordon Dove who had opposed the opportunity subdistrict and voted against H.B. 582 (which would have created an opportunity subdistrict) in 2011.[340] Another opponent of the subdistrict, former 32nd JDC Judge Edward Gaidry, donated $1,000 to Judge Pickett.[341] Judge Ellender, who

---

[335] 3/17/17 Tr. 162-165, Doc. 271.
[336] 3/17/17 Tr. 164-168, Doc. 271.
[337] 3/17/17 Tr. 167, Doc. 271.
[338] 3/17/17 Tr. 166-67, Doc. 271.
[339] P173 at 18.
[340] *Id.*
[341] P170 at 12; D127d1; P29.

had previously voiced his opposition to the subdistrict, also donated to Judge Pickett's campaign.[342]

Overall, Judge Pickett's election has all of the features of the type of election that does not necessarily negate a finding of vote dilution—it occurred during a vote dilution case for the seat at issue, he ran unopposed, and he had the backing of many opponents of the subdistrict. Accordingly, the Court finds that his election does not negate a finding of vote dilution.

*Ward Elections*

Mr. Beychock testified that Judge Pickett's election proved that black candidates can win in the current at-large system. To further support this point, he cited three ward elections from 1977, 1988, and 2004 in which a black candidate won in a majority-white ward.[343] Not only are two of these elections extremely stale, none of these elections were conducted parish-wide, and these small elections (sometimes with less than 1000 voters) reveal little, if anything, about whether a black-preferred candidate can win parish-wide. Accordingly, the fact that three black candidates won in three ward level elections over the course of 40 years does not negate a finding of vote dilution.

*Lack of Black Candidates*

The Defendants assert that the absence of black parish-wide representatives in Terrebonne and the absence of black judges on the 32nd JDC prior to Judge Pickett are explained by the fact that few minorities have run for parish-wide positions.

The Plaintiffs argue that this assertion is meritless. They argue that the lack of black candidates actually shows that the current at-large system deters minorities from running because of the pattern of RPV and the presence of enhancing factors.

---

[342] *Id.*
[343] D9 at 3-4.

The Court finds that the fact that few black lawyers have run for the 32nd JDC does not necessarily preclude a finding of vote dilution. The Fifth Circuit previously rejected such an argument because "this argument begs the ultimate question whether blacks possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters. That few or no black citizens have sought public office in the challenged electoral system does not preclude a claim of vote dilution. To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove."[344] The evidence presented in this case shows that black candidates are deterred from running for parish-wide positions, including for the 32nd JDC, because of strong RPV and the existence of enhancing factors.[345]

*Proportionality*

The Defendants also argue that there is no vote dilution in this case because the black community has proportional representation on the 32nd JDC as there are only about ten eligible minorities for the 32nd JDC who live in Terrebonne. The Defendants argue that because Judge Pickett, who is black, holds one of those seats, Plaintiffs' Section 2 claim should fail as the black community now has "proportional" representation. The Fifth Circuit has stated that the number of minority lawyers eligible to run is a relevant consideration in the totality of the circumstances

---

[344] *Clark*, 88 F.3d at 1398 (internal quotation marks and citations omitted).

[345] 3/17/17 Tr. 33-37 ("I'm basing it on the entire pattern of elections over a 24-year period, and as I explained, given this pattern, that explains why you've had this severe deterrent effect from African Americans knocking their heads against a brick wall and trying to run within a system that's not only at large, that's not only overwhelmingly white, but that has numbered posts so you can't single shot and get a candidate and [it] has a majority vote requirement), Doc. 271; 3/14/17 Tr. 27-39 (Rev. Fusilier identifying attorneys who were discouraged from running against Judge Pickett because they thought he was sponsored by the white community and they didn't think they could win in an at-large system); *Id.* at 199-201 (Mr. Turner explaining that many black attorneys believe "that they can't run and win."), Doc. 268.

inquiry: "A functional analysis of the electoral system must recognize the impact of limited pools of eligible candidates on the number of minority judges that has resulted."[346]

However, the fact that there are only about ten or so minority attorneys eligible to run for the 32nd JDC does not defeat a finding of vote dilution in this case. Section 2 does not protect a right to proportional representation by race. That is, it does not protect a "right to have members of a protected class elected in numbers equal to their proportion in the population."[347] Rather, the right that is protected by Section 2 is the right to have the equal "opportunity [as] other members of the electorate to participate in the political process and to elect representatives of their choice."[348] The concept of proportionality in a Section 2 case "links the number of majority-minority voting districts to minority members' share of the relevant population."[349] While "experience…demonstrate[s] that minority candidates will tend to be [the] candidates of choice among the minority community,"[350] the Fifth Circuit has recognized that "[t]he minority candidate need not be the preferred candidate among minority voters."[351]

In this case, the fact that a black judge is currently sitting on the 32nd JDC, does not change the fact that currently there are no majority black subdistricts for the 32nd JDC, even though, according to the 2010 Census, approximately 18% of Terrebonne's voting age population is black. In other words, the number of majority black subdistricts (zero) is not proportional to the share of the black voting age population in Terrebonne (roughly 20%). Additionally, as the Court explained above, it is less than clear that Judge Pickett would have been the minority-preferred candidate.

