IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TERREBONNE BRANCH NAACP, *et al.*,<br>         *Plaintiffs*,<br>v.<br>PIYUSH ("BOBBY") JINDAL, the GOVERNOR of the STATE OF LOUISIANA, in his official capacity, *et al.*,<br>         *Defendants*. | Civil Action. No. 3:14-cv-69-JJB-EWD |

## Special Master's Report and Recommended Remedy

On March 15, 2019, in the United States District Court for the Middle District of Louisiana, the Honorable Shelly D. Dick, Chief Judge for the Middle District of Louisiana, (hereinafter "the Court") conditionally appointed me as Special Master in the above captioned case.[1] On April 3, 2019, the Court confirmed the appointment[2]. The Court's 385 Order, (hereinafter "the Order") directed the Special Master, by April 22, 2019, to submit "a Report and Recommendation proposing a legally sound remedy that conforms to this Court's previous *Ruling* of August 17, 2017[3] and complies with the Federal and State Constitutions and the Voting Rights Act." Herein provided is the Recommended Remedy and Report called for in the Court's Order.

  Exhibit 1 presents maps for the recommended Remedial Districts (Special Master's Plan 2). Exhibit 2 presents maps for the other three plans considered; Special Master's Plan 1, and Plaintiffs' Illustrative and Alternative Plans. Exhibit 3 presents Population, Voting Age

---

[1] Rec. Doc. No. 385
[2] Rec. Doc. No. 391
[3] Rec. Doc. No. 289

Population, Citizen Voting Age Population, Registration, and Voting statistics for the four considered plans. Exhibit 4 presents maps and statistical breakdown of the Parish Council Districts for Terrebonne Parish. Exhibit 5 presents a population density map of Terrebonne Parish. Exhibit 6 presents Reock and Polsby-Popper compactness scores for the Special Master's Plans, the Plaintiffs' Illustrative and Alternative Plans, and the Terrebonne Parish Council Districts. Exhibit 7 presents tables showing the distributions of Terrebonne Parish Council Districts' population among the Districts in the Special Masters Plans. Exhibit 8 provides Post-Election Statistics for Elections in November 2014, November 2018, and December 2018.

## Background and Process

On August 17, 2017, the Court found that the at-large voting system for the 32nd Judicial District Court ("32nd JDC) had both a discriminatory purpose and effect. Specifically, the Court found that elections were characterized by Racially Polarized Voting, that black eligible voters were sufficiently numerous and compact to form the majority of a potential single member district, and that the majority black district in the Plaintiffs' Illustrative plan adheres to traditional districting principles. The districting principles examined were Shape, Contiguity, Population Equality, Communities of Interest, Political Subdivisions (precincts), Incumbent Protection, and Preserving Minority Voting Strength. The Court did not examine the potential effectiveness of the black majority district but stated that it might be considered at the remedial stage.

The Court's Order appointing the Special Master includes an instruction that the proposed remedy should conform to the August 17, 2017 ruling. Therefore, the Special Master incorporates the Court's findings regarding the compactness and community of interest of the

black communities included in Plaintiffs' Illustrative District 1 while additionally examining all five districts in potential remedial plans based on the districting principles listed above. The Special Master analyzed the Plaintiffs' Illustrative and Alternative proposals, and created and analyzed two additional plans, referred to as Special Masters Plans 1 and 2.

**Findings**

The Special Master reviewed remedial briefings by the parties as well as trial transcripts, expert reports, deposition transcripts, and a variety of data and documents provided by the parties and their experts. This examination led to a set of findings that guided the evaluation and drafting of potential remedial plans, and the eventual selection of a recommendation. These findings are listed here and are discussed below.

1. A single member district election system including a majority black district is the most appropriate remedy.

2. Population equality should be evaluated based on 2010 Census total population.

3. Preserving minority voting strength, potential effectiveness, and compliance with the Voting Rights Act should be evaluated with data reflecting Any Part Black Voting Age Population (VAP), Black Citizen VAP, Black Registered Voters, and Black Voters who Voted, each as a share of the corresponding Totals.

4. Shape and compactness of districts must be considered relative to local geography and population distribution. Terrebonne Parish presents significant challenges in this regard.

5. The Parish Council Districts are relevant to the consideration of shapes, communities of interest, political subdivisions, and the potential effectiveness of remedial plans.

6. Precinct splits are acceptable to comply with other criteria but should be avoided to the extent possible.

7. Each of the four plans considered includes a majority black district which generally complies with traditional redistricting criteria.

