**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

TERREBONNE PARISH BRANCH NAACP,
ET AL.

CIVIL ACTION

VERSUS

14-69-SDD-EWD

JOHN BEL EDWARDS, the GOVERNOR
of the STATE OF LOUISIANA,
in his official capacity, and
JEFFREY MARTIN LANDRY, the
ATTORNEY GENERAL for the
STATE OF LOUISIANA,
in his official capacity, ET AL.

**RULING**

Before the Court is the Report and Recommendation of the Court Appointed Special Master.[1] The parties have filed responses to the Special master Report.[2] Defendant, the Louisiana Attorney General, has filed on Objection[3] which is before the Court.

**I.  HISTORY AND PROCEDURAL BACKGROUND**

Plaintiffs filed suit challenging Louisiana's 32nd Judicial District Court's at-large method of electing Judges under Section 2 of the Voting Rights Act, 52 U.S.C § 10301 ("Section 2") and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.[4] The Court bifurcated the issues of liability and remedy. After an 8-day bench trial on

---

[1] Rec. Doc. 396.
[2] Rec. Docs. 399, 409, 410, 414 and 415.
[3] Rec. Doc. 409.
[4] Rec. Doc. 1.

1

liability, which included the testimony of 27 witnesses and approximately 350 exhibits, the Court[5] found that Louisiana's at-large electoral method used for electing Judges in the 32nd JDC, in combination with enhancing factors and racially polarized voting patterns ("RVP"), "deprive[d] black voters of the equal opportunity to elect candidates of their choice in violation of Section 2, and it has been maintained for that purpose, in violation of Section 2… and the United States Constitution."[6] The Court found that the "Illustrative Plan", offered by the Plaintiffs as part of their proof in the liability phase, demonstrated that "the black population is sufficiently numerous and geographically compact [in Terrebonne Parish] to comprise a majority of the voting age population in one single member district in a five-district plan for the 32nd JDC."[7]

The Court rejected the Defendants' contention that the Plaintiffs' Illustrative Plan amounted to a racial gerrymander, and it concluded that Plaintiffs' Illustrative Plan "respects communities of interest" and "adequately minimizes precinct splits," and "protects incumbent judges".[8] The Court further found that "the black population in [the majority-Black single-member] District 1 [in the Illustrative Plan] is sufficiently concentrated and compact, and the District itself adheres to traditional districting principles".[9]

The Court issued its liability Ruling on August 17, 2017. After allowing the parties and the Louisiana Legislature ample opportunity[10] to implement a remedial redistricting plan for the 32nd JDC to address the voting rights violations, this Court appointed a

---

[5] Judge James Brady, deceased, presided over the bench trial and issued *Written Reasons for Judgment* favorable to the Plaintiffs.
[6] Rec. Doc. 289, p. 2.
[7] *Id.* at 17, 26.
[8] *Id.* at 28, 30, 32.
[9] *Id.* at 33 and 38.
[10] Two regular sessions of the Louisiana Legislature have convened since the Courts August, 2017 *Ruling*.

Special Master to assist the Court by "proposing a legally sound remedy that conforms to this Court's previous *Ruling* of August 17, 2017 and complies with the Federal and State Constitutions and the Voting Rights Act."[11]

## II. THE SPECIAL MASTER'S REPORT

The Special Master considered four potential remedial redistricting plans, two plans proposed by the Plaintiffs (the "Illustrative Plan" and the "Alternative Plan") and two plans developed by the Special Master ("Plan 1" and "Plan 2"). The Special Master observed that each of the four remedial plans considered "include[d] a majority black district which generally complies with traditional redistricting criteria. . . likely to provide an effective remedy."[12] Ultimately the Special Master recommended Plan 2 which is based on Terrebonne Parish Council and School Board districts. Specifically, Plan 2 includes five single-member districts for electing five Judges, including a remedial majority-Black single-member district (District 1). The Special Master reasoned that Plan 2 was preferable because utilizing the same "grouping of communities" used in the Parish Council election districts "should allow for easier election administration and less confusion among voters in the initial election by district."[13] The Special Master further concluded that, as compared to the Illustrative and Alternative Plans proposed by the Plaintiffs, Plan 2 "minimize[ed] precinct splits and respect[ed] communities of interest in the other four Districts."[14]

---

[11] Rec. Doc. 385, p. 2.
[12] Rec. Doc. 396, pp. 3-4.
[13] *Id.* at 12-13.
[14] *Id.* at 4.

3

## III. THE PARTIES' RESPONSES

The Plaintiffs do not object to Plan 2 and voice agreement that "it will cure the existing Section 2 and Fourteenth and Fifteenth Amendment violations".[15] Plaintiffs contend that a single member district election system which includes a majority black district is consistent with U.S. Supreme Court and Fifth Circuit precedent.