---

[346] *Clements*, 999 F.2d at 865.
[347] 52 U.S.C. § 10301(b).
[348] *Id.*
[349] *Johnson v. De Grandy*, 512 U.S. 997, 1014 n. 11 (1994).
[350] *Jenkins v. Red Clay Consol. Sch. Dist.*, 4 F.3d 1103, 1126 (3d Cir. 1993).
[351] *East Jefferson Coalition*, 926 F.2d at 493.

Accordingly, the vote dilution claim does not automatically fail because there are only ten eligible black attorneys for the 32nd JDC.

*Overall Findings on this Factor*

Accordingly, the Court finds that black candidates have been overwhelmingly unsuccessful in winning parish-wide elections in Terrebonne which shows that there are barriers to black electoral opportunity in Terrebonne. The Court also finds that the absence of blacks judges on the 32nd JDC prior to Judge Pickett is better explained by RPV, the at-large system, and enhancing factors that deter black candidates from running than by the number of minority attorneys in Terrebonne. This factor, lack of black electoral success, weighs in favor of a finding of vote dilution.

## Senate Factor 8: Lack of Responsiveness on the Part of Elected Officials

The Court agrees with Dr. Lichtman who stated that "[t]his factor is less relevant in matters involving judicial elections, where judges, unlike legislators, do not typically make policies that are responsive to constituency groups."[352] Therefore, this factor is not significant in the Court's totality of the circumstance analysis.

The Defendants argue that this factor weighs against a finding of vote dilution because numerous officials worked with Terrebonne residents over the course of twenty years to determine if a minority district could be created. However, the history of unsuccessful advocacy for a black opportunity subdistrict as described *infra* shows that the black community was ultimately unsuccessful *because* of opposition from local white officials.[353] Accordingly, to the extent that this factor is relevant, it weighs in favor of a finding of vote dilution; the black community was

---

[352] P167a at 73.
[353] *See* Discriminatory Purpose Section.

persistent in creating a subdistrict through legislative means, and the white local officials, including white judges, were equally persistent in opposing these efforts.[354]

**Senate Factor 9: Policy Justification**

In this case, this factor requires the Court to analyze two questions. First, the Court must examine whether the state's explanation for the use of at-large elections for the 32nd JDC is tenuous because "a tenuous explanation for at-large elections is circumstantial evidence that the system is motivated by discriminatory purposes and has a discriminatory result."[355] If a state "[does] more than assert that its interest in [a certain] electoral scheme is not tenuous [*i.e.*, it asserts a substantial interest]" the Court must weigh this substantial state interest "*against* proven dilution to assess whether such dilution creates Section 2 liability."[356]

The Fifth Circuit has recognized that a common explanation for the use of at-large judicial elections is to further the state's interest in maintaining a judge's electoral base and his jurisdiction: "The state attempts to maintain the fact and appearance of judicial fairness that are central to the judicial task, in part, by insuring judges remain accountable to the range of people within their jurisdiction."[357] In other words, one purported justification for maintaining an at-large electoral system for judges is to insure that judges are not playing jurisdictional politics by favoring litigants from their subdistricts while ignoring the rights of those who do not vote for them but appear before them.

---

[354] *See* Discriminatory Purpose Section.
[355] *McMillan*, 748 F.2d at 1045.
[356] *Clements*, 999 F.2d at 870-71 (emphasis in original).
[357] *Id.* at 869.

However, while a court must weigh this linkage interest against proof of vote dilution, the mere assertion of the linkage interest is insufficient to defeat a Section 2 claim.[358] In order for the linkage interest to defeat a Section 2 claim, a defendant must show that the interest is "substantial" and that the asserted linkage interest outweighs racial dilution such that liability should be defeated.[359]

For the reasons that follow, the Court finds that the linkage interest is not tenuous. The Court further finds that, at least when it comes to Louisiana, this linkage interest is not substantial. Even if the Court were to hold that Louisiana has a substantial interest in maintaining the link between a Judge's electoral base and his jurisdiction, which it does not, it would not outweigh a finding of vote dilution in this case, as the Plaintiffs have introduced substantial proof of vote dilution.

The Court finds that the policy justification proffered by the Defendants in this case for maintaining at large elections is not tenuous. Many courts have recognized the accountability benefits that accrue from linking a judge's jurisdiction to his electoral base.[360] However, while the Defendants' linkage justification for at-large elections in the 32nd JDC is not tenuous, this does not mean that the State has a substantial interest in maintaining the current at-large system. The Court is unpersuaded that Louisiana has a substantial linkage interest for five reasons.

---

[358] *Houston Lawyers' Ass'n,* 501 U.S. at 427 ("Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the 'totality of circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution.").
[359] *Clements*, 999 F.2d at 868.
[360] *Id.* at 869; *Cousin v. Sundquist*, 145 F.3d 818, 822 (6th Cir. 1998).

First, the Louisiana Constitution does not require that trial court judges be elected at-large, but instead allows the Legislature, with the Governor's consent, to determine the method of election.[361] In other words, there is no constitutional prohibition on district-based voting.