8. The majority black district in each plan is likely to provide an effective remedy by providing black residents an equitable opportunity to elect candidates of their choice.

9. The Plaintiffs' Illustrative Plan splits precincts more than is necessary.

10. The Plaintiffs' Illustrative and Alternative Plans each combine distant and not well-connected communities in District 3.

11. The Special Master's Plan 1 and Plan 2 include the same communities in District 1 as the Plaintiffs' Illustrative and Alternative Plans while minimizing precinct splits and respecting communities of interest in the other four Districts.

12. The Special Master's Plan 2 is recommended as the most straightforward and recognizable option due to its respect for the Parish Council Districts and of the community groupings in those Districts.

## Appropriate Remedy

A single member district election system is the most common remedy for an at-large election system that has been found to violate the Voting Rights Act. No party in this matter has suggested any alternative remedy. When the three Gingles preconditions are satisfied, a majority minority district is generally required.

> "If a State has good reason to think that all the "*Gingles* preconditions" are met, then so too it has good reason to believe that §2 requires drawing a majority-minority district."[4]

## Appropriate Data

In order to construct and evaluate potential remedial districting plans it is necessary use several types of data. In order to comply with the equal population requirement, it is necessary to determine the total population of each district according to the most recent decennial census. This is the only data that is typically used to determine the size of districts. In order to evaluate

---

[4] Cooper v. Harris 581 U.S ___ (2017) at 13

4

compliance with the Voting Rights Act, protection of minority voting strength, and the potential effectiveness of remedial districts, additional data is required. Census enumeration includes multiple racial and ethnic categories for the Population and for Voting Age Population. OMB provided guidance for allocation of various combinations for the purpose of civil (and voting) rights monitoring and enforcement as follows:

- Responses in the five single race categories are not allocated.
- Responses that combine one minority race and white are allocated to the minority race.
- Responses that include two or more minority races are allocated as follows:
    - If the enforcement action is in response to a complaint, allocate to the race that the complainant alleges the discrimination was based on.
    - If the enforcement action requires assessing disparate impact or discriminatory patterns, analyze the patterns based on alternative allocations to each of the minority groups.[5]

In this matter, the action is in response to a complaint of discrimination against black voters and residents of the 32nd JDC, so the allocation of all race responses which include black (Any Part Black) is appropriate for analysis.

Since only citizens are eligible to vote, it is typical in Voting Rights matters to examine the minority group's share of Citizen Voting Age Population (CVAP). This data is not included in the census enumeration but is available from the American Community Survey.[6]

Registration and Voting data are often included in the evaluation of minority voting strength and the potential effectiveness of Remedial Districts. The State of Louisiana provides precinct level Post-Election Statistics which include registered voters and voters who voted by race for each statewide election. This report examines registered voters in November 2014 and November 2018, as well as voters who voted in the General Elections in November 2014 and 2018 and the runoff election in December 2018[7]. The runoff election is included to examine the

---

[5] OMB Bulletin No.00-02 (2000)
[6] Data obtained from Plaintiffs' expert Mr. Cooper was used for Population, VAP, and CVAP.
[7] https://www.sos.la.gov/ElectionsAndVoting/Pages/PostElectionStatisticsStatewide.aspx. Note

effects of low voter turnout on the composition of voters in majority black districts.

These data elements form the basis for statistical tables for each district in each districting plan under consideration which are included in Exhibits 3 and 4. An examination of these tables confirms that each of the potential remedial plans has a total population deviation under 10% and therefore meet the equal population requirement.

### District Shape and Compactness.

The Court's August 2017 ruling includes a partial quote "…A district is sufficiently compact if it allows for representation. A district would not be sufficiently compact if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived in the district."[8] The ruling discusses representational features of Plaintiffs' Illustrative District 1, but much of the district shape analysis is based on mathematical compactness scores, specifically the "Reock" and "Polsby-Popper" scores. However, these measures ignore the population distribution and the road network connecting communities within districts. Their interpretation and comparisons are often based on an assumption of a generally uniform population density and a regular road pattern throughout the jurisdiction.