Defendant, Governor Edwards,

> "does not object to the Special Master's proposed remedy to include a single member majority black district. However, Governor Edwards does not support the proposed remedy which divides the 32nd Judicial District Court into five single member districts. The Governor submits that the most appropriate remedy would be a single member majority black district with the remaining four judges to be elected at-large."[16]

The Defendant Attorney General, objects to the Special Master's Report urging the Court to "hold that no lawful remedy exists for plaintiff's alleged harms and allow the state to pursue its own policy by keeping at-large elections in Terrebonne Parish."[17] The Attorney General argues that Plan 2 is an unconstitutional racial gerrymander because "'race was the predominant factor motivating' the mapmaker's decisions."[18] The Attorney General argues that Plan 2 "surgically segregates white and black communities in an effort to obtain the bare minimum Black Voting Age Population (BVAP)" to craft a majority-minority district.[19] The Attorney General contends that the Plan 2's remedial majority-Black single-member district ("District 1") is "noncompact, splits communities of interest, and under-populates the majority-minority district, while overpopulating three of the other

---

[15] Rec. Doc. 410, p. 8.
[16] Rec. Doc. 399, pp. 1-2.
[17] Rec. Doc. 409, p. 2.
[18] *Id.*, citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995).
[19] *Id.* at 3.

four districts."[20] The Court declines what amounts to the Attorney General's invitation to reconsider its Ruling[21] on liability. The racial gerrymander argument was made by the Defendants and rejected by the Court in its Ruling on liability. The Attorney General repackages the same argument presented in the liability phase. The Attorney General argues that the *Gingles*[22] One factor (compactness of the minority population) cannot be satisfied because the proposed majority-minority district (District 1) is a racial gerrymander.[23] This Court held that plaintiffs' racial gerrymander argument was "meritless for two main reasons. First, the Court need not undertake an equal protection analysis. Second, even if this analysis were required, the Court finds that the plan is not invalid under the Equal Protection Clause."[24] The Attorney General again relies on *Miller v. Johnson*[25] arguing that "race was the predominant factor motivating" the Special Master's configuration of District 1. This Court has previously rejected that argument finding that "various courts, including the Fifth Circuit, have held that Section 2 plaintiffs in vote dilution cases are not required to show that their proposed plans comply with *Miller v. Johnson* to satisfy *Gingles* One."[26] This is the law of the case and will not be revisited by the Court in the remedy phase of this litigation.

---

[20] *Id.* at 4.
[21] Rec. Doc. 289.
[22] *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).
[23] Rec. Doc. 409.
[24] Rec. Doc. 289 at 34.
[25] 515 U.S. 900 (1995).
[26] Rec. Doc. 289 at 34 (citations omitted).

5

## IV. REVIEW OF THE SPECIAL MASTERS FINDINGS AND CONCLUSIONS

Absent a stipulation by the parties that the Special Master's findings will be reviewed for clear error, this Court reviews the factual findings and legal conclusions de novo.[27] Accordingly, the Court proceeds to review the Special Master's findings.

### A. Appropriateness of the Remedy Recommended

The Special Master concluded that "[a] single member district election system including a majority black district is the most appropriate remedy."[28]

#### 1. Appropriateness of a Single Member Majority-Minority District

Only the Attorney General objects to the creation of single member majority-minority district. The Defendant, Governor and the Plaintiffs agree that the creation of a single member majority-minority district is an appropriate remedy.

In the liability phase of the proceedings herein, the Court found that the Plaintiffs satisfied the *Gingles* factors.[29] "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district."[30] The Special Master's finding is supported by the record in these proceedings and the law.

#### 2. Appropriateness of Single Member District Election System

The Defendant Governor objects to "splitting the 32nd judicial District into five single member districts".[31]

---

[27] Fed. R. Civ. P. 53(f).
[28] Rec. Doc. 396, p. 3.
[29] Rec. Doc. 289, p. 38.
[30] *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017)(citing *Bush v. Vera*, 517 U.S. 952, 978 (1996).
[31] Rec. Doc. 414, p. 2.

Plaintiffs point out that "that single-member districts are the preferred remedies in court-ordered plans".[32] "The Supreme Court cases addressing remedies for unconstitutional vote dilution have distinguished between judicially imposed and legislatively adopted plans. The Court has generally disapproved of multimember district and at-large election schemes as components of a judicially fashioned remedy and has admonished district courts to employ single-member districts."[33] The Attorney General disagrees with his co-defendant arguing that "[a]dopting the Defendant Governor's demand of at-large elections in the 32nd Judicial District – in any form – violates the [Constitution].[34]

The Court finds that the single member district electoral process recommended in the Special Master's Plan 2 proposes a legally appropriate remedy.