Second, in the late 1980s Louisiana "stifled its policy arguments" regarding linkage by agreeing to create judicial subdistricts to end the *Clark* litigation.[362] In the *Clark* litigation, the plaintiffs challenged the use of at-large and other multimember districts for electing family court, trial court, and appellate court judges in Louisiana.[363] Following a trial in 1988, this Court found that the use of at-large districts in many parishes statewide violated Section 2, enjoined various elections, called upon the Governor and Legislature to fashion a remedy, and stated that it had "no preconceived notion as to what changes the Governor and the Legislature ought to make."[364] In June 1989, the Legislature and the Governor proposed a package of measures to change the electoral method for judges which included the use of subdistricts to elect district court judges.[365] In November 1989, the voters of the state rejected these proposed revisions to the electoral method for judges.[366] In June 1990, the Court reaffirmed its finding of Section 2 violations as to certain judicial districts, and held that the creation of subdistricts was the appropriate remedy.[367] The Court rejected the argument that Louisiana had a substantial linkage interest or that any such interest outweighed the Court's finding of vote dilution.[368] The *Clark* litigation ultimately concluded when

---

[361] La. Const. art. V, Section 22(A), art. XI, Section 1, art. III.

[362] *Prejean v. Foster*, 227 F.3d 504, 510-512 (5th Cir. 2000).

[363] *Clark v. Edwards/Roemer*, 725 F. Supp. 285, 287 (M.D. La. 1988).

[364] *Id.* at 302-303, 306.

[365] *Clark v. Edwards/Roemer*, 777 F. Supp. 445, 451 (M.D. La. 1990).

[366] *Id.*

[367] *Clark v. Edwards/Roemer*, 777 F. Supp. 471, 473 (M.D. La. 1991).

[368] *Id.* at 479, 483-85 ("[N]o such vital state interest precludes a finding of Section 2 violations…the court rejects the notion that the State has a greater interest in linking election districts and geographical jurisdiction in judicial election districts than in ridding judicial elections of minority vote dilution which violates federal law…The record before this court does not support any 'linkage' argument.").

the parties entered into a consent decree that established subdistricts in various judicial districts.[369]

Accordingly, Louisiana *chose* not to maintain any linkage interest unlike Texas in *Clements*.

Regarding this settlement, the Fifth Circuit held that Louisiana stifled any policy arguments

it may have had regarding the linkage interest by entering into a consent decree:

> To end the *Clark* litigation, and to address the Justice Department's Section 5 objections, the state agreed to implement a subdistrict election plan in the 23rd JDC, among others, that would contain at least one subdistrict with a majority black voter registration… While the Supreme Court has held that Section 2 vote dilution claims may be asserted concerning elections of judges, it also agreed that the state may have strong policies favoring multimember districts, which ought to be evaluated in the totality of the circumstances liability inquiry or in the remedial phase of suit. *Houston Lawyers' Association v. Atty. General of Texas*, 501 U.S. 419, 426–27, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991). Indeed, this court on remand of the *Houston Lawyers'* case ultimately found no Section 2 violation in part because it is essential to the responsiveness, independence and fairness of an elected judiciary that trial judges not be balkanized into small constituencies within the district for which they are responsible. *League of United Latin American Citizens (LULAC) v. Clements*, 999 F.2d 831, 872–74 (5th Cir.1993) (en banc). In 1991, Louisiana might not have foreseen the conclusion of the *LULAC* case, but surely it understood that the Supreme Court considered judicial elections to invoke more complex voting rights problems than legislative elections. Nevertheless, *the state stifled its policy arguments* to obtain final preclearance.[370]

Third, outside of litigation, Louisiana has continued to show that it no longer has a linkage

interest as it has created subdistricts for trial courts.[371]

Fourth, subdistricts are now common in Louisiana, and a majority of the JDC judges in

Louisiana are elected by subdistrict. Twelve of the 41 JDCs in Louisiana (excluding Orleans

Parish) currently use subdistricts to elect their members.[372] The 41 JDCs encompass a total of 193

judges, and 106 of those judges are elected from subdistricts.[373] Fifty-five percent (106 / 193) of

---

[369] P167a at 17-18.
[370] *Prejean*, 227 F.3d at 510-512 (internal quotation marks omitted and emphasis added).
[371] P167a at 20.
[372] For nine of the JDCs (1, 4, 14, 15, 16, 19, 23, 24, and 27), the use of subdistricts is reflected by statute. La. RS § 13:477. For the remaining three (9, 18, and 40), the use of subdistricts is only reflected in the *Clark* consent decree.
[373] See La. RS §§ 13:621.1-13:621.40 (detailing the number of judges in each JDC).

all JDC judges in Louisiana are elected via subdistrict. So while a majority of the JDCs do not use subdistricts, a majority of the JDC judges elected in Louisiana are elected by subdistrict.