To assess the reliability of these scores, the weight that they should be given, and appropriate comparisons, the Special Master examined the geographical distribution of population and roads within Terrebonne Parish. A map of population density with roads is shown in Exhibit 5. As this map demonstrates, although the Parish as a whole is a fairly simple shape, the populated area is much more irregular, especially when considered with respect to the roads. There is a core of dense population in Houma and Bayou Cane, with the remaining population primarily located along a number of highways which connect Houma with outlying areas. Also shown on the population density map is an outline labeled "Population Regions" which divides the Parish into two regions. These regions can be measured in the same way as a districting plan.

---

that turnout is shown by precinct, so parish-wide turnout rates are inappropriate for examining turnout in proposed districts. For split precincts, data was allocated according to the distribution of black and non-black VAP.

[8] Rec. Doc. No. 289 at 22 (citations omitted)

The following table shows the populations and compactness measures of these two areas.

| Region | Population | Reock | Polsby/Popper |
|--------|-----------|-------|---------------|
| 1 | 111540 | 0.23 | 0.08 |
| 2 | 320 | 0.54 | 0.19 |

Region 1 contains 99.7% of the parish population. This means that all single member districts would need to get virtually all their population from within region 1. For representational purposes, compactness only matters for the portion of districts in region 1. This table also illustrates the misleading nature of these compactness measures. Although a single border separates and is shared by both regions, region 2 has compactness scores which are more than double the compactness scores for region 1. To the extent that comparison of compactness measures is meaningful, the scores for region 1 and districts largely within region 1 are the most appropriate for comparison. The locally designed districts which represent this population are the Parish Council and the very similar School Board Districts.

The compactness scores for each of the potential Remedial plans under consideration as well as the current Parish Council districts are shown in Exhibit 6. An examination of these scores indicate the majority minority districts in the four plans under consideration have a minimum score of .20 (Reock) and .08 (Polsby-Popper). These scores are very similar to the scores for Region 1 and are comparable to several of the Parish Council districts. A much more meaningful analysis is a practical examination of the representational aspects of compactness.

All four potential remedial plans include a majority black district with the same communities in Schriever, Gray, and Houma as well as nearby areas. The same communities are also grouped in Districts 1 and 2 for Parish Council and School Board. Multiple elections have been held in Districts 1 and 2 and they provide representation to these communities. Districts 1 and 2 meet in central Houma and share that community. Because there are only 5 Judges elected from the 32nd JDC while the Parish Council and School Board each have 9 members, each remedial plan district will have nearly twice the population of those districts and will need to combine more local communities. Combining most of Parish Council Districts 1 and 2 creates a remedial district that will be readily recognizable and functional for the residents of these

7

communities, thus meeting the definition of "sufficiently compact" as given in the Court's August 2017 Ruling.

### Precincts

Precinct boundaries are discussed extensively in the Trial Record, especially in expert testimony. In the August 2017 Ruling, the Court found that "the Illustrative Plan adequately minimizes precinct splits."[9] Mr. Hefner testified that Parishes regularly change precincts following a census and that these changes often disregard Judicial District boundaries[10]. This implies that any respect for precinct boundaries now will likely only have a short-term effect, and that it is not an important consideration for local officials when creating precincts. For Remedial purposes however a somewhat different analysis is appropriate. Respecting existing precinct lines serves two relevant purposes, especially for the initial election in the remedial districts. One is to aid officials in election administration, and the other is to aid voters in recognizing the district in which they are eligible to vote. Both relate to the fact that splitting a precinct into multiple new districts requires an identification of the correct district assignment for each address within that precinct, rather than using the current known precinct assignment to determine district assignments. This can be a source of both confusion and error in the implementation of the remedy. Therefore, a remedial plan should minimize precinct splits, even at the expense of other districting criteria, unless they relate to the remedial purpose of the plan.

Plaintiffs' Alternative Plan does not split any precincts while Plaintiffs' Illustrative Plan splits 11 precincts. Many of the precinct splits were created in order to improve the compactness of District 1 while a few were created to include local areas which are in precincts that also include significant population in other areas.

Special Masters Plan 1 District 1 was created to include largely the same local areas as the Illustrative Plan District 1 while minimizing the splitting of precincts. Special Masters Plan 1 District 1 contains 91.3% of the population and 96.7% of the black population of Illustrative District 1 but splits only 3 precincts. Two precincts are split in Schriever along Highway 24 to include local areas which are in Illustrative District 1, while one precinct is split south of Houma for contiguity purposes. Two additional precincts are split, one split between Districts 4 and 5

---

[9] Rec Doc 289 at 30.
[10] Trial Transcript Day 7 at 81

along the Houma city boundary and one split between Districts 3 and 5 along Highway 24, to balance the populations of these districts.