## B. Appropriateness of the Data Used

The Special Master concluded that "Population equality should be evaluated based on 2010 Census total population."[35] The special Master explained that "it is necessary to determine the total population of each district according to the most recent decennial census."[36] The special Master also consulted data from the American Community Survey and State Registration and Voting data.[37] The Attorney General's expert, Michael C. Hefner's response to the Special Master's plan agrees that "The use of the 2010 Census

---

[32] Rec. Doc. 410, p. 9 (citing to Rec. Docs. 319 and 333-1).
[33] *McMillan v. Escambia County, Fla.*, 688 F.2d 960, 970 (C.A. Fla., 1982) citing *Connor v. Finch*, 431 U.S. 407, 414-15, 97 S. Ct. 1828, 1833-34, 52 L.Ed.2d 465 (1977); *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 639, 96 S. Ct. 1083, 1085, 47 L.Ed.2d 296 (1976); *Connor v. Johnson*, 402 U.S. 690, 692, 91 S. Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). *See also Rogers v. Lodge*, 458 U.S. 613, 627, 102 S. Ct. 3272, 3281, 73 L.Ed.2d 1012 (1982).
[34] Rec. Doc. 414, p. 2 (citing, *LULAC v. Perry*, 548 U.S. 399, 431 (2006); *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Cooper v. Harris*, 137 S. Ct. 1455, 1463-64 (2017)).
[35] Rec. Doc. 396, p. 3.
[36] *Id.* at 4.
[37] *Id.* at 5.

7

data is appropriate for use in a remedy plan."[38] Although Hefner disagrees[39] with the Special Master's reliance on Citizen Voting Age Population ("CVAP") reported in the Census Bureau's American Community Survey. CVAP is commonly used in remedial redistricting to assess effectiveness.[40] Accordingly, the court finds that the Special Master considered appropriate public data in order to analyze the equal population requirement for the remedial plan proposed.

### C. District Shape and Compactness

The Defendant Attorney General condemns the shape and compactness of District 1. The Special Master noted that the district shape and compactness analysis used to evaluate District 1 in the Plaintiffs Illustrative Plan relied principally on "Reock" and "Polsby-Popper" scores. However, the Special Master observed that these "mathematical compactness scores" assume "generally uniform population density and a regular road pattern throughout the jurisdiction."[41] The Special Master went beyond reliance on mathematical compactness scores in his evaluation of shape and compactness. In addition to the mathematical scores, the Special Master also "examined the geographical distribution of population and roads within Terrebonne Parish."[42]

The Defendant Attorney General argues that "the minority population is simply not geographically compact enough to accomplish majority-minority districts without considerations of race predominating the redistricting process."[43] The Attorney General submits that the Special Master blamed a "lack of compactness on the lack of 'uniform

---

[38] Rec. Doc. 409-3, p. 3.
[39] *Id.*
[40] *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 708, 729 (S.D. Tex. 2017*); Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391, 1405, 1412 (E.D. Wash. 2014).
[41] *Id.* at 6
[42] *Id.* at 6, attaching a population density map at Exhibit 5
[43] Rec. Doc. 414

8

population density and regular road patterns".[44] The argument is disingenuous. The Special Master does not find a lack of compactness. To the contrary, evaluating both the mathematical data and population density maps, the Special Master concluded that the proposed remedial plan was sufficiently compact.

The Court evaluated compactness of the minority population in its liability Ruling.[45] "To satisfy the compactness requirement, a plaintiff must show that the minority community is geographically concentrated."[46] "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district."[47] The Court has already evaluated the compactness of the minority population and concluded that "the black population in Terrebonne is compact."[48] The Court declines the invitation to reconsider this finding.

   1. <u>Shape</u>

The Defendant Attorney General's expert, Michael Hefner, is critical of Plan 2's District 1 (the majority-minority district) principally for reasons of District 1's shape.[49] The Court has already considered and rejected these same arguments[50] advanced in objection to Plaintiff's Illustrative Plan. The proposed majority-minority district in the Plaintiffs' Illustrative Plan as compared to the Special Master's Plan 2 (referred to as District 1 in both plans) are different. The Special Master redrew the districts in the Plaintiff's Illustrative Plan in order to eliminate unnecessary precinct splits. The Defendant Attorney General "agree[d] that the Plaintiffs' Illustrative Plan splits more precincts than

---

[44] Rec. Doc. 409, p. 5 (quoting Rec. Doc. 396, p. 6).
[45] Rec. Doc. 289.
[46] *Id.* (citing *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433 (2006)).
[47] *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1995)).
[48] *Id.* at 22.
[49] Rec. Doc. 409-3, p. 4.
[50] Rec. Doc. 289, pp. 22-26, 30.