Fifth, Louisiana has recognized that subdistricts are an important way of providing black voters an equal opportunity to elect their preferred candidates to trial courts in Louisiana. In 1996, a task force that was created by the Louisiana Supreme Court found that the creation of "subdistricts, where appropriate, [is] the only feasible means of ensuring diversity and ethnic heterogeneity in our judicial system."[374]

Additionally, there is no evidence that judges from subdistricts are any less fair than those elected at-large. Numerous defense witnesses testified that they did not think judges from subdistricts were any less accountable than those elected at-large.[375]

Accordingly, the Court is unpersuaded that Louisiana has a substantial linkage interest given all of these facts. Even if the Court were to assume that Louisiana has a substantial linkage interest, the Court would still find a Section 2 violation in this case as there has been substantial proof of vote dilution which outweighs the linkage interest in this case.[376] The *Clements* case does not alter this Court's conclusion. In that case, the court found that the vote dilution in certain counties was marginal and therefore did not outweigh Texas' linkage interest.[377] The court found that plaintiffs had presented a marginal vote dilution case because many minority candidates were elected in contested elections.[378] Here, though, the Court has found a strong case of vote dilution as no black candidate who has faced opposition in Terrebonne has been elected to an at-large

---

[374] P76 at 89.
[375] 3/14/17 Tr. 258-60, Doc. 268; 3/17/17 Tr. 180-181, Doc. 271; 3/20/17 Tr. 157, 193, Doc. 273.
[376] *See Gingles* Two and Three Conclusion that white voters are rarely willing to give their votes to minority candidates.
[377] *Clements*, 999 F.2d at 876-77.
[378] *Id.* at 881-84, 889-91.

position, and black candidates have received incredibly minimal support from white voters, a pattern which has been consistent over the course of more than twenty years.

### d)      *Overall Conclusion on the Discriminatory Effect Claim*

The Court finds that the Plaintiffs have satisfied the *Gingles* preconditions in this case. Additionally, after reviewing the totality of the circumstances, the Court finds that seven of the Senate Factors weigh in favor of a finding of vote dilution, including the most important factors— the extent of RPV in Terrebonne and the lack of black electoral success in Terrebonne when it comes to winning races for positions elected at-large. Accordingly, the Court concludes that at-large voting for the 32nd JDC deprives black voters of the equal opportunity to elect candidates of their choice.

### C.      **Discriminatory Purpose**

The Plaintiffs also bring a claim of discriminatory purpose in this case. The Court finds that the undisputed timeline of events in this case shows discriminatory intent. Evaluating motive, especially the motive of many individuals over the course of many years, is an incredibly difficult task.[379] In order to prove that an electoral system is being maintained for discriminatory purposes, a plaintiff only needs to show that "a discriminatory purpose [was] a motivating factor" in the challenged decision.[380] "Racial discrimination need only be one purpose, and not even a primary purpose, [to establish] a violation" of the Fourteenth and Fifteenth Amendments.[381]

---

[379] *Veasey*, 830 F.3d at 230.
[380] *Village of Arlington Heights*, 429 U.S. at 265-266 ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one….When there is proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.").
[381] *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted).

The Plaintiffs have offered five non-exhaustive factors, culled from the *Arlington Heights* case, to guide the Court in an intent inquiry[382]: (1) the discriminatory impact of the official action; (2) historical background of discrimination; (3) the sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decision-makers.[383] "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of state action even when the governing legislation appears neutral on its face."[384] Once a plaintiff shows that race was a motivating factor, "the burden [then] shifts to the law's defenders to demonstrate that the law would have been [maintained] without this factor."[385]

Dr. Lichtman testified for the Plaintiffs on the issue of intent. Although no political history expert testified on behalf of the Defendants, the Defendants called the various officials involved in the history of advocacy for a subdistrict for the 32nd JDC to ask them about their justifications for opposing changes to the 32nd JDC. After reviewing the timeline and the advocacy that occurred over the course of twenty years, the Court infers that, while not the only purpose, a motivating purpose in maintaining the at-large electoral scheme for the 32nd JDC was to limit the opportunity of black individuals to participate meaningfully and effectively in the political process to elect judges of their choice. The Court bases this conclusion on the persistent advocacy of the black community, and the equally persistent opposition to this advocacy which was partially based on justifications that do not seem completely legitimate.

---

[382] The Court finds that these factors, although non-exhaustive, helpfully guide the Court in its intent inquiry.
[383] *Village of Arlington Heights*, 429 U.S. at 265-266.
[384] *Id.* at 266.
[385] *Veasey*, 830 F.3d at 231 (citation omitted).

### a)     *Discriminatory Impact*

As discussed above, the Court finds that at-large voting for the 32nd JDC affords black citizens of Terrebonne less of an opportunity to elect candidates of their choice in violation of Section 2.

### b)     *Historical Background*

The Court has already found that Louisiana has a history of *de jure* discrimination, and at-large voting has been found in many other parishes as having the effect of minimizing or canceling out the black vote.[386]

### c)     *Sequence of Events Regarding the Maintenance of the System*

The parties agree about the sequence discussed below, but they disagree as to what legal conclusions can be drawn from this sequence.