Special Master's Plan 2 District 1 is identical to District 1 in the Plaintiffs' Alternative Plan and does not split any precincts. There is one precinct split in Plan 2 between Districts 4 and 5 for population balance.

### Cities and Places

Terrebonne Parish has only one incorporated city, the City of Houma, which has a 2010 Census population of 33,807. This is greater than the population of one district in a five district plan, so it will be split in any remedial plan. Although Houma is an incorporated city it does not have a separate municipal government but is part of the Terrebonne Parish Consolidated Government. There are also ten Census Designated Places (CDP). CDPs are useful for statistical analysis but the boundaries generally do not represent any official entity. The Special Master determined that these boundaries are not generally reflected in precinct or Parish Council District boundaries. For example, the CDP of Gray is divided among four precincts, three of which include areas outside of the CDP boundaries. In fact, all ten of the CDPs include portions of precincts which are only partially within the CDP boundaries. Similarly, the CDPs of Schriever, Gray, Bayou Cane, and Bayou Blue are divided between at least 2 Parish Council Districts. For these reasons the Special Master uses the CDPs as descriptive tools when examining communities of interest but does not consider them to be "political subdivisions" or evaluate remedial plans based on respect for CDP boundaries.

### Parish Council and School Board Districts.

Parish Council and School Board Districts, like precincts, are political subdivisions of Terrebonne Parish and the Special Master does evaluate remedial plans on this basis. They are also important in the consideration of communities of interest and their treatment in the proposed remedial plans is discussed in that section below.

### Communities of Interest

The Special Master defines communities of interest as reflecting some characteristic that has an impact on the representational interests or priorities of voters, or on the way voters

interact with each other to elect or communicate with a representative. In the case of judicial elections, the organization and interaction of voters, as well as the priorities of voters in evaluating the qualifications among candidates are especially important. In the August 2017 Ruling the Court found that a community of interest exists among the black communities in or around Schriever, Gray, and Houma based on three factors.[11] The first was a common bond, demonstrated by regular interaction in daily life, civic organization, and communication by television and newspapers. The second was common socio-economic characteristics which are likely to affect the priorities and preferences of voters. The third was the existence of other electoral districts that combine the communities. This community of interest is reflected in District 1 in each of the proposed remedial plans with only minor variation. The Court's finding is consistent with the Special Master's understanding of communities of interest and is binding on the evaluation of remedial districts, so no further examination of District 1 is needed. The Special Master extends a similar analysis to the remaining districts. This analysis focuses on three primary factors that are available from the record in this case. The first is the treatment of Parish Council and School Board Districts as shown in Exhibit 7. These districts are relevant themselves as they reflect an existing organization and interaction of voters in election campaigns as well as communication with representatives. In addition, these districts reflect local decisions about other communities of interest in their formation. The second is population distribution relative to the CDPs which are likely to represent opportunities for local interaction of voters. The third is population distribution relative to the highways that connect different areas of the parish. Each plan is discussed below.

      Plaintiffs Illustrative Plan District 2 contains population from Houma, Bayou Cane, and Gray. These communities are in close proximity and are relatively well connected. The population includes essentially all of Parish Council District 6 with significant population from Council Districts 3, 4, and 7. This configuration is reasonably compatible with communities of interest as described above. District 3 includes population from the communities of Schriever, Houma, Chauvin, and Dulac. Dulac and Chauvin are widely separated from Shriever at opposite ends of the highway network. The population is also divided into the southern portions of Council Districts 7 and 8, and the northern or northwestern portions of Council Districts 2 and 4.

---

[11] Rec. Doc. 289 at 28

This District does not reflect communities of interest in an acceptable manner. District 4 includes population from the communities of Houma, Bayou Cane, Bayou Blue, and Gray. These communities are located in close proximity and are well connected by the highway network. The population is primarily located in Council Districts 3 and 5 with some population from the adjacent portion of Council District 4. This District is reasonably consistent with communities of interest. District 5 includes population from the communities of Houma, Bayou Cane, Bayou Blue, Presquille, Bourg, and Montegut. These communities are either located in close proximity in the central part of the parish or are located along a single highway leading southeast from Houma. The District includes almost all of Council District 9 with additional population from adjacent portions of Council Districts 1, 5, and 8. This District is reasonably consistent with communities of interest. Because of District 3, this plan does not adequately respect communities of interest.