9

necessary."[51] As previously noted by this Court, "*Gingles* One does not require that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm…would be an unworkable concept."[52] For the same reasons previously set forth in its *Ruling* on liability,[53] the Court finds that Plan 2, District 1 "compares favorably both in terms of its shape and its geographical compactness to other surrounding electoral districts" and thus satisfies *Gingles* One.[54]

### 2. Communities of Interest

The Defendant Attorney General argues that "The Special Master's 'communities of interest' analysis with respect to District 1 is fundamentally flawed."[55] The Court previously rejected this argument as addressed to the Plaintiffs' Illustrative Pan. However, since District 1 in the recommended Plan 2 differs from District 1 in the Illustrative Plan, the Court takes a de novo review of whether District 1 as recommended in Plan 2 respects "communities defined by actual shared interests."[56]

The Court found that the evidence adduced at trial, particularly the testimony of the "Plaintiffs themselves, showed that the areas that constitute District 1 share a common bond. Second, the residents share common socioeconomic characteristics. Third, other electoral districts combine parts of Houma, Gray, and Schriever which demonstrates that these areas form a unified community."[57] The record supports the same conclusions with respect to District 1 of the recommended Plan 2. The principal

---

[51] Rec. Doc. 409-3, p. 2.
[52] Rec. Doc. 289 at 23 (quoting *Dillard v. Baldwin Cnty. Bd. of Edu.*, 686 F. Supp. 1459, 1465-66 (M.D. Ala. 1988)).
[53] *Id.* at 22-26.
[54] *Id.* at 26.
[55] Rec. Doc. 409, p. 7.
[56] *Miller v. Johnson*, 515 U.S. 900, 916 (1995).
[57] Rec. Doc. 289, p. 28.

10

populations which comprise District 1 of Plan 2 are the communities of Houma, Gray, and Schriever. The Court has already found that:

> "[r]esidents from Houma, Gray, and Schriever (1) share places of worship, libraries, and recreation; (2) belong to the same civic organizations such as the NAACP and the Southern Christian Leadership Conference; (3) shop together; and (4) have access to the same television channels and newspapers. Moreover, black residents in Gray and Schriever consider themselves to be part of the Terrebonne community."[58]

The Court also found that the evidence established that:

> "black residents in Houma, Gray, and Schriever (1) live below poverty at a rate at least three times that of non-Hispanic white residents, (2) have an average per capita income that is no more than two-thirds of their non-Hispanic white peers, and (3) rely on food stamps at a rate that is at least double that of non-Hispanic white residents."[59]

Plan 2, District 1 aligns with Parish Council and School Board Districts 1 and 2. The Court observed that "[t]his shows that Houma, Gray, and Schriever share similar interests, at least enough of a bond that local authorities thought it appropriate to combine them together."[60] The Court finds that the record evidence supports the Special Master's observation that the Parish Council and School Board Districts are "relevant themselves as they reflect an existing organization and interaction of voters in election campaigns as well as communication with representatives. In addition, these districts reflect local decisions about other communities of interest in their formation."[61]

The Special Master evaluated the 'community of interest' of Plan 2 single member Districts 2 – 5. Each correspond to Parish Council and School Board Districts as reflected

---

[58] Rec. Doc. 289, p. 28 (citing trial evidence).
[59] *Id.* at 29.
[60] *Id.* The Attorney General criticizes reliance on Parish Council Districts 1 and 2 as demonstrative of "community of interest" because the Attorney General contends that Parish Council Districts 1 and 2 were racially gerrymandered as part of a 2010 redistricting cycle. The Court considers the argument speculative at best since these Parish Council districting plan has never been legally challenged.
[61] Rec. Doc. 396, p. 10.

11

in Exhibit 7 of the Special Master's Report.[62] The Special Master further evaluated the population distribution in each single member district relative to the ten Census Designated Places ("CDP") which the Special Master found "likely to represent opportunities for local interaction of voters."[63] Finally, the Special Master examined "population distribution" in each proposed single member district "relative to the highways that connect different areas of the parish".[64] The Special Master concluded that each of the single member districts proposed as part of the recommended Plan 2 were "consistent with communities of interest".[65]

The Court finds that the record supports[66] the finding that a community of interests has been demonstrated as to the single member districts proposed in Plan 2.

## V. CONCLUSION

For the forgoing reasons, the Court adopts Plan 2 recommended by the Special Master. The Court Orders the Parties to jointly submit a proposed injunctive order for the implementation of remedial Plan 2.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana the 24th day of July, 2019.

_____
**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[62] Rec. Doc. 396-7.
[63] Rec. Doc. 396, p. 10.
[64] *Id.*
[65] *Id.* at 11.
[66] *Supra*, nn.56-57.