**The Early 1990s**

Since at least the late 1980s, beginning with the *Clark* litigation discussed above, advocates have fought to establish a subdistrict for the 32nd JDC. The demographics in Terrebonne at that time, in 1988, did not allow for the creation of a minority subdistrict.[387] Other subdistricts were created as a result of that litigation when the parties entered into a consent decree.[388]

**Legislative Advocacy**

In 1997, black residents of Terrebonne began advocating for an opportunity subdistrict to be created by the Louisiana Legislature.[389] The previous year, the Louisiana Task Force on Racial and Ethnic Fairness in the Courts filed a report that stated that "the practice of judicial elections

---

[386] *Supra* at 52-55.
[387] *Clark*, 725 F. Supp. at 289.
[388] *Supra* at 74.
[389] P128.

by sub-districts, where appropriate, [is] the only feasible means of ensuring diversity and ethnic heterogeneity in our judicial system."[390] Over the course of the next fifteen years, black residents of Terrebonne and the Terrebonne NAACP continued to advocate for the subdistrict. Countless bills were introduced, but none passed.

*HB 1399 (1997)*

In late 1996, the judges of the 32nd JDC sent a letter to the Supreme Court of Louisiana requesting an additional judgeship.[391] Many local white officials, including Representative Hunt Downer and District Attorney Joseph Waitz, also supported this new judgeship.[392] In late March 1997, a bill was prefiled in the House by Representative Downer (HB 1399) to create a sixth judgeship to be elected at-large.[393] A few days later, various black individuals from Terrebonne wrote to Representative Downer to ask him to amend the bill so that the sixth seat, instead of being elected at-large, would be elected from a majority-black subdistrict.[394] The Judicial Council, the entity responsible for determining whether to recommend new judgeships, recommended an additional judgeship for the 32nd JDC after conducting a site visit in April 1997.[395]

The bill made it out of committee in May 1997.[396] The committee approved the bill with a sixth judgeship to be elected at-large and rejected an amendment that would have created a subdistrict for the new judgeship.[397] In response to the rejection of their amendment, the black individuals from Terrebonne worked with the staff in the House to draw a subdistrict and add an

---

[390] P76 at 89.
[391] P134; P158; D127A10; D127A12.
[392] *Id.*
[393] D13 at 2, 26-28.
[394] D127J1 at 6-7.
[395] D127A31.
[396] D127J1 at 16.
[397] *Id.*

amendment to the bill when it came up for a vote on the House floor.[398] Representative Downer advised the black advocates that "an amendment ha[d] been turned in which would create the subdistrict as shown on the attached map," but he decided to table the bill citing concerns about "racial gerrymandering" objections from the DOJ.[399] To the Court, this reason seems pretextual given that the DOJ had *never* objected to a majority-black subdistrict, while it had objected to the creation of additional at-large judgeships.[400] In other words, Representative Downer was satisfied with adding an additional judgeship elected at-large while being skeptical of adding one elected from a subdistrict, even when the at-large addition was the one that likely would have elicited objections from the DOJ.

Additionally, and significantly, the bill was tabled *even though* the Judicial Council had recommended an additional judgeship for the 32nd JDC.

*SB 166 (1998)*

In 1998, Senator John Siracusa introduced SB 166 which would have created a sixth judgeship to be elected at-large for the 32nd JDC.[401] Jerome Boykin and other black residents of Terrebonne opposed the bill because instead of creating a subdistrict it would have further perpetuated a system that they thought diluted the black vote.[402] Despite their opposition to the bill, SB 166 passed the Senate, but it did not come up for a vote in the House.[403]

---

[398] P17.
[399] *Id.*
[400] 3/16/17 Tr. 39, Doc. 269.
[401] P167a at 30-31.
[402] P167a at 30-31.
[403] P167a at 30-31.

*SB 1052 (1999)*

In August 1998, Judge Ellender, on behalf of the 32nd JDC judges, and for the second time, asked the Judicial Council to recommend an additional judgeship.[404] A few months later, in November, Judge Ellender sent a letter to the Judicial Council withdrawing their request as many cases that they had originally handled had been transferred to Houma City Court.[405] This seems odd to the Court given that these judges had twice requested a sixth judgeship, and one of the sitting 32nd JDC judges had been disciplined by the Supreme Court for delays with his docket.[406] It was also odd in that it seemed to be contrary to their interests as another judge would have undoubtedly assisted them in their duties.

The Court finds, that at the time Judge Ellender sent the withdrawal request in November 1998, the Judges were likely aware of the advocacy by Mr. Boykin and other black residents of Terrebonne for the subdistrict; in fact, in January 1999, the Terrebonne Parish Council unanimously passed a resolution supporting the creation of the subdistrict which shows that the entire Terrebonne community was likely aware of Mr. Boykin's advocacy.[407]

A few months later, in April 1999, Senator Robichaux introduced SB 1052 which created a sixth judgeship in Terrebonne to be elected from a majority-black subdistrict.[408] About two weeks later, Judge Ellender got involved in the legislative process again. He sent a letter to the chair of the Senate Judiciary Committee to which the bill had been referred; he requested that the chairman vote against the bill as they no longer needed a new judge and it would be a "waste of taxpayers' money" to create an unnecessary judgeship.[409] SB 1052 died in committee.[410]

---

[404] D127B1.
[405] D127B5.
[406] *Supra* at 15.
[407] P1 at 5.
[408] D15 at 12, 13, 17, 20-24.
[409] D127C1.
[410] D15 at 13-14.