The Special Master designed Plan 1 to correct the significant community of interest problems with District 3 in the Illustrative Plan. Special Master's Plan 1 District 2 includes populations from the communities of Bayou Cane, Bayou Blue, and Gray. These communities are located in close proximity and are well connected. The District includes all of Council District 3 with additional population from the adjacent portions of Council Districts 4 and 5. This District is consistent with communities of interest. District 3 includes population from the communities of Schriever and Houma. These communities are well connected, although somewhat separated. The District includes all of Council District 6 with additional population from nearby portions of Council Districts 2, 4 and 7. This District is reasonably consistent with communities of interest. District 4 includes population from the communities of Bayou Cane, Bayou Blue, Houma, Presquille, and Bourg. These communities are located in close proximity and are well connected. The District includes most of Council District 5 with additional population from adjacent portions of Council Districts 1, 8, and 9. This District is consistent with communities of interest. District 5 includes populations from the communities Bourg, Montegut, Chauvin, and Dulac as well as other areas to the south of Houma. These communities are all located along highways leading south and southeast from Houma and are reasonably well connected. The District includes adjacent portions of Council Districts 7, 8, and 9. This District, and the plan as a whole, are consistent with communities of interest.

Plaintiff's Alternative Plan District 3, like District 3 in the Illustrative Plan, combines Schriever, in the northern portion of Council District 4, with populations in Council Districts 7, 8, and 9 to the south of Houma and the opposite end of the highway network. Special Master's Plan 2 was designed to correct this problem as well as to follow the Council Districts' grouping of communities to the extent possible.

Special Master's Plan 2 District 2 includes population from Schriever, Gray, Bayou Cane and Bayou Blue. These communities are in close proximity and are well connected. The District includes all of Council District 4 and most of Council District 3. This District is consistent with communities of interest. District 3 includes population from Houma and Dulac as well as areas to the west and to the south of Houma. The District includes all of Council District 6 and most of District 7. This District is consistent with communities of interest. District 4 includes population from the communities of Bayou Cane, Houma, Bayou Blue, and Bourg. The District includes all of Council District 5 as well as adjacent portions of Council Districts 3 and 9. This District is consistent with communities of interest. District 5 includes population from the communities of Houma, Presquille, Chauvin, and Montegut which are well connected by highways. The District includes all of Council District 8 as well as adjacent portions of Council Districts 1, 7, and 9. This District, and the plan as a whole, are consistent with communities of interest. Each District in Plan 2 contains one whole Council District. Each of the four Council Districts which are split are only divided between two Plan 2 Districts.

### Protection of Minority Voting Rights and Remedial Effectiveness

Each of the proposed remedial plans includes a district which is intended to protect minority voting rights and remedy the vote dilution found in the at-large elections scheme. In each of these districts there is a black majority of Voting Age Population. In each of these districts the black share of registered voters is approximately 56 percent. In each of these districts the black share of voters who voted in the November 2014 election was over 58%, and in the November 2018 election was over 55%. Even in the low turnout runoff election in December 2018, the black share of voters who voted was over 53%. These statistics demonstrate that the black majority district in each of these plans would provide a very realistic opportunity for the black community to elect their preferred candidates. These districts also represent most of the same population included in Parish Council Districts 1 and 2, both of which have proven

effective in providing the black community an equitable opportunity to elect their preferred candidates to the Parish Council and School Board.

### Summary and Conclusion.

The Special Master has analyzed four potential remedial districting plans. Each of the plans has been found to include a black majority district which should protect minority voting rights and provide an effective remedy to the vote dilution found in the at-large election of Judges in the 32nd JDC. Each of these districts is sufficiently compact. Each of the plans is in compliance with the equal population standards. The Plaintiffs' Illustrative Plan was found to split precincts to a greater extent than was necessary or desirable for a remedial plan. Both the Illustrative and Alternative Plans were found to be at least partially inconsistent with communities of interest in areas outside of the majority-minority district. Both Special Master's Plans 1 and 2 were found to be consistent with traditional redistricting criteria and therefore to be acceptable choices for a remedial plan. Because the design of Plan 2 is based on the Parish Council districts, the consistent grouping of communities should allow for easier election administration and less confusion among voters in the initial election by district. Therefore, the Special Master recommends the use of Plan 2 for the election of Judges by district to the 32nd JDC.

Submitted, this 29th day of April, 2019.

David Ely
Special Master