Again, this was odd as it appeared to be against their self-interest. As mentioned above, the judges of the 32nd JDC had previously requested a new judgeship, and at least one of them, Judge Wimbish, had had problems managing his docket.

During this time, Judge Ellender's request for withdrawal on behalf of the judges was still pending before the Judicial Council. In an October 1999 meeting, the Judicial Council decided to grant the judges' request for withdrawal but some members of the council "expressed their discomfort about voting to confirm the 32nd JDC's request for withdrawal," and questioned whether the Council should independently conduct a site visit.[411]

*SB 968 (2001)*

The fourth piece of legislation for a subdistrict was introduced in March 2001.[412] Senator Gautreaux introduced SB 968 to add a new judge to the 32nd JDC to be elected from a majority-black subdistrict.[413] The bill died in committee, and Senator Gautreaux later explained that the committee always goes along with the Judicial Council.[414] To the Court, this explanation was odd and contrary to the facts, given that the Judicial Council recommended a new judgeship in 1997 and 1998, yet despite this recommendation, the legislation creating a new judgeship failed. Now, the legislation failed *because* of the Judicial Council who had decided to not recommend a new judgeship. In other words, the Judicial Council justification does not hold much weight as the facts clearly show that the legislature does not always go along with the recommendation.

---

[411] P135 at 6-7.
[412] D16 at 13, 16-20; P167a at 32.
[413] *Id.*
[414] D16 at 3-4; P167a at 32-33; http://www.houmatoday.com/news/20010516/new-terrebonne-judgeship-is-denied-by-senate-committee.

*HB 1723 (2001)*

On the same day that Senator Gautreaux introduced his bill, Representative Dartez introduced a similar bill, HB 1723, in the Louisiana House.[415] Just like SB 968, HB 1723 was introduced to add a new judge to the 32nd JDC to be elected from a majority-black subdistrict.[416] One of the sitting judges of the 32nd JDC, Judge Gaidry, wrote a letter to Representative Dartez requesting that she withdraw the bill to "avoid unnecessary consumption of time of the Legislature."[417] He stated that "our case load does not justify the creation of an additional judgeship, whether that be at large or through a special district."[418] HB 1723 died in committee.[419]

Again, the Court finds this insistence on no new judgeship to be odd because it goes against the judges' self-interest, and they had obviously needed an additional judge in the past. Moreover, the fact that some of their work shifted to the Houma City Court, does not show that the workload problem had been alleviated; it had just been shifted to the City Court Judge who became overburdened with work. As a result, the discussion of whether and how to create a new judgeship was essentially shifted to the Houma City Court. As shown below, after the workload of the City Court Judge increased, local Terrebonne officials requested help for the City Court, but once black advocates got involved and suggested a subdistrict to elect a second City Court Judge, those requests were withdrawn.

---

[415] D17 at 2, 5-9.
[416] *Id.*
[417] D127D1.
[418] *Id.*
[419] P167a at 35.

*Houma City Court Advocacy*

In late 1998, certain cases that had been handled by the 32nd JDC were transferred to Houma City Court.[420] In 2001 to 2002, Judge Fanguy, the single Houma City Court Judge, was becoming overburdened.[421] Although he needed help, as a long term solution, Judge Fanguy requested funding for a new facility so that a second City Court Judge could be accommodated, and for a short term solution, he suggested the use of a hearing officer to assist him.[422] In January 2003, Senator Dupre filed SB 12 to create a commissioner position to assist Judge Fanguy with his caseload.[423]

A month later, the two Parish Council members elected from the majority-black subdistricts, Alvin Tillman and Wayne Thibodeaux, wrote to Senator Dupre (copying other local legislators) about SB 12.[424] They argued that creating a commissioner position rather than a second City Court Judge would actually be more expensive in the long-run because litigants had the right to appeal the rulings of the commissioner.[425] They urged Senator Dupre to amend his bill to create a new judgeship for City Court who would be elected from a black opportunity district.[426] In February 2003, Judge Fanguy eventually withdrew his request for the Judicial Council recommendation for a commissioner. He also asked Senator Dupre to withdraw SB 12, as local officials had deemed the use of a judge pro tempore a "better approach."[427] It would "allow time

---

[420] D127B5.
[421] P24.
[422] *Id.*
[423] P114.
[424] P89 at 6-7.
[425] *Id.*
[426] *Id.*
[427] P87; P95.

for local officials…to address the primary concern," about the fact that it would be inappropriate to create a new judgeship when there was no physical facility to accommodate that new judge.[428]

In June 2003, the Legislature authorized a building fund for the City Court.[429] Additionally, in June 2003, the Terrebonne Parish Council requested that the Judicial Council consider whether a new judgeship in either the City Court or in the 32nd JDC was feasible:

> In consideration of the growing population of Terrebonne Parish and due to the apparently full docket of the local judges, the Terrebonne Parish Council unanimously adopted the attached resolution that requests consideration of an additional judgeship in the 32nd Judicial District and/or City of Houma City Court. The Council seeks to benefit the over one hundred thousand residents of our community and has expressed support for the maintenance of the new court.[430]

A few weeks later, the judges of the 32nd JDC sent a letter to the Judicial Council, noting that they had not been informed about the Parish Council Resolution, and they wanted to express their disagreement with the addition of a new judgeship:

> Please be informed that none of the judges in the 32nd Judicial District court were consulted with regard to this resolution. We are at a loss to explain its purpose. For the record, please be informed that we, the judges of the 32nd Judicial District Court, are not requesting a new judgeship. We do not need an additional judgeship. We do not want an additional judgeship and we feel that an additional judgeship would be a waste of the state and parish's money. With regard to the resolution dealing with the City Court of Houma, we at this time do not take a position but would like for your office to keep us informed because, as you know, some of the jurisdiction of the city court is concurrent with the district court, especially in the area of juveniles. We would like to be consulted and informed regarding the additional city judgeship.[431]

At this point, it is important to address the pattern here. In August 1998, Judge Ellender, on behalf of the judges, asked for a new judgeship but withdrew that request in November 1998; this withdrawal occurred around the same time the black community was vocal about its support of a subdistrict and its opposition to an at-large judgeship. Now, in June 2003, even while Judge

---

[428] P87; P95.
[429] 3/16/17 Tr. 69, Doc. 269; P167a at 37.
[430] D127E1.
[431] D127E3.

Fanguy surely needed help with his docket, the judges again opposed a new judgeship, citing concerns about taxpayer dollars. This opposition occurred a few months after black members of the parish council were advocating for a new City Court Judge to be elected from a majority-black subdistrict.

The Parish Council eventually withdrew their request for a study, citing the fact that the Council member who "originally addressed this issue asked to have the request [for the study of a new judgeship] removed from consideration. I believe that [the Parish Council] will re-address this matter when the new City Court Building is constructed."[432]

In April 2007, the City Court moved into a new facility.[433] In March 2009, the Judicial Council issued a report that 2.05 judges were needed for the City Court.[434] There was no action taken by the Legislature to create the second judgeship, and during this time the black community continued to advocate for a new City Court judgeship to be elected from a majority-black subdistrict.[435]

*HB 582 (2011)*

In October 2010, a local representative wrote to the Louisiana Supreme Court to request consideration of a new minority judgeship for the 32nd JDC.[436] In response, an official from the Supreme Court wrote to all five sitting judges of the 32nd JDC, explaining that the role of the Judicial Council is only to address whether there is a need for an additional judgeship and not to opine on the method of election for that new judgeship: "[T]he creation of a minority judgeship does not fall within the prevue [sic] of the [Judicial Council]…The Judicial Council will only

---

[432] D127E5.
[433] P167a at 38.
[434] *Id.*
[435] *Id.*
[436] D127F2 at 3.

address the need for an additional judgeship."[437] The Judicial Council sent a site team and ultimately found that a new judgeship was not warranted.[438]

In April 2011, HB 582 was introduced to create a majority-black subdistrict to elect the Division C seat which would be vacated by Judge Ellender in 2014.[439] This bill was different than the previous bills in that it *did not add a sixth judgeship*, but reorganized the method for election for the existing five seats. Specifically, this bill would create two election sections.[440] One judge would be elected from section one which would be a majority-black subdistrict while four judges would be elected at-large from section two.[441]

From April 2011 to June 2011, many individuals opposed this bill by sending letters and testifying against it.[442] The Parish Council and the Parish School Board, at least initially, appeared to support the bill. In May 2011, the majority-white Terrebonne School Board voted 8 to 1 to support diversity in the judiciary, and the majority-white Terrebonne Parish Council also passed a similar resolution which encouraged diversity in local government.[443] Although the School Board resolution did not specifically mention HB 582, Mr. Harding, a school board member, testified that the resolution was specifically passed to support HB 582.[444] Mr. Boykin testified that "[t]hey didn't just decide one day out of the blue we are going to do a resolution for diversity. We [advocates of the minority subdistrict] spoke with them [the Parish Council and School Board]. We told them exactly what we was trying to do here."[445]

---

[437] D127F2 at 1.
[438] P80.
[439] D19 at 2-3, 14, 17-24.
[440] *Id.*
[441] *Id.*
[442] P29; D19; P28.
[443] P8 at 1; P9 at 4.
[444] 3/13/17 Tr. 220-21, Doc. 267.
[445] *Id.* at 120.

However, after these two resolutions were adopted, five of the nine members of the Parish Council—all white—wrote to the local Terrebonne delegation to clarify that their adoption of the resolution was not meant to be an endorsement of HB 582.[446] The two Council members from the majority-black subdistricts decided not to sign this letter.[447] Additionally, on the same day (May 26, 2011) that this letter was sent, Judge Gaidry, a former 32nd JDC judge, sent a letter to various state senators opposing the bill.[448] Notably, Judge Gaidry had been on the bench in 1997, when advocacy for the subdistrict began. In his opposition he stated: "I do not believe creating a special minority district is in the best interest of the judiciary or the public. If a black candidate is better qualified than a white candidate, I would vote for the best qualified and am sure a majority of the white voters would do so also."[449] Even though Louisiana had created subdistricts to remedy Section 2 violations in the past, Judge Gaidry basically remained resolute in the position that one was not necessary. Dr. Lichtman also testified that the "qualifications" argument "is an old argument designed to keep [black people] and other [minorities] from having equal opportunities" by asserting that the issue is not about race but about qualifications.[450] But the extreme RPV pattern in Terrebonne shows that black and white citizens have a "very, very, different view," of who is qualified.[451]

Judge Gaidry was not the only prominent opponent of the bill. The 32nd JDC judges also expressed their opposition in a letter to members of the House on June 3, 2011:

> As elected officials, we are concerned that the wishes of our constituents are not being adequately considered or respected. To be clear, there has not been an adequate opportunity for public comment or analysis…In addition, the hasty adoption of this

---

[446] P27 at 2.
[447] *Id.*
[448] P29.
[449] *Id.*
[450] 3/16/17 Tr. 98-103, 122-25, Doc. 269.
[451] *Id.*

legislation would be contrary to the legislature's own directive which calls for the prior review of judicial district changes by the Judicial Council.[452]

The Court finds the proffered justifications in this letter tenuous. First, their strong opposition to the bill was odd in that it would not threaten any of their incumbencies, as Judge Ellender was set for mandatory retirement in 2014. Second, the opposition based on a "lack of public comment," appears unconvincing as (1) the public committee hearing on the bill lasted more than two hours; (2) additional House proceedings were held; and (3) the judges were aware of the advocacy for a subdistrict that had occurred since 1997. The last justification—prior review by the Judicial Council—is especially shaky given that the Judicial Council had indicated multiple times that it only reviewed additional judgeships not the method of election.[453] The House Committee on House and Governmental Affairs approved HB 582 on June 1, 2011,[454] but, on June 7, 2011, the House voted against the bill by a vote of 51 to 41 with every black legislator voting for it.[455]

**Overall**

District-based voting was rejected for the 32nd JDC on at least six occasions between 1997 and 2011. Taken as a whole, this timeline shows discriminatory intent. Local white officials, including the judges on the 32nd JDC, originally wanted an additional judgeship, but when black advocates requested that the new judgeship be elected from a subdistrict, this request was withdrawn. This occurred again with the Houma City Court—requests for an additional judgeship were made, and when local white officials heard that a request was made for a subdistrict, they got involved and effectively defeated the request. In 2011, when the request was not for an additional judgeship, but rather for a rearrangement of the method of election, the reasons offered in

---

[452] P28.
[453] 3/17/17 Tr. 242-44, Doc. 270.
[454] D19 at 14-15.
[455] D19 at 11; P167a at 41-42.

opposition appeared even more pretextual. The Court is unwilling to accept that the lack of public comment or the failure of the Judicial Council to issue an opinion were the true reasons behind the opposition. Accordingly, the Court finds that this pattern shows that a motivating purpose in maintaining the at-large electoral scheme for the 32nd JDC was to limit the opportunity of black individuals to participate meaningfully and effectively in the political process to elect judges of their choice.

### d) *Procedural or Substantive Deviations*

There were not any procedural or substantive deviations in the rejection/maintenance of the at-large system in this case. However, as stated above, the sequence of events related to the maintenance of the at-large system shows discriminatory intent.

### e) *Contemporaneous Viewpoints*

The Court considers the various arguments made in opposition to district-based voting, and finds the following are pretextual.

First, some opponents of HB 582 claimed that judicial redistricting should not be done in a piecemeal fashion.[456] Yet, Louisiana has created subdistricts, outside of litigation, in a piecemeal fashion before.[457]

Second, many opponents of HB 582 argued that there should be more time to consider the changes. Representative Dove argued that "We can't rush into this."[458] The Court finds that this was a pretextual argument considering the many years of advocacy and the fact that the local white officials were not being presented with the idea of a subdistrict for the first time.

---

[456] D19A.
[457] P167a at 20.
[458] P167a at 51; D19B.

Finally, the "well-qualified" black person argument is pretextual. It has been made by many white officials over the course of many years in opposition to district-based advocacy. But this justification ignores the history of white opposition to black candidates regardless of their qualifications, as shown by the strong patterns of RPV in this case. It also presumes that the white majority has the sole right to determine who is "qualified," while clearly, the black community, over the course of many years, has voted for black candidates they think are qualified who consistently lose to white candidates.

**f)**        ***Overall Conclusion***

The Court finds that (1) the discriminatory impact of at-large voting; (2) the sequence of events leading to the rejection of many efforts to create a subdistrict; and (3) the pretextual arguments made by the opponents of the subdistrict demonstrate that a discriminatory purpose was a motivating factor in the maintenance of the at-large system for the 32nd JDC in Terrebonne Parish. The Court finds that at-large voting would not have been maintained without this discriminatory purpose.

## V.    CONCLUSION

For the foregoing reasons, the Court finds in favor of the Plaintiffs on the discriminatory effect claim and the discriminatory purpose claim. The Court has bifurcated the issues of liability and remedy. Accordingly, the Court will schedule a status conference to discuss the proper way to address the remedy phase and possible motions for fee awards.

Signed in Baton Rouge, Louisiana, on August 17, 2017.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**